# UNITED STATES COURT OF APPEALS
# FOR THE EIGHT CIRCUIT

*JOHN DOE, APPELLANT*

*v.*

*UNIV. OF ST. THOMAS, APPELLEE*

---

Appeal from the United States District Court of Minnesota
Case No: 16-cv-1127 (JRT/DTS)

---

## APPELLANT'S ADDENDUM

---

For Appellant John Doe:

Beau D. McGraw (31190X)
McGraw Law Firm, P.A.
10390 39th St. North, Suite 3
Lake Elmo, MN 55042
651.209.3200 phone
beau@mcgrawlawfirm.com


Eric J. Rosenberg (0069958)
Rosenberg & Ball Co. LPA
395 North Pearl Street
Granville, Ohio 43023
740.644.1027 phone
erosenberg@rosenbergball.com

**Appeal Case No. 19-1594**

## UNITED STATES COURT OF APPEALS
## FOR THE EIGHT CIRCUIT

*JOHN DOE, APPELLANT*
*v.*
*UNIV. OF ST. THOMAS, APPELLEE*

Appeal from the United States District Court of Minnesota
Case No: 16-cv-1127 (JRT/DTS)

## APPELLANT'S INDEX TO ADDENDUM

Memorandum Opinion and Order on Defendant's Motion to Dismiss, dated March 1, 2017, Document 63……………………………………………………1

Order on Motion to Compel Deposition of Jane Doe and to Amend Pleadings, dated August 6, 2018, Document 285……………………………………………...22

Memorandum Opinion and Order on Motion for Summary Judgment, dated February 21, 2019, Document 296 ……………………………………….30

Judgment in a Civil Case, dated February 21, 2019, Document 297……………………………………..49

## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | | |
|---|---|---|
| JOHN DOE, | | Civil No.  16-1127 (JRT/KMM) |
| | Plaintiff, | |
| v. | | **MEMORANDUM OPINION AND** |
| | | **ORDER ON DEFENDANT'S** |
| UNIVERSITY OF ST. THOMAS, | | **MOTION TO DISMISS** |
| | Defendant. | |

Beau D. McGraw, **MCGRAW LAW FIRM, PA**, 10390 39th Street North, Lake Elmo, MN  55042, for plaintiff.

David A. Schooler and Ellen A. Brinkman, **BRIGGS & MORGAN, PA**, 80 South Eighth Street, Suite 2200, Minneapolis, MN  55402, for defendant.

This case arises from alleged sexual misconduct that occurred on Defendant University of St. Thomas's ("UST") campus in December 2015.  Even though the Ramsey County Attorney decided not to prosecute Plaintiff John Doe, UST initiated disciplinary proceeding and suspended Doe.  Doe filed an Amended Complaint regarding the disciplinary process, alleging six causes of action.  UST moved to dismiss the Amended Complaint pursuant to Fed. R. Civ. P. 12(b)(6).  For the reasons set forth below, the Court will grant UST's motion to dismiss Counts I through V, but deny UST's motion to dismiss Count VI.

# BACKGROUND

## I.    UST SEXUAL MISCONDUCT POLICY

### A.    Prohibited Conduct

In December 2015, UST's Sexual Misconduct Policy (the "Policy") prohibited students from engaging in "[a]ll forms of sexual misconduct." (Am. Compl., Ex. 1 at 2, May 20, 2016, Docket No. 34.) Students who "engaged in sexual misconduct . . . [were] subject to disciplinary action." (*Id.* at 3.) The Policy defined "sexual misconduct" to include "non-consensual sexual intercourse." (*Id.*) The Policy also defined "consent" to engage in sexual acts as "conduct or words that indicate[d] a person freely agree[d]." (*Id.*) In defining "consent," the Policy explicitly stated "[c]onsent to one form of sexual activity [did] not imply consent to other forms of sexual activity" and "[s]ilence or failing to resist a sexual act [did] not constitute consent." (*Id.*)

### B.    Response and Resolution Process

The Policy included a process to address allegations of sexual misconduct. (*Id.* at 7-8, 10-17.) The Policy set forth guidelines UST would follow when investigating allegations of sexual misconduct, but also stated the "provisions [were] intended to be flexible so as to allow UST to meet its legal obligations while fulfilling its educational mission." (*Id.* at 10.) The Policy permitted "[t]he Title IX Coordinator [to] authorize departures from the[] provisions when warranted by the circumstances." (*Id.*)

UST applied its formal sexual-misconduct resolution process when a complaint alleged nonconsensual intercourse. (*Id.* at 13.) Under this process, the "Response

- 2 -

Manager" – the Dean of Students – would first take interim actions to protect the parties and assign a "Process Advisor" to "explain the response and resolution process and provide information about available resources." (*Id.* at 10-12.)   Next, the Response Manager would assign one or more "Factfinders" to "conduct[] an investigation into the facts of the incident" and notify both the complainant and the respondent. (*Id.* at 14.) Following the notices, the Process Advisor would hold a meeting with the respondent to review the allegations, discuss available resources, review UST's Policy, and answer any questions. (*Id.* at 14-15.) The Policy also indicated UST would provide the respondent a written summary of all allegations and defenses during the factfinding process. (*Id.* at 14.)

With regard to the Factfinders' investigation, the Policy stated the Factfinders would conduct interviews, offer written summaries, and afford both the complainant and the respondent an opportunity to respond. (*Id.*)   As part of the response, both the complainant and the respondent could identify witnesses, documents, and other evidence; offer questions to ask witnesses; and supply responsive statements. (*Id.*)

After completing the investigation, the Factfinders would "weigh the evidence and determine whether it [was] more likely than not (using a 'preponderance of the evidence' standard) that the [r]espondent [was] responsible for the misconduct alleged." (*Id.* at 15.) If the Factfinders found the respondent responsible, a determination would be made that the Policy had been "violated," a report would be prepared, and the Response Manager would determine appropriate sanctions. (*Id.*)   Finally, UST would provide a written

notification of the Factfinders' decision and give both the complainant and the respondent an opportunity to appeal. (*Id.* at 15-16.)

## II.   INCIDENT

On December 11, 2015, Doe – a freshman at UST – attended an on-campus party. (Am. Compl. ¶¶ 1, 30.) Doe, the alleged female victim ("Jane Doe"), and others left to attend an off-campus party. (*Id.* ¶¶ 36-37.) Shortly thereafter, Jane Doe indicated she wanted to go back to her dorm room and Doe offered to walk with Jane Doe. (*Id.* ¶ 41.)

Doe and Jane Doe engaged in consensual kissing in the dorm's common room. (*Id.* ¶ 46.) The pair eventually ended up in the bathroom connected to Jane Doe's dorm room. (*Id.* ¶¶ 52-55, 93-95.) Doe and Jane Doe gave varying accounts regarding how they ended up in the bathroom. (*Id.*) While in the bathroom, Doe digitally penetrated Jane Doe. (*Id.* ¶ 62.) Doe and Jane Doe both agreed Jane Doe's vagina bled after the digital penetration. (*Id.* ¶¶ 68-69.) Jane Doe also alleged in two police reports that she did not consent to the digital penetration. (*Id.* ¶¶ 95-97, 107-08, 112.)

Doe does not dispute that Jane Doe did not verbally consent to the digital penetration. Doe alleges, however, that Jane Doe did not object to removal of her pants and that Jane Doe stroked his penis, which Doe interpreted as consent to the digital penetration. (*Id.* ¶¶ 59-62.)

## III.   INVESTIGATIONS

Jane Doe reported the incident to UST on December 13, 2015, and the St. Paul Police Department a day later. (*Id.*, Ex. 2.) Police arrested Doe on December 14, 2015,

Appellate Case: 19-1594     Page: 6     Date Filed: 05/16/2019 Entry ID: 4788309

but the Ramsey County Attorney's Office decided not to prosecute. (*Id.*; Am. Compl., Ex. 5.)

UST also investigated the incident. Doe received a written notice from the Dean of Students informing Doe that Jane Doe made a complaint. (Am. Compl., Ex. 6.) The letter provided notice of interim actions UST would take, including (1) a no contact order applicable to both parties; (2) removal of Doe from his on-campus residence during the investigation; and (3) a prohibition against Doe being on campus except for specified purposes, such as going to class. (*Id.*) Doe received a second letter from the Dean of Students on December 15, 2015, advising Doe about the Policy, identifying the Factfinders, and informing Doe about his rights. (Am. Compl., Ex. 7.)

UST held a meeting with Doe and his attorney to explain Jane Doe's allegations and the process UST would follow. (Am. Compl. ¶ 130; *id.*, Ex. 4.) The Factfinders investigated the incident and interviewed several witnesses, including Doe, Jane Doe, and witnesses identified by Doe. (Am. Compl. ¶¶ 132-42; *id.*, Ex. 8.) Doe also provided additional evidence, which the Factfinders reviewed and considered as part of the investigation. (Am. Compl., Ex. 8.) When the Factfinders concluded the investigation, the Factfinders informed Doe he had been found responsible for non-consensual sexual intercourse and would be suspended from UST until fall semester 2017, pending his right to appeal. (Am. Compl. ¶¶ 144, 153.)

Doe appealed. (*Id.*, Exs. 11-12.) A five-member board and an Appeal Officer considered the appeal and found no grounds to change the determination. (*Id.* ¶¶ 154-55.) The Appeal Officer ultimately upheld the original determination of the Factfinders,

but adjusted the sanction – extending the suspension period until spring semester 2018. (Am. Compl. ¶¶ 154-55; *id.*, Ex. 12.)

## IV.    PROCEDURAL HISTORY

On May 20, 2016, Doe filed an Amended Complaint alleging UST violated Doe's rights through its application of the Policy.  The Amended Complaint alleged six causes of action:  (1) Declaratory Judgment under Title IX (Count I); (2) Violation of Title IX – Erroneous Outcome (Count II); (3) Violation of Title IX – Deliberate Indifference (Count III); (4) Breach of Contract (Count IV); (5) Breach of the Covenant of Good Faith and Fair Dealing (Count V); and (6) Negligence (Count VI). (*Id.* ¶¶ 158-211.)  On June 6, 2016, UST filed a motion to dismiss the Amended Complaint, in its entirety, asserting Doe failed to state a claim upon which relief can be granted.

