**Appeal Case No. 19-1594**

**UNITED STATES COURT OF APPEALS**
**FOR THE EIGHT CIRCUIT**

*JOHN DOE, APPELLANT*
*v.*
*UNIV. OF ST. THOMAS, APPELLEE*

_____
Appeal from the United States District Court of Minnesota
Case No: 16-cv-1127 (JRT/DTS)

---

**BRIEF OF APPELLANT JOHN DOE**

---

For Appellant John Doe:

Beau D. McGraw (31190X)
McGraw Law Firm, P.A.
10390 39th St. North, Suite 3
Lake Elmo, MN 55042
651.209.3200 phone
beau@mcgrawlawfirm.com


Eric J. Rosenberg (0069958)
Rosenberg & Ball Co. LPA
395 North Pearl Street
Granville, Ohio 43023
740.644.1027 phone
erosenberg@rosenbergball.com

1

# SUMMARY OF THE CASE

Appellant John Doe ("John") filed suit against University of Saint Thomas ("UST") asserting state law claims and Title IX claims. John's claims stemmed from UST's erroneous discipline of John after UST student Jane ("Jane") falsely accused John of engaging in sexual misconduct. All John's claims, except for John's negligence claim, were dismissed pursuant to FRCP 12(b)(6). The District Court then dismissed John's negligence claim in summary judgment after erroneously determining UST did not breach its duty: "to create and administer a process that was fair and impartial to both" John and Jane. (A.41).

The District Court's determination was erroneous because UST breached its duty by manifesting a bias in favor of students who accuse others of sexual misconduct ("Accusing Students"). This bias was established in part by: (a) UST training employees to believe Accusing Students tell the truth 90% to 98% of the time even if they "provide inconsistent explanations of assault" and/or "deliberately omit[] details" related to allegations against other Students ("Accused Students") (A.50-51), and (b) the District Court acknowledged UST manifested a "bias[] in favor of the" Accusing Students that cut "against" Accused Students (A.12).

This Court has not previously addressed the negligence duty owed by universities such as UST, to their students. Therefore, John requests 20 minutes per side for oral argument.

Appellate Case: 19-1594    Page: 2    Date Filed: 05/22/2019 Entry ID: 4790373

# TABLE OF CONTENTS

SUMMARY OF THE CASE..................................................................... 2

TABLE OF AUTHORITIES ................................................................. 4

JURISDICTIONAL STATEMENT ........................................................ 7

STATEMENT OF THE ISSUES ON APPEAL ...................................... 8

STATEMENT OF THE CASE ............................................................... 9

SUMMARY OF THE ARGUMENT ..................................................... 11

ARGUMENT....................................................................................... 13

      I.    Standard of Review............................................................. 13

      II.    UST's Unlawful Bias Against Accused Students Prohibits the
Dismissal of John's Negligence Claims. ....................................... 14

      III.   UST's Bias in Favor of Accusing Students Breached its Negligence
Duty Obligations Owed John Under UST Policies. .................................... 15

      IV.   UST Breached its Negligence Duty by Enforcing a UST Policy That
Prohibited John's Cross Examination of Jane. ................................. 44

      V.    The District Court Abused Its Discretion When It Prohibited John
From Taking Jane's Deposition................................................. 51

CONCLUSION.................................................................................... 55

Appellate Case: 19-1594   Page: 3   Date Filed: 05/22/2019 Entry ID: 4790373

# TABLE OF AUTHORITIES

## CASES

*Abbariao v. Hamline University School of Law*, 258 N.W.2d 108 (Minn. 1977) .................................................................................................................. passim

*Austin v. Univ. of Oregon*, 205 F. Supp. 3d 1214 (D. Or. 2016) ............................ 42

*Ballard v. Heinman,* 548 F.3d 1132 (8th Cir. 2008) ................................................. 54

*Blake v. M.J. Optical Inc.,* 870 F.3d 820 (8th Cir. 2017) ......................................... 12

*Chapa v. United States,* 497 F.3d 883, 887 (8th Cir. 2007) ......................... 8, 13, 51

*de Llano v. Berglund*, 282 F.3d 1031 (8th Cir. 2002) .............................................. 37

*Doe v. Allee,* 2019 Cal. App. LEXIS 8 (Cal. App. 2d Dist. January 4, 2019) ........ 47

*Doe v. Amherst Coll.*, 238 F. Supp. 3d 195 (D. Mass. 2017) ................................. 42

*Doe v. Baum*, 903 F.3d 575 (6th Cir. 2018) ............................................................. 46

*Doe v. Brandies Univ.*, 177 F.Supp.3d 561 (D. Mass. 2016) ............................ 38, 39

*Doe v. Claremont McKenna College,* 236 Cal.Rptr.3d 655 (Cali. 2nd App. Dist. Aug. 8, 2018) ......................................................................................................... 47

*Doe v. Columbia Coll. Chicago*, 299 F.Supp.3d 939 (N.D. Ill. 2017) .................. 42

*Doe v. Marymount Univ.,* 297 F.Supp.3d 573 (E.D.VA. Mar. 14, 2018) .............. 47

*Doe v. Trustees of Boston College*, 892 F.3d 67 (1st Cir. 2018) ...................... 40, 41

*Doe v. Univ. of Southern Mississippi,* No.2:18-cv-1 (S.D.E.D. Miss., Sept. 26, 2018) ....................................................................................................................... 49

*Doe v. Univ. of Cincinnati*, 173 F. Supp. 3d 586 (S.D. Ohio 2016) ................. 42, 43

*Doe v. University of Southern California*, 28 Cal.App.5th 26 (2018) ................... 47

*Doe v. Westmont College,* No. B287799, (CA.Ct.App., April 23, 2019) ... 39, 40, 47

*Doe v. Miami Univ.* 882 F.3d 579 (6th Cir. 2018) ................................................... 48

*Doe v. Ohio State Univ.*, 219 F. Supp. 3d 645 (S.D. Ohio 2016) .......................... 18

*Doe v. Penn. St. Univ.,* No.17-cv-1315, 2017 WL 3581672 (M.D.Pa. Aug. 18, 2017) ....................................................................................................................... 48

*Doe v. The Penn. State Univ.* No. 4:18-cv-164, Docket 27 (M.D. Pa. Aug. 21, 2018) ....................................................................................................................... 49

*Doe v. The Regents of The Univ. of Cali.,* No. B283229 2nd App. Dist. 6th Div. (Oct. 9. 2018) ........................................................................................................ 49

*Doe v. The Trustees of The Univ. of Penn.,* No.16-5088, 2017 WL 4049033 (E.D. Pa. Sept. 13, 2017) ................................................................................................ 17

*Doe v. the Univ. of Colorado, Boulder,* No. 1:18-cv-02243-LTB, 2019 WL 764568 (D. Co. Feb. 21, 2019) ............................................................................ 17, 48

*Doe v. Univ. of Cinn.* No.16-4693, 2017 WL 4228791 (6th Cir. Sept. 25, 2017) ... 48

*Doe v. Univ. of Mich.,* No.2:18-cv-11776-AJT-EAS, Docket 30 (E.D.S.D. Mich. July 6, 2018) .......................................................................................................... 50

4

*Doe v. Univ. of Mississippi,* No. 3:16-CV-63-DPJ-FKB, 2018 WL 3570229
(S.D.Miss. July 24, 2018) ............................................................. 16

*Domagala v. Rolland*, 805 N.W.2d 14 (Minn. 2011) ...................................... 15

*Fairway Center Corp. v. U.I.P Corp.,* 502 F.2d 1135 (8th Cir. 1974) ............... 55

*Foss v. Kincaide*, 766 N.W.2d 317 (Minn. 2009) ......................................... 15

*Gibson v. Berryhill*, 411 U.S. 564 (1973) ............................................... 38

*Gomes v. Univ. of Maine Sys.*, 365 F. Supp. 2d 6 (D. Me. 2005) ................... 37, 38

*Gorman v. Univ. of R.I.,* 837 F.2d 7 (1st Cir. 1988) ................................ 41

*Hessel v. O'Hearn*, 977 F.2d 299 (7th Cir. 1992) ....................................... 18

*In re Murchison*, 349 U.S. 133 (1955) ................................................... 38

*Jane Roe v. Javaune Adams-Gaton,* Case No. 17-cv-945-EAS-CMV (S.D.E.D. Oh.
April 17, 2018) ....................................................................... 49

*Keefe v. Adams*, 840 F.3d 523 (8th Cir. 2016) ....................................... 7

Krulewich v. United States, 336 U.S. 440 (1949) ....................................... 18

*Lee v. Univ. of New Mexico,* No.1:17-cv-01230, Doc. 36 (N.M. Sept. 20, 2018).. 50

*Mathews v. Eldridge*, 424 U.S. 319 (1976) ............................................... 7

*McDonnell v. Cisneros*, 84 F.3d 256 (7th Cir. 1996) ................................... 18

*Oliver v. Univ. of Tx. Southwestern Med. Sch.,* NO. 3:18-CV-1549-B, 2019 WL
536376 (N.D. Tx. Feb. 11, 2019) ...................................................... 48

*Powell v. Montana State Univ.,* No. 2:17-cv-15 SEH, Docket 134 (MT Dec. 21,
2018) ................................................................................. 47

*Richmond v. Fowlkes*, 228 F.3d 854 (8th Cir. 2000) ................................ 37

*Robinson v. Univ. of Minnesota*, No. A17-1620, 2018 WL 4395020 (Minn. Ct.
App. Sept. 17, 2018) ................................................................. 37

*Rollins v. Cardinal Strich Univ.*, 626 N.W.2d 464 (Minn. App. 2001) ............... 14

*Rooney v. Rock-Tenn Converting Co.,* 879 F.3d 1111 (8th Cir. 2018)............. 12, 13

*ServiceMaster of St. Cloud v. GAB Business Services, Inc.,* 544 N.W.2d 302
(Minn. 1996) ......................................................................... 16

*Smock v. Bd. of Regents of the Univ. of Mich.* 353 F.Supp.3d 651 (E.D. Mich.
2018) ................................................................................. 49

*State Farm Fire and Cas. v. Aquila Inc.*, 718 N.W.2d 879 (Minn. 2006) ............. 15

*State Farm Mut. Auto Ins. Co. v. Village of Isle*, 122 N.W.2d 36 (Minn. 1963).... 16

