# No. 19-1594

# In The
# United States Court of Appeals
# For the Eighth Circuit

---

JOHN DOE,

*Appellant,*

v.

UNIVERSITY OF ST. THOMAS

*Appellee.*

---

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MINNESOTA
CASE NO. 0:16-cv-1127 (JRT/DTS)
Hon. John R. Tunheim

---

## APPELLEE'S BRIEF

---

BRIGGS AND MORGAN, P.A.
David A. Schooler (#0225782)
Ellen A. Brinkman (#0386578)
Maren M. Forde (#0390221)
2200 IDS Center
80 South Eighth Street
Minneapolis, Minnesota 55402-2157
(612) 977-8400
dschooler@briggs.com
ebrinkman@briggs.com
mforde@briggs.com
*Attorneys for Appellee University of St.
Thomas*

## CORPORATE DISCLOSURE STATEMENT

Appellee University of St. Thomas ("UST") does not have a parent corporation, and no publicly held corporation owns 10 percent or more of its stock. *See* Fed. R. App. P. 26.1(a).

Appellate Case: 19-1594    Page: 2    Date Filed: 06/24/2019 Entry ID: 4800914

# TABLE OF CONTENTS
(continued)

**Page**

CORPORATE DISCLOSURE STATEMENT ....................................................i

TABLE OF AUTHORITIES .................................................................vi

STATEMENT OF THE ISSUES.............................................................1

STATEMENT OF THE CASE................................................................3

    A.    The Policy...........................................................................3

    B.    Individuals Involved in the Formal Resolution Process .....................6

        1.    Title IX coordinator ................................................6

        2.    Response manager ..................................................6

        3.    Process advisors ....................................................7

        4.    Factfinders.............................................................7

        5.    Appeal officer .......................................................9

        6.    Appeal board........................................................10

    C.    Investigation and Resolution of John's Reported Policy
        Violation ............................................................................11

        1.    UST receives a report of an alleged policy violation ..........11

        2.    Formal response process is initiated and investigation
            into the allegations is commenced under the Policy............12

            a.    Interim sanctions are imposed ........................13

            b.    Process advisors are appointed .......................13

            c.    Factfinders are appointed...............................13

            d.    Notices are sent to Jane and John ...................14

        3.    UST conducts a fair and impartial factfinding
            investigation .......................................................14

            a.    Commencement of the factfinding investigation ..........15

            b.    The factfinders interview Jane......................15

            c.    The factfinders interview John .....................16

            d.    Information provided by John and Jane to
               factfinders includes undisputed and disputed facts .......16

Appellate Case: 19-1594    Page: 3    Date Filed: 06/24/2019 Entry ID: 4800914

# TABLE OF CONTENTS
### (continued)

**Page**

     e.    Jane and John identify witnesses and evidence.............17

     f.    The factfinders visit Jane's residence hall and conduct witness interviews.............................................18

     g.    The factfinders conduct second interview with Jane ...................................................................19

     h.    The factfinders conduct second interview with John...................................................................20

   4.    The factfinders conclude it is more likely than not that John violated the Policy.......................................21

   5.    John unsuccessfully appeals the factfinders' conclusion ..............................................................22

D.    The District Court Action...................................................23

   1.    The district court determines that the deposition of Jane would be burdensome and irrelevant..........................23

   2.    The district court grants UST's motion for summary judgment as to John's remaining negligence claim.............24

E.    John's Mischaracterizations and Misrepresentations of the Record............................................................................25

**ARGUMENT** ........................................................................................27

I.    SUMMARY OF ARGUMENT................................................27

II.    STANDARD OF REVIEW ....................................................28

III.   THE DISTRICT COURT'S SUMMARY JUDGMENT ORDER SHOULD BE AFFIRMED, ON ALTERNATIVE GROUNDS, BECAUSE UST DID NOT OWE JOHN A COMMON LAW DUTY OF REASONABLE CARE ....................................................30

IV.   THE DISTRICT COURT CORRECTLY HELD THAT UST DID NOT BREACH ANY DUTY OF REASONABLE CARE..........................33

A.    John's Assertion of "Bias" is Based on a Mischaracterization of the District Court's Order and Applicable Law ...............................33

Appellate Case: 19-1594   Page: 4   Date Filed: 06/24/2019 Entry ID: 4800914

B.    The Undisputed Material Facts Support the District Court's Finding that Training Received by UST Officials Did Not Cause Actual Bias Against John ....................................................... 34

    1.    The case law cited by John to support his argument is inapposite ............................................................................ 36

    2.    John's mischaracterizations of training materials produced in discovery do not justify the reversal of the district court's summary judgment order ............................. 39

        a.    UST's appeal board training was not biased ................ 40

        b.    External training materials received by individual UST employees do not create a genuine issue of material fact as to whether UST acted with reasonable care................................................................ 41

        c.    Training that includes a case study in which factfinders find a policy violation does not create a genuine issue of material fact as to whether UST acted with reasonable care with respect to John............ 42

        d.    UST's compliance with state and federal law does not require reversal of the district court's summary judgment order................................................ 43

    3.    John's misrepresentations of the record are insufficient to create a genuine issue of material fact as to whether UST administrators failed to exercise reasonable care by demonstrating actual bias against him ............................ 44

        a.    There was no "exculpatory evidence" to which UST could deny John access .......................................... 44

        b.    The factfinders questioned both Jane and John regarding inconsistencies between their stories and other evidence gathered ................................................ 45

        c.    Emails between Baughman and Lange do not violate the Policy ......................................................... 46

Appellate Case: 19-1594    Page: 5    Date Filed: 06/24/2019    Entry ID: 4800914

d. John's additional allegations of breach are unsupported by the record ..............................................47

C. UST Was Not Required to Permit John to Cross-Examine Jane .......48

1. John waived any argument that he had a right to cross-examine Jane .......................................................................48

2. UST did not violate any duty to John by not allowing the cross-examination of Jane ..............................................49

3. Requiring cross-examination in student a disciplinary proceeding would have negative impacts for private institutions and increase the administrative burdens of proceedings ..........................................................................53

V. JOHN'S FAILURE TO IDENTIFY AN EXPERT PROVIDES AN ALTERNATIVE BASIS FOR AFFIRMING THE DISTRICT COURT'S OPINION .....................................................................................54

VI. THE ABSENCE OF COGNIZABLE DAMAGES PROVIDES AN ALTERNATIVE BASIS FOR AFFIRMING THE DISTRICT COURT'S DISMISSAL OF JOHN'S NEGLIGENCE CLAIM .................55

VII. THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION IN REFUSING TO PERMIT JOHN TO DEPOSE JANE ...............................57

CERTIFICATE OF BRIEF LENGTH ...................................................................59

Appellate Case: 19-1594    Page: 6    Date Filed: 06/24/2019 Entry ID: 4800914

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*A.M.J. v. Royalton Pub. Schs.*,
  No. 05-2541, 2006 WL 3626979 (D. Minn. Dec. 12, 2006) ...................1, 54, 55

*Abbariao v. Hamline Univ.*,
  258 N.W.2d 108 (Minn. 1977) ................................................................1, 27, 31

*Alexander v. Pathfinder, Inc.*,
  189 F.3d 735 (8th Cir. 1999) ..............................................................................48

*Anderson v. Benson*,
  394 N.W.2d 171 (Minn. Ct. App. 1986)..............................................................56

*Anderson v. Liberty Lobby, Inc.*,
  477 U.S. 242 (1986)........................................................................................28, 29

*Austin v. Univ. of Or.*,
  205 F. Supp. 3d 1214 (D. Or. 2016) ...................................................................30

*Bleier v. Coll. of Holy Cross*,
  No. 11-11541-DJC, 2013 WL 4714340 (D. Mass. Aug. 26, 2013) ...................38

*Blum v. Bacon*,
  457 U.S. 132 (1982)............................................................................................33

*Davenport v. Univ. of Ark. Bd. of Trs.*,
  553 F.3d 1110 (8th Cir. 2009) ...........................................................................29

*Davis v. Monroe*,
  526 U.S. 629 (1999).......................................................................................30, 54

*de Llano v. Berglund*,
  282 F.3d 1031 (8th Cir. 2002) ...........................................................................34

*Doe 175 v. Columbia Heights Sch. Dist.*,
  873 N.W.2d 352 (Minn. Ct. App. 2016)..............................................................56

*Doe v. Allee*,
  242 Cal. Rptr. 3d 109 (Cal. Ct. App. 2019).......................................................51

Appellate Case: 19-1594     Page: 7     Date Filed: 06/24/2019 Entry ID: 4800914

*Doe v. Amherst Coll.*,
    238 F. Supp. 3d 195 (D. Mass. 2017) ................................................... 30

*Doe v. Baum*,
    903 F.3d 575 (6th Cir. 2018) ............................................................... 49

*Doe v. Belmont Univ.*,
    334 F.Supp.3d 877 (M.D. Tenn. 2018) ................................................ 49

*Doe v. Columbia Coll. Chi.*,
    No. 17-CV-00748, 299 F. Supp. 3d 939 (N.D. Ill. 2017) ..................... 30

*Doe v. Cornell Univ.*,
    163 A.D.3d 1243 (N.Y. 2018) ............................................................. 50

*Doe v. Cummins*,
    662 Fed. App'x. 437 (6th Cir. 2016) ................................................... 51

*Doe v. Kmart Corp.*,
    No. A16-0465, 2017 WL 474404 (Minn. Ct. App. Feb. 6, 2017) ........ 2, 56

*Doe v. Laremont McKenna College*,
    236 Cal. Rptr. 3d 655 (Cal. Ct. App. 2018) ........................................ 51

*Doe v. Marymount University*,
    297 F.Supp.3d 573 (E.D. Va. 2018) .................................................... 51

*Doe v. Ohio State Univ.*,
    219 F. Supp. 3d 645 (S.D. Ohio 2016) .......................................... 36, 38

*Doe v. Trs. of Boston Coll.*,
    892 F.3d 67 (1st Cir. 2018) ........................................................... 30, 36

*Doe v. Trs. of Univ. of Pa.*,
    270 F. Supp. 3d 799 (E.D. Pa. 2017) ............................................ 36, 37

*Doe v. Univ. of Cincinnati*,
    173 F. Supp. 3d 586 (S.D. Ohio 2016) ............................................ 1, 38

*Doe v. Univ. of Denver*,
    No. 16-cv-00152, 2018 WL 1304530 (D. Colo March 13, 2018) ........ 38

Appellate Case: 19-1594    Page: 8    Date Filed: 06/24/2019    Entry ID: 4800914

*Doe v. Univ. of Miss.*,
No. 3:16-CV-63-DPJ-FKB, 2018 WL 3570229 (S.D. Miss. July
24, 2018) .................................................................................................36, 37

*Doe v. University of Southern California*,
238 Cal. Rptr. 3d 856 (Cal. Ct. App. 2018).....................................50, 51

*Doe v. Westmont College*,
246 Cal. Rptr. 3d 369 (Cal. Ct. App. 2019).............................................51

*Donohue v. Baker*,
976 F.Supp. 136 (N.D.N.Y. 1997).............................................................52

*Flaim v. Med. Coll. of Ohio*,
418 F.3d 629 (6th Cir. 2005) ...........................................................1, 53

*Furey v. Temple Univ.*,
884 F. Supp. 2d 223 (E.D. Pa. 2012)........................................................52