## DISCUSSION

## I.    STANDARD OF REVIEW

In reviewing a motion to dismiss brought under Rule 12(b)(6), the Court considers all facts alleged in the complaint as true to determine if the complaint states a claim for "relief that is plausible on its face." *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 594 (8th Cir. 2009) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).  To survive a motion to dismiss, a complaint must provide more than "'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action.'" *Iqbal*, 556 U.S. at 678 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).  Although the Court accepts the complaint's factual allegations as true, it is "not bound to accept as true a

- 6 -

legal conclusion couched as a factual allegation." *Twombly*, 550 U.S. at 555 (quoting *Papasan v. Allain*, 478 U.S. 265, 286 (1986)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility,'" and therefore must be dismissed. *Id.* (quoting *Twombly*, 550 U.S. at 557).

## II.     DECLARATORY JUDGMENT (COUNT I)

UST first argues Doe's claim seeking declaratory judgment fails as a matter of law. UST asserts Doe's claim stems from UST's alleged violation of Title IX's regulatory requirements and that, under Supreme Court precedent, there is no private right of action for enforcement of regulatory requirements. Doe responds that the Supreme Court has never addressed the precise issue in this case – whether there is a private right of action when a student is wrongfully accused of sexual assault. Doe posits that because the law has, over time, expanded the implied private right of action for Title IX claims, the Supreme Court would find an implied private right of action in this case.

In *Gebser v. Lago Vista Independent School District*, the Supreme Court noted that it had "never held . . . that the implied private right of action under Title IX allows recovery in damages for violation of . . . administrative requirements." 524 U.S. 274, 292 (1998). The Court specifically found that a school's "failure to promulgate a grievance procedure [did] not itself constitute 'discrimination' under Title IX" and only "the

Department of Education could enforce [a regulatory] requirement administratively." *Id.* Numerous district courts have interpreted *Gebser* to mean there is no private right of action to enforce grievance procedures and other regulations under Title IX. *See, e.g.*, *Moore v. Regents of the Univ. of Cal.*, No. 15-5779, 2016 WL 2961984, at *8 (N.D. Cal. May 23, 2016); *Melton v. Alaska Career Coll., Inc.*, No. 15-209, 2016 WL 1312738, at *4 (D. Alaska Apr. 4, 2016); *Doe v. Case W. Reserve Univ.*, No. 14-2044, 2015 WL 5522001, at *4 (N.D. Ohio Sept. 16, 2015).

Here, Doe's declaratory judgment claim relies solely on violations of regulations promulgated under Title IX – requiring the adoption of certain grievance procedures. (Am. Compl. ¶¶ 161-65.) Under *Gebser*, there is no private right of action to enforce the regulatory requirements under Title IX because failure to promulgate a grievance process is not itself discrimination. 524 U.S. at 292. Because there is no private right of action, the Declaratory Judgment Act cannot be used as an independent cause of action and, therefore, Doe's claim fails as a matter of law. *See Schilling v. Rogers*, 363 U.S. 666, 679 (1960). The Court will, therefore, grant UST's motion to dismiss Count I.

## III. TITLE IX – ERRONEOUS OUTCOME AND DELIBERATE INDIFFERENCE (COUNTS II & III)

UST next alleges Doe's Title IX claims based on erroneous outcome and deliberate indifference should be dismissed because Doe failed to allege specific facts giving rise to a plausible inference of gender bias.

Title IX states that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to

- 8 -

Appellate Case: 19-1594   Page: 10   Date Filed: 05/16/2019 Entry ID: 4788309

discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). As a general rule, Title IX is not an invitation for courts to second-guess disciplinary decisions of colleges or universities. *See Davis ex rel. LaShonda D. v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629, 648-49 (1999). And Title IX should be construed to give "[s]chool administrators . . . the flexibility they require" to initiate a reasonable disciplinary response. *Id.*

To allege a Title IX claim based on a disciplinary proceeding under either erroneous outcome[1] or deliberate indifference[2] theory, Doe must plausibly allege

---

[1] A plaintiff may assert a claim under Title IX based upon an erroneous outcome theory when "the plaintiff 'attack[s the] university disciplinary proceeding on grounds of gender bias' by arguing that the plaintiff 'was innocent and wrongly found to have committed an offense.'" *Sahm v. Miami Univ.*, 110 F. Supp. 3d 774, 777-78 (S.D. Ohio 2015) (quoting *Yusuf v. Vassar Coll.*, 35 F.3d 709, 715 (2d Cir. 1994)). To allege a Title IX claim based on erroneous outcome, Doe must plead: "(1) facts sufficient to cast doubt as to the accuracy of the outcome of the disciplinary proceeding and (2) a causal connection between the flawed outcome and gender bias." *Id.*.

[2] In general, a plaintiff alleges a Title IX deliberate indifference claim by "demonstrat[ing] . . . an official of the institution who had authority to institute corrective measures had actual notice of, and was deliberately indifferent to, the misconduct" directed at the plaintiff. *Mallory v. Ohio Univ.*, 76 F. App'x 634, 638 (6th Cir. 2003). To satisfy this standard, "the plaintiff must be able to identify an 'appropriate person' under Title IX, i.e., a school district official with the authority to take corrective measures in response to actual notice of sexual harassment." *Doe v. Sch. Bd. of Broward Cty.*, 604 F.3d 1248, 1254 (11th Cir. 2010). Further, a plaintiff must meet the high bar of alleging an institution's response to the alleged misconduct was "clearly unreasonable in light of the known circumstances." *Doe v. Univ. of the South*, 687 F. Supp. 2d at 757 (quoting *Patterson v. Hudson Area Schs.*, 551 F.3d 438, 446 (6th Cir. 2009)).

But it is an open question whether the Title IX deliberate indifference standard applies to claims related to alleged gender discrimination in a university's disciplinary proceedings. *Compare Doe v. Baum*, No. 16-13174, 2017 WL 57241, at *26 (E.D. Mich. Jan. 5, 2017), *and Marshall v. Ohio Univ.*, No. 15-775, 2015 WL 7254213, at *8 (S.D. Ohio Nov. 17, 2015), *and Sahm*, 110 F. Supp. 3d at 778 n.1, *with Wells v. Xavier Univ.*, 7 F. Supp. 3d 746, 751 (S.D. Ohio 2014), *and Shank v. Carleton Coll.*, No. 16-1154, 2017 WL 80249, at *5 (D. Minn. Jan. 9, 2017).

(Footnote continued on next page.)

circumstances suggesting gender bias motivated UST's disciplinary proceeding. *See Yusuf v. Vassar Coll.*, 35 F.3d 709, 715 (2d Cir. 1994) (under an erroneous outcome theory "[a] plaintiff must . . . allege particular circumstances suggesting that gender bias was a motivating factor behind the erroneous finding"); *Doe v. Univ. of the South*, 687 F. Supp. 2d 744, 757-58 (E.D. Tenn. 2009) (under a deliberate indifference theory a plaintiff must allege the "University's alleged actions constituted sexual harassment").

Doe points to several allegations in the Amended Complaint to show Doe alleged sufficient facts regarding gender bias to survive a motion to dismiss. Doe highlights the following allegations: (1) a UST official stated, in the presence of the "ultimate decision maker," that she was not surprised Ramsey County declined to prosecute Doe because Ramsey County "always" declines to prosecute "he said she said" cases, (Am. Compl. ¶ 130); (2) a UST official stated Doe could make things easier for everyone if he withdrew from UST and received a tuition refund, (*id.* ¶ 145); (3) UST questioned medical professionals differently regarding Doe and Jane Doe, (*id.* ¶¶ 149-50); (4) UST challenged Jane Doe's statements less vigorously than Doe's statements, (*id.* ¶ 151); (5) UST's general counsel improperly filled the role of Title IX Coordinator, (*id.* ¶¶ 181, 183-84); (6) UST only applied the Policy to male students accused by female students,

---

(Footnote continued.)

    Because the Court finds Doe did not allege a plausible claim of gender bias to survive a motion to dismiss on any Title IX claim, the Court does not decide whether a deliberate indifference claim is appropriate in this circumstance. *See Mallory*, 76 F. App'x at 638-39 (assuming without deciding that a Title IX deliberate indifference claim can be alleged to challenge a disciplinary proceeding, but ultimately finding the plaintiff failed to state a claim).

(*id.* ¶ 175); and (7) the Federal government pushed colleges and universities to punish male students accused of sexual assault, (*id.* ¶¶ 10-14, 175-76).

The Court finds Doe's allegations are insufficient to support a plausible claim for relief.[3] Many of Doe's allegations have nothing to do with gender. Specifically, comments about "he said she said" cases could relate to the alleged perpetrator being either a man or a woman and comments about Doe withdrawing from school are not gender-based.

Regarding UST's alleged unbalanced questioning of Jane Doe (the complainant-victim) and Doe (the respondent-perpetrator), numerous courts have held that "[e]ven if [a] [u]niversity treated [a] female student more favorably than the [p]laintiff, during the

---

[3] Doe cites a number of cases to argue his allegations are more than conclusory and show gender bias. Doe's cases are distinguishable from the Amended Complaint. In *Doe v. Washington & Lee University*, the plaintiff alleged the Title IX officer endorsed an article discussing sexual misconduct in gendered terms. No. 14-52, 2015 WL 4647996, at *10 (W.D. Va. Aug. 5, 2015). The court in *Wells v. Xavier University* found the plaintiff sufficiently alleged a "pattern of decision-making" improperly based on gender. 7 F. Supp. 3d 746, 751 (S.D. Ohio 2014). And the court in *Doe v. Salisbury University* found (on a "close call") that gender bias was alleged when the plaintiff asserted the University possessed communications evidencing discriminatory intent. 123 F. Supp. 3d 748, 766, 768 (D. Md. 2015).

Here, in contrast, Doe does not point to the endorsement of gender-based articles by school officials or the existence of any UST communication that would show UST disciplined Doe because of his gender. Further, while a pattern of disparate treatment of men can in some instances show gender bias, a court "cannot plausibly infer . . . that a higher rate of sexual assaults committed by men against women, or filed by women against men, indicates discriminatory treatment of males accused of sexual assault." *Regents of the Univ. of Cal.*, 2016 WL 5515711, at *5; *see also Doe v. Cummins*, No. 16-3334, 2016 WL 7093996, at *14 (6th Cir. Dec. 6, 2016). Thus, Doe's allegations regarding UST's use of the Policy only against men does not show gender bias in the absence of evidence women are treated differently when accused of sexual assault. *Doe v. Univ. of Mass.-Amherst*, No. 14-30143, 2015 WL 4306521, at *9 (D. Mass. July 14, 2015) ("Plaintiff has not alleged any facts indicating male and female students accused of sexual harassment are treated differently by the university in terms of the way complaints are pursued or discipline is imposed.").