*Thomas v. Eastman Kodak Co.*, 183 F.3d 38 (1st Cir. 1999) ............................ 19

## STATUTES

20 U.S.C. §1681 ........................................................................... 6

28 U.S.C. § 1651 .......................................................................... 6

28 U.S.C. § 2201 .......................................................................... 6

28 U.S.C. § 2202 .......................................................................... 6

Appellate Case: 19-1594    Page: 5    Date Filed: 05/22/2019 Entry ID: 4790373

**OTHER AUTHORITIES**

Audrey J. Lee, *Unconscious Bias Theory in Employment Discrimination,* 40 Harv. C.R.-C.L.L. Rev. 481 (2005) .............................................................. 20

Christine L. Ruva & Michelle A. LeVasseur, *Behind Closed Doors: The Effect of Pretrial Publicity on Jury Deliberations*, 18 Psychol., Crime, & L. 431 (2012) 18

Emily Yoffe, *The Bad Science Behind Campus Response to Sexual Assault*, THE ATLANTIC, Sept. 8, 2017. .............................................................. 20

Linda Hamilton Krieger, *The Content of Our Categories: A Cognitive Bias Approach to Discrimination and Equal Employment Opportunity*, 47 Stan. L. Rev. 1161, 1119 (1995) ..................................................................... 19

Appellate Case: 19-1594     Page: 6     Date Filed: 05/22/2019 Entry ID: 4790373

# JURISDICTIONAL STATEMENT

On March 19, 2019, in Appendix ("A.") (A.61), John appealed the following Orders by United States District Court For Minnesota ("District Court") in Case No.16-cv-01127:

1. District Court's March 1, 2017 in A.1 granting UST's motion to dismiss Counts I-V of John's Amended Complaint ("AC") found at A.125;

2. District Court's Aug. 6, 2018 Order in A.22 denying John's motion to compel contained in A.59 ("MTC") and John's motion to file an amended complaint in A.60;

3. District Court's Feb. 21, 2019 Orders in A.30 and judgment granting UST's motion for summary judgment ("UST's MSJ") regarding John's negligence claim which culminated in a Judgment against John (items 1 -3 collectively referred to as "Appealed Orders").

This Court and the District Court possess jurisdiction of the Appealed Orders in this case under Title IX of the Educational Amendments of 1972, 20 U.S.C. §1681, *et seq.* Diversity and supplemental jurisdiction also exist pursuant to 20 U.S.C. §§ 1681-1688; 28 U.S.C. § 2201; 28 U.S.C. § 2202; and 28 U.S.C. § 1651 in part because: (a) John is not a citizen of Minnesota; (b) UST is a corporation incorporated in Minnesota with its principal place of business in Minnesota; (c) John's state law claims arise from the same case or controversy under Article III of

Appellate Case: 19-1594    Page: 7    Date Filed: 05/22/2019 Entry ID: 4790373

the U.S. Constitution; and (d) John's state law claims seek damages in excess of $75,000, exclusive of costs and interest.

## <u>STATEMENT OF THE ISSUES ON APPEAL</u>

Whether the District Court erred in dismissing John's negligence claim because disputed facts exist regarding whether UST breached its duties to John by administering a biased disciplinary process that: (a) unfairly favored Accusing Students like Jane over Accused Students like John, and (b) failed to afford the procedural due process protections necessary for addressing allegations of sexual misconduct.

- *Keefe v. Adams*, 840 F.3d 523 (8th Cir. 2016); and

- *Abbariao v. Hamline University School of Law*, 258 N.W.2d 108 (Minn. 1977); and

- *Mathews v. Eldridge*, 424 U.S. 319 (1976).

Whether the District Court abused its discretion in denying John's motion to take Jane's deposition, which John sought in order to elicit facts related to UST's MSJ by establishing further evidence of how UST's biased disciplinary process: (a) unfairly favored Accusing Students like Jane over Accused Students like John, and (b) failed to afford the procedural due process protections necessary for addressing allegations of sexual misconduct.

- *Chapa v. United States,* 497 F.3d 883, 887 (8th Cir. 2007).

# STATEMENT OF THE CASE

John and Jane engaged in consensual sexual contact, that did not include sexual intercourse, on the night of December 11th and the morning of December 12, 2015. A.229-230. Nevertheless, Jane filed reports with UST and law enforcement that falsely alleged her sexual interactions with John were non-consensual. A.243-244; A.205-209. Ramsey County Attorney's Office declined to prosecute John after an independent investigation of its own,[1] UST erroneously determined John violated UST's *Sexual Misconduct Policy and Procedures* Manual ("UST Policies") and suspended Plaintiff from UST. A.262-264.

After this suspension, John filed a complaint asserting state law claims and Title IX claims because of UST's erroneous discipline of John. *See generally,* A.125-181 (containing AC). Following UST's FRCP 12 (b)(6) motion, the District Court dismissed all of John's claims except for his negligence claim. (A.1-21). To gather evidence to refute UST's MSJ regarding John's negligence claim, John requested permission to take Jane's deposition. A.59 (containing John's Motion to Compel) ("John's MTC") and A.551 (containing John's Memorandum of Law in Support of Motion to Compel Discovery). The District Court denied John's request. (A.27-29).

---

[1] A.212; (Crouse Dep.) A.321-322.

9

In evaluating UST's MSJ, the District Court defined the duty that UST owed John as the:

> obligation to create and administer a process that was *fair and impartial to both parties* . . . and [to] provide some measure of *due process* in the proceeding to ensure that an accurate outcome was achieved . . . [via] '*procedural protections as the particular situation demands*.'" (A.41) (citing *Abbariao v. Hamline University School of Law*, 258 N.W.2d 108, 110-113 (Minn. 1977); *Keefe v. Adams*, 840 F.3d 523, 535 (8th Cir. 2016) and *Mathews v. Eldridge*, 424 U.S. 319, 334 (1976)(emphasis added) ("Negligence Duty").

In establishing UST's breach of this Negligence Duty, John detailed, among other things, how UST trained its employees to believe Accusing Students tell the truth 90% to 98% of the time even if they "provide inconsistent explanations of assault" and/or "deliberately omit[] details" related to allegations against Accused Students. (A.50-51). This type of evidence likely caused the District Court's acknowledgement that UST likely manifested a bias "against" Accused Students when Accusing Students like Jane make allegations of sexual misconduct. (A.12). Nonetheless, the District Court dismissed John's negligence claim in response to UST's MSJ. (A.30-48). John maintains this decision was in error because UST breached its duties to John by administering a biased disciplinary process that: (a) unfairly favored Accusing Students like Jane over Accused Students like John, and (b) failed to afford the procedural due process protections necessary for addressing allegations of sexual misconduct.

Appellate Case: 19-1594    Page: 10    Date Filed: 05/22/2019 Entry ID: 4790373

Although John's Notice of Appeal in A.61 involved other issues, John subsequently narrowed this appeal to only the two issues detailed in the *Statement of Issues On Appeal.*

## SUMMARY OF THE ARGUMENT

John and Jane engaged in consensual sexual conduct, which did not include intercourse, while the two were first-semester, first-year students at UST. Instead of the truth vindicating John in a fair and impartial disciplinary proceeding, UST allowed its bias against Accused Students ("Bias Against Accused Students") to erroneously brand John a sexual offender and thereby significantly limit his future personal, educational and occupational opportunities.

Yet, after acknowledging UST likely manifested "bias[] in favor of" Accusing Students like Jane (A.12), the District Court erroneously dismissed John's negligence claim. This was a mistake because John presented facts that a reasonable juror would likely determine proved UST breached its Negligence Duty to provide John with a "fair and impartial" disciplinary proceeding with appropriate "due process" protections. (A.41)(detailing Negligence Duty). These facts include UST's decision to deny Accused Students like John basic due process protections, such as the ability to cross-examine Jane in a hearing setting. (Crouse Dep.) A.338-339.

11

Similarly, a reasonable juror would likely find UST violated its Negligence Duty by training its investigators and adjudicators to favor Accusing Students from the moment they make an allegation because UST claims these is almost no chance Accusing Students fabricate allegations of sexual misconduct. UST trained its investigators and adjudicators to believe: (a) only 2% to 10% of Accusing Students' sexual assault allegations are false (A.50); (b) Accusing Students tell the truth even if they "provide inconsistent explanations of assault" and/or "deliberately omit[] details" related to allegations against Accused Students (A.51); partly because (c) "51% of college males admit perpetrating one or more sexual assaults during college." (A.53).

As detailed below, UST's training caused the investigators and adjudicators in this case to manifest a Bias Against Accused Students so strong that it eliminated UST's ability to satisfy the Negligence Duty established by the Minnesota Supreme Court's *Abbariao* decision. (A.41)(discussing *Abbariao*'s requirement of fair and impartial disciplinary proceedings).

The impact that UST's Training Materials had on UST's investigators and adjudicators is akin to the impact jury instructions have on a jury in a criminal trial. Jury instructions are designed to ensure jurors render verdicts based on factors like the fair and impartial due process mandates expressed in *Abbariao. Abbariao,* 258 N.W.2d at 110-113. Therefore, reasonable jurors would likely conclude UST

Appellate Case: 19-1594    Page: 12    Date Filed: 05/22/2019 Entry ID: 4790373

violated its Negligence Duty because it goes without saying that no court would permit jury instructions that told jurors in a criminal case: (a) victims of crime tell the truth 90 to 98% of the time, and that (b) jurors must believe crime victims even if they provide "inconsistent" testimony or "deliberately omit[] details" that undermine their allegations against criminal defendants.

As a result, John respectfully requests this Court determine that only a jury can pass judgment on the sufficiency of the disputed facts underlying John's negligence claim.

Additionally, John requests this Court find that the District Court abused its discretion by prohibiting John's taking of Jane's deposition. Jane's deposition would have provided additional evidence of how UST's training materials culminated in the violation of the Negligence Duty by manifesting a profound bias in favor of Accusing Students like Jane.