*Gebser v. Lago Vista Ind. Sch. Dist.*,
524 U.S. 274 (1998)....................................................................................3

*Gleason v. Univ. of Minn.*,
116 N.W. 650 (Minn. 1908) ....................................................................31

*Gomez v. Univ. of Me. Sys.*,
365 F. Supp. 2d 6 (D. Me. 2005) .......................................................24, 38

*Gov't of Ghana v. Proenergy Servs.*,
LLC, 677 F.3d 340 (8th Cir. 2012)...........................................................29

*Hall v. Hofstra Univ.*,
No. 003540/17, 2018 WL 1802212 (N.Y. Sup. Ct. April 3, 2018)...................50

*Hill v. Okay Constr. Co.*,
252 N.W.2d 107 (1977) ............................................................................56

*Hohn v. BNSF Ry.*,
707 F.3d 995 (8th Cir. 2013) ...................................................................28

*K.A.C. v. Benson*,
527 N.W.2d 553 (Minn. 1995) ...........................................................1, 55

Appellate Case: 19-1594    Page: 9    Date Filed: 06/24/2019 Entry ID: 4800914

*Langeland v. Farmer's State Bank of Trimont*,
  319 N.W.2d 26 (Minn. 1982) .....................................................................56

*Misc. Docket Matter No. 1 v. Misc. Docket Matter*
  *No. 2*, 197 F.3d 922 (8th Cir. 1999).........................................................57

*Nash v. Auburn Univ.*,
  812 F.2d 655 (11th Cir. 1987) ...............................................................1, 52

*In re Nat'l Hockey League Players' Concussion Injury Litig.*,
  No. 14-cv-2551, 2017 WL 1493671 (D. Minn. April 26, 2017).......................57

*NCAA v. Tarkanian*,
  488 U.S. 179 (1988)................................................................................31

*Norris v. Univ. of Colo.*,
  362 F. Supp. 3d 1001 (D. Colo. 2019)....................................................36, 37

*Oti Kaga, Inc. v. S.D. Hous. Dev. Auth.*,
  342 F.3d 871 (8th Cir. 2003) ..................................................................49

*Patmon v. Parker*,
  3 Fed. App'x 337 (6th Cir. 2001) .............................................................29

*People v. Hampton*,
  746 P.2d 947 (Colo. 1987).......................................................................40

*Porter v. Children's Health Care - Minneapolis*,
  No. C5-98-1342, 1999 WL 71470 (Minn. Ct. App. Feb. 16, 1999)...............2, 55

*Reliance Ins. v. Areneson*,
  322 N.W.2d 604 (Minn. 1982) .................................................................55

*Rendell-Baker v. Kohn*,
  457 U.S. 830 (1982)...........................................................................31, 49

*Richardson v. Sugg*,
  448 F.3d 1046 (8th Cir. 2006) ..............................................................48, 49

*Richmond v. Fowlkes*,
  228 F.3d 854 (8th Cir. 2000) ..................................................................34

Appellate Case: 19-1594    Page: 10    Date Filed: 06/24/2019 Entry ID: 4800914

*Roberts v. Shawnee Mission Ford, Inc.*,
  352 F.3d 358 (8th Cir. 2003) ..............................................................29

*Robinson v. Univ. of Minn.*,
  No. A17-1620, 2018 WL 4395020 (Minn. Ct. App. Sept. 17, 2018)................35

*Rollins v. Cardinal Stritch Univ.*,
  626 N.W.2d 464 (Minn. Ct. App. 2001)........................................31, 32

*Sahm v. Miami University*,
  110 F. Supp. 3d 774 (S.D. Ohio 2015) ...............................................34

*Sievert v. First Nat'l Bank in Lakefield*,
  358 N.W.2d 409 (Minn. Ct. App. 1984)...............................................56

*Spirtas Co. v. Nautilus Ins.*,
  715 F.3d 667 (8th Cir. 2013) ..............................................................33

*State v. Obeta*,
  796 N.W.2d 282 (Minn. 2011) ...........................................................40

*Stuart v. General Motors Corp.*,
  217 F.3d 621 (8th Cir. 2000) ..............................................................29

*United States v. Undetermined No. of Unlabeled Cases*,
  21 F.3d 1026 (10th Cir. 1994) ...........................................................29

*Winnick v. Manning*,
  460 F.2d 545 (2d Cir. 1972) ..............................................................53

*Yu v. Vasser Coll.*,
  97 F. Supp. 3d 448 (S.D.N.Y. 2015) ..................................................24

*Z.J. v. Vanderbilt Univ.*,
  355 F.Supp.3d 646 (M.D. Tenn. 2018)...............................................49

**Statutes**

20 U.S.C. § 1092.................................................................................3,10

20 U.S.C. § 1681..................................................................................3

Minn. Stat. § 135A.15..................................................................*passim*

Appellate Case: 19-1594   Page: 11   Date Filed: 06/24/2019 Entry ID: 4800914

Minn. Stat. § 609.341 ............................................................................5

**Other Authorities**

34 C.F.R. § 668.46 ................................................................3, 43, 55, 14

34 C.F.R. § 106.8. .............................................................................3

Fed. R. Civ. P. 12 ............................................................23, 34, 36

Fed. R. Civ. P. 45 ................................................................2, 57

Fed. R. Civ. P. 56 ............................................................................28

Appellate Case: 19-1594    Page: 12    Date Filed: 06/24/2019 Entry ID: 4800914

## STATEMENT OF THE ISSUES

1.   Should the district court's order granting summary judgment be affirmed, on alternative grounds, because UST, a private institution, did not owe John Doe a common law duty of reasonable care related to his disciplinary proceeding?

**Apposite Authority:**

- *Abbariao v. Hamline Univ.*, 258 N.W.2d 108 (Minn. 1977).

2.   Should the district court's order granting summary judgment be affirmed because the undisputed facts demonstrated that UST officials exercised reasonable care in UST's student conduct proceeding?

**Apposite Authority:**

- *Doe v. Univ. of Cincinnati*, 173 F. Supp. 3d 586 (S.D. Ohio 2016).

- *Nash v. Auburn Univ.*, 812 F.2d 655 (11th Cir. 1987).

- *Flaim v. Med. Coll. of Ohio*, 418 F.3d 629 (6th Cir. 2005).

3.   Should the district court's order granting UST's motion for summary judgment be affirmed, on alternative grounds, because, contrary to a footnote in the district court's order, John Doe was required but failed to identify an expert to opine on the appropriate professional standard of care to be followed by a school when undertaking a student conduct proceeding?

**Apposite Authority:**

- *A.M.J. v. Royalton Pub. Schs.*, No. 05-2541, 2006 WL 3626979 (D. Minn. Dec. 12, 2006).

4.   Should the district court's order granting UST's motion for summary judgment be affirmed, on alternative grounds, because John Doe failed to produce evidence of cognizable damages?

Apposite Authority:

- *K.A.C. v. Benson*, 527 N.W.2d 553 (Minn. 1995).

- *Porter v. Children's Health Care - Minneapolis*, No. C5-98-1342, 1999 WL 71470 (Minn. Ct. App. Feb. 16, 1999).

- *Doe v. Kmart Corp.*, No. A16-0465, 2017 WL 474404 (Minn. Ct. App. Feb. 6, 2017).

5. Did the district court properly exercise its discretion in denying John Doe's motion to compel the deposition of Jane Doe?

Apposite Authority:

- Fed. R. Civ. P. 45(d)(3)(A)(iv).

## STATEMENT OF THE CASE

The district court's orders granting summary judgement and denying John Doe's ("John") motion to compel Jane Doe's ("Jane") deposition should be affirmed. As the record evidence establishes, UST investigated and adjudicated Jane's complaint against John consistent with the procedures set forth in its Sexual Misconduct Policy and Response and Resolution Procedures (together, the "Policy"). That process was robust, thoughtful, and impartial and afforded both John and Jane the opportunity to present evidence, identify witnesses, and provide questions for the factfinders to ask of the other party and other witnesses. At the conclusion of that process, the factfinders found John responsible for a violation of the Policy based primarily on his own statements. The district court properly held that there was no evidence in the record upon which a reasonable jury could conclude that UST failed to act with reasonable care. Furthermore, the district court properly held that John did not need to depose Jane.

### A.    The Policy

UST is required by state and federal law to implement policies to prohibit sexual misconduct and to investigate any allegations thereof. *See* Minn. Stat. § 135A.15; 20 U.S.C. § 1681(a); 34 C.F.R. §§ 106.8, 668.46(k) et. seq.[1] The Policy

---

[1] Neither Title IX nor the Clery Act create a private cause of action related to regulatory requirements for investigation and grievance proceedings. 20 U.S.C. § 1092 (f)(14); *Gebser v. Lago Vista Ind. Sch. Dist.*, 524 U.S. 274, 291-92 (1998).

- 3 -

also reflects UST's organizational values and its intention to maintain a campus culture that best supports UST's mission to "educate students to be morally responsible leaders who think critically, act wisely, and work skillfully to advance the common good." APP.31.[2]

UST invites individuals to join and remain in its private educational community based not only on their objective skills and qualifications, but also on their commitment to uphold the university's community standards: its organizational mission, values, policies, and applicable law. In addition to legal obligations, these standards reflect academic norms and UST's distinctive values and objectives as a Catholic university, with the aim to create an environment that facilitates holistic learning—including intellectual, personal, and interpersonal awareness, knowledge, capacity, and growth—for all its students.

Established against this backdrop, the Policy is designed to provide as much clarity as possible for UST's students. The Policy prohibits "[s]exual harassment, sexual assault and other forms of sexual misconduct . . . ." APP.1. Sexual assault includes non-consensual sexual intercourse, which is: "(1) any sexual intercourse or penetration (anal, oral or vaginal), however slight (2) by a penis, tongue, finger or any object (3) by any person upon any other person (4) without consent and/or by force." APP.3. "Consent" is:

---

[2] "APP._" refers to Appellee's Appendix.

conduct or words that indicate a person freely agrees to engage in a sexual act at the time of the act, subject to the following:

. . .

- Consent to one form of sexual activity does not imply consent to other forms of sexual activity.

- Silence or failing to resist a sexual act does not constitute consent.

. . .

- Corroboration of a victim's testimony is not required to show lack of consent . . . .

*Id.*[3]

Consistent with other UST student conduct policies and then-current federal guidance (APP.33-51), the Policy uses a "preponderance of the evidence" standard, considering whether, based on the evidence available, it is more likely than not that a violation occurred. APP.24.

The Policy provides both informal and formal processes for resolving allegations of sexual misconduct. APP.20-27. These processes are "intended to be flexible" to allow UST to maintain sufficient discretion, based upon the particular facts and circumstances of any matter that may arise under the Policy. APP.15.

---

[3] This definition is consistent with Minnesota's statutory definition. *See* Minn. Stat. § 609.341, subd. 4.

Appellate Case: 19-1594    Page: 17    Date Filed: 06/24/2019 Entry ID: 4800914

**B.** **Individuals Involved in the Formal Resolution Process**

Multiple individuals are involved in the formal resolution process. Each receives both internal and external training on the investigation and resolution of sexual misconduct complaints in the university environment. A-423-424.[4]

### 1. Title IX coordinator

"[T]he Title IX coordinator . . . [is] responsible for overseeing the implementation of [UST's] sexual misconduct policy and procedures." APP.212.