- 11 -

disciplinary process, 'the mere fact that [p]laintiff is male and [the alleged victim] is female does not suggest that the disparate treatment was because of [p]laintiff's sex.'" *Salau v. Denton*, 139 F. Supp. 3d 989, 999 (W.D. Mo. 2015) (quoting *Doe v. Columbia Univ.*, 101 F. Supp. 3d 356, 371 (S.D.N.Y. 2015)); *see also Austin v. Univ. of Or.*, Nos. 15-2257, 16-647, 2016 WL 4708540, at *8 (D. Or. Sept. 8, 2016).     And "[d]emonstrating that a university official is biased in favor of the alleged victims of sexual assault claims, and against the alleged perpetrators, is not the equivalent of demonstrating bias against male students." *Sahm v. Miami Univ.*, 110 F. Supp. 3d 774, 778 (S.D. Ohio 2015).

With respect to Doe's claims about the Title IX Coordinator, Doe cannot show gender bias simply by alleging a decision-maker was involved in multiple roles. *Id.* And, accepting as true that the Policy has only been applied to men, numerous courts have held a court "cannot plausibly infer . . . a higher rate of sexual assaults committed by men against women, or filed by women against men, indicates discriminatory treatment of males accused of sexual assault." *Doe v. Regents of the Univ. of Cal.*, No. 15-2478, 2016 WL 5515711, at *5 (C.D. Cal. 2016); *see also Doe v. Cummins*, No. 16-3334, 2016 WL 7093996, at *14 (6th Cir. Dec. 6, 2016).

This leaves Doe's allegation that gender bias existed in the disciplinary process because the federal government pressured colleges and universities to punish male students accused of sexual assault. (*Id.* ¶¶ 10-14, 175-76). Some courts have allowed a Title IX discrimination claim to proceed even where the only evidence of gender bias was pressure from the federal government. *See Regents of the Univ. of Cal.*, 2016 WL

5515711, at *5 (collecting cases). But this Court joins the majority of federal courts in finding a general reference to federal pressure, by itself, is insufficient to show gender bias. *Cummins*, 2016 WL 7093996, at *13 (noting reference to the Department of Education's "Dear Colleague Letter" as evidence of federal pressure was "conclusory" and did not create a plausible claim); *Doe v. Baum*, No. 16-13174, 2017 WL 57241, at *24 (E.D. Mich. Jan. 5, 2017) (finding two-year-old news events did not supply plausible support to show public pressure).

This finding is consistent with the Second Circuit's recent decision in *Doe v. Columbia University*, 831 F.3d 46, 57 (2d Cir. 2016). There, the Second Circuit reversed the district court holding the following allegations were sufficient to show gender bias:

> [T]he Complaint allege[d] that during the period preceding the disciplinary hearing, there was substantial criticism of the University, both in the student body and in the public media, accusing the University of not taking seriously complaints of female students alleging sexual assault by male students. It allege[d] further that the University's administration was cognizant of, and sensitive to, these criticisms, to the point that the President called a University-wide open meeting with the Dean to discuss the issue.

*Id.* The Second Circuit concluded that "[a]gainst this factual background, it [was] entirely plausible that the University's decision-makers and its investigator were motivated to favor the accusing female over the accused male, so as to protect themselves and the University from accusations that they had failed to protect female students from sexual assault."[4] *Id.*

---

[4] In *Columbia University*, the Second Circuit also appeared to apply a more lenient standard of review. 831 F.3d at 53-56. The Sixth Circuit recently declined to apply a more

(Footnote continued on next page.)

Addendum Page 13

In contrast to *Columbia University*, while Doe alleged UST faced general federal pressure to "treat male students accused of sexual misconduct with a presumption of guilt," (Am. Compl. ¶ 11), Doe did not allege any targeted stress UST faced from government institutions or the public at large for UST's handling of previous sexual misconduct complaints on campus.   Thus, unlike *Columbia University*, Doe does not point to a specific stressor that would cause UST to "favor the accusing female over the accused male" because of the accused male's gender.   831 F.3d at 57; *see also Cummins*, 2016 WL 7093996, at *13 (noting reference to the Department of Education's "Dear Colleague Letter" as evidence of federal pressure was "conclusory" and did not create a plausible claim); *Doe v. Washington & Lee Univ.*, No. 14-52, 2015 WL 4647996, at *10 (W.D. Va. Aug. 5, 2015) (pointing to both governmental pressure and recent actions on campus as evidence of discrimination in the disciplinary procedure).   The Court, therefore, finds Doe's allegations of federal pressure to prosecute male students of sexual assault are insufficient to show gender bias.

Because Doe's allegations are insufficient to show UST's disciplinary process was motivated by gender bias, the Court will grant UST's motion to dismiss Count II and Count III.

---

(Footnote continued.)

lenient standard, *see Cummins*, 2016 WL 7093996, at *5, 12-14, and at least two district courts have elected not to apply the standard, *see Austin*, 2016 WL 4708540, at *9; *Collick v. William Paterson Univ.*, No. 16-471, 2016 WL 6824374, at *10 (D.N.J. Nov. 17, 2016).   The Eighth Circuit has not weighed in on this issue.   Here, the Court applies the standard used by the Sixth Circuit in *Cummins* and the majority of federal courts.   But even under the arguably more lenient standard set forth in *Columbia University*, the Court finds Doe failed to allege gender bias.

## IV.   BREACH OF CONTRACT (COUNT IV)

UST next argues Doe's breach of contract claim should be dismissed because Doe failed to allege the existence of a contractual relationship.   UST asserts contractual obligations between students and their schools generally do not arise based upon a student handbook.   Doe responds that his breach of contract claim should not be dismissed because UST made specific promises to follow the Policy in several letters and, by failing to comply with those specific promises, UST breached its contract.

In Minnesota, "[e]lements of the law of contracts have been applied to the student-university relationship, but rigid importation of contractual doctrine has been rejected." *Abbariao v. Hamline Univ. Sch. of Law*, 258 N.W.2d 108, 113 (Minn. 1977). "Minnesota courts [have been] generally reluctant to find contractual obligations between students and their schools based upon student handbooks." *Rollins v. Cardinal Stritch Univ.*, 626 N.W.2d 464, 470 (Minn. Ct. App. 2001); *see also Zellman ex rel. M.Z. v. Indep. Sch. Dist. No. 2758*, 594 N.W.2d 216, 220 (Minn. Ct. App. 1999) (holding "a student handbook provided by a public school district does not form a unilateral contract between the student and the school district"). For example, the court in *Ross v. University of Minnesota* held due process procedures used by the University of Minnesota when a medical resident failed to meet academic requirements did "not constitute a unilateral contract." 439 N.W.2d 28, 34 (Minn. Ct. App. 1989). The Court further held that, even if a unilateral contract existed, a material breach did not occur so long as the University of Minnesota "substantially complied" with the procedure by providing "basic due

Addendum Page 15

process protections." *Id.*  Similarly, the *Rollins* court held a student handbook at a private university "did not constitute a contract between the school and the student that required strict compliance with every provision."   626 N.W.2d at 471.   Further, a breach of contract claim did not exist because the record showed the school substantially complied with the handbook's procedures by providing a hearing and an appeal.  *Id.*

Here, as pointed out by UST, Doe's Amended Complaint does not point to any specific provisions of the Policy that UST breached.  In fact, many of Doe's allegations do not arise from specific terms in the Policy.  For example, Doe contends UST breached its contract by preventing an independent investigation, refusing to provide all materials related to the investigation, and denying him access to the identities of individuals interviewed as part of the investigation.  (Am. Compl. ¶¶ 121, 145-46, 201(f), (h).)  But the Policy did not mandate any of those actions.  In fact, the Policy only required "a written notification" regarding the outcome of the investigation and explicitly stated that "UST [was] limited in the information it [could] share in providing [a] notice of outcome."  (*Id.*, Ex. 1 at 15.)  Further, the Policy provided that the respondent could "**identify**" witnesses, documentation, and other evidence for the Factfinders to review, but the Policy did not speak to whether a respondent could conduct an independent investigation.  (*See id.* at 14 (emphasis added).)

Doe attempts to circumvent the Amended Complaint's failure to identify a breach of specific provisions in the Policy by arguing UST made specific promises to Doe in letters dated December 14, 2015, December 15, 2015, and February 10, 2016.  (*See* Am. Compl., Exs. 6 & 7.)  Doe asserts that these letters amount to specific promises made to

- 16 -

Doe that UST would adhere to the Policy in its investigation. Doe then argues the Amended Complaint stated a claim for relief because UST did not provide a written summary of all allegations and defenses or allow Doe time to respond.

There is no evidence in the record that the Factfinders provided "a written summary of all allegations and defenses" during the factfinding process – as required by the Policy. (*See id.*, Ex. 1 at 14.) But, in the Amended Complaint, Doe does not allege a breach of contract for UST's failure to comply with this provision. (*See* Am. Compl. ¶¶ 197-202.) Further, the Amended Complaint and attached exhibits evidence that UST provided Doe an opportunity to respond to the allegations and identify witnesses, documentation, and other evidence. (*See id.* ¶¶ 135-38; *id.*, Exs. 8-9.)[5]

For these reasons, Doe failed to allege a breach of contract claim under Minnesota law. Not only is it unlikely UST formed a unilateral contract under Minnesota law, *see Rollins*, 626 N.W.2d at 471, Doe did not allege any breaches of the Policy in the Amended Complaint. Further, even if UST formed a unilateral contract with Doe by sending several letters, the Policy provided that the "provisions [were] intended to be flexible" and that the "Title IX Coordinator [could] authorize departures from [the] provisions when warranted by the circumstances." (Am. Compl., Ex. 1 at 10.) To the extent UST failed to provide Doe a "written summary of all allegations and defenses,"

---

[5] Plaintiff also implies that UST failed to provide notice of the outcome of the investigation in writing. But the notice provided by UST is attached to the Amended Complaint as Exhibit 10.

Appellate Case: 19-1594   Page: 19   Date Filed: 05/16/2019 Entry ID: 4788309

the remainder of UST's response substantially complied with the Policy. *See, e.g.*, *Ross*, 439 N.W.2d at 34.