## **ARGUMENT**

### I.   **Standard of Review.**

This appeal involves two standards of review. Regarding the District Court's granting of UST's MSJ, this Court conducts a *de novo* review. *Rooney v. Rock-Tenn Converting Co.,* 879 F.3d 1111, 1115 (8th Cir. 2018)(citing *Blake v. M.J. Optical Inc.,* 870 F.3d 820, 825 (8th Cir. 2017). This Court should affirm the District Court's summary judgment decision only if "there is no genuine dispute as to any material

Appellate Case: 19-1594    Page: 13    Date Filed: 05/22/2019 Entry ID: 4790373

fact." *Id.* In "assessing whether such a dispute exists, [this Court must] view the evidence in the light most favorable to [John] and afford him all reasonable inferences." *Id.* Moreover, this Court must reverse the District Court if there is "enough evidence to allow a rational trier of fact to find for [John] on the required elements of his claims." *Id.*

The District Court's prohibition of Jane's deposition is reviewed under a different standard - abuse of discretion. *Fairway Center Corp. v. U.I.P Corp.,* 502 F.2d 1135, 1143 (8th Cir. 1974)(finding no abuse of discretion in denial of party's request to take a deposition when moving party "offer[ed] no valid excuse for not having taken the desired depositions prior to the *last day of the trial*.")(emphasis added). John establishes an "abuse of discretion" if the District Court's "judgment was based on clearly erroneous factual findings or erroneous legal conclusions." *Chapa v. United States,* 497 F.3d 883, 887 (8th Cir. 2007).

## II.   UST's Unlawful Bias Against Accused Students Prohibits the Dismissal of John's Negligence Claims.

In *Abbariao,* the Minnesota Supreme Court established that students arbitrarily disciplined by private universities have a remedy in "common law" based on "the due process clause of the Federal Constitution." *Abbariao,* 258 N.W.2d at 110-113. *Abbariao* noted courts should "intervene and direct" universities like UST "to treat" students "fairly" if discipline is imposed in an "arbitrary" manner. *Id.,* 112 (citations omitted). This finding clearly established that students attending private

14

colleges and universities do not check their constitutional rights at the door of the school.

The District Court correctly acknowledged *Abbariao's* role in determining the Negligence Duty. (A.36-48)(evaluating UST's "duty of care" within the context of *Abbariao* and *Rollins v. Cardinal Stritch Univ.*, 626 N.W.2d 464 (Minn. App. 2001)). The District Court also appropriately looked to the Supreme Court's *Mathews* decision to define UST's "duty" as requiring UST: "create and administer a process that was *fair and impartial to both*" John and Jane with enough "*due process* . . . to ensure that an accurate outcome . . . .was reached." (A.41)(emphasis added).[2]

The District Court explained that the Negligence Duty triggered the U.S. Supreme Court's *Mathews* requirement that "something more than the arbitrary standard" must be applied when evaluating a private university's "due process" type of obligations in "disciplinary actions based on student misconduct". (A.40). Nevertheless, as detailed below, the District Court misapplied the Negligence Duty in dismissing John's negligence.

## III. UST's Bias in Favor of Accusing Students Breached its Negligence Duty Obligations Owed John Under UST Policies.

---

[2] The District Court accurately determined UST owed this duty to John regardless of whether he was expelled or suspended. A.38, fn.3.

15

At the outset, the District Court correctly noted: "bias certainly provides some indication that a university failed to use reasonable care . . . [because] fundamental to any fair investigation and hearing is that the tribunal is unbiased and the outcome not predetermined." (A.42). Here, disputed material facts exist regarding whether UST's training materials caused UST to violate the Negligence Duty by teaching its employees to manifest impermissible bias in favor of Accusing Students like Jane at the expense of Accused Students like John.

John's negligence claim consists of four elements: "(1) the existence of a duty of care; (2) a breach of that duty; (3) an injury was sustained; and (4) breach of the duty was the proximate cause of the injury." *State Farm Fire and Cas. v. Aquila Inc.*, 718 N.W.2d 879, 887 (Minn. 2006). Minnesota law imposes "a general duty of reasonable care when the defendant's own conduct creates a foreseeable risk of injury to a foreseeable plaintiff." *Domagala v. Rolland*, 805 N.W.2d 14, 23 (Minn. 2011).

The existence and scope of UST's legal duty is generally a question of law for the court, but where there are issues of foreseeability involved, these issues must be submitted to a jury. *Foss v. Kincaide*, 766 N.W.2d 317, 320 (Minn. 2009). As detailed below, John satisfies these elements because UST's bias in favor of Accused Students like Jane proximately caused its breach of its Negligence Duty which culminated in John's injury – a suspension from UST; limiting his ability to achieve

16

his future personal, educational and occupational goals by branding him a sexual offender; and causing severe emotional distress.[3]

While UST's decision to undertake a disciplinary process, coupled with UST's Policies, form the basis for the existence of UST's duty, UST's Policies and due process court decisions are instructive in evaluating UST's breach of the Negligence Duty. *See e.g., Abbariao* 258 N.W.2d at 110-113; *ServiceMaster of St. Cloud v. GAB Business Services, Inc.,* 544 N.W.2d 302, 307 (Minn. 1996) (stating that in determining if a duty exists, courts look to contractual relationships, applicable statutes, the common law, and the conduct of the parties).

Many courts have refused to dismiss claims made by students like John when they allege that training materials caused their universities to manifest a bias in favor of Accusing Students. One example is *Doe v. Univ. of Mississippi,* No. 3:16-CV-

---

[3] Beyond the suspension UST imposed, John sustained the loss of a $17,000.00 scholarship that had a value of $51,000.00 over his remaining three years at UST. A.266 (containing October 24, 2017 email to Maren Grier). That being said, John need not establish economic damages to advance a negligence claim when "there has been some conduct on the part of defendant constituting a direct invasion of the plaintiff's rights such as that constituting slander, libel, malicious prosecution, seduction or other like willful, wanton, or malicious conduct." *State Farm Mut. Auto Ins. Co. v. Village of Isle*, 122 N.W.2d 36, 41 (Minn. 1963). Here, UST's breach of the Negligence Duty involves slanderous and/or libelous conduct because it amounted to a direct attack on John's character. Moreover, it will not be difficult for a jury to understand how John suffered serious emotional impact as a result of UST's actions, particularly after hearing from John's treating psychiatrist regarding John's diagnosis, including the physical symptoms.

17

63-DPJ-FKB, 2018 WL 3570229 (S.D.Miss. July 24, 2018). The *Univ. of Mississippi* refused to dismiss a Title IX claim, in part, because the university's Title IX training materials "might suggest bias" favoring accusing students. *Id.,* *4-7. A district court in Colorado reached the same conclusion in *Doe v. the Univ. of Colorado, Boulder,* No. 1:18-cv-02243-LTB, 2019 WL 764568 (D. Co. Feb. 21, 2019) when the court denied the motion to dismiss a male plaintiff's Title IX claim because the plaintiff alleged the university's "trauma-informed" practices favored female Accusing Students. *Id.,* *9.

Similarly, a district court in Pennsylvania refused to dismiss a male plaintiff's contract claim in part because his university's policies required investigators and adjudicators be trained "to provide a process that is 'free of bias.'" *Doe v. The Trustees of The Univ. of Penn.,* No.16-5088, 2017 WL 4049033 *10 (E.D. Pa. Sept. 13, 2017). The court found this plaintiff advanced a valid breach of this requirement because he alleged the university's training did: "not promote fairness and impartiality' and, instead, 'undermine[d] principles of impartiality, favor[ed] complainants (typically female), and [created] biase[d] proceedings against respondents (typically male)." *Id.* The court noted this breach may have occurred because University of Pennsylvania trained it employees that: (a) "victims 'recount[ing] a sexual assault somewhat differently from one retelling to the next", and (b) claims of "false accusations of rape are not common." *Id.*

18

A district court in Ohio also addressed concerns about bias in training materials used by The Ohio State University. In doing so, it noted biased sexual misconduct training can overcome the "presumption" that university employees acted with "honesty and integrity" in disciplining a student for alleged sexual misconduct. *Doe v. Ohio State Univ.*, 219 F. Supp. 3d 645, 658 (S.D. Ohio 2016).

Such concerns are appropriate because training materials are like negative pretrial publicity that can bias jurors' decisions. *See, e.g.,* Christine L. Ruva & Michelle A. LeVasseur, *Behind Closed Doors: The Effect of Pretrial Publicity on Jury Deliberations*, 18 Psychol., Crime, & L. 431 (2012)(discussing how anti-defendant pretrial publicity can cause jurors to construe evidence in favor of the prosecution. In fact, federal courts routinely issue decisions that prohibit the type of collective guilt espoused in UST's Training Materials. For instance, in *Krulewich v. United States*, Justice Robert H. Jackson famously issued a concurring decision requiring criminal defendants be tried separately by observing: "it is difficult for the individual to make his own case stand on its own merits in the minds of jurors who are ready to believe that birds of a feather are flocked together." 336 U.S. 440, 454 (1949) Judge Posner of the Seventh Circuit noted collective punishment is "not … a part of our law." *Hessel v. O'Hearn*, 977 F.2d 299, 305 (7th Cir. 1992)(Posner, J.). And, the Seventh Circuit's *McDonnell* decision determined an employer engaged in impermissible "collective punishment" when it disciplined a group of

Appellate Case: 19-1594    Page: 19    Date Filed: 05/22/2019 Entry ID: 4790373

people in retaliation for one of them filing a Title VII complaint. *McDonnell v. Cisneros*, 84 F.3d 256, 262 (7th Cir. 1996).

The harmful impact of collective bias is also addressed in *Thomas v. Eastman Kodak Co.*, 183 F.3d 38 (1st Cir. 1999). *Thomas* reversed a district court's decision granting summary judgment to an employer in a Title VII case. *Id.* In doing so, *Thomas* noted:

> The concept of "stereotyping" includes not only simple beliefs such as "women are not aggressive" but also a host of more subtle cognitive phenomena which can skew perceptions and judgments. *Price Waterhouse* highlighted one such phenomenon: the tendency of "unique" employees (that is, single employees belonging to a protected class, such as a single female or a single minority in the pool of employees) to be evaluated more harshly in a subjective evaluation process. *Id.,* 61.