### 2. Response manager

The response manager is responsible for: (1) determining whether interim actions are necessary pending completion of the investigation and resolution process; (2) appointing process advisors for complaining parties ("Complainants") and responding parties ("Respondents"); (3) appointing factfinders; and (4) contacting the Complainant and Respondent in writing and providing certain information set forth in the Policy. APP.17-18, 21-22. When the Complainant and the Respondent are both students, the response manager is UST's Dean of Students. APP.16.

If the factfinders determine it is more likely than not that a Respondent violated the Policy, the response manager is responsible for determining the appropriate educational sanction. APP.24.

---

[4] "A-_" refers to Appellant's Appendix.

Appellate Case: 19-1594    Page: 18    Date Filed: 06/24/2019 Entry ID: 4800914

### 3. Process advisors

A "Process Advisor's role is to understand the situation, explain the response and resolution process, and to provide information about available resources." APP.18. After a report of a violation of the Policy, a process advisor is appointed for each of the Complainant and Respondent. *Id.*

Process advisors are different from support persons under the Policy. Complainants and Respondents may "have a support person of the individual's choice accompany him or her throughout the response and resolution process." APP.21. Support persons are "allowed to consult with and advise the Complainant or Respondent the person is accompanying, but [are] not otherwise permitted to participate in any proceedings." *Id.* While a process advisor may also serve as a support person, a support person is not a process advisor under the Policy.

### 4. Factfinders

Factfinders "conduct[] an investigation in to the facts of the incident alleged to have occurred" (APP.21), and "weigh the evidence and determine whether it is more likely than not . . . that the Respondent is responsible for the misconduct alleged" (APP.24). The factfinders are both investigators and adjudicators and document their findings in a factfinding report. *Id.* UST commonly assigns two factfinders who work together to investigate complaints.

Appellate Case: 19-1594    Page: 19    Date Filed: 06/24/2019 Entry ID: 4800914

Factfinders receive both internal and external training on how to conduct and prepare a careful, complete, and fair investigation and report. APP.56-65. (explaining the meaning of force and consent under UST's Sexual Misconduct Policy); APP.75 (training factfinders that investigations must be (1) "Prompt," (2) "Reliable and thorough," (3) "Impartial," and (4) "Fair and equitable").

Current Minnesota law requires universities to provide training to investigators on the neurobiological responses to trauma. Minn. Stat. § 135A.15, subd. 8.[5] This training includes information concerning the Forensic Experiential Trauma Interview ("FETI") method and the neurobiological research upon which it is based. A-448-449; A-509-510; A-562-570. Neurobiological research has established that when an individual experiences a traumatic event, the prefrontal cortex of an individual's brain may shut down or be impaired, leaving more primitive areas of the brain operating to record the event. A-562-570. This can result in limitations on the individual's ability to recall specific details about an incident. *Id.* When recounting the event, the missing details may appear as inconsistencies in the story, but, in reality, may be gaps caused by the failure of the prefrontal cortex to record all the details of the event. *Id.* The FETI method affords interviewees the opportunity to describe the event as they recall the experience

_____

[5] This training requirement was passed by the legislature in May 2015 and went into effect on August 1, 2016. UST factfinders, including the factfinders in John's case, were trained on the FETI method and related neurobiological research even before the effective date of this statute.

- 8 -

through the structuring of questions in an open-ended and non-confrontational way that also invites sensory memories, which may help to access memories from the more primitive areas of the brain. *Id.* In light of the scientific research, police departments and college and university personnel around the country have received training on the FETI method in recent years. APP.101-105. The FETI method does not, as John argues, teach that a reported victim should be automatically believed. *Compare* John Br. at 30 *with* A-562-570.

### 5. Appeal officer

The appeal officer is responsible for making a decision as to whether, using a preponderance of the evidence standard, the grounds for an appeal under the Policy have been satisfied. APP.26-27. The grounds for appeal are:

> a. a procedural error occurred that substantially affected the outcome of the process;
>
> b. the decision was arbitrary and capricious or violated academic freedom;
>
> c. there has been discovery of significant new factual material not available to the Factfinder that could have affected the original outcome; however, intentional omission of factual information by the appealing party is not a ground for an appeal; or
>
> d. the sanction or other response by UST under the formal process was excessively severe or grossly inadequate.

*Id.* The appeal officer must provide the appeal officer's final, written decision on the appeal to both the Complainant and Respondent. *Id.*

### 6.    Appeal board

When both the Complainant and Respondent are students, the appeal officer has discretion to appoint an appeal board, which is an advisory body; its role is to "consider whether or not it is more likely than not the above-listed grounds for appeal have been satisfied" and to provide the appeal officer with a recommendation "as to whether UST should remand the matter or take any different or additional action than was originally determined." *Id.* If an appeal board is appointed, the appeal officer must seriously consider its recommendation but has sole discretion to decide the appeal.

Appeal board members are trained on their role and responsibilities and on the requirements of Title IX. APP.117-152. Additionally, and consistent with legal requirements and Department of Education guidance (*see, e.g* 20 U.S.C. 1092(f)(8)(B)(iv)(I)(bb)), appeal boards are trained on issues related to sexual assault, including research-based statistics. The appeal board training seeks to dispel a number of "Sexual Assault Myths," including the myth that "[f]alse reports of sexual assault are common," instructing instead that "[t]he rate of false reports falls within a range of 2% to 10% of all sexual assault reports." APP.121; *see also* APP.153-160.

The appeal board training also includes research-based information that "[s]exual [a]ssault can be extremely traumatic; survivor responses vary and are not

- 10 -

always logical." APP.122; *see also* APP.161-172. The training provides a list of responses which may not be logical including, but not limited to:

- Failing to fight or physically resist;

- Experiencing "frozen fright" during the assault;

- Delayed reporting;

- Speaking/being friendly with the alleged perpetrator;

- Failing to recall or deliberately omitting details; and

- Denying, minimizing, or providing inconsistent explanations of assault.

APP.122. The training instructs appeal board members that investigations under the Policy must be (1) "Prompt," (2) "Adequate," (3) "Reliable," and (4) "Impartial," and that the grievance procedure must be "Fair and Equitable" and provide "Equal opportunities for the parties." APP.127.

**C.** **Investigation and Resolution of John's Reported Policy Violation**

**1.** **UST receives a report of an alleged policy violation**

On December 12, 2015, Jane reported to her resident advisor that she had been sexually assaulted by John in the bathroom attached to her UST dorm room the previous night. APP.220-247.[6] Jane specifically alleged that John digitally penetrated her vagina without her consent. *Id.*

---

[6] Several documents included in Appellant's Appendix include the highlighting of John's counsel not included in the original documents or district court filings. UST has included clean copies of those documents in its Appendix. To the extent Appellant's Appendix includes redacted versions of documents that were filed

Appellate Case: 19-1594     Page: 23     Date Filed: 06/24/2019 Entry ID: 4800914

Jane's resident advisor reported the incident internally to appropriate individuals in the Department of Residence Life and Dean of Students Office, including UST Dean of Students Linda Baughman and Assistant Dean of Students and Student Ombudsperson Sister Sharon Howell. APP.248-249.

Jane went to a local hospital for an exam conducted by a Sexual Assault Nurse Examiner ("SANE") at approximately 4:15 p.m. on December 12, 2015. APP.250-264. Jane made a formal report to UST Public Safety at approximately 11:15 p.m. on December 12, 2015. *Id.* On December 13, 2015, Jane reported the alleged sexual assault to the St. Paul Police Department. APP.265-270. John was arrested that same day but was subsequently released on December 15, 2015. *Id.*; APP.271 The Ramsey County Attorney's Office declined to prosecute John. APP.272.

### 2. Formal response process is initiated and investigation into the allegations is commenced under the Policy

Jane initiated the formal resolution process under the Policy by signing a formal written complaint on December 14, 2015. APP.16, APP.273-274. Consistent with the Policy, Dean Baughman acted as the response manager.

---

unredacted and under seal with the district court, UST has included unredacted versions of those documents in its sealed Appendix volume.

Appellate Case: 19-1594    Page: 24    Date Filed: 06/24/2019 Entry ID: 4800914

### a. Interim sanctions are imposed

Dean Baughman determined that interim sanctions were "reasonably necessary and appropriate" and sent John a letter on December 14, 2015, informing him of the complaint made against him and the interim sanctions imposed pending completion of the Policy's process. APP.275-276. These interim sanctions included: (1) a no contact order; (2) an order that John could not live in his residence hall during the pendency of the process; and (3) an order limiting John's access to campus during the process to "attending classes and taking finals." *Id.*

### b. Process advisors are appointed

Dean Baughman appointed experienced process advisors for both Jane and John. Howell agreed to serve as the process advisor for Jane. APP.221. Jane elected to have Howell also serve as her support person throughout the formal resolution process.

Assistant Dean of Students Jesse Langer agreed to serve as the process advisor to John. APP.277. Langer contacted John multiple times to offer assistance, but John declined his services. APP.278-279. John chose to have his attorney, Beau McGraw, serve as his support person. APP.286.

### c. Factfinders are appointed

On December 15, 2015, Vern Klobassa and Dr. Jean Giebenhain were appointed as factfinders to investigate Jane's sexual misconduct complaint and

- 13 -

make a determination as to whether it was more likely than not that John violated the Policy. APP.213-219.

### d. Notices are sent to Jane and John

On December 15, 2015, Dean Baughman separately sent Jane and John letters, via email, providing the information set forth on page A8 of the Policy. *Id.* These letters included, among other things: (1) notice that a complaint had been made that John violated the Policy; (2) information regarding the Policy and process that would be followed; (3) information regarding the rights of each individual; (4) the name of the individual's assigned process advisor; and (5) the names of the assigned factfinders. *Id.* While John claims that UST provided Jane, but not John, with information regarding campus "mental health counseling, advocacy assistance, [and] academic support" in these notices (John Br. at 25),[7] John was provided with a link to a website that provided similar information. APP.217-219.

### 3. UST conducts a fair and impartial factfinding investigation

The Policy describes the factfinding process as follows:

The Factfinder(s) will conduct a thorough and impartial inquiry into the facts and circumstances surrounding the Complaint. At a minimum, the Factfinder(s) will seek to interview the Complainant, Respondent and other key persons who may have relevant information

---

[7] By law, UST must provide information on such services to a person who reports being a victim of sexual assault. Minn. Stat. § 135A.15 Subd. 2(5); 34 C.F.R. § 668.46(b)(11)(iv).

Appellate Case: 19-1594     Page: 26     Date Filed: 06/24/2019 Entry ID: 4800914

about or related to the incident and will seek to obtain all information, documentation and materials the Factfinder(s) deem relevant to the investigation, the Factfinder will ensure that, before the conclusion of the investigation, the parties have been provided a written summary of all allegations and defenses and have had an opportunity to respond. The opportunity to respond includes: (1) an opportunity to identify relevant witnesses, documentation and other physical evidence; (2) to identify questions that may be asked of witnesses; and (3) to provide responsive written or oral statements.

APP.23.

### a. Commencement of the factfinding investigation

UST's factfinding investigation commenced on December 16, 2015. APP.213-219. On that day and in the days immediately following, the factfinders reviewed Jane's Complaint and met to discuss the case. APP.213-219. In addition, Klobassa reviewed available Public Safety video footage of relevant outdoor areas and building entrances from the date of the alleged sexual assault. A-305. No video footage existed of Jane and John's interactions in either the common areas of Jane's residence hall or in her bathroom. *Id.*

### b. The factfinders interview Jane

On December 21, 2015, the factfinders conducted their first interview with Jane. APP.304-308. The factfinders utilized the FETI method, consistent with their training, asking Jane non-confrontational and open-ended questions that allowed her to recount her recollection of her experience. *Id.*; A-448-451; A-459; A-509-510.