Therefore, the Court will grant UST's motion to dismiss Count IV.

## V.     DUTY OF GOOD FAITH AND FAIR DEALING (COUNT V)

UST next argues Doe failed to allege a plausible claim for breach of the duty of good faith and fair dealing because Doe failed to state a claim for breach of contract. "Minnesota does not recognize a cause of action for breach of the implied covenant of good faith and fair dealing without an underlying breach of contract claim." *i-Sys., Inc. v. Softwares, Inc.*, No. 02-1951, 2004 WL 742082, at *12 (D. Minn. Mar. 29, 2004); (*see also* Am. Compl. ¶ 204 (basing Doe's breach of the duty of good faith and fair dealing claim on UST's breach of contract)). Because the Court finds Doe failed to allege a breach of contract, the Court will also dismiss Count V.

## VI.     NEGLIGENCE (COUNT VI)

UST finally argues Doe failed to allege a plausible negligence claim. In Minnesota, to survive a motion to dismiss, Doe must allege: (1) UST owed Doe a duty of care; (2) UST breached that duty of care; (3) Doe was injured; and (4) UST's breach of the duty of care was the proximate cause of Doe's injury. *Glorvigen v. Cirrus Design Corp.*, 816 N.W.2d 572, 585 (Minn. 2012).

UST argues Doe failed to allege a duty of care because Minnesota law does not recognize a claim for negligent breach of contract. *See Lesmeister v. Dilly*, 330 N.W.2d 95, 102 (Minn. 1983). Doe concedes that Minnesota law does not recognize a claim for

Addendum Page 18

Appellate Case: 19-1594     Page: 20     Date Filed: 05/16/2019 Entry ID: 4788309

negligent breach of contract, but argues the Amended Complaint does not limit his negligence claim to the language of the Policy. (*See* Am. Compl. ¶ 209.)   Citing cases related to arbitrary expulsion of students, *see Abbariao*, 258 N.W.2d at 112-13; *Rollins*, 626 N.W.2d at 470, Doe argues UST owed him a duty of care to conduct its disciplinary proceeding in a non-negligent manner.

"Minnesota law follows the general common law rule that a person does not owe a duty of care to another – e.g., to aid, protect, or warn that person – if the harm is caused by a third party's conduct." *Doe 169 v. Brandon*, 845 N.W.2d 174, 177-78 (Minn. 2014). But exceptions to this rule exists "(1) where there was a special relationship between the defendant and the plaintiff; (2) where the defendant's own conduct created a foreseeable risk of harm to the plaintiff; [or] (3) where the defendant voluntarily assumed a duty of care toward the plaintiff." *Shank v. Carleton Coll.*, No. 16-1154, 2017 WL 80249, at *6 (D. Minn. Jan. 9, 2017); *see also Doe v. Univ. of the South*, No. 9-62, 2011 WL 1258104, at *20–21 (E.D. Tenn. Mar. 31, 2011) (applying the "foreseeable risk of harm" duty to a university's implementation of a disciplinary policy).   Whether such a duty arises "requires a careful consideration of the particular facts of the case." *Shank*, 2017 WL 80249, at *6.

While a close case, construing the Amended Complaint in the light most favorable to Doe, Doe pled sufficient facts to allege UST owed him a duty of care.   Even though the cases cited by Doe are not directly on point, *Abbariao* and *Rollins* provide that there are some instances where a special relationship between a student and a college or university creates a duty of care.   *Abbariao*, 258 N.W.2d at 112-13 (noting that at

- 19 -

common law a university had a duty not to "arbitrarily expel a student" (citing *Gleason v. Univ. of Minn.*, 116 N.W. 650 (1908))); *Rollins*, 626 N.W.2d at 470 ("[W]e hold that common law imposes a duty on the part of private universities not to expel students in an arbitrary manner."). Further, Doe alleged that UST's creation of a "disciplinary process" created a foreseeable risk of harm to a student if UST officials conducted the disciplinary process in a negligent manner. (Am. Compl. ¶¶ 209-10.) Therefore, while the Court is skeptical that the facts underlying this case will ultimately establish a duty of care, a factual record must be developed to assess whether a duty exists. *See Shank*, 2017 WL 80249, at *6.

UST also argues that, to the extent Doe alleged a duty of care, Doe failed to plead facts giving rise to a plausible inference that UST breached any duty. But the Amended Complaint sets forth allegations that UST officials made a plethora of errors during the disciplinary process that amounted to a breach of UST's alleged duty of care. (*See* Am. Compl. ¶¶ 208, 210, *see also id.* ¶¶ 131, 145-46, 149-51, 163-64, 173, 186-90, 201(d)-(k).) Further, the Court finds it difficult to assess whether UST breached any alleged duty of care without UST's report or other documents underlying UST's disciplinary decision. Because Doe has not had access to this information and, therefore, the Court must rely on Doe's characterization of the proceedings, the Amended Complaint alleged enough facts to give rise to a plausible inference that UST breached a duty of care.

Therefore, the Court finds Doe pled sufficient facts to support a plausible negligence claim and the Court will deny UST's motion to dismiss Count VI.

- 20 -

## ORDER

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that the University of St. Thomas's Motion to Dismiss [Docket No. 43] is **GRANTED in part** and **DENIED in part** as follows:

1.  The motion is **GRANTED** as to Counts, I, II, III, IV, and V.

    a.  Plaintiff's claims for Declaratory Judgment (**Count I**), Breach of Contract (**Count IV**), and Breach of the Covenant of Good Faith and Fair Dealing (**Count V**) are dismissed **with prejudice**.[6]

    b.  Plaintiff's claims for Violation of Title IX – Erroneous Outcome (**Count II**) and Violation of Title IX – Deliberate Indifference (**Count III**) are dismissed **without prejudice**.

2.  The motion is **DENIED** with respect to the negligence claims found in Count VI of the Amended Complaint.

DATED:  March 1, 2017
at Minneapolis, Minnesota.

s/ John H. Tunheim

JOHN R. TUNHEIM
Chief Judge
United States District Court

---

[6] The Court finds that, for Counts I, IV, and V, it "is unable to conceive of any set of facts under which [Doe] would be entitled to relief." *Hamilton-Warwick v. U.S. Bancorp*, No. 15-2730, 2016 WL 6916798, at \*2 (D. Minn. Nov. 22, 2016) (quoting *Bounds v. Hanneman*, No. 13–266, 2014 WL 1303715, at \*14 (D. Minn. Mar. 31, 2014)).

Appellate Case: 19-1594     Page: 23     Date Filed: 05/16/2019 Entry ID: 4788309

UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

JOHN DOE,                                   CIVIL NO. 16-1127 (JRT/DTS)

    Plaintiff,

v.                                          <u>ORDER</u>

UNIVERSITY OF ST. THOMAS,

    Defendant.

## INTRODUCTION

Plaintiff John Doe ("Plaintiff") claims the University of St. Thomas ("UST") discriminated against him in its investigation of a fellow student's complaint that he had sexually assaulted her. He now moves to amend his complaint to reallege a previously dismissed "erroneous outcome" claim under Title IX. But there is no new evidence to make that claim more viable now than when it was originally dismissed. Accordingly, because the amendment would be futile, the motion to amend is denied.

Plaintiff has also moved to depose the female student ("Jane Doe") who accused him of assaulting her. The Court previously quashed a subpoena for her deposition. Nothing in the record has changed to convince this Court to reverse its prior order. Accordingly, this motion too is denied.

## BACKGROUND

This case arises out of a sexual encounter between two freshman students at UST. Complaint, Docket No. 1. The female student, Jane Doe, filed a complaint against Plaintiff alleging sexual assault. *Id.* UST investigated the complaint and found that Plaintiff had violated its sexual misconduct policy, resulting in discipline imposed on Plaintiff. *Id.* ¶1. Plaintiff claims the encounter was consensual and that UST's investigation was biased and unfair and resulted in a flawed and erroneous outcome.

*Id.* He sued UST raising claims under Title IX of the Education Amendments of 1972, 20 U.S.C. §§ 1681-85, breach of contract, breach of the covenant of good faith and fair dealing, and negligence.  On June 6, 2016, UST moved to dismiss the action under Fed. R. Civ. P. 12(b)(6), which motion was granted except as to the negligence claim. Motion, Docket No. 43; Order, Docket No. 63.  Jane Doe has never been a party to this litigation.

During the course of discovery, Plaintiff subpoenaed Jane Doe for a deposition. Motion to Quash, Docket No. 71.  By Order dated August 21, 2017, this Court quashed the deposition of Jane Doe on grounds that her deposition testimony, even if marginally relevant to the issues in this litigation, imposed a disproportionate burden on her. Order, Docket No. 89.  Plaintiff also moved to compel UST to produce training materials that UST disseminated to its fact-finding panels who investigated sexual assault claims. Motion to Compel Discovery, Docket No. 95.  That motion was granted, and the training materials were produced.  Minute Entry, Docket No. 125.

Plaintiff now moves to amend his complaint to reallege his previously dismissed Title IX erroneous outcome claim and also moves, once again, to take the deposition of Jane Doe.

## ANALYSIS

### I.    Motion to Amend

Under Fed. R. Civ. Proc. 15, a motion to amend the complaint may be denied if the amendment would be futile.  Thus, the amendment may be denied if the claim

2

created by the amendment would be unable to withstand a motion to dismiss. *Ulrich v. City of Crosby*, 848 F.Supp. 861, 877 (D. Minn. 1994).[1]

In order, therefore, to succeed on the motion to amend, Plaintiff must demonstrate that the proposed amendment passes muster under the now familiar *Twombly/Iqbal* standard. *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007); *Ashcroft v. Iqbal*, 556 U.S. 662 (2009). Under that standard, Plaintiff's amendment must allege factual allegations sufficient to raise a right to relief above the speculative level that is not merely possible, but plausible. *Twombly,* 550 U.S. at 555-56; *Iqbal,* 556 U.S. at 678-79.