In detailing the discriminatory impact of this "stereotyping," *Thomas* cited Stanford University Professor Linda Hamilton Krieger's research in: *The Content of Our Categories: A Cognitive Bias Approach to Discrimination and Equal Employment Opportunity*. *Id.*

Professor Krieger's research detailed how: "discrimination is premised on the notion that intergroup bias is motivational in origin" and can therefore occur when organizations have facially "neutral policies." Linda Hamilton Krieger, *The Content of Our Categories: A Cognitive Bias Approach to Discrimination and Equal Employment Opportunity*, 47 Stan. L. Rev. 1161, 1119 (1995). Professor Krieger

Appellate Case: 19-1594     Page: 20     Date Filed: 05/22/2019 Entry ID: 4790373

details how: "[o]nce activated" this bias "will profoundly affect how we interpret a person's subsequent behavior, what about that behavior we remember, and how we use the behavior in judging the person later." *Id.* 1202. Reasonable triers of fact inherently understand the impact bias has when evaluating a person's actions for culpability. As a result, a jury would likely find UST's Training Materials biased UST's Relevant Employees to find Accused Students like John guilty.

The noted Harvard Law Professor Audrey J. Lee, in her work entitled, "*Unconscious Bias Theory in Employment Discrimination*" provides a rationale for why the bias in UST's Training Materials would have likely caused UST's Relevant Employees to manifest a bias in favor of Accusing Students. Specifically, Professor Lee noted discrimination is "specifically tied to the human cognitive process for receiving and storing information." Audrey J. Lee, *Unconscious Bias Theory in Employment Discrimination,* 40 Harv. C.R.-C.L.L. Rev. 481 (2005). This is because "[r]esearchers have demonstrated that individuals tend to process incoming information by relying on cognitive shortcuts—in essence, stereotypes." *Id.* And, this "[b]ias against another . . . begins to occur at the point when new information is processed by the individual, such as upon a first meeting, and continues with each interaction between two people." *Id.*

The impact of training materials on university employees' propensity to believe Accusing Students over Accused Students is described by Harvard Law

21

School Professor Emily Yoffe. Emily Yoffe, *The Bad Science Behind Campus Response to Sexual Assault*, THE ATLANTIC, Sept. 8, 2017. This law professor determined that Harvard's training materials were: "100% aimed to convince [adjudicators] to believe complainants, precisely *when* they seem unreliable and incoherent." *Id*. A reasonable juror reviewing UST's training materials would likely reach a similar conclusion since these training materials instructed UST employees to believe Accusing Students even when they give unreliable and inconsistent testimony.

In evaluating the impact of UST's Training Materials on John's case, it is instructive to note that those who were primarily involved in John's discipline were all UST employees without any legal background. All, with the exception of Factfinder Giebenhain, who is a professor, are administrative staff employed by UST. These UST employees were: (a) Title IX Coordinator Nora Fitzpatrick ("Fitzpatrick"); (b) Response Manager and Dean of Students Linda Baughman ("Baughman"); (c) Appeal Officer and Vice President Karen Lange ("Lange"); (c) Jane's Process Advisor and Assistant Dean of Students Sharon Howell ("Howell"); (d) Investigator and Director of Communication and Training for Student Affairs, Vern Klobassa ("Klobassa"); and (e) Investigator and Professor of Psychopathology Jean Giebenhain ("Giebenhain") (Giebenhain and Klobassa are herein referred to as "Factfinder[s]"); (Fitzpatrick, Baughman, and Lange are collectively referred to as

22

"Adjudicators"); Fitzpatrick, Baughman, Lange, Howell, Klobassa, and Giebenhain (collectively referred to as "Relevant UST Employees").

Fitzpatrick, as Title IX Coordinator, was responsible for ensuring all UST employees involved in sexual misconduct disciplinary proceedings were appropriately trained on at least an annual basis. (Fitzpatrick Dep.) A.423-424; A.425-429; A.431.   Deposition testimony revealed that the Relevant UST Employees received training both internally and externally with trainings being offered internally on a monthly basis. (Fitzpatrick Dep.)  A.434-438; A.428; A.429-430;  A.423-424; A.425; A.426; A.429; A.432; A.433; (Pulles Dep.) A.376-377; A.378;  A.379;  A.380;  (Klobassa Dep.)  A.443-444;  A.445-446;  A.446-447; (Giebenhain Dep.) A.504-506; A.507-509; A.509; (Baughman Dep.) A.382-389; A.390; A.391-393; A.394-396; A.400; (Lange Dep.) A.343-344; A.345-348; A.348-351; A.352; A.353-361; A.362-363; A.364-365;  (Howell Dep.) A.416; (Crouse Dep.) A.313-320.

The UST training materials were requested in plaintiff John's initial discovery requests. Defendant refused to provide the requested training materials ("UST Training Materials") until ordered to do so by the District Court.  A.561 (containing Court's Order). It was only after John had already taken the depositions of most of UST's Relevant Employees that the training materials were produced due to the Court's Order.  UST's Training Materials are incorporated into UST Policies

23

because they qualify as UST "policies, procedures, and practices" that guide UST's handling of allegations of sexual misconduct. For instance, Fitzpatrick was required to review the Factfinders' report to determine if it was "consistent with" UST's "policies, procedures, and practices." *Id.* Here, a reasonable juror would likely find that UST's Training Materials qualify as UST's "policies, procedures, and practices."

A reasonable trier of fact also would likely conclude UST's Training Materials violated UST's Negligence Duty because these materials trained the Factfinders and Adjudicators to believe:

a. Accusing Students make false allegations of sexual misconduct only 2% to 10% of the time. (A.50)(containing page from *Sexual Misconduct Policy Appeal Process* - authored by Fitzpatrick).[4]

b. "51% of college males admit perpetrating one or more sexual assaults during college." (A.53)(containing page from *Recognizing and Working with Stalking Victims*).

c. Accusing Students like Jane should be believed even when their allegations are "inconsistent" and "deliberately omit[] details" that undermine allegations against Accused Students like John. (A.51)(containing page from Sexual Misconduct Policy Appeal Process- authored by Fitzpatrick).[5]

UST's bias in favor or Accusing Students is also manifested in UST's

---

[4] Although Fitzpatrick's presentation postdated John's appeal, Fitzpatrick indicated the same general PowerPoint presentation would have been given in John's case as well. (Fitzpatrick Dep.) A.436-441.

[5] *Id.*

Appellate Case: 19-1594    Page: 24    Date Filed: 05/22/2019 Entry ID: 4790373

Training Materials which included a template for ruling against Accused Students like John. A.271-272 (containing UST Factfinders & Process Advisor Training: Writing Investigative Reports, General Counsel – authored by Abigail Crouse ("Crouse") and Rachel Harris ("Harris")). The template instructed UST employees how to draft a Fact Finder Report that found an Accused Student had violated UST Policies because his testimony lacked credibility. *Id.* UST provided no similar template for finding Accused Students innocent. *Id.*

Similarly, UST's Training Materials taught UST employees to instruct Accusing Students like Jane about the "[i]mportance of preserving physical evidence." UST provided Jane with this critical information but did not provide this guidance to John. (Baughman Dep.) A.397-399 (discussing significant differences in UST communications with John and Jane wherein Jane was provided additional services as the Accusing Student such as mental health counseling, advocacy assistance, academic support and Jane's ability to request interim sanctions against John).

Instead, UST informed John's Counsel that if he was found to be conducting his own investigation this would "hurt the witnesses' credibility and [would] likely [] hurt the credibility of [his] client if [John's Counsel] is seen as trying to influence their testimony." (Crouse Dep., discussing Dep. Ex.22) A.332-337. UST also attempted to impede John's defense by telling him that he should not talk to

25

witnesses or gather evidence. (Crouse Dep., discussing Exhibit 22) A.332-337; A.328-329; A.341 (Exhibit 22) (Lange Dep., discussing Exhibit 29) A.366-367; A.547 (Exhibit 29).

It wasn't until after the Factfinders were deposed in December 2017 and January 2018, that John discovered how UST's Training Materials eliminated any chance of his obtaining the fair and impartial process mandated by *Abbariao*. 258 N.W.2d 110-113. Only through the depositions did John learn that Jane had lied to the Factfinders. To wit: Jane told Factfinders that after she walked John downstairs to the exit door -- and John walked out of the door -- she went down to the exit door to make sure that it was shut, because she wanted to make sure John couldn't get back in the building. (Klobassa Dep.) A.486; A.486-488; A.486-488; (Giebenhain Dep.) A.536.

The Factfinders included this allegation in the Factfinding Report that was then relied upon by the Adjudicators. (Factfinders' Report) A.279. But, Klobassa and Giebenhain knew Jane's allegation was false because Klobassa reviewed the security camera footage of John leaving through the dorm's exit door and verified that Jane never went to check the exit door to be sure it had locked behind John. (Klobassa Dep., discussing Exhibit 58) A.500; A.549 (Exhibit 58); (Giebenhain Dep.) A.534-540.

As a result, reasonable jurors would likely determine UST's Training

Appellate Case: 19-1594    Page: 26    Date Filed: 05/22/2019 Entry ID: 4790373

Materials caused the Factfinders and UST Relevant Employees to actively deny John knowledge of, and access to, the exculpatory evidence that conclusively established Jane lied about following John to the exit door to the dorm and then, after he was gone, again went back to the exit door to be sure the door was shut and locked behind him. (Crouse Dep.) A.325-331; (Klobassa Dep., discussing Exhibit 58) A.500-502; A.491-492; A.217; A.549 (Exhibit 58). It is also likely reasonable jurors would attribute the denial of John's access to exculpatory evidence to UST's Training Materials, which instructed the Factfinders to believe Jane's version of events even if she provided "inconsistent" testimony that undermined her credibility. (A.51); (Giebenhain Dep.) A.515-533.

A reasonable trier of fact would reach the same conclusion about the Factfinders' handling of other demonstrably false allegations by Jane. One such false claim involved Jane's allegation that her roommate would not have heard John sexually assault her in their shared bathroom because the roommate was a heavy sleeper and asleep at that time. (Klobassa Dep.) A.467-469; (Giebenhain Dep.) A.524-530; A.532-533. The Factfinders included Jane's allegation about her roommate being asleep in the Factfinder Report provided to the Adjudicators. (Factfinders' Report) A.278. The factfinders found all the witnesses to be credible. They did so even though Jane's roommate told the Factfinders: (a) she was awake when Jane came into her room and she talked with Jane while John was in the

Appellate Case: 19-1594    Page: 27    Date Filed: 05/22/2019 Entry ID: 4790373

bathroom;[6] (b) she heard John flush the toilet and the water run in their bathroom;[7] (c) she knew Jane entered the bathroom, without knocking, while John was still in the bathroom. Furthermore, Jane's roommate clearly established that (d) she did not hear any sounds or disturbance coming from the bathroom.