- 15 -

### c. The factfinders interview John

On December 22, 2015, the factfinders conducted their first interview with John. APP.312-315. As with Jane, the factfinders conducted John's first interview using the FETI method. A-448-449; A-459; A-509-510. According to the factfinders, this first interview was designed to provide students with the opportunity to tell their story in whatever way they recalled the experience. *Id.*

### d. Information provided by John and Jane to factfinders includes undisputed and disputed facts

There were consistencies and inconsistencies within and between the stories told by John and Jane at their first interviews. Both students agreed that they encountered one another on the evening of December 11, 2015, at a gathering in a dorm room; walked to a house party where they did not stay; walked back to Jane's dorm; and spent time in the dorm's lounge where some consensual physical activity, including kissing, took place. APP.224-230. John's and Jane's stories also include some differing and sometimes contradictory details, particularly with respect to why they left the lounge, what happened when they entered Jane's dorm room, and what happened inside the bathroom attached to her dorm room. Jane described sexual activity in the bathroom, including digital penetration, to which she had not consented. *Id.* John described sexual activity in the bathroom that he believed to be consensual. John and Jane also described different details related to leaving the bathroom and John leaving the dorm. *Id.*

- 16 -

### e. Jane and John identify witnesses and evidence

In accordance with the Policy, both Jane and John were given the opportunity to identify individuals they believed to be relevant witnesses and to share what they believed to be relevant documentary and other evidence. Jane provided the following documentation, all of which was reviewed by the factfinders:

> 1. Summary and chronology of events, dated December 14, 2015, prepared by Public Safety and signed by Jane;
>
> 2. Regions Hospital Sexual Offense Medical Report, dated December 14, 2015; and
>
> 3. Jane's medical records from UST Health Services for three visits occurring in December of 2015.

APP.226.

John provided the following documentary and audio-recorded information, all of which was reviewed by the factfinders:

> 1. Summary of events prepared by the factfinders that was reviewed, revised, and signed by John;
>
> 2. St. Paul Police Reports, including the initial and all supplemental reports;
>
> 3. December 17, 2015 denial of prosecution letter from the Ramsey County Attorney's Office;
>
> 4. Regions Hospital Sexual Offense Medical Report, dated December 12, 2015, for Jane's SANE exam;
>
> 5. Text messages between John and Jane and John and a third-party UST student;

- 17 -

6. Photo of John's penis to demonstrate an injury; and

7. Audio-recorded interviews conducted by McGraw of student witnesses identified by John.

APP.230.

John also provided a list of eighteen potential witnesses, later narrowing that list to five suggested interviewees. APP.320-328. John had the opportunity to identify questions that the factfinders might ask witnesses and Jane but he chose not to do so. *Id.*; APP.21; APP.23; APP.315.

### f. The factfinders visit Jane's residence hall and conduct witness interviews

Between January 20, 2016, and January 29, 2016, the factfinders conducted a tour of a dorm room similar to that of Jane and conducted interviews of eleven witnesses. APP.222-223. In addition to John's suggested interviewees, the factfinders interviewed (1) Jane's resident advisor, (2) Jane's roommate, who was present in the dorm room at the time of the alleged assault, (3) a friend of Jane who accompanied her to the hospital, (4) a certified nurse practitioner with UST's Health Services who examined Jane and additionally consulted on medical records, and (6) a doctor with UST's Health Services who consulted on medical records. APP.220-221.

The factfinders found each of the witnesses to be credible. APP.231-239.

- 18 -

### g. The factfinders conduct second interview with Jane

On February 1, 2016, the factfinders conducted their second interview with Jane. APP.309-311. The factfinders (1) provided Jane the opportunity to review and respond to John's statement and other evidence and (2) asked clarifying questions based upon additional information obtained during the course of the investigation. *Id.* The factfinders asked Jane about John's statement that he placed her hand on his penis and that, upon doing so, Jane proceeded to rub his penis. *Id.* Jane stated that John placed her hand on his penis multiple times and she removed it multiple times. *Id.* She further stated that she gave his penis a hard tug because she "remember[ed] thinking . . . if he [ejaculated] this would all be over." *Id.*

The factfinders also: (1) asked Jane to confirm her statement in the first interview that she checked to see if the dorm's door was locked after John left and questioned her about the fact that security footage did not show her checking the door; (2) questioned Jane about her encounter with her roommate the night of the incident, informing her that her roommate said the two spoke while John was in the bathroom, contrary to Jane's statement that they had not; and (3) inquired into whether there was any spanking involved in her encounter with John, which was mentioned in the SANE report but not in her first interview. *Id.*

- 19 -

### h. The factfinders conduct second interview with John

The factfinders conducted their second interview with John on February 3, 2016. APP.316-319. As with Jane's second interview, the factfinders (1) allowed John the opportunity to review and respond to Jane's statement and other evidence and (2) asked clarifying questions based upon additional information obtained during the course of the investigation. *Id.* For instance, the factfinders questioned John about his statement that he and Jane entered the bathroom together, informing him that Jane's roommate stated that she and Jane were talking when he entered the bathroom. *Id.* They also asked about John's statement that he left Jane's residence hall alone, showing him a screenshot of security footage that showed him giving someone a thumb's up on his departure. *Id.* Additionally, John was asked to comment on the statements of his friends about his demeanor upon returning from Jane's dorm room, statements that he was "flustered, distraught, exasperated, upset, moaning, whimpering, all worked up, and on the verge of tears." *Id.*

The factfinders also asked John what caused him to believe that Jane had given consent. *Id.* John admitted that Jane did not verbally consent. *Id.* He reported that she "never indicated that she *wanted* it, other than through the progression of events over the course of the evening, but 'never did anything to indicate that she didn't want it.'" *Id.* John told the factfinders he was relying upon a "chronology of consent" and that Jane "never tried to push him away, never closed her legs, never

- 20 -

called for her roommate, never tried to put her pants back on, and never told him to stop." *Id.*

### 4. The factfinders conclude it is more likely than not that John violated the Policy

Upon the conclusion of the investigation, the factfinders reviewed and weighed the disputed and undisputed evidence, and the credibility of Jane, John, and all other witnesses. The factfinders prepared a factfinding report setting forth in extensive detail (1) the timeline of the investigation, (2) interviews conducted (including notes and summaries thereof), (3) documentation and information reviewed, (4) facts in dispute and not in dispute, (5) credibility assessments of each interviewee, and (6) the factfinders' findings and analysis. APP.220-247. They noted the inconsistencies in and between the statements made by Jane and John but also deemed both parties to be credible. A-387-390.

The factfinders ultimately determined that, based upon all the evidence, it was more likely than not that John did not obtain consent and, as a result, violated the Policy. APP.245.

In making this determination, "the most compelling evidence came from statements made by the [John]." A-498. John admitted that Jane had not consented verbally. APP.244-245; APP.316-319. The factfinders concluded that his reliance on the "progression of things" did not constitute consent under the terms of the Policy because the Policy states, "[c]onsent to one form of sexual activity does not

- 21 -

imply consent to other forms of sexual activity." APP.244-245. John's statement, "that the complainant never gave a physical or a verbal no" and did not resist also was not consent because under the express terms of the Policy, "[s]ilence or failing to resist a sexual act does not constitute consent." *Id.* Although John and Jane presented different versions of what had occurred, the factfinders concluded that under John's own version of events, he had not obtained consent. *Id.*

Dean Baughman, as the response manager, then determined the educational sanctions to be imposed. John was suspended for three semesters, after which he could return to UST to complete his degree. APP.329-331.

### 5. John unsuccessfully appeals the factfinders' conclusion

John appealed the results of the investigation on all four grounds permitted under the Policy. APP.332-337. Jane also appealed the decision on the grounds that the sanction imposed on John was "grossly inadequate." APP.338-339.

Vice President for Student Affairs Karen Lange, the appeal officer, appointed an appeal board. APP.340-343. Following review of the appeal board's recommendation, Lange did not find any of the grounds for John's or Jane's appeals were satisfied. *Id.* However, Lange postponed the commencement of John's suspension to allow him to complete the remainder of the Spring 2016 semester. *Id.*

Appellate Case: 19-1594    Page: 34    Date Filed: 06/24/2019 Entry ID: 4800914

John transferred to a different university and enrolled starting in Fall 2016. APP.293. UST's suspension did not cause a gap in his academic studies.

## D.  The District Court Action

John commenced his action against UST on April 29, 2016. Upon UST's Rule 12 motion, John's Title IX and breach of contract claims were dismissed. A-1-21. His negligence claim, pursuant to which he asserted that UST failed to exercise reasonable care, was thus the only remaining claim.

### 1.  The district court determines that the deposition of Jane would be burdensome and irrelevant

Discovery commenced with respect to John's negligence claim, including UST's production of a significant number of documents and the depositions of those involved in the investigation, adjudication, and appeal of the complaint against John, including the Title IX coordinator, response manager, factfinders, appeal officer, Jane's process advisor, and a member of the appeal board. *See* A-342, A-375, A-381, A-415, A-422, A-442, A-503.

The district court did not permit John to take the deposition of non-party Jane, finding that the burden on Jane in sitting for such a deposition outweighed its relevance to the matter. Specifically, the district court held, in part, as follows:

> Plaintiff argues that Jane's testimony is necessary to fully assess whether UST's investigation was conducted in a negligent manner. He suggests Jane may testify that she did not make statements attributed to her by investigators in their report. But Plaintiff has already deposed the investigators and has had full access to all persons who

- 23 -

conducted the investigation he claims was flawed. Nothing has changed in the facts discovered to alter this Court's ruling – which was consistent with existing precedent – quashing Jane's deposition.

A-28 (citing *Gomez v. Univ. of Me. Sys.*, 365 F. Supp. 2d 6, 14 (D. Me. 2005); *Yu v. Vasser Coll.*, 97 F. Supp. 3d 448, 461 (S.D.N.Y. 2015)).

### 2. The district court grants UST's motion for summary judgment as to John's remaining negligence claim

In opposing UST's motion for summary judgment, John argued that:

> At the very least, when St. Thomas undertook to involve itself in the business of conducting investigations and determining whether its students were guilty of sexual assault or not, it had an obligation to create and administer a process that was fair and impartial to both parties, and, even though it is not the same level of due process as a criminal defendant would receive, provide some measure of due process in the proceeding to ensure that an accurate outcome was achieved.

A-86. John argued that UST breached this duty by (1) providing training that allegedly predisposed those involved in the process to believe female victims over males accused of sexual assault, (2) failing to screen the response manager from the appeal officer and Jane's process advisor, and (3) failing to follow its own policies and procedures. APP.381-384.

The district court granted UST's motion, finding that the undisputed facts demonstrated that there was no breach of any duty. A-41-48. The district court did

- 24 -

find UST owed John a duty of care, but explained "what reasonable care requires is beyond the scope of this decision."[8] A-39.

## E. John's Mischaracterizations and Misrepresentations of the Record

John's opening brief includes numerous misrepresentations of the record and facts, of which the most glaring are identified below.