In order to prevail on an erroneous outcome claim under Title IX, Plaintiff must plead facts (1) sufficient to cast doubt on the accuracy of the outcome of the proceeding, and (2) sufficient to demonstrate that the flawed outcome was "because of" gender bias. *Yusuf v. Vassar College*, 35 F.3d 709, 715-16 (2d Cir. 1994). The causation prong of this test requires that Plaintiff demonstrate more than that gender bias was a "motivating factor" behind the alleged erroneous outcome but was in fact a "but for" cause of the allegedly erroneous outcome.[2]

---

[1]    Plaintiff's Motion to Amend is beyond the deadlines set in this Court's Scheduling Order. UST has urged this Court to deny the motion to amend under Rule 16(b) because Plaintiff has not been able to demonstrate good cause to modify the scheduling order. However, Plaintiff asserts the Motion to Amend is based, at least in part, on documents that were produced to him only recently and that therefore good cause exists to modify the scheduling order. This Court will reach the merits of this motion.

[2]    Though several courts have discussed the erroneous outcome test in terms of "motivating factor," this interpretation appears to be based upon comparison of Title IX to current language contained in 42 U.S.C. § 2000e-2 of Title VII of the Civil Rights Act of 1964. As explained by the Supreme Court, absent similar statutory language or clear legislative intent, a statute prohibiting discrimination "because of" a trait must be interpreted to require "but for" causation. *See, e.g., Gross v. FBL Financial Services,*

3

In support of element one (flawed outcome of the proceedings), Plaintiff alleges generally that the fact finders assigned to his case ignored Jane Doe's "frequent and varied untruths throughout the investigation" and treated Plaintiff and Jane Doe very differently during their questioning.   But Plaintiff cannot establish a flawed outcome because his own statements provided a basis on which the fact finders could reasonably have determined that he violated UST's sexual misconduct policy.   Report at 25-6, Docket No. 221.

More importantly, however, Plaintiff's proposed amendment utterly fails on grounds of causation.  In support of causation, Plaintiff has identified the following facts:

- That UST's Associate General Counsel stated that she was not surprised the Ramsey County Attorney's Office had declined to prosecute plaintiff because prosecution was "always" declined in cases like this.  (Amended Complaint ¶ 130).

- That UST informed Plaintiff's counsel that Plaintiff could make things easier for everyone and receive a tuition refund if he just withdrew from UST (Amended Complaint ¶ 145).

- The difference in the manner in which unidentified medical professionals were questioned regarding Plaintiff and Jane Doe (Amended Complaint ¶¶ 149-50).

- The difference in the manner in which Plaintiff was repeatedly and aggressively challenged by UST officials regarding his version of the events, whereas Jane Doe was never similarly challenged despite giving at least five varying versions of the events (Amended Complaint ¶ 151).

- That Associate General Counsel, Abigail Crouse, improperly operated in the role of both the Title IX Coordinator and General Counsel (Amended Complaint ¶¶ 181, 183 and 184).

Pl. Mem. 14-15, Docket No. 185

---

*Inc.,* 557 U.S. 167, 176-77 (2009); *University of Texas Southwest Medical Center v. Nassar*, 570 U.S. 338, 347 (2013).

4

These allegations are virtually identical to the prior factual allegations raised in Plaintiff's initial Complaint which this Court found insufficient to establish gender bias so as to withstand the motion to dismiss (Order at 11-12, Docket No. 63).

The only new evidence discovered since the Order dismissing the erroneous outcome claim relates to UST's training materials. But the training materials upon which Plaintiff relies are also insufficient to establish gender bias causing an erroneous or flawed outcome.

Plaintiff's new evidence falls broadly into three categories:

(1)    Training documents and videos providing hypotheticals and case studies which typically, though not uniformly, refer to victims using female pronouns or proper names and perpetrators using male pronouns or proper names;

(2)    Training documents that reference statistics on the frequency of sexual assaults perpetrated on women and on men, and the frequency of such assaults that are perpetrated by men; and

(3)    Training materials which reference the Obama administration's efforts to combat sexual violence against women on college campuses.

Pl. Mem. 16-20, Docket No. 185.

Plaintiff argues these training materials created an institutional bias on the part of UST fact finders to find Jane Doe inherently credible and to find Plaintiff not credible. *Id.* But this argument fails for several reasons. First, the statistics merely reflect reality – that women are more likely to be victims of sexual assault than are men (but not to the exclusion of men), and that men are more likely than women to perpetrate sexual assault (but again, not to the exclusion of women). The prevalence of the use of female names and pronouns to describe victims and male names and pronouns to describe perpetrators merely reflects these unpleasant statistics. These same training materials

5

Appellate Case: 19-1594     Page: 28     Date Filed: 05/16/2019 Entry ID: 4788309

also expressly cautioned investigators to be careful, thoughtful and fair. McGraw Decl. Exs. 14-15, Docket Nos. 195-96.

As for the training materials' reference to the Obama Administration's efforts to combat sexual violence against women on campus, this Court previously required Plaintiff to show targeted stress brought to bear on UST specifically. *Id.* at 14. While the training materials reference the "pressure" brought to bear on universities in general, they fall far short of establishing that the federal government applied any pressure or stress on UST specifically. The mere fact that UST revised its policies shortly after the White House had issued its "Not Alone" report, and after UST had created an in-house presentation summarizing that report, does not demonstrate targeted stress sufficient to raise a plausible inference of gender bias in UST's investigation of this incident. Thus, the training materials do not establish a plausible claim that UST's training created an institutional bias against males accused of violating the sexual misconduct policy, much less that the investigators in this case found Plaintiff had violated the policy because of that bias. The training materials are no different than the prior evidence and allegations that this Court found insufficient. *See generally* Order, Docket No. 63.

Plaintiff's motion to amend must be denied because it relies on allegations already found insufficient to support such a claim and because the new evidence on which it is premised is likewise insufficient.

## II.   Motion to Compel Deposition of Jane Doe

In addition to seeking to amend his complaint, Plaintiff revisits the question of whether he may depose Jane Doe. Plaintiff makes three arguments. First, he suggests that Jane Doe might possibly recant her prior accusation which, were that to happen, would support his (proposed) erroneous outcome claim. This argument puts the cart

6

before the horse. Plaintiff has not produced evidence sufficient to raise a viable erroneous outcome claim in the first instance. Jane Doe's deposition was previously quashed because the burden it would impose on her exceeded the relevance – if any – to the claims then in this case. That is still true. Speculation that her testimony might support an otherwise dismissed claim that is not presently in the case does not alter this analysis.

Second, Plaintiff argues that Jane Doe's testimony is necessary to fully assess whether UST's investigation was conducted in a negligent manner. He suggests Jane Doe may testify that she did not make statements attributed to her by investigators in their report. But Plaintiff has already deposed the investigators and has had full access to all persons who conducted the investigation he claims was flawed. Nothing has changed in the facts discovered to alter this Court's prior ruling – which was consistent with existing precedent - quashing Jane Doe's deposition. *See Gomes v. Univ. of Maine Sys.,* 365 F. Supp. 2d 6, 14 (D. Maine 2005); *Yu v. Vassar Coll.,* 97 F. Supp. 3d 448, 461 (S.D.N.Y. 2015).

Finally, Plaintiff argues that the door has been opened to this deposition because Plaintiff was questioned during his deposition as to the underlying facts of the sexual encounter that gave rise to his discipline. Therefore, he argues, he should be allowed to depose Jane Doe as to her version of events on the night of December 11, 2015. This argument fails at the outset. First, the Court has reviewed the excerpts from the deposition of Plaintiff and finds that the questioning regarding the facts of the underlying incident was not nearly so in-depth as to "open the door" to revisiting UST's disciplinary findings (which is beyond the scope of this case in any event). More importantly, Plaintiff is in a materially different circumstance than Jane Doe. Unlike Plaintiff, Jane

7

Doe is not a party to this lawsuit.  Unlike Plaintiff, Jane Doe did not put anything at issue here.  Thus, even if the "door has been opened" Jane Doe did not open it and it is Jane Doe's rights, not UST's that lie at the heart of this deposition issue.  Plaintiff has not demonstrated a basis for this Court to reverse its earlier decision prohibiting the deposition of Jane Doe.

## CONCLUSION

For all the foregoing reasons, IT IS HEREBY ORDERED that:

1.      Plaintiff's Motion to Compel the Deposition of Jane Doe [Docket No. 141] is DENIED; and

2.      Plaintiff's Motion Seeking Leave to Amend Pleadings [Docket No. 182] is DENIED.

Dated:      August 6, 2018

*s/ David T. Schultz*
DAVID T. SCHULTZ
United States Magistrate Judge

8

# UNITED STATES DISTRICT COURT

# DISTRICT OF MINNESOTA

| | |
|---|---|
| JOHN DOE, | Civ. No. 16-1127 (JRT/DTS) |
| Plaintiff, | |
| v. | **MEMORANDUM OPINION AND ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT** |
| UNIVERSITY OF ST. THOMAS, | |
| Defendant. | |

Beau D. McGraw, **McGraw Law Firm, PA**, 10390 Thirty-Ninth Street North, Lake Elmo, MN 55042, for plaintiff.

David A Schooler, Ellen A. Brinkman, and Maren F. Grier, **Briggs & Morgan, PA**, 80 South Eighth Street, Suite 2200, Minneapolis, MN 55402, for defendant.

Plaintiff John Doe ("Doe") brought this action against the University of St. Thomas ("UST"), a private university, stemming from UST's investigation of a sexual misconduct complaint made against him. Doe originally brought six causes of action; however, the Court dismissed five of them, and the only remaining cause of action is one based on negligence. UST now moves for summary judgment on the negligence claim. The Court finds that UST owed Doe a duty of reasonable care, but because UST did not breach its duty of care, the Court will grant the Motion.

## BACKGROUND

### I.   UST'S SEXUAL MISCONDUCT POLICY

The events giving rise to this action occurred in December 2015. At that time, UST had a Sexual Misconduct Policy (the "Policy") that set forth guidelines UST would follow when

Appellate Case: 19-1594   Page: 32   Date Filed: 05/16/2019 Entry ID: 4788309

investigating allegations of sexual misconduct. (Decl. of Linda Baughman ("Baughman Decl."),

¶ 3, May 30, 2018, Docket No. 150.) The Policy's "provisions [were] intended to be flexible so

as to allow UST to meet its legal obligations while fulfilling its educational mission." (Baughman

Decl., Ex. 1 ("UST Policy") at 15, Docket No. 150-1.)