The testimony of Jane's roommate clearly established Jane was not being truthful about the events in question. Her roommate's testimony established that she was awake, spoke with Jane, noted no distress on Jane's part and was nonchalantly texting friends while Jane and John were in the bathroom. A.287. Jane's roommate also testified that she would have heard if someone was being pushed around in the bathroom, but she heard nothing at all. *Id.*

In addition to the exculpatory evidence, and Jane's outright fabrications, she also deliberately omitted facts that disproved her allegations. For example, Jane initially failed to inform the Factfinders that she had engaged in the consensual touching of John's penis. (Klobassa Dep.) A.451-456; A.457-472; A.477-494; (Giebenhain Dep.) A.533. Jane not only touched John's penis, she did so in a manner which left John's penis clearly abraded and bruised. A.282. Yet, the Factfinders' Report never mentioned these facts that favored John. (Factfinder Report) A.273-300.

---

[6] (Klobassa Dep.) A.467-469; (Giebenhain Dep.) A.532-533.

[7] (Klobassa Dep.) A.474-476; (Giebenhain Dep.) A.532-533.

Appellate Case: 19-1594   Page: 28   Date Filed: 05/22/2019 Entry ID: 4790373

The deliberate omissions of the above exculpatory facts are even more concerning because, contrary to what Jane told law enforcement, she never told the Factfinders how just prior to the alleged sexual assault: (a) she walked across campus holding John's hand; (b) she had voluntarily straddled John in the dorm lounge; and (c) "made out" with John in the lounge. (Klobassa Dep.) A.458-466; (Giebenhain Dep.) A.515-517; A.521-523.

Nevertheless, during their depositions, the Factfinders suggested these omitted facts were not particularly troublesome to them. Giebenhain's oft-repeated response to questioning regarding Jane's failure to provide the details of her actions to the factfinders was "[s]he was telling her story." (Geibenhain Dep.) A.516; A.517; A.520; A.533; A.534; A.536; A.537; A.538; A.540; A.544. Similarly, factfinder Klobassa's flat response was: "[i]t did not look like we documented that, no." (Klobassa Dep.) A.466; A.458; A.460; A.461; A.462; A.467; A.470; A.471; A.472; A.473.

It becomes clear that the ability of the Factfinders to assess credibility and to conduct a fair and impartial investigation was severely limited by the bias found within UST's Training Materials. Both of the Factfinders underwent extensive training on the use of the FETI (Forensic Experiential Trauma Interview) approach to investigations. (Giebenhain Dep.) A.509; (Klobassa Dep.) A.448-450. The training on this interview technique was given to all the UST Relevant Employees,

29

and stresses that they should expect that a Complainant will omit significant details, and that the Complainant's "story" will not make sense and will be contradictory. (Defendant's Responses to Plaintiff's First Interrogatories) A.69. This training taught that the deliberate omission of information and inconsistency in retelling the story is proof that an Accusing Student has been victimized and should be believed. (FETI Training) A.562-563 ("when a person is stressed or traumatized, inconsistent statements are not only the norm, but sometimes strong evidence that the memory was encoded in the context of severe stress or trauma"). (Giebenhain Dep.) A.509.

Reasonable jurors reviewing these facts would likely find the Factfinders violated the Negligence Duty because they destroyed John's chance of obtaining the fair and impartial disciplinary hearing mandated by *Abbariao.* 258 N.W.2d 110-113. This is partly because Factfinders found Jane credible even though she repeatedly made false, misleading, and/or contradicted statements that severely undermined her allegations against John. (Klobassa Dep.) A.491-495; (Giebenhain Depo.) A.534-538; A.543-545.

This would be especially true if jurors learned how the Factfinders failed to challenge or question Jane's false, misleading, and/or inconsistent testimony. For instance, during Giebenhain's deposition, she explained how she responded to inconsistencies in Jane's testimony. In doing so, Giebenhain repeatedly maintained the Factfinders: (a) role was to give Jane the opportunity for her to tell her story, and

Appellate Case: 19-1594    Page: 30    Date Filed: 05/22/2019 Entry ID: 4790373

that (b) all that was asked of Jane was to "tell her story." (Giebenhain Dep.)A.530; A.517; A.516; A.520; A.533; A.534.

When the number of errors and inconsistencies in Jane's testimony were pointed out to Klobassa, he merely noted: "I think it's typical that there are inconsistencies that arise in these types of cases." (Klobassa Dep.) A.451; A.469. Despite this whitewashing of critical exculpatory facts, the Factfinders harbored doubts about Jane's credibility that never appear in the Factfinders' Report. Specifically, Giebenhain wrote Klobassa a comment on a draft of the report that stated:

> I suppose when we have [Jane] come back in we really need to get her to commit to "telling the truth" as we did with John, and we need to directly ask her about touching him. We might even need to tell her that he has photos, and that he told people immediately after the incident about it. Does that make sense? Is it okay for us to share that information? I assume it is okay because they will be reading the reports? What do you think? If she says that she did, then that is pretty big regarding her credibility. (Klobassa Dep. discussing Giebenhain Dep., discussing Exhibit 59) A.495; A.546 (Exhibit 59).

Despite the above concern about Jane's "credibility," both Giebenhain and Klobassa maintained that Jane was "credible" and included this finding in the Factfinders' Report. A.295-297; (Giebenhain Dep.) A.528. Klobassa attempted to distance himself from Jane's defective testimony by alleging the events in the bathroom were the "most salient" issues to him. (Klobassa Dep.) A.497-499.

The information detailed above proves that even though UST's Policies may

31

appear facially neutral, any neutrality was undermined and annulled by the bias found in UST's Training Materials. The UST Training Materials taught UST's Relevant Employees that Accusing Students like Jane: (a) almost never make false allegations, and (b) are credible even if they provide "inconsistent" testimony or "deliberately omit[] details" that undermine their allegations against Accused Students like John. A.51.

Therefore, a reasonable juror evaluating UST's Training Materials, would likely find UST violated the Negligence Duty in at least four ways. First, UST's Training Materials made it nearly impossible for UST's Factfinders to honor UST's Policy requirement that they conduct an "*impartial* inquiry into the facts of the allegations." (UST Sexual Misconduct Policy) A.79. The Factfinders could not be "impartial" if they began investigations mandated to believe that allegations of sexual misconduct are only false 2% to 10% of the time. A.50-58.

Second, reasonable triers of fact would likely find UST's Training Materials caused the Factfinders to erroneously believe Jane was telling the truth even though she provided inconsistent testimony and deliberately omitted evidence proving John was innocent. These triers of fact would reach this conclusion because UST Policy gave Factfinders the power to limit investigations to materials "they deem relevant." A.80 (stating: "[a]t a minimum, the Factfinders…will seek to obtain all information, documentation and materials the Factfinder(s) deem relevant to the investigation.").

Appellate Case: 19-1594    Page: 32    Date Filed: 05/22/2019 Entry ID: 4790373

Here, UST's Training Materials taught the Factfinders that Jane's "inconsistent" testimony and "deliberate[]" omission of "details" was not relevant because Accusing Students should be believed if they engage in these practices. (A.51). On the other hand, triers of fact would likely find Jane's "inconsistent" testimony and "deliberate[]" omission of "details" that suggested John was innocent should have been included in the Factfinders' Report to achieve the fair and impartial investigation mandated by *Abbariao.* 258 N.W.2d 110-113.

Third, reasonable jurors would likely find UST's Training Materials required Fitzpatrick, Lange, and UST's Appeal Board to affirm the Factfinder's errors above. For, UST Policies required Fitzpatrick to evaluate the Factfinders' report pursuant to UST's Training materials. A.78. And, requiring that Fitzpatrick evaluate the Factfinders' Report to determine if it was "consistent with St. Thomas policies, practices and procedures" and "take appropriate action" only if it violated these policies, practices, and procedures. A.80.

Fourth, reasonable triers of fact would likely find UST's Training materials caused Lange and UST's Appeal Board to find it was impossible for John to satisfy UST's "arbitrary and capricious" standard for reversing the Factfinders' Report. This is because UST's policies and procedures instructed Lange and UST's Appeal Board to believe Accusing Students like Jane as they tell the truth 90 to 98% of the time even if they provide "inconsistent" testimony or "deliberately omit[] details" that

33

undermine their allegations against Accused Students like John. (A.50-58)(containing selections of UST's Training Materials).

It is very likely that reasonable triers of fact would reach this conclusion in part because - even before it was known whether John would file an appeal - Baughman informed Lange by email that there were likely no grounds for the Appeal Board to grant John's appeal. (Lange Dep., discussing Exhibit 31) A.371-372; A.374 (Exhibit 31). Further, despite being the Appeal Officer, Lange was actively involved in the process of drafting the final disposition report authored by Baughman. (Lange Dep., discussing Exhibit 30) A.369-372; A.373 (Exhibit 30). These facts troubled the District Court which noted:

> the Court does believe that UST acted improperly on two occasions. First, while Dean Baughman was writing the final disposition letter to John to inform him of the Factfinder's determination and the punishment she was imposing, she sent a draft to VP Lange, who would go on to be the Appeal Officer, and asked for suggestions or edits. Second, just six days after John received notice of the decision, Baughman emailed Lange, asking if John had appealed the decision and stating that she didn't see any of the grounds for appeal being applicable. Because Baughman and Lange were, respectively, the overseer of John's original investigation and the overseer of John's appeal, their contact in this case raises questions. At a minimum, it gives the impression that Lange was involved with the original disposition of the case, or that Baughman was priming Lange on the issue before Lange took up the appeal. Either is undesirable. Ideally, there is complete separation between the two levels of the adjudicatory process. (A.46-47)(citations omitted).

The direct involvement of Lange in the drafting of Baughman's final disposition report, and then presiding over the appeal of the final disposition report,

34

is akin to the Appellate Court inserting themselves into a ruling by the District Court, and then presiding over the appeal of that District Court's order.

It is hard to imagine how triers of fact could fail to conclude that the afore-mentioned conduct of UST's Relevant Employees violated the fair and impartial mandates of the Negligence Duty because John also detailed how:

- UST prejudiced John's ability to defend himself by only allowing him to view a heavily redacted version of the Factfinder's Report.