John repeatedly and incorrectly represents to the Court that "UST train[ed] employees to believe Accusing Students tell the truth 90-98% of the time even if they 'provide inconsistent explanations of assault' and/or 'deliberately omit[] details' . . . ." John Br. at 2; *see also id.* at 10, 12-13, 24, 27, 32-33, 39, 44. John relies on a slide from a training presentation to a UST appeal board (an advisory board without decisionmaking authority) that seeks to dispel certain "myths" about sexual assault that, as research has demonstrated, are commonly believed to be true. For example, one slide addressed the myth that "[f]alse reports of sexual assault are common." APP.121. As discussed *supra* p.8-9, this slide corrects the myth with statistics, commonly cited by law enforcement and other reputable public sources, that "the rate of false reports falls within a range of 2% and 10% of

---

[8] John asserts that the district court held that UST "had an obligation to create and administer a process that was fair and impartial to both parties . . . and [to] provide some measure of due process in the proceeding to ensure that an accurate outcome was achieved." John Br. at 2. This portion of the district court's order was, however, simply restating John's opposition brief and his argument as to the scope of the duty. A-41.

- 25 -

all sexual assault reports." *Id.*; *see also* APP.153. John's assertion is inconsistent with the training materials.

John further claims that "the Factfinders failed to challenge or question Jane's false, misleading, and/or inconsistent testimony." John Br. at 30; *see also id.* at 26-27, 42, 45-46. John claims that the factfinders maintained that their "(a) role was to give Jane the opportunity for her to tell her story and that (b) all that was asked of Jane was to 'tell her story.'" John Br. at 30-31. These statements mischaracterize the record. Both John and Jane were initially interviewed using the FETI method, pursuant to which both were asked open-ended questions and given the opportunity to tell their stories. A-448-451; A-459; A-509-510. There were consistencies and inconsistencies within and between the stories told by both Jane and John in the course of the investigation, and between their stories and other evidence obtained by the factfinders. APP.224-230; APP.387-390. Consistent with the FETI method, Jane and John were questioned about these inconsistencies in a second interview, after they had the opportunity in their first interview to recount the experience as they recalled it. APP.309-311; APP.316-319.

There are multiple other inaccurate statements in John's brief.[9]

---

[9] For example, Emily Yoffe, a journalist for the magazine *Atlantic*, is not a law school professor. *See* John Br. at 21-22. The cited article by Ms. Yoffee has been criticized by researchers. https://www.psychologytoday.com/us/blog/sexual-assault-and-the-brain/201801/sexual-assault-and-neuroscience-alarmist-claims-vs-facts.

- 26 -

**ARGUMENT**

## I.   **SUMMARY OF ARGUMENT**

The district court properly granted summary judgment in favor of UST on John's negligence claim but erred in determining that UST owed John a common law duty of reasonable care. This holding is inconsistent with Minnesota case law, which specifically states that the only duty imposed on private universities is the duty not to expel students in an arbitrary manner. *See Abbariao v. Hamline Univ.*, 258 N.W.2d 108, 112 (Minn. 1977).

Even if private universities do owe a duty of reasonable care in the implementation of their disciplinary proceedings, the district court properly determined that UST did not breach any such duty. John's selective cites to excerpts from training slides that provide factual information on the common responses to sexual assault and the neurobiological impacts of trauma—and which were only a sliver of the extensive training provided to UST officials—simply do not demonstrate a breach of any duty of care. Moreover, John has failed to establish the presence of any "actual bias" on the part of those involved in the investigation and adjudication of Jane's complaint against him and, thus, cannot overcome the presumption that university administrators acted with honesty and integrity. Finally, John waived any argument that he had a right to formally cross-

- 27 -

examine Jane during his disciplinary proceeding and, in any event, he had no such right.

The district court's summary judgment order can be affirmed, in the alternative, on two additional grounds. First, John failed to identify an expert to testify as to the appropriate standard of care to be followed in conducting student misconduct and disciplinary investigations, as required by law. Second, John has failed to establish cognizable damages, an essential element of a negligence claim.

The district court also properly denied John's motion to compel the deposition of Jane. The burden imposed on Jane by requiring her to sit for a deposition far outweighed any limited relevance her testimony might have had on John's negligence claim.

## II.   **STANDARD OF REVIEW**

This Court reviews "*de novo* the district court's grant of summary judgment and may affirm the judgment on any basis supported by the record." *Hohn v. BNSF Ry.*, 707 F.3d 995, 1000 (8th Cir. 2013). Summary judgment is appropriate when there are no disputed issues of material fact and the moving party can demonstrate that it is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Summary judgment is not

- 28 -

precluded by a dispute of law. *Patmon v. Parker*, 3 Fed. App'x 337, 339 (6th Cir. 2001); *United States v. Undetermined No. of Unlabeled Cases*, 21 F.3d 1026, 1028 (10th Cir. 1994).

When opposing summary judgment, the nonmoving party cannot create a genuine dispute of fact by relying upon conclusory allegations, speculation, or general assertions, but must instead produce sufficient probative evidence in the record demonstrating a genuine issue for trial. *See id.* at 256; *Davenport v. Univ. of Ark. Bd. of Trs.*, 553 F.3d 1110, 1113 (8th Cir. 2009). "The mere existence of a scintilla of evidence in support of the Plaintiff's position will be insufficient"; rather, "there must be evidence on which the jury could reasonably find for the Plaintiff." *Anderson*, 477 U.S. at 252.

"Appellate review of a district court's discovery rulings is both narrow and deferential." *Roberts v. Shawnee Mission Ford, Inc.*, 352 F.3d 358, 360 (8th Cir. 2003) (quotation omitted). This Court reviews a district court's denial of a motion to compel a deposition for a "gross abuse of discretion affecting the fundamental fairness of the proceedings." *Stuart v. General Motors Corp.*, 217 F.3d 621, 631 (8th Cir. 2000). If a party can demonstrate a gross abuse of discretion by the district court, the party must also demonstrate that the denial of the motion to compel was prejudicial. *Gov't of Ghana v. Proenergy Servs.*, LLC, 677 F.3d 340, 345 (8th Cir. 2012).

## III. THE DISTRICT COURT'S SUMMARY JUDGMENT ORDER SHOULD BE AFFIRMED, ON ALTERNATIVE GROUNDS, BECAUSE UST DID NOT OWE JOHN A COMMON LAW DUTY OF REASONABLE CARE

It is well settled that "courts should refrain from second-guessing the disciplinary decisions made by school administrators." *Davis v. Monroe*, 526 U.S. 629, 648 (1999); *see also Doe v. Trs. of Boston Coll.*, 892 F.3d 67, 94-95 (1st Cir. 2018) (determining that university owned no independent duty of care relating to student disciplinary process); *Doe v. Columbia Coll. Chi.*, No. 17-CV-00748, 299 F. Supp. 3d 939, 963 (N.D. Ill. 2017) (refusing to find that college "owe[s] a duty to its students relating to the implementation of student disciplinary proceedings" (internal quotation and citation omitted)); *Doe v. Amherst Coll.*, 238 F. Supp. 3d 195, 228 (D. Mass. 2017) ("[T]he court does not find that currently existing social values or customs are consistent with imposing a legal duty on college administrators, which would be owed directly to students, relating to the implementation of student disciplinary proceedings."); *Austin v. Univ. of Or.*, 205 F. Supp. 3d 1214 (D. Or. 2016) (refusing to impose duty of care in conduct of student disciplinary proceedings).

No Minnesota appellate court decision has recognized a negligence cause of action against a private school based on a student disciplinary proceeding. Minnesota courts have recognized a duty on the part of a private university not to expel a student arbitrarily, and they have applied this duty in both academic and

- 30 -

disciplinary dismissals of students. *See Abbariao*, 258 N.W.2d at 112 (academic dismissal); *Gleason v. Univ. of Minn.*, 116 N.W. 650 (Minn. 1908) (dismissal for academic and disciplinary reasons); *Rollins v. Cardinal Stritch Univ.*, 626 N.W.2d 464, 469-70 (Minn. Ct. App. 2001) (disciplinary dismissal).

On this issue of first impression, the district court found that UST owed John a common law duty of reasonable care in its implementation of the Policy and the investigation and resolution of the sexual misconduct complaint made against him and suggested that this duty of care parallels the due process protections available to students at public universities. The district court reached this conclusion in reliance on *dicta* from the Minnesota Supreme Court's decision in *Abbariao*.

In *Abbariao*, the plaintiff claimed that Hamline University's receipt of government funding made it a state actor subject to constitutional due process obligations. 258 N.W.2d at 111. The Minnesota Supreme Court noted that it was unlikely the plaintiff would be able to prove sufficient state action for the due process claim to be successful, but the court determined that the plaintiff's allegations were sufficient to survive a motion to dismiss.[10] *Id.* at 111-12.

The facts in *Abbariao* involved a dismissal for academic reasons. In holding that there is a Minnesota common law duty for a private school not to expel

---

[10] Based on current pleading standards, it is unlikely that the Minnesota Supreme Court would allow a due process claim against a private university to survive a motion to dismiss. *See NCAA v. Tarkanian*, 488 U.S. 179, 191 (1988); *Rendell-Baker v. Kohn,* 457 U.S. 830, 846 (1982).

Appellate Case: 19-1594    Page: 43    Date Filed: 06/24/2019 Entry ID: 4800914

students in an arbitrary manner, the Court referenced that this duty paralleled the due process requirements for academic decisions (*i.e.* non-arbitrary conduct). The Court did not consider whether a university owed a heightened duty of care with respect to non-academic discipline, but subsequent Minnesota state decisions have applied the common law duty not to expel in an arbitrary manner to non-academic student discipline. *See Rollins,* 626 N.W.2d at 469 (applying the common law duty not to expel in an arbitrary manner to non-academic discipline case and holding discipline was not arbitrary). Thus, to the extent UST owed John any duty of care, it owed John a duty not to expel him in an arbitrary manner. The district court erred in holding that Minnesota courts are likely to recognize a common law duty of reasonable care that imposes additional obligations on a private university in a disciplinary dismissal that parallel due process protections. *Cf. Rollins*, 626 N.W.2d at 469-70.

John was not expelled, and UST fulfilled any common law duty to John to conduct its educational disciplinary process in a non-arbitrary manner, providing a process that was prompt, impartial, equitable, and fair. It is undisputed that John was given notice of the allegations against him and an opportunity to respond, tell his story, suggest witnesses, submit documentary evidence, review evidence, respond, and appeal.

Appellate Case: 19-1594    Page: 44    Date Filed: 06/24/2019 Entry ID: 4800914

Because the district court erred in finding that UST owed John a common law duty of care that is higher than the duty recognized by Minnesota courts, its dismissal of John's negligence claim can—and should—be affirmed on the alternative ground that UST owed John no duty of reasonable care. *Blum v. Bacon*, 457 U.S. 132, 137 n.5 (1982) ("[A]n appellee may rely upon any matter appearing in the record in support of the judgment below."); *Spirtas Co. v. Nautilus Ins.*, 715 F.3d 667, 670-71 (8th Cir. 2013) ("This court can affirm on any basis supported in the record . . .").

## IV. THE DISTRICT COURT CORRECTLY HELD THAT UST DID NOT BREACH ANY DUTY OF REASONABLE CARE

John sets forth two bases for his contention that the district court erred by granting summary judgement in favor of UST. He argues UST breached its duty of reasonable care by favoring accusing students over accused students and by adopting a disciplinary process that did not allow him to cross-examine Jane. Both arguments fail.