The Policy contained both formal and informal resolution processes. At the initiation of

the formal resolution process, a "Response Manager" would be appointed to take interim actions

and manage the investigation as it began. (*Id.* at 16–17.) The Response Manager would also

appoint "Factfinders." Factfinders were responsible for "conduct[ing] an investigation into the

facts of the incident" and notifying both the complainant and the respondent of the results. (*Id.* at

21.) The Factfinders would conduct interviews, offer written summaries of the charges and results

to the complainant and respondent, and give both the complainant and the respondent an

opportunity to participate at various points along the way. (*Id* at 23.) Both the complainant and

the respondent could identify witnesses, provide documents and other evidence, submit questions

for the Factfinders to ask witnesses, and supply responsive statements. (*Id.*)

After completing the investigation, the Factfinders would "weigh the evidence and

determine whether it [was] more likely than not (using a 'preponderance of the evidence' standard)

that the [r]espondent [was] responsible for the misconduct alleged." (*Id.* at 24.) If the Factfinders

made such a finding, a determination would be made that the Policy had been "violated," a report

would be prepared, and the Response Manager would determine the appropriate sanctions. (*Id.* at

24.) UST would then provide a written notification of the Factfinders' decision to both the

complainant and respondent and give both the opportunity to appeal. (*Id.* at 25–26.) If the

respondent was a student, the Vice President for Student Affairs would be designated as the Appeal

Officer. (*Id.* at 26.) The Appeal Officer would have the option to consider the appeal directly or

to appoint an appeal board. (*Id.* at 26–27.) If appointed, an appeal board would consider the appeal and present a non-binding recommendation to the Appeal Officer, who would then make the final determination. (*Id.* at 27.)

To assist students in the process, the Response Manager would also appoint Process Advisors, who would "explain the response and resolution process and provide information about available resources" to both the complainant and the respondent. (*Id.* at 18.) Additionally, students were allowed a support person. (*Id.* at 21.) A support person could "accompany [the student] throughout the response and resolution process . . . to consult with and advise" the student. (*Id.*)

## II.   THE INCIDENT

Doe was a freshman at UST in 2015. (Am. Compl. ¶ 1, May 20, 2016, Docket No. 34.) On the night of December 11, 2015, both he and Jane Doe, the complainant, attended an off-campus party. (*Id.* ¶ 30, 36.) Later that evening, Doe walked Jane Doe back to her dorm room and the two began consensually kissing in the dorm's common room. (*Id.* ¶ 46.) The two eventually ended up in the bathroom connected to Jane Doe's dorm room, where they continued kissing and removed some of their clothing. (*Id.* ¶¶ 56–60.) Then, Doe digitally penetrated Jane Doe. (*Id.* ¶ 62.) Jane Doe did not verbally consent nor did she verbally object. (Decl. of Vern Klobassa ("Klobassa Decl.") ¶ 4, May 30, 2018, Docket No. 170, Ex. 1 ("Factfinders' Report") at 9, Docket No. 171.) Doe left the dorm room shortly thereafter. (Am. Compl. ¶ 70.) The next morning, Jane Doe reported the incident to UST, and UST began a formal investigation of the incident on December 14, 2015. (Klobassa Decl. ¶ 8, Ex. 5, Docket No. 175.)

## III.   THE INVESTIGATION

Linda Baughman, the Dean of Students at UST, was the designated Response Manager. (Baughman Decl. ¶ 1.) On December 14, 2015, Baughman sent Doe an email to inform him about

-3-

Jane Doe's complaint. (Baughman Decl. ¶ 6, Ex. 4, Docket No. 153.)   Shortly thereafter, Doe received a second letter from Dean Baughman, which advised Doe about his rights under the Policy and identified the Factfinders. (Baughman Decl. ¶ 9, Ex. 7, Docket No. 156.)   As the investigation commenced, Doe, Doe's father, and Doe's attorney attended a meeting with Dean Baughman and UST's Associate General Counsel Abigail Crouse, the purpose of which was to "answer questions [Doe] and his father ha[d] about the process," and to allow Doe's attorney to "learn . . . how the process works."[1]   (Am. Compl., Ex. 4 at 1, Docket No. 34-4.)

In the ensuing weeks, the Factfinders conducted interviews, reviewed security footage, and reviewed evidence provided by both Doe and Jane Doe.   The Factfinders first interviewed Jane Doe and Doe on December 21 and 22, respectively. (Factfinders' Report at 3.)   Doe's lawyer was present at his interview. (Klobassa Decl. ¶ 12, Ex. 9 at 1, Docket No. 178.)   After the interviews, Doe and Jane Doe provided the Factfinders with evidence and the names of witnesses they believed had relevant information. (Factfinders' Report at 7, 11.)   Additionally, Doe and his attorney were asked to provide suggested questions for the witnesses they identified. (Klobassa Decl. ¶ 13, Ex. 10, Docket No. 179.)

---

[1] Shortly after this meeting, Doe's attorney apparently made clear that he intended to reach out to several witnesses and record interviews with them. (Decl. of Beau McGraw ("McGraw Decl.") ¶ 23, June 20, 2018, Docket No. 241, Ex. 23 ("Crouse Dep.") at 22, Docket No. 264.) Crouse cautioned Doe's attorney against that plan of action.   Crouse stated that "if witness testimony appears planned or influenced, it will hurt the witness's credibility and is likely to hurt the credibility of your client if he is seen as trying to influence their testimony." (*Id.*) For those reasons, and because the Factfinders would interview each of the relevant witnesses anyway, she cautioned that conducting outside interviews "is not appropriate under our process and will harm your client more than help." (*Id.*) Nevertheless, Doe's attorney conducted five independent interviews and provided recordings of those interviews to Crouse and the Factfinders. (Factfinders' Report at 11.)

Addendum Page 33

The Factfinders interviewed eleven other individuals during the investigation, including Jane Doe's roommate, her Resident Advisor, two health care professionals, and several individuals who interacted with both parties on the night of December 11 and the morning of December 12. (Factfinders' Report at 1–2, 4.) The Factfinders also viewed text messages between Doe and Jane Doe, security footage from Jane Doe's dorm, a report from the St. Paul police department, and Jane Doe's relevant medical records. (Factfinders' Report at 3, 7, 11.) After reviewing this evidence, the Factfinders separately interviewed both Doe and Jane Doe a second time, presented both with the evidence, and asked pertinent follow-up and clarifying questions. (Klobassa Decl. ¶¶ 10, 12; Ex. 7, Docket No. 177; Ex. 9, Docket No. 178.)

On February 10, 2016, Doe and his attorney attended a meeting with Crouse and Dean Baughman. (Am. Compl. ¶ 144.) Doe was informed that "he had been found responsible for non-consensual sexual intercourse." (*Id.*) As a result, Doe was suspended from UST for three semesters, which was—at that point—until the beginning of the 2017 fall semester. (Baughman Decl. ¶ 10, Ex. 9, Docket No. 157.) On March 10, 2016, Doe appealed the decision. (Decl. of Karen Lange ("Lange Decl.") ¶ 3, May 30, 2018, Docket No. 165, Ex. 1 (the "Appeal"), Docket No. 166.) Karen Lange, the Vice President of Student Affairs, was named the Appeal Officer. (Lange Decl. ¶ 3, Ex. 3 at 1, Docket No. 168.) She appointed an Appeal Board, who considered Doe's appeal and determined that none of the grounds to overturn a decision were applicable. (*Id.*) Lange agreed with the Board's recommendation and upheld the Factfinders' original determination.[2] (*Id.* at 2–3.)

---

[2] Because Doe had been attending classes pending the outcome of his appeal, Lange also adjusted the suspension to run until the spring semester of 2018. After his appeal was denied, John Doe transferred to another university. He does not plan on re-enrolling at UST. (Decl. of Maren Grier ¶ 5, May 30, 2018, Docket No. 136, Ex. 3 ("Doe Dep.") at 14, Docket No. 139.)

-5-

## IV.   PROCEDURAL BACKGROUND

On May 20, 2016, Doe filed an Amended Complaint alleging that UST violated Doe's rights through its application of the Policy. The Amended Complaint alleged six causes of action: (1) Declaratory Judgment under Title IX (Count I); (2) Violation of Title IX – Erroneous Outcome (Count II); (3) Violation of Title IX – Deliberate Indifference (Count III); (4) Breach of Contract (Count IV); (5) Breach of the Covenant of Good Faith and Fair Dealing (Count V); and (6) Negligence (Count VI). (Am. Compl. ¶¶ 158–211.) On March 1, 2017, the Court dismissed the first five counts. (Mem. Opinion and Order, March 1, 2017, Docket No. 63.) UST now moves for summary judgment on the negligence claim. (Mot. for Summary J., May 30, 2018, Docket No. 128.)

## DISCUSSION

### I.   STANDARD OF REVIEW

Summary judgment is appropriate when there are no genuine issues of material fact and the moving party can demonstrate that it is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). A fact is material if it might affect the outcome of the suit, and a dispute is genuine if the evidence is such that it could lead a reasonable jury to return a verdict for either party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A court considering a motion for summary judgment must view the facts in the light most favorable to the nonmoving party and give that party the benefit of all reasonable inferences to be drawn from those facts. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Summary judgment is appropriate if the nonmoving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

UST argues that Doe is not able to prove the elements of his negligence claim. In Minnesota, a negligence claim requires a showing of four elements: that (1) the defendant owed the plaintiff a duty of care; (2) the defendant breached that duty of care; (3) the plaintiff was injured; and (4) the defendant's breach of the duty of care was the proximate cause of the injury. *Glorvigen v. Cirrus Design Corp.*, 816 N.W.2d 572, 581–82 (Minn. 2012). The arguments at this stage revolve mainly around the first two elements.

## II.    DUTY OF CARE

In Minnesota, a defendant owes "a general duty of reasonable care when the defendant's own conduct creates a foreseeable risk of injury to a foreseeable plaintiff." *Domagala v. Rolland*, 805 N.W.2d 14, 23 (Minn. 2011). While this overarching concept is well-established, courts in Minnesota have not yet applied it in the context of a challenge to a sexual assault investigation by a private college or university. More broadly, using negligence to challenge such investigations is a relatively new and untested legal strategy in Minnesota. As such, the Minnesota Supreme Court has not been asked to address the precise issues presented in this case. Nevertheless, the Court finds guidance in analogous Minnesota Supreme Court and Court of Appeals cases.

In *Abbariao v. Hamline Univ. Sch. of Law*, 258 N.W.2d 108 (Minn. 1977), the Minnesota Supreme Court considered the case of a law student who had been expelled from Hamline for poor grades. The plaintiff there, Abbariao, claimed that his expulsion was the result of a flawed process because Hamline failed to inform him of many of his grades, failed to notify him of his probationary status until four weeks before a finals period, and expelled him without conducting a hearing. *Id*. at 110.