- UST's Assistant General Counsel Crouse stated, in front of Baughman, that Crouse was not at all surprised that John was not criminally prosecuted because the prosecutors "always" decline to prosecute "he said she said cases." A.311 (Declaration of John's father who heard Crouse's comment); (Crouse Dep.) A.321-323 (containing Crouse's testimony that she did not recall saying "he said she said" but recalled making some explanation upon learning there was to be no prosecution by Ramsey County); and

- Baughman - who would ultimately decide John's punishment - was in near constant communication with Howell who told Baughman how hard the process was on Jane and how strong and courageous Jane was. (Howell Dep., discussing Exhibit 47) A.420; A.417-419; A.421 (Exhibit 47); (Baughman Dep.) A.401; A.404-406; A.406-413.

The interplay between UST's biased training materials and the conduct of UST's Relevant Employees proves the District Court erred when it concluded UST adequately confronted Jane about "inconsistencies" in her claims against John. (A.46). Reasonable jurors would reach this conclusion because UST's Training Materials caused the Factfinders and Adjudicators to manifest a Bias Against Accused Students so strong it eliminated John's chance of obtaining the fair and

Appellate Case: 19-1594    Page: 35    Date Filed: 05/22/2019 Entry ID: 4790373

impartial disciplinary hearing mandated by *Abbariao*.  258 N.W.2d 110-113.

As a result, John requests this Court remand this case to the District Court to allow jurors to decide if UST violated its Negligence Duty.  This is necessary in part because the District Court rejected John's request to take Jane's deposition.  *Infra,* p.52-56 (discussing same).  John sought Jane's deposition to rebut claims in UST's MSJ that alleged UST's Training Materials did not manifest a bias in favor of Jane during her interactions with UST's Relevant Employees.  *Id.*  In addition, Jane's deposition was necessary because some of UST's Relevant Employees did not keep notes of their interactions with Jane and their recollections were incomplete and likely inaccurate. *Id.* 55-55.

The District Court's decision to deny John the opportunity to depose Jane might have been harmless if the District Court determined a jury had to rule on the Negligent Duty question.  Instead, the District Court dismissed John's negligence claim even though Jane's testimony would likely have provided additional proof that UST violated its Negligence Duty.  In fact, if Jane was deposed, John would likely have provided extra evidence disproving the District Court's following erroneous findings:

- "Even considering all of the facts in a light most favorable to John. . . [t]he Court . . . concludes that no reasonable jury could decide that UST breached its duty of care." (A.48);

- " . . . . most of the facts John cites as evidence of breach are either mischaracterized or otherwise fail to establish that UST did not exercise

36

reasonable care . . . ." (A.45-46); and

- "John has not provided any facts suggesting that those involved in his adjudication process were actually biased against him; nowhere does he show any connection between the training that UST administrators were given and bias in his specific case." (A.43).

Stated another way, a reasonable trier of fact would likely have found that by taking Jane's deposition John would have been able to establish UST's breach of the Negligence Duty by proving that Relevant UST Employees enforced UST's Policy in a biased, unfair, or impartial manner. (A.44)(noting John can establish UST breached a duty owed if UST "fail[ed] to . . . use reasonable care" in the application of its "policies" in its handling of John's disciplinary proceeding).

The error in the District Court's dismissal also manifests its finding regarding whether UST was "entitled to a presumption of honesty and integrity . . . ." (A.42). UST is not entitled to this presumption because UST's bias in favor of Accusing Students distinguishes this case from the three decisions the District Court cited in support of its finding that UST was entitled to the presumption. (A.42)(discussing *Richmond v. Fowlkes*, 228 F.3d 854 (8th Cir. 2000); *Robinson v. Univ. of Minnesota*, No. A17-1620, 2018 WL 4395020 (Minn. Ct. App. Sept. 17, 2018); *de Llano v. Berglund*, 282 F.3d 1031 (8th Cir. 2002). The plaintiffs in the above cases could not overcome the presumption of honesty and integrity because they could not establish the university officials acted with bias. *Richmond* 228 F.3d at 858-59 (dismissing due process claim on summary judgment because student failed to establish disputed

37

material fact suggesting university administrators' bias overcame a presumption of honesty and integrity); *de Llano v. Berglund*, 282 F.3d at 1035-36 (same); *Robinson* 2018 WL 4395020 * 3 (rejecting due process certiorari appeal because student failed to establish university administrators' bias overcame a presumption of honesty and integrity).

The District Court's reliance on the *Gomes v. Univ. of Maine Sys.,* decision is also distinguishable. (A.42-43)(discussing *Gomes v. Univ. of Maine Sys.*, 365 F. Supp. 2d 6 (D. Me. 2005). The District Court correctly noted *Gomes* found "the mere fact that a hearing board chair had participated in sexual assault victim advocacy programs was insufficient to prove bias." *Id.* But, the District Court neglected to mention the summary judgment decision in *Gomes* was granted because the plaintiffs: "failed to make a showing that, as a result of her experience and affiliations, [the hearing board chair] demonstrated any bias against [plaintiffs] during the hearing." *Gomes,* 365 F. Supp. 2d, at 32. Unlike the plaintiff in *Gomes*, John has established the existence of disputed material facts that could cause reasonable jurors to determine UST's biased training materials compelled UST's employees to manifest a bias that violated UST's Negligence Duty.

Instead of looking to these cases, the District Court should have looked to U.S. Supreme Court decisions that comment on the importance of impartial investigators and adjudicators. For instance, the U.S. Supreme Court observed "[o]ur system of

38

law . . . has always endeavored to prevent even the probability of unfairness" by not allowing judges to even appear biased. *In re Murchison*, 349 U.S. 133, 136 (1955). The Supreme Court found the requirement of fair and unbiased adjudicators "applies with equal force to…administrative adjudicators." *Gibson v. Berryhill*, 411 U.S. 564, 579 (1973).

The District Court could also have evaluated the Negligence Duty according to *Doe v. Brandeis Univ.*, 177 F.Supp.3d 561 (D. Mass. 2016). John directed the District Court to the *Brandeis* decision because it was instructive on how courts view allegations of university bias in favor of Accusing Students. A.85-87 (discussing *Brandeis Univ.*, 177 F.Supp.3d 561). *Brandeis* echoes *Abbariao's* Negligence Duty by noting courts should evaluate disciplinary decisions: "to determine whether [they] provided "basic fairness" to the student . . . with some minimum level of fair play." *Brandeis Univ.*, 177 F.Supp.3d at 572.

More importantly, *Brandeis* speaks directly to why UST violated its Negligence Duty by training employees that Accusing Students' allegations of sexual misconduct are only false 2% to 10% of the time. (A.50-58). Specifically, *Brandeis* noted:

> Whether someone is a "victim" is a conclusion to be reached at the end of a fair process, not an assumption to be made at the beginning. Each case must be decided on its own merits, according to its own facts. If a college student is to be marked for life as a sexual predator, it is reasonable to require that he be provided a fair opportunity to defend

Appellate Case: 19-1594     Page: 39     Date Filed: 05/22/2019 Entry ID: 4790373

himself and an impartial arbiter to make that decision. *Brandeis Univ.*, 177 F.Supp.3d at 573.

*Brandeis* drove home this critical point by stating: "[p]ut simply, a fair determination of the facts requires a fair process, not tilted to favor a particular outcome, and a fair and neutral fact-finder, not predisposed to reach a particular outcome." *Id.* (emphasis added).

A very recent case, *Doe v. Westmont College,* No. B287799, (CA.Ct.App., April 23, 2019); A.100, also provides guidance and weight to John's argument UST violated its Duty of Care. In the *Westmont College* case, the California Court of Appeals found that the college's "investigation and adjudication of Jane's accusation was fatally flawed. Westmont did not provide John with a fair hearing; indeed, it did not comply with its own policies and procedures. The Panel withheld material evidence from John, which its policies required it to turn over." *Id.*, at *2.

The facts in the *Westmont Case* are remarkably similar to those here. The student/plaintiff in *Westmont* was denied access to significant and potentially exculpatory evidence[8] just as John herein was denied the video surveillance tapes which objectively demonstrated that Jane was being deceitful or dishonest. A.54; (Crouse Dep., discussing Exhibit 21) A.324-331; A.340 (Exhibit 21).

---

[8]*Doe v. Westmont College,* No. B287799, p. 13, 15-17 (CA.Ct.App., April 23, 2019) A.100.

Appellate Case: 19-1594    Page: 40    Date Filed: 05/22/2019 Entry ID: 4790373

Additional support for remanding this case is found in the First Circuit's *Boston College* decision. *Doe v. Trustees of Boston College*, 892 F.3d 67 (1st Cir. 2018). *Boston College* addressed a breach of contract claim filed by a student disciplined for allegedly engaging in sexual misconduct. *Id. Boston College* reversed a summary judgment decision because a university dean may have violated the university handbook's "fair procedure" provision. *Id.,* 86. This violation stemmed from the Dean's comments that could be interpreted as suggesting adjudicators "give special treatment" to a student who testified against plaintiff after he was charged with sexual misconduct. *Id.* This "special treatment" is similar to how UST violated its Negligence Duty when UST's Relevant Employees provided Jane a similar type of "special treatment" based on biased training mandates.

*Boston College* is also applicable in how it addressed the presumption of honesty and integrity discussed in the District Court's decision. *Boston College* addressed "a presumption of impartiality that favors university administrators in disputes with students. *Id.,* 84 (quoting *Gorman v. Univ. of R.I.,* 837 F.2d 7, 15 (1st Cir. 1988). *Boston College* relied on this presumption in rejecting plaintiff's contract claim based on an adjudicator's alleged hostility towards plaintiff during his disciplinary proceedings. *Id.* However, this was because the plaintiff's sole basis for alleging bias was the adjudicators' tone towards [plaintiff] during the disciplinary proceedings. *Id.*

Appellate Case: 19-1594   Page: 41   Date Filed: 05/22/2019 Entry ID: 4790373

Nevertheless, *Boston College* noted the plaintiff could have rebutted this "presumption" if he had produced "other evidence of bias showing that the Board was either prejudiced or partial against John." *Id.* In this case, the requisite type of additional evidence exists and is found in the bias created by the UST's Training Materials and the resulting decision of UST's Relevant Employees to disregard false statements and deliberate omissions by Jane. A.50-58.