### A. John's Assertion of "Bias" is Based on a Mischaracterization of the District Court's Order and Applicable Law.

John's argument that UST training materials caused decisionmakers to act with bias against accused students is without factual or legal support. Throughout his argument, John falsely represents that "the District Court acknowledged UST manifested a 'bias[] in favor of the' Accusing Student that cut 'against' Accused

- 33 -

Students." John Br. at 2; *see also id.* at 10-11. The March 1, 2017 Order cited by John contains no such acknowledgment. Instead, the district court held that absent plausible allegations of bias "because of John's sex," John's generic allegations of bias could not save his Title IX claims from Rule 12 dismissal. A-39-43. In support of its holding, the district court quoted *Sahm v. Miami University*, 110 F. Supp. 3d 774 (S.D. Ohio 2015), which held that, "[d]emonstrating that a university official is biased in favor of the alleged victims of sexual assault claims, and against the alleged perpetrators, is not the equivalent of demonstrating bias against male students." A-41 (quoting *Sahm*, 110 F. Supp. 3d at 778). This is not an acknowledgment that UST was biased in favor of accusing students. In fact, as part of its summary judgment order, the district court expressly found there was no evidence in the record that UST was biased against John. A-43-44.

### B.     The Undisputed Material Facts Support the District Court's Finding that Training Received by UST Officials Did Not Cause Actual Bias Against John

As the district court correctly recognized, "[u]niversity 'administrators are 'entitled to a presumption of honesty and integrity unless actual bias . . . can be proven.'" A-42 (quoting *Richmond v. Fowlkes*, 228 F.3d 854, 858 (8th Cir. 2000)). "Where a plaintiff relies only on his or her belief that administrators acted with bias, the presumption is not overcome." *Id.* (citing *de Llano v. Berglund*, 282 F.3d 1031, 1035 (8th Cir. 2002)). The burden of proving "actual bias" falls on John.

- 34 -

*Robinson v. Univ. of Minn.*, No. A17-1620, 2018 WL 4395020, at *3 (Minn. Ct. App. Sept. 17, 2018).

John relies on inapposite case law, mischaracterizations of training materials, and misrepresentations of the record. In discovery, UST produced hundreds of pages of training materials that had been provided, at internal and external trainings, to individuals involved in the investigation, adjudication and appeal of John's case. Of these hundreds of pages of materials, John selectively identifies only five excerpts that he deems create an inference of bias. John Br. 24-25. John misrepresents the content and context of these training material excerpts. Moreover, as the district court held:

> [N]owhere does he show any connection between the training that UST administrators were given and bias in [Doe's] specific case. Instead, he relies on bare platitudes such as arguing that the 'training and indoctrination of everyone involved in the process [created] a process that was going to lead to a particular and biased result' and that 'those involved in the process are working toward a predetermined result and evidence of that is everywhere in the proceedings against' Doe . . . . Doe does not overcome the presumption of fairness that should be afforded to UST administrators. Instead, Doe would have the Court presume just the opposite, and hold that university training aimed at gaining a greater understanding of sexual violence, and which uses materials backed by research, presumptively biases administrators against accused males.

A-43-44. Like the district court did, this Court should "refuse[] to make such a presumption." *Id.* at 15.

### 1. The case law cited by John to support his argument is inapposite

John asserts that "[m]any courts have refused to dismiss claims made by students like John when they allege that training materials caused their universities to manifest a bias in favor of Accusing Students." However, each of the cases cited by John in support of this proposition involve Rule 12 motions, in which courts are obligated to accept a plaintiff's factual allegations as true, not Rule 56 motions, in which courts are no longer obligated to accept a plaintiff's unsupported factual allegations as true. *See Doe v. Univ. of Miss.*, No. 3:16-CV-63-DPJ-FKB, 2018 WL 3570229 (S.D. Miss. July 24, 2018); *Norris v. Univ. of Colo.*, 362 F. Supp. 3d 1001 (D. Colo. 2019); *Doe v. Trs. of Univ. of Pa.*, 270 F. Supp. 3d 799 (E.D. Pa. 2017); *Doe v. Ohio State Univ.*, 219 F. Supp. 3d 645, 658 (S.D. Ohio 2016).[11]

Moreover, these cases do not otherwise stand for the proposition that courts have refused to dismiss negligence claims *solely* on the grounds they include

---

[11] John further cites to *Trs. of Boston Coll.*, 892 F.3d 67, to support his contention that UST breached its duty of reasonable care to John. *Trustees of Boston College* included claims for breach of contract and breach of a common law duty to conduct a disciplinary process with basic fairness. In that case, the court specifically determined that the university did not owe the plaintiff any independent duty of care and dismissed the plaintiff's negligence claims. *Id*. John's arguments regarding the court's findings as to the breach of contract claim are of no precedential or persuasive value because the terms of UST and Boston College's policies differ, and John has not appealed the dismissal of his breach of contract claim.

Appellate Case: 19-1594    Page: 48    Date Filed: 06/24/2019 Entry ID: 4800914

allegations "that training materials caused their universities to manifest a bias in favor of Accusing Students." John Br. at 17. For instance, in *University of Mississippi*, the court stated in conclusory fashion that "[t]here are also additional factual allegations regarding [a university official's] policy-making responsibilities and her training materials that might suggest bias." 2018 WL 3570229 at *6. The court made no determination as to whether these allegations alone would be sufficient to save the plaintiff's complaint from dismissal, let alone from summary judgment.

In *University of Colorado*, the court relied on numerous allegations of alleged procedural errors, potential bias "because of plaintiff's sex," and the university's responses to particularized public pressure on the university's past handling of sexual assault complaints. 362 F. Supp. 3d at 1012-1015. It is in this context that the court referred, in passing, to the plaintiff's allegation that a university official "improperly used a trauma-informed approach . . . ." *Id.*

In *Trustees of the University of Pennsylvania*, the plaintiff claimed the university breached a *contractual* requirement to train adjudicators "to fulfill their responsibilities as adjudicators according to the procedures and policies outlined . . . and to ensure compliance with Title IX." 270 F. Supp. 3d at 817. This decision has no application to John's negligence claim.

Appellate Case: 19-1594     Page: 49     Date Filed: 06/24/2019 Entry ID: 4800914

Finally, in *Ohio State University*, the plaintiff alleged that a hearing panel received only one-sided training that included "no training or direction on their role as fair and neutral judges." 219 F. Supp. 3d at 659. The factfinders in John's matter did receive such training. APP.75.

*Doe v. University of Cincinnati*, 173 F. Supp. 3d 586 (S.D. Ohio 2016), provides the better analysis of the issue. In that case, the court held that the presumption of honesty and impartiality afforded to university administrators can only be overcome by a showing of "actual bias," such as "statements by board members or university officials indicating a pattern of bias or a pattern of decision-making . . . ." *Id*. at 601. The court went on to hold:

> Plaintiffs' allegations concerning the sexual assault training provided to UC staff members and pressure allegedly exerted on universities by the Department of Education to intensify their response to sexual assault complaints fall short of creating a reasonable inference that the ARC panels in Plaintiffs' cases were biased. . . . Plaintiffs' mere belief that Defendants acted with such ulterior motives is insufficient to state a claim for relief."

*Id.* at 602 (citations omitted); *see also Gomes v. Univ. of Me. Sys*., 365 F. Supp. 2d at 31-32 (D. Me. 2005) (participation in assault victim advocacy program does not give rise to presumption administrator is biased); *Doe v. Univ. of Denver*, No. 16-cv-00152, 2018 WL 1304530, at *10 (D. Colo March 13, 2018) (training materials similar to those at issue here do not create an inference of gender bias); *Bleier v. Coll. of Holy Cross*, No. 11-11541-DJC, 2013 WL 4714340, at * 12 (D. Mass.

Appellate Case: 19-1594    Page: 50    Date Filed: 06/24/2019 Entry ID: 4800914

Aug. 26, 2013). There is simply no evidence in the record that the training received by UST officials caused them to act with bias against John or in any way caused the factfinders to find him responsible for a Policy violation. Absent any record evidence of "actual bias" on the part of the decisionmakers involved in John's case, John's reliance on selective training materials does not save his claim from dismissal.

### 2. John's mischaracterizations of training materials produced in discovery do not justify the reversal of the district court's summary judgment order

John's argument that select training materials demonstrate bias is based on a mischaracterization of training materials produced in discovery.

Throughout his brief, John asks this Court to hold that training received by university officials on conducting Title IX investigations and disciplinary proceedings are comparable to jury instructions given to jurors or to pretrial publicity that jurors see in a criminal trial. *See* John Br. at 12-13, 19. They are not.

First, juries are lay people who are brought in randomly for a one-time proceeding. In contrast, campus administrators involved in sexual assault investigations and adjudications are higher education professionals who, by law, must be trained on issues related to sexual assault, including "neurobiological responses to trauma." Minn. Stat. 135A.15, subd. 8.

- 39 -

Second, the assumption made by John that juries should not be educated about trauma's effects on memory is inconsistent with the views of prosecutors and applicable law. *See State v. Obeta*, 796 N.W.2d 282, 293 (Minn. 2011) ("the lay notion of what behavior logically follows the experience of being raped may not be consistent with the actual behavior which social scientists have observed from studying rape victims . . . Expert testimony that challenges or explains these assumptions [could be seen as] valuable information which the jury should hear and consider in its search for the truth" (quoting *People v. Hampton*, 746 P.2d 947, 952 (Colo. 1987)); *See* https://www.ag.state.mn.us/Office/Communications /201812_SexualAssaultTaskForceReport.pdf at page 12 (Minnesota Attorney General's Working Group on Sexual Assault report recommending juries be educated about neurobiology of trauma).[12]

### a.     UST's appeal board training was not biased

John asserts that "UST trained its investigators and adjudicators to believe: (a) only 2% to 10% of Accusing Students' sexual assault allegations are false . . . [and] (b) Accusing Students tell the truth even if they "provide inconsistent explanations of assault" and/or "deliberately omit[] details" related to allegations against Accused Students . . . ." John Br. at 12. But as set forth above (*supra* discussion at p. 23), John cites to training materials from a presentation given to

---

[12] John's citations to secondary sources regarding group discipline and collective punishment are likewise wholly irrelevant.

Appellate Case: 19-1594     Page: 52     Date Filed: 06/24/2019 Entry ID: 4800914

members of an advisory appeal board, not to the factfinders and decisionmakers involved in John's case. Moreover, he misstates the content and context of the slides. *Id.*

The training provided to these appeal board members simply does not, as John claims, instruct those members that all Complainants must be believed regardless of the results of an investigation. Indeed, that very same training teaches appeal board members that investigations under the Policy must be (1) "Prompt," (2) "Adequate," (3) "Reliable," and (4) "Impartial," that determinations must be made based on the "preponderance of the evidence," and that the grievance procedure must be "Fair and Equitable" and provide "Equal opportunities for the parties." APP.127. The record evidence shows the factfinders conducted a careful investigation and based their determination on the facts gathered—primarily on John's own statements.

> **b.  External training materials received by individual UST employees do not create a genuine issue of material fact as to whether UST acted with reasonable care**

John further asserts that "UST's Training Materials violated UST's Negligence Duty because these materials trained the Factfinders and Adjudicators to believe . . . '51% of college males admit perpetrating one or more sexual assaults during college.'" John Br. at 24. But this document was not part of UST's internal training materials. The document was received by Lange and Elizabeth

- 41 -

Dussol (an appeal board member) at an external training each individually attended.[13] A-53; APP.173. Holding that the contents of external training materials constitute a breach of a duty by UST would be akin to holding a law firm responsible for materials received by its attorneys at external CLEs. The inclusion of this research-backed statistic in an external training document does not create a genuine issue of material fact as to whether UST officials failed to act with reasonable care in their investigation of the sexual misconduct complaint made against John.