Abbariao first alleged that his procedural due process rights had been violated. In examining this argument, the Minnesota Supreme Court noted that "[d]etermination of the process

-7-

due necessitates a balancing of the interests and needs of the student against the interests and resources of the university." *Id.* at 112. The Supreme Court further explained that the process due depends on whether an expulsion is based on misconduct or academic deficiencies. This is an important distinction, as "[e]xpulsion for misconduct triggers a panoply of safeguards [under the Due Process Clause] designed to ensure the fairness of factfinding by the university." *Id.* On the other hand, courts may intervene for academic expulsions only if the expulsion is the result of "arbitrary, capricious, or bad-faith actions of university officials." *Id.*

Because the Due Process Clause applies only to public universities, Abbariao also alleged "a common-law duty on the part of the law school not to expel students in an arbitrary manner." *Id.* In discussing this argument, the Supreme Court held that "[t]he requirements imposed by the common law on private universities parallel those imposed by the due process clause on public universities." *Id.* at 113. Because Abbariao was expelled for academic deficiencies, the more lenient arbitrariness standard applied.

The Minnesota Court of Appeals extended this reasoning in *Rollins v. Cardinal Stritch Univ*, 626 N.W.2d 464 (Minn. Ct. App. 2001). Rollins, a male student, had sent several unsolicited emails to female students, prompting complaints. As the university investigated those complaints, Rollins continued sending unwanted emails. Rollins was notified of his immediate suspension pending a hearing. At that hearing, which his attorney attended, Rollins showed little remorse and stated that he wouldn't change his behavior. Accordingly, the university told him that he could not repeat his behavior and had to switch out of the specific student section he was in if he wanted to be reinstated. Rollins refused, and thus was never reinstated. In suing the university, Rollins argued that the university's disciplinary actions "were unfair, biased, arbitrary, lacking in due process, and based on the bad faith" of the university. *Id.* at 469. Following *Abbariao*, the court

-8-

explicitly held that the "common law imposes a duty on the part of private universities not to expel students in an arbitrary manner." *Id.* at 470. Analyzing the university's actions under this standard, the court held that the expulsion was not arbitrary. *Id.*

As *Abbariao* and *Rollins* make clear, although private universities are not subject to the Due Process Clause, they do not escape judicial oversight entirely when seeking to discipline their students. To the contrary, private universities have a common law duty not to act arbitrarily in handling disciplinary matters. Although not based on negligence, the Court finds the cases sufficiently analogous to support finding a duty of reasonable care here.[3]

In making this finding, the Court bears in mind that universities are entitled to discretion in dealing with their students, including in disciplinary proceedings. *See Goss v. Lopez*, 419 U.S. 565, 589–90 (1975) (Powell, J., dissenting) ("In prior decisions, this Court has explicitly recognized that school authorities must have broad discretionary authority . . . [t]his includes wide latitude with respect to maintaining discipline and good order."); *see also Davis Next Friend LaShonda D. v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629, 648 (1999) ("courts should refrain from second-guessing the disciplinary decisions made by school administrators.").

But the Court does not believe that unfettered discretion is appropriate. The relationship between student and university is a unique one. Universities are, for all intents and purposes, societies within a society. These sub-societies often have their own sets of rules, manifested in the form of student handbooks. Naturally, these handbooks establish student academic requirements and university academic duties. Rules in this regard are necessary to sustain a productive and fair academic culture. But the universities and colleges of today are not just responsible for providing

---

[3] The Court is similarly unpersuaded that the difference between an expulsion and a suspension—such as the one here—warrants different treatment.

Addendum Page 38

a productive and fair academic environment; they are also expected to ensure a healthy and safe living environment. Thus, handbooks contain rules governing the non-academic behavior of students. Rules to this end often apply both on- and off-campus, requiring students to conduct themselves in accordance with stated university requirements wherever they are.

In many instances, violations of university handbooks have consequences only felt within the university environment. But they can also have consequences that extend far beyond that environment and can affect students in significant and permanent ways. Of course, students voluntarily accept the rules of the university they attend. They are, or should be, aware of the ramifications of violating those rules. The issue, therefore, is not whether universities have the **ability** to discipline their students in ways that give rise to severe consequences. Instead, given the harm that can come from that discipline, and given the unique relationship between student and university, the question is whether a private university must use reasonable care before making disciplinary decisions. The Court today holds that they must.

Precisely what reasonable care requires is beyond the scope of this decision. Whether a given university exercised reasonable care will, like most negligence claims, depend on the circumstances of each case. "However, the fact that it may be difficult to establish 'precise criteria' by which to judge a defendant's actions does not mean that the defendant owes others no duty." *Atria v. Vanderbilt Univ.*, 142 F. App'x 246, 251 (6th Cir. 2005) (citing *Stehn v. Bernarr MacFadden Foundations, Inc.*, 434 F.2d 811, 815 (6th Cir. 1970)).

UST argues that the Court should adopt something like the "arbitrary" standard found in *Rollins* and *Abbariao.* The Court disagrees. As noted above, the *Abbariao* court explicitly noted that required due process protections differ depending on whether a disciplinary decision is based on academic deficiencies or student misconduct. For review of academic violations, the Minnesota

-10-

Supreme Court held that the arbitrary standard applies. But for misconduct violations, the common law provides students a "panoply of safeguards designed to ensure the fairness of factfinding." *Abbariao*, 258 N.W.2d at 112. It was for academic violations which the Minnesota Supreme Court held that the arbitrary standard applies. Thus, when the Supreme Court stated that "the requirements imposed by the common law on private universities parallel those imposed by the due process clause on public universities," it necessarily implied that something more than the arbitrary standard would apply to university disciplinary actions based on student misconduct. Certainly, whether an investigation or decision was arbitrary will factor into a reasonable care analysis. But that a decision was non-arbitrary is insufficient, by itself, to establish reasonable care.

On the other hand, Doe suggests that UST's Policy and Procedure manual provides the applicable duty of care, and that a failure to adhere to that manual constitutes a breach of duty. Once again, the Court disagrees. Reasonable care does not require strict adherence to a university's handbook, just as a university handbook is not considered binding in a due process analysis. *See Keefe v. Adams*, 840 F.3d 523, 536 (8th Cir. 2016) (rejecting the argument that a university's policies could be used to "create an expectation" which, if not met, would violate due process). University policies and procedures are fundamental to the operation of the university environment, as they often provide the guiding principles in the relationship between university and student. However, they are intended to, and must be, flexible, in order to account for the unique circumstances of each situation. If courts were to require strict adherence, the purpose and utility of the handbooks would be undercut, not bolstered. This is, in part, why Minnesota courts have been "generally reluctant to find contractual obligations between students and their schools

-11-

based upon student handbooks." *Shank v. Carleton College*, 232 F. Supp. 3d 1100, 1116 (D. Minn. 2017) (citing *Rollins*, 626 N.W.2d at 470).

Doe also argues that UST "had an obligation to create and administer a process that was fair and impartial to both parties . . . and [to] provide some measure of due process in the proceeding to ensure that an accurate outcome was achieved." (Pl.'s Mem. in Opp. at 23, June 20, 2018, Docket No. 241.)  While vague, the Court believes that this is a closer application of the *Abbariao* decision and of the parallel due process protections afforded students at public universities.  "Due process is flexible and calls for such procedural protections as the particular situation demands." *Keefe*, 840 F.3d at 535 (quoting *Mathews v. Eldridge*, 424 U.S. 319, 334 (1976)).  What constitutes reasonable care must also be flexible.

## III.   BREACH

Having determined that UST owed Doe a duty of reasonable care, the Court must now analyze whether UST breached that duty during its investigation.  Doe's breach argument is two-fold.  First, he argues that UST breached its duty of care to provide him a fair hearing because the individuals adjudicating and investigating his claim had been indoctrinated with bias against men accused of sexual assault.  Second, he argues that procedural flaws throughout the process, when considered together, amount to a breach of the duty of reasonable care.

### A. Bias as Breach

In arguing that UST's administrators had a bias against him, Doe highlights training materials that UST provided these administrators on the increasingly salient issue of campus sexual assault.  The types of things that Doe takes exception to can fairly be categorized as: (1) gender-slanted language used in training materials; (2) training about how victims of sexual assault

-12-

typically behave following the assault; and (3) statistics about campus sexual assaults and the low rate of false reports.

When it exists, bias certainly provides some indication that a university failed to use reasonable care in conducting its investigation. Indeed, fundamental to any fair investigation and hearing is that the tribunal is unbiased and the outcome not predetermined. However, none of the factors cited by Doe, when viewed in context, establishes that UST or those involved in Doe's adjudication were impermissibly biased such that UST failed to exercise reasonable care.

University "administrators are 'entitled to a presumption of honesty and integrity unless actual bias . . . can be proven.'" *Richmond v. Fowlkes*, 228 F.3d 854, 858 (8th Cir. 2000) (quoting *Ikpeazu v. Univ. of Nebraska*, 775 F.2d 250, 254 (8th Cir. 1985)); *see also Robinson v. Univ. of Minnesota*, No. A17-1620, 2018 WL 4395020, at *3 (Minn. Ct. App. Sept. 17, 2018) ("the party claiming otherwise has the burden of proving that a decision was made improperly by showing a risk of actual bias") (citing *Kennedy v. L.D.*, 430 N.W.2d 833, 837 (Minn. 1988)) (emphasis omitted). Where a plaintiff relies only on his or her belief that administrators acted with bias, the presumption is not overcome. *See de Llano v. Berglund*, 282 F.3d 1031, 1035 (8th Cir. 2002).[4]

This presumption is a common one across the country and has been applied in similar cases to this one. For instance, in *Gomes v. Univ. of Maine Sys.*, 365 F. Supp. 2d 6, 31–32 (D. Me. 2005), the mere fact that a hearing board chair had participated in sexual assault victim advocacy programs was insufficient to prove bias. The court in that case refused to presume that, "because

---

[4] Even though the cited cases dealt with public universities and therefore considered bias in the due process context, the principles apply equally here. "The requirements imposed by the common law on private universities parallel those imposed by the due process clause on public universities." *Abbraio*, 258 N.W.2d at 113.

someone is against sexual assault, [he or she] would be unable to be a fair and neutral judge as to whether a sexual assault had happened in the first place." *Id.*

*Doe v. Univ. of Cincinnati*, 173 F. Supp. 3d 586, 602 (S.D. Ohio 2016), is another remarkably similar case. There, a plaintiff complained that "training materials that allegedly presume that sexual assault complainants are truthful and that elevate the rights of the complainants over the due process rights of the accused" impermissibly conditioned the adjudicatory body against the accused. The court disagreed and stated that, without concrete facts showing actual bias, "such as statements by board members or university officials indicating bias," a plaintiff could not show that an adjudicatory panel was biased. *Id.* at 601–02. The court went on to say that, instead of holding training against a university, "[i]t should be a laudable goal for a university to raise the awareness of its faculty and staff to sexual assault and to increase their sensitivity to the particular problems that victims of sexual violence experience in coming forward to make complaints." *Id* at 602.