*Boston College* and *Brandeis* highlight the error in the District Court's finding that no dispute of material fact existed regarding whether UST's Training Materials contributed to UST's breach of its Negligence Duty. The District Court reached this erroneous decision by citing the Sixth Circuit's *Univ. of Cincinnati* decision. A.43(quoting *Doe v. Univ. of Cincinnati*, 173 F. Supp. 3d 586, 602 (S.D. Ohio 2016)). In particular, the District Court noted how *Univ. of Cincinnati* commended "training materials" that serve the: "laudable goal . . . .[of raising] the awareness of its faculty and staff to sexual assault and to increase their sensitivity to the particular problems that victims of sexual violence experience in coming forward to make complaints." *Id.* This case differs from *Univ. of Cincinnati.* For, a reasonable juror would likely believe UST's Relevant Employees were trained to believe there was almost no chance Jane fabricated her allegations against John even if she provided "inconsistent" testimony and she "deliberately omit[]ted details" that undermined those allegations. A.50-58.

42

In response, UST may repeat its argument that the decisions in *Columbia Coll. Chicago, Amherst Coll.,* and *Austin* prove UST did not violate its Negligence Duty. *Doe v. Columbia Coll. Chicago*, 299 F.Supp.3d 939 (N.D. Ill. 2017); *Doe v. Amherst Coll.*, 238 F. Supp. 3d 195 (D. Mass. 2017); and *Austin v. Univ. of Oregon*, 205 F. Supp. 3d 1214 (D. Or. 2016). These cases are distinguishable. *Columbia Coll.* and *Amherst Coll.* rejected negligence claims because plaintiffs could not establish the "special relationship" necessary to establish a negligence duty under Illinois and Massachusetts law. *Columbia Coll. Chicago*, 299 F.Supp.3d at 692-63. *Doe v. Amherst Coll.*, 238 F. Supp. 3d 195, 228 (D. Mass. 2017); *Amherst Coll.*, 238 F. Supp. 3d., at 228.

Here, Minnesota does not define UST's duties pursuant to Illinois' and Massachusetts' "special relationship" test. Instead, the Negligence Duty required UST provide John a fair and unbiased disciplinary proceeding with constitutional due process type protections. A.41. As a result, the *Austin* decision cited by the District Court is also distinguishable as it rejected a negligence claim because Oregon law requires plaintiffs to establish lost income damages to establish the "special relationship" needed to advance a negligence claim.

In a back-up argument, UST may seek safe harbor in the District Court's finding that UST employees should be commended for addressing "particular problems that victims of sexual violence experience." A.43(quoting *Univ. of*

43

*Cincinnati*, 173 F. Supp. 3d at 602).   This goal is commendable in many circumstances.   However, the *Abbariao* based Negligence Duty precluded UST from manifesting such bias in adjudicating allegations of sexual misconduct.   This is because disputed facts suggest UST's Training Materials caused Fact Finders and Adjudicators to violate the Negligence Duty's mandate that UST create a process that was: "*fair and impartial* to both parties . . . and [to] provide some measure of *due process* . . . ."  (A.41.

Stated another way, UST's Training Materials served as the jury instructions the Fact Finders and Adjudicators used to judge John.  And no court would sanction jury instructions that told jurors: (a) victims of crime tell the truth 90 to 98% of the time, or that (b) jurors must believe crime victims even if they provide "inconsistent" testimony or "deliberately omit[] details" that undermine their allegations against criminal defendants. A.50-58.

Based on the aforementioned law and facts, John requests this Court remand this case to the District Court to allow jurors to decide if UST violated its Negligence Duty.

## IV.   **UST Breached its Negligence Duty by Enforcing a UST Policy That Prohibited John's Cross Examination of Jane.**

The District Court appropriately determined UST could violate its "Negligence Duty" based on rights not afforded in UST policies. A.45.  Specifically, the District Court noted it was "entirely plausible that UST . . . could breach its duty

44

of care without violating its policies, if the application of those policies does not provide reasonable care . . . [and thereby] breach [a] duty of reasonable care." *Id.* For example, the District Court noted students like John were entitled to "due process" protections stemming from the Supreme Court's due process decision in *Mathews*. A.41(detailing how *Keefe*, 840 F.3d at 535's quotation of *Mathews* 424 U.S. at 334 serves a foundation for the Negligence Duty.

The fundamental need for John to have access to some form of cross-examination of Jane is clearly demonstrated by the flawed "investigation" conducted by the UST Factfinders. The Factfinders' Report clearly shows that Jane was not questioned by the Factfinders about her many inconsistencies and omissions. If the Factfinders did question Jane at the time, they neither: (a) detailed her answers in the Factfinder Report, nor (b) recalled asking Jane about the rampant inconsistencies in her testimony. A.279; (Klobassa Dep.) A.453-455; A.455-456; A.458-459; A.460-461; A.462-467; A.467-472; (Giebenhain Dep.) A.511-513; A.517-518; A.519; A.522; A.529-530; A.534-538.

Therefore, the District Court erred in determining the UST Policy complied with due process standards of care related to issues such as cross-examination. This error is highlighted in the District Court's erroneous finding that no reasonable juror could find UST's Policy unlawfully prohibited John from "conducting his own investigation into the matter." A.46. The District Court reached this flawed

45

conclusion by finding the Factfinders adequately confronted Jane about "inconsistencies" in her claims against John during interviews John was not allowed to attend. (A.46.

The evidence detailed on pages 27-32 would likely cause a reasonable trier of fact to conclude Factfinders' private questioning of Jane did _not_ adequately confront her about "inconsistencies" in her claims against John. Moreover, the District Court's sanctioning of UST employees' covert and incomplete questioning of Jane cannot be reconciled with twenty-one court decisions that address the need for live cross-examination in Title IX proceedings.

Many of the twenty-one decisions looked to due process precedent like _Mathews_ to determine Title IX proceedings _cannot_ be fair and impartial without cross-examination in "he said, she said" cases of sexual misconduct. One example is the Sixth Circuit's decision in _Doe v. Baum_, 903 F.3d 575 (6th Cir. 2018). _Baum_ looked to _Mathews_ in holding:

> if a public university has to choose between competing narratives to resolve a case, the university _must give the accused student or his agent an opportunity to cross-examine the accuser and adverse witnesses in the presence of a neutral fact-finder_. _Id.,_ at 578 (emphasis added).

In reaching this decision, _Baum_ relied on _Mathews_ which weighs the competing interests of students and universities in evaluating whether cross examination is necessary. In weighing these interests, _Baum_ determined cross examination was necessary because:

46

"Time and again, this circuit has reiterated that students have a substantial interest at stake when it comes to school disciplinary hearings for sexual misconduct . . . Being labeled a sex offender by a university has both an immediate and lasting impact on a student's life. The student may be forced to withdraw from his classes and move out of his university housing. His personal relationships might suffer. And he could face difficulty obtaining educational and employment opportunities down the road, especially if he is expelled." *Baum*, 903 F.3d at 582 (internal citations omitted).

Although *Baum* involved a public university, at least five courts have determined cross-examination is necessary for fair adjudication of campus sexual misconduct allegations at *private* universities. Four of these cases come from California where - like Minnesota – private university students receive constitutional due process protections. *See, Doe v. University of Southern California,* 28 Cal.App.5th 26 (2018)(granting male plaintiff's writ of administrative mandate because private university did not allow cross-examination during Title IX disciplinary proceeding); *Doe v. Claremont McKenna College,* 236 Cal.Rptr.3d 655, 656 (Cali. 2nd App. Dist. Aug. 8, 2018)(same); *Doe v. Westmont College,* No. B287799, (CA.Ct.App., April 23, 2019)(A.100)(same); *Doe v. Allee,* 2019 Cal. App. LEXIS 8, *55, 56, 60 (Cal. App. 2d Dist. January 4, 2019)("We also agree with *Baum*'s holding extending the right of cross-examination to the questioning of witnesses other than the complainant where their credibility is critical to the fact-finder's determination."); *See also, Doe v. Marymount Univ.,* 297 F.Supp.3d 573, 584 (E.D.VA. Mar. 14, 2018)(rejecting motion to dismiss Title IX claim at private

47

university in part because private university denied plaintiff right to cross-examine his accuser in Title IX proceeding).

Similarly, at least fifteen other courts looked to Supreme Court decisions such as *Mathews* in determining the need for cross-examination in adjudications of sexual misconduct allegations at public schools. *Powell v. Montana State Univ.,* No. 2:17-cv-15 SEH, Docket 134, p.21 (MT Dec. 21, 2018)(citing lack of cross examination as basis for rejecting university's summary judgment motion to dismiss a procedural due process claim because "[i]f a university is faced with competing narratives about potential misconduct, the administration must facilitate some form of cross-examination in order to satisfy due process."). *See, Powell v. Montana State Univ.,* No. 2:17-cv-15 SEH, Docket 134, p.21 (MT Dec. 21, 2018)(citing lack of cross examination as basis for rejecting university's summary judgment motion to dismiss a procedural due process claim because "[i]f a university is faced with competing narratives about potential misconduct, the administration must facilitate some form of cross-examination in order to satisfy due process."); *Doe v. Univ. of Cinn.* No.16-4693, 2017 WL 4228791, *5 (6th Cir. Sept. 25, 2017)(discussing need for cross-examination in Title IX disciplinary proceedings); *Doe v. Miami Univ.* 882 F.3d 579 (6th Cir. 2018)(same); *Nokes v. Miami Univ.,* No. 1:17-cv-482, 2017 WL 3674910, *10-12 (S.D.OH. Aug. 25, 2017)(same); *Doe v. Penn. St. Univ.,* No.17-cv-1315, 2017 WL 3581672, *7-8 (M.D.Pa. Aug. 18,