  **c. Training that includes a case study in which factfinders find a policy violation does not create a genuine issue of material fact as to whether UST acted with reasonable care with respect to John**

John argues that "UST's bias in favor of Accusing Students is also manifested in UST's Training Materials which included a template for ruling against Accused Students like John." John Br. at 24-25. John cites to a training provided to UST factfinders and process advisors in December of 2015. *Id.* At the end of the training, a sample case study and sample factfinding report analysis was provided for instruction. The example included a finding that a Respondent was responsible for a Policy violation. It does not follow that UST's factfinders were incapable of concluding, or unlikely to conclude, that an accused student did not

---

[13] Despite John's assertion that factfinders received this training, neither Lange nor Dussol was a factfinder in this matter.

Appellate Case: 19-1594  Page: 54  Date Filed: 06/24/2019 Entry ID: 4800914

violate the Policy in a future investigation. Indeed, as John points out, the example "found an Accused Student had violated UST Policies because his testimony lacked credibility," (John Br. at 25), whereas the factfinders specifically found John to be credible. APP.389.

### d. UST's compliance with state and federal law does not require reversal of the district court's summary judgment order

Finally, John complains that "UST's Training Materials taught UST employees to instruct accusing students like Jane about the '[i]mportance of preserving physical evidence' . . . but did not provide this guidance to John." Both state and federal law require universities to review with Complainants the "[i]mportance of preserving physical evidence." 34 C.F.R. 668.46(b)(11)(ii)(A); Minn. Stat. § 135A.15, subd. 2.

John proceeds to argue that he, conversely, was discouraged from gathering evidence. John Br. at 25-26. This, again, misrepresents the record. Through its Associate General Counsel Abigail Crouse, UST shared with John's counsel, McGraw, potential negative impacts that McGraw's proposed pre-investigation witness interviews might have on the investigative process. In a December 17, 2015 email, Crouse wrote, "If witness testimony appears planned or influenced, it will hurt the witness's credibility and is likely to hurt the credibility of your client if he is seen as trying to influence their testimony." APP.343. Crouse further

- 43 -

explained during her deposition testimony, "I believed that if the witnesses, if their testimony appeared to be coached or tainted, they may not be credible, and wanted [McGraw] to understand that risk. And as I recall, we had a conversation about that, and [he] acknowledged that [he] would be very careful in [his] conversations with those students." A-333.

McGraw did interview certain UST students who were identified as witnesses by John. Audio recordings of the interviews were provided to the factfinders, who listened to them and found each of these witnesses credible. APP.230-239; APP.325-328.

> ### 3. John's misrepresentations of the record are insufficient to create a genuine issue of material fact as to whether UST administrators failed to exercise reasonable care by demonstrating actual bias against him

John attempts to tie these allegedly biased training materials to an alleged lack of reasonable care by UST by misrepresenting the factual record to the Court. This is not evidence of actual bias.

> #### a. There was no "exculpatory evidence" to which UST could deny John access

John speculates that the training materials caused the factfinders to refuse to provide him with "exculpatory evidence." John Br. at 26-27. But, the events giving rise to the sexual misconduct complaint against John took place in the bathroom of

Jane's dorm room and there were no video or audio recordings of those events nor any third-party witnesses. A-305.

To the extent John claims the video of entrances in and out of the dorm building was exculpatory, that evidence was considered by the factfinders and is documented in the report and its attachments. APP.222-223; A-305. The video evidence was inconsistent with both Jane's and John's recollections of how the incident ended. There is no evidence the factfinders were trying to hide exculpatory evidence.[14]

### b. The factfinders questioned both Jane and John regarding inconsistencies between their stories and other evidence gathered

What John claims to be exculpatory evidence are, in reality, mere inconsistencies between Jane's testimony and other evidence. There were however, also inconsistencies between John's version of events and the evidence. *See* discussion *supra* pp.18-19.

John's assertion to this Court that "the Factfinders failed to challenge or question Jane's false, misleading, and/or inconsistent testimony" (John Br. at 30) is blatantly false. John relies on deposition testimony of answers to questions regarding the first interview of Jane in which, as with the first interview of John,

---

[14] John's assertion that he did not learn until discovery that the video review did not show Jane checking the door (John Br. at 26) is false. This fact is in the factfinding report. (APP.242.)

- 45 -

Jane was permitted to "tell her story" (John Br. at 29-30). Jane, like John, was questioned at her second interview about inconsistencies between her statements and other evidence. APP309-311.

Moreover, as the Findings and Analysis section of the factfinding report notes, "regardless of the veracity" of Jane's or John's accounts, the conduct John reportedly relied on to argue that he had consent to digitally penetrate Janes does not constitute consent under the terms of the Policy. *See* discussion *supra* 19-20. John's own acknowledgments, not inconsistencies between his and Jane's stories, were the cause of UST's finding John was responsible for a violation of the Policy.

### c.    Emails between Baughman and Lange do not violate the Policy

John further argues that "reasonable triers of fact would likely find UST's training materials caused Lange and UST's appeal board to find it was impossible for John to satisfy UST's 'arbitrary and capricious' standard for reversing the Factfinders' Report." John Br. at 33. They would, he argues, in part because (1) Baughman emailed Lange inquiring into whether an appeal had been filed and noting that she didn't see any applicable grounds for an appeal, and in part, John claims, because (2) "Lange was actively involved in the process of drafting the final disposition report drafted by Baughman." John Br. at 33-34. As to Baughman's email, John fails to draw any connection between it and UST's training materials. With respect to Lange's supposed involvement in the "drafting

- 46 -

of the final disposition report," John misstates the record. The "report" was, in fact, the letter informing John of the investigation outcome, and John cites to no evidence Lange modified or drafted that letter. As John knows, Baughman was new to her position (A-391-393) and sought advice from Lange on the form and content of the disposition letter because Lange was Baughman's predecessor as dean and response manager for student matters; Baughman's email notes, "I won't [bug] you once I have written one of every letter." A-373. Moreover, Lange did not rely on Baughman's email. Lange convened an appeal board, considered its recommendation, wrote a careful explanation of her decision on both parties' appeals, and postponed the commencement of John's suspension to enable him to complete the semester.

The district court found these contacts were "undesirable," but stated "[T]he Court is unpersuaded that this contact indicates a breach of UST's duty of care." A-47. John cannot identify a single provision of the Policy that these limited communications violated.

### d. John's additional allegations of breach are unsupported by the record

John further claims that "UST prejudiced John's ability to defend himself by only allowing him to view a heavily redacted version of the Factfinder's Report." John Br. at 35. But, as the district court recognized, "Doe was not prohibited from accessing the written Factfinders' report, though his access was restricted insofar

- 47 -

as he or his lawyer were forced to come to campus to view the report. And . . . there was not 'heavy' redaction, as Doe alleges." A-45.

Likewise, while John claims that "Baughman—who would ultimately decide John's punishment—was in near constant communication with Jane's Process Advisor" (John Br. at 35), the district court recognized that there was no evidence to support this claim (A-46).

Finally, while John laments that "Crouse stated, in front of Baughman, that Crouse was not at all surprised that John was not criminally prosecuted because the prosecutors 'always' decline to prosecute 'he said she said cases,'" the district court correctly recognized that this statement was inconsequential. A-47.

While John disagrees with UST's decision, there is no record evidence demonstrating that UST's decision was caused by actual bias or that UST otherwise breached a duty of care to John.

### C.    UST Was Not Required to Permit John to Cross-Examine Jane

#### 1.    John waived any argument that he had a right to cross-examine Jane

John's alleged right to cross-examine Jane is an entirely new issue, neither raised before, nor argued to, the district court.[15] APP.176-210; APP.347-386. This Court does "not consider arguments raised for the first time on appeal." *Richardson v. Sugg*, 448 F.3d 1046, 1059 (8th Cir. 2006) (quoting *Alexander v.*

---

[15] John also did not raise this issue with the factfinders or on appeal to UST.

Appellate Case: 19-1594    Page: 60    Date Filed: 06/24/2019 Entry ID: 4800914

*Pathfinder, Inc.*, 189 F.3d 735, 742 (8th Cir. 1999)). Accordingly, John's cross-examination related arguments are improperly before this Court and should be stricken based upon John's failure to properly preserve the argument below. *See id.* Any effort by John to abandon his previous argument in favor of a new argument should be rejected by this Court. *See Oti Kaga, Inc. v. S.D. Hous. Dev. Auth.*, 342 F.3d 871, 879 (8th Cir. 2003)

### 2. UST did not violate any duty to John by not allowing the cross-examination of Jane

John cites several recent cases to support his position that the denial of the opportunity to cross-examine adverse witnesses violates his procedural due process rights. (John Br. at 48-51.) However, the bulk of this caselaw details the application of this principal to students of public institutions. Private universities are not state actors, and students subject to discipline by private universities are not entitled to constitutional protection. *See, e.g., Rendell-Baker v. Kohn*, 457 U.S. 830, 841 (1982) (finding a private school is not a state actor). Consequently, this mass of caselaw is irrelevant and should not be considered by the Court.

Courts do not extend the same procedural due process rights to private university students. *Z.J. v. Vanderbilt Univ.*, 355 F.Supp.3d 646, 698 (M.D. Tenn. 2018) (declining to resolve questions of constitutional due process involving a private university); *Doe v. Belmont Univ.*, 334 F.Supp.3d 877, 894 (M.D. Tenn. 2018) (declining to apply *Doe v. Baum*, 903 F.3d 575 (6th Cir. 2018), to a private

- 49 -

university student's claim he was denied procedural due process because he did not have an opportunity to cross-examine the accuser); *Doe v. Cornell Univ.*, 163 A.D.3d 1243, 1245 (N.Y. 2018) (determining that denial of opportunity to cross-examine witnesses was not a violation of procedural due process because "a student subject to disciplinary action at a private educational institution is not entitled to the full panoply of due process rights"); *Hall v. Hofstra Univ.*, No. 003540/17, 2018 WL 1802212, at *11 (N.Y. Sup. Ct. April 3, 2018) (slip. op.) (determining that denial of opportunity to cross-examine adverse witnesses is not a procedural due process violation during private university disciplinary proceeding).

John points to five cases (four of which are from the state of California, which has different standards than other states), to support his argument that private university students are entitled to the procedural due process right to cross-examine adverse witnesses; however, these cases do not support John's proposition. (*See* John Br. at 47-48.) *Doe v. University of Southern California*, 238 Cal. Rptr. 3d 856 (Cal. Ct. App. 2018), is inapplicable to this case, and John has fully misstated its facts and holding. The court in *University of Southern California* did not review a university's Title IX proceeding, as John asserts, and instead reviewed a university's disciplinary proceeding for violation of academic standards. *Id.* at 859. Also contrary to John's assertion, the court actually determined there was *no* violation of the student's procedural due process rights

- 50 -

and never considered, nor did the plaintiff in that case even argue, whether there was a right to cross-examine adverse witnesses. *Id.* at 867-71. In *Doe v. Laremont McKenna College*, 236 Cal. Rptr. 3d 655 (Cal. Ct. App. 2018), the court determined only that the university must "provide a means for the fact finder to evaluate an alleged victim's credibility, not for the accused to physically confront his accuser." *Id.* at 669. In *Doe v. Marymount University*, 297 F.Supp.3d 573 (E.D. Va. 2018), the court merely mentioned the accused did not have the opportunity to cross-examine the accuser in the context of a Title IX erroneous outcome claim; the court did not determine whether the accused had a right to cross-examine the accuser. *Id.* at 584.