Doe has not provided any facts suggesting that those involved in his adjudication process were actually biased against him; nowhere does he show any connection between the training that UST administrators were given and bias in his specific case. Instead, he relies on bare platitudes such as arguing that the "training and indoctrination of everyone involved in the process [created] a process that was going to lead to a particular and biased result" and that "those involved in the process are working toward a predetermined result and evidence of that is everywhere in the proceedings against" Doe. (Pl.'s Mem. in Opp. at 35–36.) Doe does not overcome the presumption of fairness that should be afforded to UST administrators. Instead, Doe would have the Court presume just the opposite, and hold that university training aimed at gaining a greater understanding of sexual violence, and which uses materials backed by research, presumptively

Addendum Page 43

biases administrators against accused males. The Court refuses to make such a presumption. Accordingly, Doe's argument that UST's bias establishes a breach of reasonable care is without merit.

### B. Procedural Deficiencies as Breach

Doe's second complaint is with alleged procedural flaws throughout the process. Doe argues that UST's Policy and Procedures manual, and relevant Title IX guidance, are instructive of the scope of reasonable care, such that a failure to comply with them evidences a breach. As discussed above, the Court does not believe that strict adherence to a university's policies and procedures is required for a university to satisfy its duty of reasonable care. However, adherence to school policy is also not irrelevant when considering whether that duty has been breached. As evidenced in UST's policies, there will often be substantial overlap between procedures employed in university handbooks and those procedures that courts consider indicative of a fair investigation. Thus, when—as here—a university relied on and sought to follow its own policies, evidence that it failed to do so may provide evidence of a university's failure to use reasonable care.

Doe points to a number of alleged discrepancies and improprieties on the part of UST. However, Doe does not point out any specific provisions of the Policy, or relevant Title IX guidance, that these alleged improprieties violated. At his most specific, he says that UST failed to adhere to its own Policy by: (1) denying Plaintiff access to information he needed to identify people and documents favorable to his defense; (2) refusing Plaintiff access to the written findings against him; and (3) even when providing "access, " doing so only for his counsel and then only to heavily redacted documents. (Def.'s Mem. in Opp. at 38, June 20, 2018, Docket No. 240.) However, none of these actions violated the Policy.

-15-

As to the first category, Doe seems to be under the erroneous impression that he would be able to mount something of a full defense and become intricately involved in the investigatory process. To the contrary, the Policy clearly established that the Factfinders were responsible for all aspects of the investigation, that they would conduct the investigation at an arms-length from the parties, and that they would seek input from the parties only when they needed it. UST's policy was never intended to provide the protections of a trial. Instead, the Policy states that, before the Factfinders finished, they would ensure that both parties were "provided a written summary of all allegations . . . and []an opportunity to respond," including "(1) an opportunity to identify relevant witnesses, documents, and other physical evidence, (2) identify questions that may be asked of witnesses, and (3) provide responsive written or oral remarks." (UST Policy at 23.) UST did all those things.

The alleged wrongdoings cited in categories two and three, while potentially violations of the Policy if true, do not form the basis for a violation in this case. Doe was not prohibited from accessing the written Factfinders' report, though his access was restricted insofar as he or his lawyer were forced to come to campus to view the report. And while the names of the witnesses were redacted in the report made available to Doe, there was not "heavy" redaction, as Doe alleges.

Of course, the Court's inquiry is not limited to considering whether UST violated its own policies. It is entirely plausible that UST, or any university, could breach its duty of care without violating its policies, if the application of those policies does not provide reasonable care. Thus, even though Doe does not plausibly show that UST violated its policy, the Court must otherwise consider whether his allegations demonstrate a breach of the duty of reasonable care. In doing so, the Court finds that most of the facts Doe cites as evidence of breach are either mischaracterized

-16-

Appellate Case: 19-1594  Page: 47  Date Filed: 05/16/2019 Entry ID: 4788309

or otherwise fail to establish that UST did not exercise reasonable care, even when viewed in the aggregate.

For instance, Doe argues the fact that Jane Doe was found credible by the Factfinders, even after initially lying or omitting facts when speaking to St. Paul Police and UST investigators, is evidence that UST was not impartial. He contends that this fact is particularly egregious because she was allegedly never confronted about her inconsistencies. However, the Factfinders **did** question her about these inconsistences during their second interview with her. (See Complainant Interview, May 30, 2018, Docket No. 177.) The Factfinders also challenged Doe about his own inconsistences during his second interview, and found him credible as well.

Doe also complains that "during the investigation process" Dean Baughman was in "constant communication" with Jane Doe's Process Advisor, who was telling Dean Baughman that Jane Doe was courageous and strong. (Def.'s Mem. in Opp. at 36.) However, as evidence, Doe cites a single email from the Process Advisor to Dean Baughman. While the email does say that Doe was courageous and strong, it was in reference to how Jane Doe was handling the news that Doe had decided to appeal the decision. The email was written on February 29, 2016, **after** Dean Baughman had received the report by the Factfinders and **after** she had made her disciplinary decision.

Doe further claims that he was prohibited from conducting his own investigation into the matter. This seems to be in reference to General Counsel Abigail Crouse's warning him against conducting his own interviews of witnesses. As discussed above, instead of telling Doe that he could not interview witnesses, Crouse simply warned Doe that affirmatively interviewing witnesses may make them appear coached when the Factfinders finally interviewed them, and that

-17-

any appearance of coaching would harm a witness's credibility. For this reason, she stated that conducting interviews may "harm your client more than help."[5]  (Crouse Dep. at 22.)

This is not to say that UST's actions were flawless, and the Court does believe that UST acted improperly on two occasions. First, while Dean Baughman was writing the final disposition letter to Doe to inform him of the Factfinder's determination and the punishment she was imposing, she sent a draft to VP Lange, who would go on to be the Appeal Officer, and asked for suggestions or edits. (*See* Declaration of Beau McGraw ("McGraw Decl.") ¶ 9, June 20, 2018, Docket No. 241, Ex. 7 ("Lange Dep.") at 25, Docket No. 248.) Second, just six days after Doe received notice of the decision, Baughman emailed Lange, asking if Doe had appealed the decision and stating that she didn't see any of the grounds for appeal being applicable. (Lange Dep. at 26.)

Because Baughman and Lange were, respectively, the overseer of Doe's original investigation and the overseer of Doe's appeal, their contact in this case raises questions. At a minimum, it gives the impression that Lange was involved with the original disposition of the case, or that Baughman was priming Lange on the issue before Lange took up the appeal. Either is undesirable. Ideally, there is complete separation between the two levels of the adjudicatory process. However, the Court is unpersuaded that this contact indicates a breach of UST's duty of care. UST utilized an Appeal Board in this case, consisting of five members who were trained in UST's policies and had no role in the original adjudication. The Appeal Board heard and considered the appeal, and ultimately recommended to Lange that it be denied. Thus, the contact between Lange and Baughman, while arguably improper, was likely harmless.

---

[5] Doe also takes issue with Crouse's statement in front of Baughman that the state "always" declines prosecution in "he said she said" cases. It is unclear what Doe thinks was wrong with this statement, and it seems to simply reflect the reality that criminal prosecutions come with a high standard of proof that often provides a barrier for sexual assault claimants.

-18-

Although the Court finds that UST owed John Doe a duty of reasonable care, even considering all of the facts in a light most favorable to Doe, Doe cannot show a genuine issue of material fact as to UST's alleged breach. The Court therefore concludes that no reasonable jury could decide that UST breached its duty of care. As such, Doe "fails to make a showing sufficient to establish the existence of an element essential" of his case. Accordingly, the Court will grant summary judgment for UST.[6]

## ORDER

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that UST's Motion for Summary Judgment [Docket No. 128] is **GRANTED**.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

DATED: February 21, 2019                       s/John R. Tunheim
at Minneapolis, Minnesota.                      JOHN R. TUNHEIM
                                                Chief Judge
                                                United States District Court

---

[6] UST alternatively argues for summary judgment based on Doe's failure to identify an expert. UST contends that an expert is required in cases such as this. As the Court grants summary judgment because Doe cannot establish breach, it need not reach the expert issue. Nevertheless, the Court notes that an expert is not always necessary in cases involving standards of care. Generally, "when the standard of care centers around the exercise of professional judgment, it must be proven by expert testimony." *A.M.J. v. Royalton Pub. Sch.*, Civ. No. 05-2541, 2006 WL 3626979, at *3 (D. Minn. Dec. 12, 2006). "[I]f it would be speculative for the factfinder to decide the issue of negligence without having the benefit of expert testimony on the standard of care, the expert testimony is necessary." *Atwater Creamery Co. v. W. Nat. Mut. Ins. Co.*, 366 N.W.2d 271, 279 (Minn. 1985). In the present case, a jury would be asked whether the university exercised reasonable care in conducting its disciplinary proceeding. This question necessarily centers around issues like fairness and impartiality, issues that the average citizen can consider without the help of an expert. Were the Court to decide this issue, the Court would likely find an expert to be unnecessary.

# UNITED STATES DISTRICT COURT
## District of Minnesota

John Doe,

               Plaintiff(s),

v.

University of St. Thomas,

               Defendant(s).

### JUDGMENT IN A CIVIL CASE

Case Number:   16-cv-1127 (JRT/DTS)

☒ **Decision by Court**. This action came to trial or hearing before the Court. The issues have been tried or heard and a decision has been rendered.

IT IS ORDERED AND ADJUDGED THAT:

UST's Motion for Summary Judgment [Docket No. 128] is **GRANTED**.

Date:  February 21, 2019

KATE M. FOGARTY, CLERK

s/Jennifer Beck
(By)  Jennifer Beck, Deputy Clerk