48

2017)(same); *Doe v. the Univ. of Colorado, Boulder,* Civil Case No. 1:18-cv-02243-LTB, 2019 WL 764568, *15 (D. Co. Feb. 21, 2019)(rejecting motion to dismiss due process claim because "the lack of a full hearing with cross-examination provides evidence supporting a claim for a violation of [plaintiff's] due process rights."); *Oliver v. Univ. of Tx. Southwestern Med. Sch.,* NO. 3:18-CV-1549-B, 2019 WL 536376, *13 (N.D. Tx. Feb. 11, 2019)(rejecting motion to dismiss procedural due process claim in part because university did not provide plaintiff with an opportunity to cross-examine plaintiff's accuser in a "live hearing."); *Doe v. The Regents of The Univ. of Cali.,* No. B283229 2nd App. Dist. 6th Div., p.2 (Oct. 9. 2018)(same); *Doe v. Univ. of Mississippi,* 361 F.Supp.3d 597, 611-13 (S.D. Miss. 2019)(rejecting motion to dismiss procedural due process claims based on university prohibiting plaintiff from cross-examining "witnesses whose accounts of the evening led to his discipline."); *Smock v. Bd. of Regents of the Univ. of Mich.* 353 F.Supp.3d 651, 657-58 (E.D. Mich. 2018)(rejecting motion to dismiss procedural due process claims based on university prohibiting plaintiff from cross-examining witnesses in disciplinary proceeding involving allegations of sexual misconduct); *Doe v. The Penn. State Univ.* No. 4:18-cv-164, Docket 27, Page Id.15-18 of 19, Memorandum Opinion (M.D. Pa. Aug. 21, 2018) (unreported) ( rejecting university's motion to dismiss male student's due process claim is based on concerns about lack of meaningful cross-examination); *Doe v. Univ. of Southern Mississippi,* No.2:18-cv-

49

153, Docket 35, p.5-7 (S.D.E.D. Miss., Sept. 26, 2018)(unreported)(enjoining ongoing sexual misconduct disciplinary proceeding because university violated plaintiff's due process rights by denying him the right to cross-examination); *Jane Roe v. Javaune Adams-Gaton,* Case No. 17-cv-945-EAS-CMV, Docket 46 (S.D.E.D. Oh. April 17, 2018)(unreported)(enjoining university from imposing Title IX disciplinary sanctions against plaintiff because her procedural due process rights were violated since she was unable to cross-examine her accusers and/or adverse witnesses during her university level disciplinary hearing); *Doe v. Univ. of Mich.,* No.2:18-cv-11776-AJT-EAS, Docket 30, PageId.743, 739 *Order Granting In Part and Denying In Part Plaintiff's Motion For Temporary Restraining Order And Preliminary Injunction* (E.D.S.D. Mich. July 6, 2018) (unreported)(enjoining disciplinary proceeding because university violated plaintiff's due process rights by not providing "the opportunity for a live hearing" where plaintiff could submit cross-examination questions to adjudicators to be asked of witnesses because "[w]ithout a live proceeding, the risk of an erroneous deprivation of Plaintiff's interest in his reputation, education, and employment is significant."); *Lee v. Univ. of New Mexico,* No.1:17-cv-01230, Doc. 36, p.2-3 (N.M. Sept. 20, 2018)(rejecting motion to dismiss student's due process claim because university prohibited him from cross-examining witnesses in "formal or evidentiary hearing" and because the court "conclude[d] that preponderance of the evidence may not be the proper standard for disciplinary

50

investigations . . . given the significant consequences for students found responsible for engaging in sexual misconduct).

All twenty-one decisions are applicable here because the District Court acknowledged constitutional "due process . . . principles apply equally" to the Negligence Duty. A.42. This is because *Abbariao* determined "[t]he requirements imposed by the common law on private universities parallel those imposed by the due process clause on public universities." *Id.*

Consequently, John requests this Court remand John's negligence claim because UST violated the due process standards of care by prohibiting John's cross-examination of Jane. To do otherwise would deny John a cornerstone of the due process foundation necessary for the fair and impartial mandates in the Negligence Duty.

## V.    The District Court Abused Its Discretion When It Prohibited John From Taking Jane's Deposition.

John requests this Court determine the District Court abused its discretion by rejecting John's motion to compel Jane's deposition. This is because the District Court's decision "was based on clearly erroneous factual findings or erroneous legal conclusions." *Chapa,* 497 F.3d 883 at 887 (defining "abuse of discretion" standard of review).

The District Court's rejection of Jane's deposition was based on erroneous factual findings and legal conclusions because it denied John the opportunity to

51

gather additional evidence to refute arguments in UST's MSJ. UST filed its motion for summary judgment on May 30, 2018. A.88/MSJ. Later that day, John filed John's MTC requesting the deposition of Jane. A59/John's MTC.

John's MTC addressed the District Court's 2017 initial decision granting Jane's motion to quash John's subpoena. A.90-99. John also detailed how the District Court "left open the possibility that as discovery progressed" it might "revisit[]" whether Jane's deposition could be taken. *Id.,* p.2. John's rationale included the following reasons why Jane's deposition was necessary to rebut the arguments against negligence in UST's MSJ:

- UST's Relevant Employees "contradicted each other on significant issues related to the investigation, the [F]actfinders' role and . . . the adjudicative decision . . . [as a result] Jane is the . . . person other than [John] with first-hand knowledge of many relevant facts" related to "investigation and the process used by" UST. *Id.;*

- John should be permitted to ask Jane the same types of questions UST's Counsel asked John during his deposition such as how "process and procedures" of UST's investigation unfolded; *Id.,* p.3.

John's Counsel addressed these concerns during the July 17, 2018 hearing on John's MTC. John's Counsel detailed how Jane's testimony was necessary to rebut "negligence" arguments in UST's MSJ. *See e.g.,* A.307 (detailing how John's Counsel requested Jane's deposition to address "the negligence part" of John's lawsuit against UST).

52

Similarly, John's Counsel explained the deposition would primarily focus on "process" questions related to Jane's interactions with UST employees and not her "dealings" with John. *Id.,* A.308-309. John sought to ask these questions to determine the impact UST's "training" had on how UST employees: "investigat[ed], and specifically question[ed Jane], and what deference [UST employees gave to] complaining witnesses in sexual misconduct type allegation cases." *Id.,* A.310.

John's Counsel explained these types of questions were warranted in part because John's deposition involved questions about his views on whether UST adhered to UST policies while investigating and adjudicating Jane's allegations. *Id.,* A.308-309. John's Counsel also described the need to ask Jane these questions because some UST employees that interacted with Jane did not keep notes of their conversations, and as a result, their recollections of these conversations were incomplete and likely inaccurate. *Id.,* A.307-309.

The aforementioned facts - along with the testimony and conduct of UST's Relevant Employees detailed in pages 27-32 detail why the District Court's refusal to permit Jane's deposition was an abuse of discretion pursuant to *Chapa.* 497 F.3d 883 at 887 (defining "abuse of discretion" standard of review). In particular, the District Court determined John did not need Jane's deposition testimony to respond to "negligence" arguments in UST's MSJ because John had: "already deposed the investigators and has had full access to all persons who conducted the investigation

he claims was flawed." A.28. This finding was based on clearly erroneous factual findings and legal conclusions for at least two reasons. First, the evidence and deposition testimony proves UST's Training Materials caused UST's Relevant Employees to manifest a bias in favor of an Accusing Student like Jane. Second, the deposition testimony of UST's Relevant Employees proved they did not recall much of their interactions with Jane and disregarded the importance of exculpatory evidence. (Klobassa Dep.) A.453-455; A.455-456; A.458-459; A.460-461; A.462-467; A.467-472; (Giebenhain Dep.) A.511-513; A.517-518; A.519; A.522; A.529-530; A.534-538. As a result, Jane was the only person who could provide clarity about how pronounced the bias in favor of Accusing Student was with regard to UST's Relevant Employees. Since this issue is the most dispositive fact in John's negligence claim, John requests this Court find the District Court abused its discretion by refusing to allow John to take Jane's deposition.

John requests this Court do so even though John's MTC did not explicitly reference FRCP 56(f). For, this Court's *Ballard* decision details why John's MTC and the District Court's rejection of that motion negated the need for a separate FRCP 56(f) motion. *Ballard v. Heinman,* 548 F.3d 1132 (8th Cir. 2008). *Ballard* determined a district court did not abuse its discretion by rejecting a plaintiff's request for additional discovery because plaintiff did not file a proper FRCP 56(f) motion. *Id.,* 1137. But, *Ballard* noted a FRCP 56(f) motion would not have been

necessary if plaintiff had filed a "motion to conduct discovery." As a result, John requests this Court find that John's MTC was the legal equivalent of a FRCP 56(f) motion. Such a finding is warranted because the District Court's rejection of Johns' MTC acknowledged that John sought Jane's testimony because it was "necessary to fully assess whether UST's investigation was conducted in a negligent manner." A.28.

Additionally, the timing of John's MTC distinguishes this case from this Court's *Fairway Center* decision. *Fairway Center Corp. v. U.I.P Corp.,* 502 F.2d 1135 (8th Cir. 1974). *Fairway Center* found no abuse of discretion in the denial of a party's request to take a deposition when the moving party "offer[ed] no valid excuse for not having taken the desired depositions prior to the *last day of the trial*." *Id.,* 1143 (emphasis added). Here, John's MTC occurred more than eight months before the District Court's February 2, 2019 decision on UST's MSJ.

Therefore, John respectfully requests this Court remand this case with instructions requiring the District Court allow for the taking of Jane's deposition.

## CONCLUSION

Based on the factual and legal positions detailed above, John respectfully requests this Court reverse the District Court's dismissal of John's negligence claim. To do otherwise would prohibit students of Minnesota's private institutions from seeking legal recourse when, in violation of the Negligence Duty, biased university

administrators brand students as sex offenders and destroy their reputations, future prospects for personal relationships, educational options and future employment opportunities.

Respectfully Submitted,

/s/ Eric Rosenberg
Eric Rosenberg (0069958)
Rosenberg & Ball Co. LPA
395 North Pearl Street
Granville, Ohio 43023
Phone: 740.644.1027
Fax 866.498.0811 fax
erosenberg@rosenbergball.com


/s/Beau D. McGraw
Beau D. McGraw, I.D. No.: 31190X
McGraw Law Firm, PA
10390 39th Street North, Suite 3
Lake Elmo, MN 55042
Telephone: (651) 209-3200
beau@mcgrawlawfirm.com

56

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to Federal Rule of Appellate Procedure 32(a)(7), I hereby certify that this brief is proportionally spaced, 14-point Times New Roman font. Per Microsoft Word software, the brief contains 12,727 words, excluding those parts exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii).

*/s/ Eric J. Rosenberg*
Counsel for Plaintiff-Appellant John Doe

Appellate Case: 19-1594    Page: 57    Date Filed: 05/22/2019 Entry ID: 4790373

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on May 21, 2019, a copy of the foregoing BRIEF OF APPELLANT was filed electronically with the Clerk of the Court using the CM/ECF system, which will send notice of such filing to all registered parties.

*/s/ Eric J. Rosenberg*
Counsel for Plaintiff-Appellant John Doe

58