John also cites to *Doe v. Westmont College*, 246 Cal. Rptr. 3d 369, 382 (Cal. Ct. App. 2019), and *Doe v. Allee*, 242 Cal. Rptr. 3d 109, 137 (Cal. Ct. App. 2019). In those cases, the courts explained that *based upon the independent facts of each case*, the accused should have been afforded some opportunity to indirectly cross-examine the accuser, such as submitting questions to the factfinder(s). *Westmont Coll.*, 246 Cal. Rptr. 3d at 382-83; *Allee*, 242 Cal. Rptr. 3d at 138. John was afforded this opportunity. APP.21; APP.23; APP.315. Even if John was entitled to procedural due process, this opportunity was sufficient. *See Doe v. Cummins*, 662 Fed. App'x. 437, 448 (6th Cir. 2016) (determining that where accused submitted questions for witnesses to disciplinary panel, there was no violation of accused's

- 51 -

due process rights); *Nash v. Auburn Univ.*, 812 F.2d 655, 664 (11th Cir. 1987) (determining that where accused was allowed to pose questions to the disciplinary board chair for adverse witnesses there was no violation of procedural due process rights); *Furey v. Temple Univ.*, 884 F. Supp. 2d 223, 252 (E.D. Pa. 2012) ("[accused] was afforded that right [to cross-examine witnesses] because the [accused] was able to cross examine the witnesses by posing questions through the Chair"); *Donohue v. Baker*, 976 F.Supp. 136, 147 (N.D.N.Y. 1997) ("[D]ue process required that the panel permit the plaintiff to . . . direct questions to his accuser through the panel."). That John neglected to submit such questions does not qualify as a denial of procedural due process. *See Nash*, 812 F.2d at 664 ("Appellants were told they could pose questions of the accusing witnesses by directing their questions to the presiding board chancellor. . . . That they did not avail themselves of the opportunity to question the witnesses through the chancellor cannot be characterized as a denial of process.")

The cases cited by John do not support his argument that private institutions must allow for an accused student to formally and directly cross-examine any adverse witness during a disciplinary proceeding.

Even if private university students were entitled to a procedural due process to directly cross-examine adverse witnesses, there was no violation of any such right in this case. The Sixth Circuit has stated that due process does not require

- 52 -

cross-examination in a student disciplinary proceeding where "cross-examination would have been a fruitless exercise" because the suspected student admitted the "critical fact[s] against him." *Flaim v. Med. Coll. of Ohio*, 418 F.3d 629, 641 (6th Cir. 2005); *see also Winnick v. Manning*, 460 F.2d 545, 549-50 (2d Cir. 1972). Here, the factfinders noted that the most compelling evidence that John violated the Policy was John's own testimony. APP.244-245. John admitted that Jane had not consented verbally and admitted that he solely relied on Jane's failure to resist and the "progression of things," which does not constitute consent under the terms of the Policy. *Id.* Because John admitted the "critical facts against him" there was no violation of any alleged procedural due process rights by not providing him the opportunity to directly cross-examine Jane. *See Flaim*, 418 F.3d at 641.

### 3. Requiring cross-examination in student a disciplinary proceeding would have negative impacts for private institutions and increase the administrative burdens of proceedings

John's argument, if accepted, could have significant negative repercussions for private colleges and universities. For a private institution like UST, the cost of requiring formal direct cross-examination would be significant as it would entirely alter UST's student disciplinary system. At UST, student discipline is intended to be an educational process and the system is designed to minimize the adversarial nature of the proceedings, facilitate the parties' personal learning and development, and serve UST's educational objectives for its students, while ensuring the

- 53 -

effective gathering and fair consideration of evidence. Holding that as a matter of Minnesota common law private institutions must allow direct cross-examination in a student disciplinary proceeding would interfere with these objectives and create significant burdens and additional administrative costs for UST and other private universities.

## V.   JOHN'S FAILURE TO IDENTIFY AN EXPERT PROVIDES AN ALTERNATIVE BASIS FOR AFFIRMING THE DISTRICT COURT'S OPINION

Although "courts should refrain from second-guessing the disciplinary decisions made by school administrators," *Davis*, 526 U.S. at 648, the district court suggested in a footnote that a jury could adequately second-guess such decisions without the aid of expert testimony on the appropriate standard of care in conducting a student disciplinary proceeding. A-48. The district court's suggestion fails to recognize the professional expertise of higher education administrators, and John's failure to timely identify an expert as to the appropriate standard of care provides an alternative basis for affirmance.

In *A.M.J. v. Royalton Pub. Schs.*, No. 05-2541, 2006 WL 3626979 (D. Minn. Dec. 12, 2006), the court correctly concluded that the appropriate standard of care to be followed in conducting misconduct and educational disciplinary investigations is a question beyond layperson understanding, involves the "exercise of professional judgment," and thus "must be proven by expert testimony. *Id.* at

Appellate Case: 19-1594     Page: 66     Date Filed: 06/24/2019 Entry ID: 4800914

*3-4. Like *A.M.J.*, John's negligence claim against UST involves questions beyond layperson understanding, as UST's student disciplinary process is designed for an educational environment that serves students at a particular stage of development and is designed to comply with multiple regulatory requirements.[16] And like the plaintiff in *A.M.J.*, John's failure to timely identify an expert to opine as to these issues was "fatal to [his] negligence claim . . . ." *Id.* at *4.

## VI. THE ABSENCE OF COGNIZABLE DAMAGES PROVIDES AN ALTERNATIVE BASIS FOR AFFIRMING THE DISTRICT COURT'S DISMISSAL OF JOHN'S NEGLIGENCE CLAIM

Finally, the district court's grant of UST's summary judgment motion can be alternatively affirmed because the undisputed facts established that John suffered no cognizable damages, an essential element of a negligence claim. *See K.A.C. v. Benson*, 527 N.W.2d 553, 561 (Minn. 1995); *Reliance Ins. v. Areneson*, 322 N.W.2d 604, 607 (Minn. 1982).

John indicated in his deposition that he had suffered emotional distress and had been damaged by paying attorneys' fees for this lawsuit. APP.295-299. However, "[i]n Minnesota, one who alleges emotional injuries as the result of another's negligence can recover damages only if he or she has suffered a physical injury or develops physical symptoms as a result of direct exposure to physical harm." *Porter v. Children's Health Care - Minneapolis*, No. C5-98-1342, 1999 WL

---

[16] *See, e.g.*, 34 C.F.R. § 668.46; Minn. Stat. § 135A.15.

Appellate Case: 19-1594     Page: 67     Date Filed: 06/24/2019 Entry ID: 4800914

71470, at *11  (Minn. Ct. App. Feb. 16, 1999) (citing *Langeland v. Farmer's State Bank of Trimont*, 319 N.W.2d 26, 31 (Minn. 1982)). John produced no evidence of any physical injury or direct exposure to physical harm caused by UST. Similarly, "[a]ttorneys fees and expenses are not generally included in the measure of recoverable damages for negligence." *Hill v. Okay Constr. Co.*, 252 N.W.2d 107, 121 (1977).

It is unclear whether John suffered any economic damages.  John failed to provide any evidence or clear calculation of his alleged economic damages, and, during his deposition, he could not provide information on the specific amount he was seeking or the basis therefore. APP.299-303. "At the summary judgment stage, a plaintiff must produce enough evidence to show there is a genuine issue of economic damages." *Doe v. Kmart Corp.*, No. A16-0465, 2017 WL 474404, at *6 (Minn. Ct. App., Feb. 6, 2017) (citing *Doe 175 v. Columbia Heights Sch. Dist.*, 873 N.W.2d 352, 359 (Minn. Ct. App. 2016)). "Speculative, or conjectural damages are not recoverable." *Id.* (citing *Anderson v. Benson*, 394 N.W.2d 171, 175 (Minn. Ct. App. 1986) & *Sievert v. First Nat'l Bank in Lakefield*, 358 N.W.2d 409, 415 (Minn. Ct. App. 1984). Because he has not satisfied his burden, the district court's dismissal of John's negligence claim can be affirmed for lack of cognizable damages.

- 56 -

## VII. **THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION IN REFUSING TO PERMIT JOHN TO DEPOSE JANE**

The district court was well within its discretion when it denied John's motion to compel Jane's deposition (A-27-29). Pursuant to Federal Rule of Civil Procedure 45(d)(3)(A)(iv), a court must quash or modify a subpoena that subjects a person to undue burden. "In evaluating whether the burden of production outweighs the likely benefit of discovery, 'concern for the unwanted burden thrust upon non-parties is a factor entitled to special weight in evaluating the balance of competing needs." *In re Nat'l Hockey League Players' Concussion Injury Litig.*, No. 14-cv-2551, 2017 WL 1493671, at *7 (D. Minn. April 26, 2017) (quoting *Misc. Docket Matter No. 1 v. Misc. Docket Matter No. 2*, 197 F.3d 922, 927 (8th Cir. 1999)).

The burden imposed on Jane by requiring her to sit for a deposition far outweighed any limited relevance her testimony might have had on John's negligence claim. Jane has no internal insight into how the factfinders assessed the evidence or reached their conclusions. Moreover, the factfinders painstakingly detailed their investigation, findings, and analysis in a twenty-seven page report and associated interview notes. Jane's testimony would have provided no additional information relevant to John's negligence claim.

As such, the district court did not grossly abuse its discretion by denying John's Motion to Compel.

- 57 -

Dated:  June 21, 2019                    BRIGGS AND MORGAN, P.A.


By: _/s/ Maren M. Forde_____
    David A. Schooler (#0225782)
    Ellen A. Brinkman (#0386578)
    Maren M. Forde (#0390221)
2200 IDS Center
80 South Eighth Street
Minneapolis, MN  55402-2157
Telephone: (612) 977-8400
Facsimile:  (612) 977-8650

**ATTORNEYS FOR APPELLEE**
**UNIVERSITY OF ST. THOMAS**

Appellate Case: 19-1594     Page: 70     Date Filed: 06/24/2019 Entry ID: 4800914

## CERTIFICATE OF BRIEF LENGTH

This brief complies with Fed. R. App. P. 32(a)(7)(B) by being printed in 14-point, proportionately spaced typeface, utilizing Microsoft Word 2007 and containing 12,948 words.


Dated:  June 21, 2019                    BRIGGS AND MORGAN, P.A.


                                         By:  /s/ Maren M. Forde
                                             David A. Schooler (#0225782)
                                             Ellen A. Brinkman (#0386578)
                                             Maren M. Forde (#0390221)
                                         2200 IDS Center
                                         80 South Eighth Street
                                         Minneapolis, MN  55402-2157
                                         Telephone: (612) 977-8400
                                         Facsimile:  (612) 977-8650

                                         **ATTORNEYS FOR APPELLEE**
                                         **UNIVERSITY OF ST. THOMAS**

Appellate Case: 19-1594    Page: 71    Date Filed: 06/24/2019 Entry ID: 4800914