# UNITED STATES COURT OF APPEALS
# FOR THE EIGHTH CIRCUIT

*JOHN DOE, APPELLANT*
*v.*
*UNIV. OF ST. THOMAS, APPELLEE*

_____

Appeal from the United States District Court of Minnesota
Case No: 16-cv-1127 (JRT/DTS)

---

## REPLY BRIEF OF APPELLANT JOHN DOE

---

For Appellant John Doe:

Beau D. McGraw (31190X)
McGraw Law Firm, P.A.
10390 39th St. North, Suite 3
Lake Elmo, MN 55042
651.209.3200 phone
beau@mcgrawlawfirm.com


Eric J. Rosenberg (0069958)
Rosenberg & Ball Co. LPA
395 North Pearl Street
Granville, Ohio 43023
740.644.1027 phone
erosenberg@rosenbergball.com

i

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ............................................................................. iii

ARGUMENT .............................................................................................. 5

    I.    UST's Training Materials Caused Its Breach of District Court's Negligence Duty. ......................................................................... 5

    II.   The Record Disproves UST's Claim That John Received A Fair and Equitable Proceeding. ................................................................ 13

    III.  UST Waived Its Ability to Collaterally Attack the Negligence Duty. 20

    IV.  The Record Disproves UST's Claim That It Did Not Breach the Negligence Duty. ................................................................... 25

    V.   UST Did Not Refute DC's Abuse of Discretion in Prohibiting Jane's Deposition. ............................................................................. 32

    VI.  Experts Are Not Necessary to Establish UST's Breach of the Negligence Duty. ................................................................... 32

    VII.   UST's Negligence Duty Breach Caused John Significant and Lasting Damage and Such Breach Was Foreseeable by UST. ................. 33

CONCLUSION ......................................................................................... 34

Appellate Case: 19-1594    Page: 2    Date Filed: 07/24/2019 Entry ID: 4811238

# TABLE OF AUTHORITIES

## CASES

*A.M.J. v. Royalton Pub. Sch.*, Civ. No. 05-2541, 2006 WL 3626979 (D. Minn. Dec. 12, 2006) ................................................. 33

*Abbariao v. Hamline University School of Law*, 258 N.W.2d 108 (Minn. 1977) ................................................................ 23

*Bleier v. Coll. of Holy Cross*, No. 11-11541-DJC, 2013 WL 4714340 (D. Mass. Aug. 26, 2013) ............................................ 29, 30

*Blum v. Bacon*, 457 U.S. 132 (1982) ................................................ 22

*Davis Next Friend LaShonda D. v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629 (1999) ..................................................... 25

*de Llano v. Berglund*, 282 F.3d 1031 (8th Cir. 2002) ...................... 31

*Doe v. Amherst Coll.*, 238 F. Supp. 3d 195 (D. Mass. 2017) ............ 31

*Doe v. Brown Univ.*, 210 F. Supp. 3d 310 (D.R.I. 2016) .................. 30

*Doe v. Columbia Coll. Chicago*, 299 F.Supp.3d 939 (N.D. Ill. 2017) ............. 31

*Doe v. Cummins*, 662 Fed. App'x. 437 (6th Cir. 2016) ..................... 29

*Doe v. Kmart Corp.,* No. A16-0465, 2017 WL 474404, (Minn. Ct. App., Feb. 6, 2017) ............................................... 33, 34

*Doe v. Ohio State Univ.*, 219 F. Supp. 3d 645 (S.D. Ohio 2016) ...... 29

*Doe v. Trs. of Univ. of Pa.*, 270 F. Supp. 3d 799 (E.D. Pa. 2017) .............. 7, 29

*Doe v. Trustees of Boston College*, 892 F.3d 67 (1st Cir. 2018) ......... 25

*Doe v. Univ. of Cincinnati*, 173 F. Supp. 3d 586 (S.D. Ohio 2016) ............. 29, 30

*Doe v. Univ. of Cincinnati*, 872 F.3d 393 (6th Cir. 2017) .................. 21

*Doe v. Univ. of Miss.*, No. 3:16-CV-63-DPJ-FKB, 2018 WL 3570229 (S.D. Miss. July 24, 2018) .............................. 29

*Doe v. University of Southern California*, 238 Cal. Rptr. 3d 856 (Cal. Ct. App. 2018) ................................................ 24

*Doe v. University of Southern California***,** 29 Cal.App.5th 1212 (2018) ............ 24

*Duit Construction Co. v. Bennett,* 796 F.3d 938 (8th Cir. 2015) ......... 21

*East Iowa Plastics Inc., v. PI, Inc.,* 889 F.3d 454 (8th Cir. 2018) ....... 21

*Gomes v. Univ. of Maine Sys.*, 365 F. Supp. 2d 6 (D. Me. 2005) ........ 29, 30

*Gross v. FBL Financial Svs.,* 588 F.3d 614 (8th Cir. 2009) ................ 21

*Jennings v. Stephens,* 135 S.Ct. 793 (2015) .................................... 20

*NCAA v. Tarkanian*, 488 U.S. 179 (1988) ....................................... 23

*Norris v. Univ. of Colo.*, 362 F. Supp. 3d 1001 (D. Colo. 2019) ......... 29

*Rendell-Baker v. Kohn,* 457 U.S. 830 (1982) ................................... 23

*Richmond v. Fowlkes*, 228 F.3d 854 (8th Cir. 2000) .......................... 31

iii

*Robinson v. Univ. of Minnesota*, No. A17-1620, 2018 WL 4395020 (Minn. Ct. App. Sept. 17, 2018)..................................................................... 31
*Rollins v. Cardinal Stritch Univ.*, 626 N.W.2d 464 (Minn. App. 2001) ........... 23
*Sahm v. Miami University*, 110 F. Supp. 3d 774 (S.D. Ohio 2015) ............. 29, 30
*Spirtas Co. v. Nautilus Ins.*, 715 F.3d 667 (8th Cir. 2013) ................................ 22
*State v. Obeta*, 796 N.W.2d 282 (Minn. 2011) ..................................................... 7
*United States v. American Railway Express Co.,* 265 U.S. 425 (1924) ............ 21
*Z.J. v. Vanderbilt Univ.*, 355 F.Supp.3d 646 (M.D. Tenn. 2018) ...................... 29

## STATUTES

20 U.S.C. §1092.................................................................................................... 14
Minn. Stat. § 135A.15............................................................................................. 4

## OTHER AUTHORITIES

Emily Yoffe, *The Bad Science Behind Campus Response to Sexual Assault*, *The Atlantic*, Sept. 8, 2017                                                                                    5

Appellate Case: 19-1594    Page: 4    Date Filed: 07/24/2019 Entry ID: 4811238

## **ARGUMENT**

**I.  UST's Training Materials Caused Its Breach of District Court's Negligence Duty.**

Reasonable jurors would likely find the University of St. Thomas' ("UST") Title IX training caused UST to manifest bias: (a) in favor of students who accuse other students of sexual misconduct ("Accuser-Favored Bias"); and (b) against accused students like John Doe ("John"), who are viewed through a "collective guilt" lens. *John-Br.,* pgs.15-44. Jurors would also likely find UST's training caused UST's Factfinders and Adjudicators to violate the District Court's ("DC") Negligence Duty in allowing Accuser-Favored Bias to cause John's unlawful suspension. *Id.,* pgs.10, 22-23.

UST's six attempts to disprove causal connections between its Accuser-Favored Bias and its Negligence Duty breach are at best disputes over material facts, which prove DC erred in dismissing John's negligence claim.  First, UST attempts to whitewash the Accuser-Favored Bias in UST's Forensic Experiential Trauma Interview ("FETI") training. *UST-Br.,* p.15-16, p.26. This training taught UST employees to *believe* students accusing others of sexual misconduct ("Accusers") tell the truth even when they clearly provide inconsistent information and/or deliberately omitted facts.  *John-Br.,* p.30.

UST alleges FETI conforms with Minn. Stat. § 135A.15 subd. 8.  *UST-Br.,* pgs.8-9, 39. This statute requires training on "best practices" for addressing

5

"neurobiological responses to trauma," but does _not_ identify FETI as a "best practice." *Minn. Stat. § 135A.15* subd. 8. Jurors would likely find UST's FETI training violated this statute because UST provided _no_ training on how to determine if an Accusers' contradicted claims or inconsistencies stemmed from lies or neurobiologically induced trauma. *App.52-100, App.117-152* (containing UST's Title IX training). Instead, UST taught employees to implement a two-tiered system: contradictions and deliberate omissions were interpreted as signs of Accusers' _truthfulness_ and accused students' _untruthfulness_.

This failure caused UST's Accuser-Favored Bias. This is partly because UST acknowledged the "trauma" components of its FETI training of Factfinders _and_ Adjudicators is based on the work of Rebecca Campbell. *App.110*. UST neglected to mention Campbell admitted her neurological research was _not_ intended "to support the idea that no matter how a complainant behaves, she is almost certainly telling the truth." Emily Yoffe, *The Bad Science Behind Campus Response to Sexual Assault*, *The Atlantic*, Sept. 8, 2017, https://www.theatlantic.com/education/archive/2017/09/the-bad-science-behind-campus-response-to-sexual-assault/539211/ (last assessed July 1, 2019).[1]

---

[1] UST correctly noted John misidentified Ms. Yoffe as a law professor. *UST-Br.,* 26, fn.9 John apologies for this oversight. UST also alleged Yoffe's work was "criticized." *Id.* But, UST neglected to mention Harvard Law Professor Jeannie Suk Gersen expressed concerns similar to Yoffe's

Instead of teaching how to ferret out truthful testimony, UST taught employees that Accusers are to be "*believed*" even when they "provide inconsistent explanations of assault" or "deliberately omit[] details," because they are traumatized "survivor[s]." *A.51* (emphasis added). UST claims "scientific" and "[n]eurobiological research" substantiate UST's trauma training. *UST-Br.,* pgs.8-11. This claim lacks merit because UST's allegations are <u>not</u> supported by citations to scientific or neurobiological research. *Id.* Rather, UST relies on employees' unsubstantiated testimony and newspaper articles. *UST-Br.,* pgs.8-9.

UST also incorrectly claims its "trauma" training cannot violate the Negligence Duty due to a Minnesota Attorney General's Working Group's publication and *State v. Obeta*, 796 N.W.2d 282, 293 (Minn. 2011). *UST-Br.,* p.40. UST is incorrect because the publication and *Obeta* address *criminal law* issues not campus disciplinary proceedings. Instead, UST should have looked to decisions like *Doe v. Trs. of Univ. of Pa*., 270 F. Supp. 3d 799 (E.D. Pa. 2017). That decision refused to dismiss a contract claim because the university's biased Title IX training did "'*not* promote fairness and impartiality' and, instead, 'undermines principles of impartiality, favors Accusers (typically female), and biases proceedings against respondents.'" *Id.,* 816 (emphasis added). The court found the university's training

---

<u>https://www.newyorker.com/news/our-columnists/assessing-betsy-devos-proposed-rules-on-title-ix-and-sexual-assault</u> (last assessed July 1, 2019).

7

exhibited the same Accuser-Favored Bias as in UST's training. *Id.,* 816-17 (criticizing training that "warns against victim blaming . . . explains that major trauma to victims may result in fragmented recall, which may result in victims 'recount[ing] a sexual assault somewhat differently from one retelling to the next' . . . and cites studies suggesting that false accusations of rape are not common.").

UST's backup argument alleges John misrepresents UST's application of FETI because Factfinders followed FETI mandates which required Factfinders address "inconsistencies" in Jane Roe's ("Jane") testimony during her second interview. *UST-Br.,* p.26. This argument fails. UST identifies <u>no</u> FETI training suggesting Factfinders handle second interviews differently than first interviews. *Id*. Additionally, Factfinders' interview notes *show no* good-faith attempt to address Jane's false and/or inconsistent testimony.

For example, Factfinders <u>*never*</u> asked Jane specific questions about the following testimony from John, which proved Jane engaged in <u>*conduct*</u> that manifested "<u>*consent*</u>" under UST's Policies: [2]

1. Prior to arriving at Jane's dorm, Jane and John engaged in a consensual "make out" session at a party;

2. Upon arriving at Jane's dorm, Jane "suggest[ed]" they "go to a lounge" where Jane "got on top of" John, wrapping her legs around him; "unbutton[ed] his shirt" and started "biting John's ear" while "straddl[ing]" him;

---

[2] *Infra,* pgs.24 (discussing UST's "consent" definition).

Appellate Case: 19-1594     Page: 8     Date Filed: 07/24/2019 Entry ID: 4811238

3. Later, they entered Jane's bathroom, where Jane again "unbutton[ed] his shirt, kiss[ed] him, and nibbl[ed] on his ear";

4. While in the bathroom, John "emphasized that he tried to get consent throughout the encounter, stating that 'she rubs me' and the[n] 'I rub her back;'"

5. John added, "I'm fingering her, and she's rubbing [my] penis." Regarding this interchange, John stated Jane "was 'moaning' (which [John] later reported that he interpreted as [Jane] experiencing pleasure" and consent to the contact;

6. Jane's rubbing of John's penis "hurt" because it was "very harsh and painful" so he told Jane "I want to stop." John removed Jane's hand from his penis, but she "put [her hand] back" on his penis;

7. John stated Jane was "very dominant" and was "hurting" John's penis. John provided photos of his penis with one showing a "1" gash";

8. Because Jane caused John so much pain, John suggested oral sex to which Jane replied with "something like: 'I don't do that for boys I'm not dating . . . .'" John replied "[w]hatever you're comfortable with;"

9. Jane continued to rub John's penis until he could not "stand the pain" so he stopped digitally penetrating Jane's vagina. When he did, he noticed blood on his fingers which he assumed occurred because Jane was "on her period;" and

10. When Jane saw the blood, she said "[a]ugh or yikes.'" John thought Jane "was embarrassed" so he got dressed and left the bathroom; *Compare, App.312-15* (containing Factfinders' notes from John's first interview), with *App.309-311* (containing Factfinders' notes from Jane's second interview).

9

Similarly, Factfinders' notes from Jane's second interview prove Factfinders did not ask her to respond to the following evidence John provided in support of his innocence:

1. Jane's statements to police;

2. The prosecutor's decision not to charge John;

3. Text messages between John and Jane and John and a third-party UST student; and

4. Audio-recorded interviews of witnesses identified by John. *Compare*, UST-Br., pgs.17-18 (detailing exculpatory evidence John provided Factfinders), with *App.309-311* (Factfinders' notes of Jane's second interview which contain no reference to items 1-4).

Instead of asking about Jane's *conduct* that manifested "consent" as UST defines the term, Factfinders allowed Jane to control the narrative of her second interview. For instance, when asked about Jane's "contact with" John's penis, Factfinders complied with Jane's request to "switch the topic." *App.309.* Later, when Jane was "ready to go back to the questions," Factfinders avoided the critical consent-centered questions regarding her aforementioned conduct. *App.310.*

Factfinders' notes allege they "pressed" Jane to "recount what happened in the bathroom." *Id.* But, Factfinders' notes show Jane deflected their questions without answering them. For example, Jane provided a "bullet point[]" list of her allegations against John that contradicted some of the information in: (a) notes from Jane's first interview; (b) her statements to police; and/or (c) John's testimony.

10

*Compare, Id.* (containing bullet points), with *App.268-270* (Jane's statement to police); *App.304-308* (Factfinders' notes from Jane's first interview). Troublingly, Factfinders did not ask Jane about these contradictions. *App.310.*

Factfinders also failed to explore Jane's inconsistent testimony. For example, when Factfinders asked Jane about her earlier claim that John had "pulled her hair," Jane stated that "she didn't remember the hair pulling." *App.310-11.* Similarly, when Factfinders told Jane that her roommate said Jane and John were in the bathroom for only "about 10 minutes," not the "hours" Jane had claimed, Jane mused "[h]ow could it only be 10 minutes . . . ." *Id.* Factfinders asked no follow-up questions addressing either of these contradictions—or the obvious problems they posed for Jane's more general credibility. *Id.*

On the other hand, Factfinders' notes from *John's* second interview reveal Accuser-Favored Bias. Factfinders *began* Jane's second interview by providing her John's written statement. *App.309.* Conversely, Factfinders *withheld* Jane's written statement from John until late in his second interview. *App.317.* Factfinders also withheld surveillance video screenshots until *after* they questioned John about Jane's written statement. *App.317-318.* Factfinders acknowledged this interrogation technique — not employed with Jane — "shocked" John. *Id.* However, Factfinders admitted their technique did not produce the desired inconsistent testimony because

11

Factfinders noted John provided "legitimate" responses in support of his innocence when Factfinders surprised him with documents. *Id.*

Reasonable jurors reviewing these facts would therefore likely <u>*reject*</u> two of UST's central arguments: (1) John's request to cross-examine Jane could not have resulted in exculpatory evidence because "John admitted the 'critical facts against him;"[3] and (2) UST provided John the "Impartial . . . Fair and Equitable" process UST alleges on pages 8, 10, and 41 of its brief.

The evidence above also disproves UST's allegation that John "mischaracterized" the record in establishing how Factfinders' Accuser-Favored Bias breached the Negligence Duty. *UST-Br.,* p.26. In support of this allegation, UST claims Factfinder Jean Giebenhain ("Giebenhain") questioned Jane about her "inconsistencies" in Jane's second interview. *UST-Br.,* p.26. Giebenhain conceded otherwise, admitting that during the interview, Factfinders failed to press Jane regarding her contradictory testimony because they wanted to let her "tell us the events as she recalled them." *A.544.*

Similarly, Factfinder Vern Klobassa ("Klobassa") detailed how UST's training produced his Accuser-Favored Bias. Klobassa did not "recall" any "training" on how to "question witnesses" who provided "[in]consistent" testimony.

---

[3] *UST-Br.,* p. 53.

*A.488.* While he acknowledged "cross-examin[ation]" is a tool he generally uses to address "problem[s] with [someone's] story," (*A.489*) Klobassa did not recall asking Jane to address problems with her story. *See e.g., A.474-76* (detailing how Factfinders did not ask Jane to address contradictions between her roommate's testimony about hearing nothing unusual emanating from their bathroom and Jane's allegation that John "slammed [Jane] into the cabinet above the [bathroom] sink."); *A.471* (discussing how instead of asking Jane direct questions about her "wrapping her legs" around John and engaging in a mutual make-out session, Factfinders: "asked [Jane] to recall events . . . to the best of her ability.").

After reviewing the acts and omissions above, jurors would likely find UST's application of FETI methodologies caused Accuser-Favored Bias that breached the Negligence Duty.

## II.     **The Record Disproves UST's Claim That John Received A Fair and Equitable Proceeding.**

UST claims John received a "Reliable . . . Impartial, . . . Fair and equitable" disciplinary proceeding. *UST-Br.,* pgs. 8, 10, and 41. Jurors would likely disagree. For, the words reliable, impartial, and/or fair and equitable appear only <u>once</u> in Factfinders' 47-page training materials. *App.*52-100 (containing UST's Factfinder Training). This one reference contains <u>no</u> suggestions about <u>how</u> to conduct a reliable, impartial, and/or fair and equitable proceedings. *App.*75. Instead, UST's

13

Factfinder training manifested Accuser-Favored Bias occasionally veering into promotion of collective guilt, including the following examples:

1. Providing "Analytic[s]" instructing Factfinders how to find accused students guilty of sexual misconduct – while providing no "Analytic[s]" for finding students not-guilty;

2. Identifying examples of words and/or conduct by accused students that establish _sanctionable_ sexual misconduct – while providing no examples suggesting _not-guilty_ findings;

3. Providing a case study on how to prepare a report finding an accused student guilty – and no case study finding a student not-guilty;

4. Containing _no_ discussion of how to ascertain a potential _false_ allegation of sexual misconduct; *App.54-App.100;*

5. Training Factfinders _not_ to ask about "consent" in "coercion" cases because it "is a distraction" and the "wrong question"[4] – even though the training states "[s]eduction" can qualify as "coercion." *App.58;*

6. Containing no training about how to address situations where both parties were incapacitated and mutually consented to sexual activity.[5] Instead, Factfinders learn the accused student in these situations is guilty, and how to "sanction him proportionally. . . ." *App.63;* and

7. Referring to Accusers as "victim[s]." *App.55; App.60; App.68; App.69.*

Jurors reviewing these items would likely reject UST's arguments that UST "train[ed]" Factfinders to be impartial, fair or equitable. *UST-Br.,* p.8.

---

[4] *App.66.*

[5] *App.54-App.100.*

This is partly because UST's General Counsel Abigail Crouse ("Crouse") trained UST Factfinders. Crouse's Accuser-Favored Bias was so strong that she admitted to the false belief that prosecutors "*always*" decline to prosecute "he said she said cases." *John-Br.,* pgs. 35. UST alleges Crouse's incorrect beliefs on prosecutors' prosecutorial decision-making are "inconsequential." *UST-Br.,* p.48. Jurors would likely disagree: Crouse's training materials taught UST employees to find accused students guilty in "he said she said cases" even when the evidence contradicted Accusers' claims.

UST next claims that training employees that only "2% to 10% of all sexual assault reports" are false did not breach the Negligence Duty because the figure is based on verifiable "research" consistent with 20 U.S.C. § 1092(f)(8)(B)(iv)(I)(bb). *UST-Br.,* pgs.10, 40-41. *Nothing* in 20 U.S.C. § 1092 suggests UST should teach employees about the percentage of false (or true) sexual assault allegations. *See,* 20 U.S.C. §1092(f)(8)(B)(iv)(I)(bb).

Instead, UST's use of 2-10% false claim manifests Accuser-Favored Bias. Professor David Lisak authored the survey producing the statistic. Lisak's study calculated a false claim rate of 6%, a true claim rate of 35%, and an unfounded/ambiguous claim rate of 59%. Lisak et al., *False Allegations of Sexual Assault: An Analysis of Ten Years of Reported Cases*, VIOLENCE AGAINST WOMEN 16: 1318-1334. https://cdn.atixa.org/website-media/atixa.org/wp-

15

content/uploads/2016/03/12193336/Lisak-False-Allegations-16-VAW-1318-2010.pdf (last accessed July 7, 2019). UST could have used this data to construct training slides showing 65% of sexual assault claims are either false, unfounded, or too ambiguous to render judgment. Instead, UST distorted the data to reinforce UST's collective guilt/Accuser-Favored Bias. Therefore, jurors would likely find UST's use of statistic prompted outcomes based on collective guilt.

Furthermore, a publication by the *National Center for the Prosecution of Violence Against Women* ("NCPVAW") disproves UST's claim that *FBI data* determined only 2-10% of sexual assault allegations are false. *UST-Br.,* p.10. NCPVAW contended a <u>non</u>-FBI generated study was the "*only* research conducted in the U.S. to evaluate the percentage of false reports made to law enforcement." *App.162.* NCPVAW noted: "a very comprehensive review article estimates [allegations of false sexual assault] in the literature [as] ranging from 1.5% *to <u>90%</u>*." *Id.* Given this range, NCPVAW recognized, "In reality, <u>*no one knows*</u> – and in fact <u>*no one can possibly* know</u> – exactly how many sexual assault reports are false." *App.163.* (emphasis added).

Next, UST alleges training prepared by UST's associate general counsel and/or its Title IX coordinator - two people with supervisory authority over the Title IX process - is irrelevant. *UST-Br.,* p.25. Specifically, UST alleges this training was given to "UST's appeal board (an advisory board without decision making

16

authority)." *Id.* This argument fails because UST trained Factfinders to utilize FETI, which taught Accusers should be believed even when they provide inconsistent explanations and/or deliberately omit information. *Supra,* pgs.2-4. Moreover, Appeal Officer/UST Vice President Karen Lange ("Lange") received UST's dubious Appeals Board training which contributed to her erroneous rejection of John's appeal. *John-Br.,* pgs.33-34.

For its third argument,[6] UST disputes John's likening UST's training to jury instructions that maintain: victims of crime should be believed 90 to 98% of the time even if they provide inconsistent testimony and deliberately omit details that undermined their allegations. *John-Br.,* p.44. In particular, UST denies its training is equivalent to jury instructions because UST trains employees how to evaluate neurological trauma. *UST-Br.,* p.39. However, UST's training contains <u>*no*</u> actual <u>*training*</u> on how employees might determine if Accusers' inconsistent explanations or deliberate omissions were intentional lies or trauma induced. *App.*52-100, *App.*117-152 (containing UST's Title IX training).

Fourth, UST accuses John of bad faith because he only produced a "sliver of" UST's training materials. *UST-Br.,* p.27. But, the <u>*only*</u> training materials UST provides in support of this argument are <u>*single*</u> PowerPoint slides shown to Factfinders and Adjudicators. *UST-Br.,* pgs.8, 11, 41. These <u>*single*</u> slides discuss the

---

[6] *UST-Br.,* pgs.39-40.

Appellate Case: 19-1594     Page: 17     Date Filed: 07/24/2019 Entry ID: 4811238

need for "Reliable" and "Impartial" Title IX proceedings – with no direction on how to accomplish such a proceeding. *Id.*

Consequently, jurors reviewing UST training would likely find it manifests Accuser-Favored Bias. This is partly because it included collective guilt messages such as training that accused students should be presumed guilty since "51% of college males admit perpetrating one or more sexual assaults during college." *Id.* UST claims the 51% statistic is irrelevant because Lange received it as part of "external" Title IX training. *UST-Br.,* pgs.41-42. Jurors would likely reject this argument because: (a) Lange chaired John's appeal board,[7] and (b) UST provided no training to counter this "collective guilt" statistic. Rather, UST's "external" training reinforced its Accuser-Favored Bias by excluding any reference to organizations, academics, or experts that might expose UST's collective guilt worldview. *App.52-100, App.118-152*.

Fifth, UST argues its Accuser-Favored Bias did not breach the Negligence Duty because Factfinders found both John and Jane "credible." *UST-Br.,* p.43. The problem with this argument: UST's training led its employees to find Jane credible despite the massive holes in her testimony. *See e.g., John-Br.,* pgs.26-29, 31.

Next, UST minimizes John's evidence of UST's differential treatment of Jane. *John-Br.,* p.25 (discussing how UST (a) instructed only Jane about the "[i]mportance

---

[7] *Infra,* pgs.25 (discussing same).

18

of preserving physical evidence"; and (b) offered only Jane access to mental health counseling and academic support).   For instance, UST claims 34 C.F.R. § 668.46(k)(3) only required UST tell Accusers to preserve evidence. *UST-Br.,* 43. Actually, 34 C.F.R. § 668.46(k)(3) required UST implement "fair, and impartial" Title IX proceedings: (a) "transparent to the accuser and accused"; and (b) "[c]onducted by officials [without] conflict of interest or bias . . ." *34 C.F.R. § 668.46(k)(3)*.   Jurors would likely find UST violated this regulation when it instructed Jane—not John—to preserve evidence.

Jurors also would likely determine UST violated 34 C.F.R. § 668.46(k)(3) by discouraging John - but not Jane - from independently interviewing witnesses. *John-Br.,* 25-26 (discussing same).  For, UST admits Crouse – the attorney/instructor for some of UST's Title IX training[8] - warned John that conducting these interviews would likely undermine his "credibility" and that of his witnesses. *UST-Br.,* pgs.43-44.

As for why UST sent Jane –not John – a letter offering mental health counseling and academic support, UST implausibly claims it provided John "similar information" via a link to UST's Policy. *UST-Br.,* p.14.  Jurors would likely find this link to a densely-written policy "dissimilar." *See e.g., App.9-14* (containing UST

---

[8] *Infra,* p.12.

policy identifying organizations assisting "victim[s]" of sexual misconduct and no organizations for accused students (and) offering counseling services only to "individuals who have experienced or otherwise been involved in sexual misconduct.")

The _collective_ weight of this evidence shows DC erroneously determined UST's Accuser-Favored Bias did not breach the Negligence Duty. This is partly because John detailed how this bias ran afoul of decisions by this Court, the Supreme Court, and concerns raised in academic studies about bias triggered by viewing individuals though a "collective guilt" lens. *See generally, John-Br.,* pgs.19-21. UST's _only_ response is a footnote claiming these decisions and articles are "wholly irrelevant." *UST-Br.,* p.40, fn.12. Jurors, by contrast, would likely find the "collective guilt" in UST's training highly relevant in finding the University breached the Negligence Duty.

## III. <u>UST Waived Its Ability to Collaterally Attack the Negligence Duty.</u>

This Court should reject UST's attempt to reverse DC's Negligence Duty[9] because UST filed no cross-appeal. The Supreme Court discussed the need for cross-appeals in *Jennings v. Stephens,* 135 S.Ct. 793 (2015). *Jennings* determined: "an appellee who does not cross-appeal may not 'attack the decree with a view either to enlarging his own rights thereunder or of lessening the rights of his adversary.'"

---

[9] *UST-Br.,* pgs.30-33.

Appellate Case: 19-1594      Page: 20      Date Filed: 07/24/2019 Entry ID: 4811238

*Id.,* at 798 (quoting *United States v. American Railway Express Co.,* 265 U.S. 425, 435 (1924)).

Like *Jennings*, this Court's *Gross* decision cited *American Railway Express Co.* in denying appellee's collateral attack of a district court ruling when appellee did not file a cross-appeal. *Gross v. FBL Financial Svs.,* 588 F.3d 614, 21 (8th Cir. 2009). This was because "an appellee must file a cross-appeal when he seeks to enlarge his rights under the judgment . . . ." *Id. See also, East Iowa Plastics Inc., v. PI, Inc.,* 889 F.3d 454, 459 (8th Cir. 2018)(denying appellee relief because it would "enlarge" appellee's rights without cross-appeal); *Duit Construction Co. v. Bennett,* 796 F.3d 938, 941-92 (8th Cir. 2015)(finding failure to file cross-appeal prohibited relief sought because "an appellate court may not alter a judgment to benefit a nonappealing party.'")(citations omitted).

Here, reversing the Negligence Duty, which UST admits arose from a "case of first impression," would significantly enlarge UST's rights. *UST-Br.,* p.31. In fact, UST repeatedly acknowledges the benefits it would reap from a reversal. UST wants to eliminate the Negligence Duty to avoid the alleged "negative repercussions" caused by providing "due process protections." *See e.g., Id.,* pgs.31, 53.[10] Stated

---

[10] This argument coming from a university is deeply troubling. As the Sixth Circuit has recognized, "Reaching the truth through fair procedures is an interest [an accused student] and [his University] have in common." *Doe v. Univ. of Cincinnati*, 872 F.3d 393, 402 (6th Cir. 2017).

Appellate Case: 19-1594     Page: 21     Date Filed: 07/24/2019 Entry ID: 4811238

another way, UST wants the Negligence Duty reversed so Minnesota's private colleges can deny students common-sense procedural protections required at public and private colleges across America. *Compare, John-Br.,* pgs.44-50 (discussing decisions requiring live hearings and cross-examination in Title IX disciplinary proceedings) with *UST-Br.,* pgs.48-54 (containing UST's opposing arguments).[11]

UST's lack of a cross-appeal is not remedied by its *Blum* and *Spirtas Co.* based claims that UST is attempting to "affirm" DC's decision on "alternative grounds." *UST-Br.,* p.33 (discussing *Blum v. Bacon*, 457 U.S. 132 (1982) *Spirtas Co. v. Nautilus Ins.*, 715 F.3d 667 (8th Cir. 2013). UST seeks to *terminate* the Negligence Duty, not *affirm* it. As a result, John requests this Court determine UST's failure to file a cross-appeal precludes its collateral attack of the Negligence Duty.

In the alternative, this Court should reject UST's four arguments for reversing the Negligence Duty. First, UST alleges DC did not intend to define the Negligence Duty in terms proposed by John. *Id.,* p.25. This argument fails because DC

---

[11] Because of word limits, John's supplementation of the cross-examination material in this reply is limited to two points. First, UST's Brief incorrectly claims - on pages 18 and 52 - that UST's policies gave John the right to propose cross-examination questions to Jane. UST's policies only allowed John to propose questions of "witnesses," not accusing students like Jane. *UST-Br.,* p.15. Second, John's cross-examination arguments are examples of per-se violations of the Negligence Duty in UST policies and therefore should not be deemed "waived" under court decisions cited by UST.

Appellate Case: 19-1594   Page: 22   Date Filed: 07/24/2019 Entry ID: 4811238

"believe[d]" John's view (albeit a "vague" one) was "a closer application of the *Abbariao* decision and of the parallel due process protections afforded students at public universities." A-41 (discussing *Abbariao v. Hamline University School of Law*, 258 N.W.2d 108 (Minn. 1977).

Second, UST claims the Negligence Duty cannot be squared with *Abbariao* and *Rollins v. Cardinal Stritch Univ.*, 626 N.W.2d 464 (Minn. App. 2001). *UST-Br., pgs.30-32.* However, DC properly rejected these arguments for many of the reasons in John's Brief. *Compare,* A-36-41; with *John-Br.,* pgs.14-15.

Third, UST argues the Negligence Duty must be reversed because "it is unlikely the Minnesota Supreme Court would allow a due process claim against a private university" given private universities are not "state actor[s]." *UST-Br.,* p.31 (citing *NCAA v. Tarkanian*, 488 U.S. 179 (1988); *Rendell-Baker v. Kohn,* 457 U.S. 830 (1982)). John, however, did not base his claim on "state actor" allegations like the plaintiffs in the decisions cited by UST. *See e.g., NCAA v. Tarkanian*, 488 U.S. 179 (1988) (dismissing §1983 claims where plaintiff alleged private entity was a "state actor"); *Rendell-Baker v. Kohn,* 457 U.S. 830 (1982) (same).

UST's speculations about the Minnesota Supreme Court's thinking is also difficult to reconcile with the University's citation of *Abbariao*, which recognized UST's duty to provide students some "due process" protections. *UST-Br.,* p.32. Moreover, UST acknowledged courts in California and Virginia determined private

23

schools must afford private school students due process protections such as cross-examination. *Id.,* pgs.50-51.[12]

UST also neglected to mention proposed revisions to the federal regulations UST cites in its brief. On November 15, 2018, the U.S. Dept. of Education proposed revised regulations regarding Title IX investigations. *https://www2.ed.gov/about/offices/list/ocr/docs/title-ix-nprm.pdf* (last accessed July 1, 2019) ("Proposed Regulations"). Explicitly prohibiting the disciplinary proceedings UST seeks to preserve, the Proposed Regulations (a) do not allow investigators to serve as adjudicators; (b) require live hearings; and (c) give both parties the right to cross-examine the other party and all witnesses. *Id.,* at § 106.45, subd. (b)(3)(4).

Fourth, UST argues for reversal of the Negligence Duty because courts should refrain from second-guessing disciplinary decisions made by school administrators. *UST-Br.,* pgs.30, 54. In support, UST cites *Davis Next Friend LaShonda D. v.*

---

[12] Regarding this issue, UST alleges John "misstated" the "facts and holding" of *Doe v. University of Southern California*, 238 Cal. Rptr. 3d 856 (Cal. Ct. App. 2018). *UST-Br.,* p.50. UST is incorrect because John did *not* refence this decision. Rather, John referenced a different case against *University of Southern California. See, John-Br.*, p.47 (discussing *Doe v. University of Southern California,* 28 Cal.App.5th 26 (2018)). But John unintentionally provided the incorrect citation for this case. The correct citation is *Doe v. University of Southern California***,** 29 Cal.App.5th 1212 (2018)(granting male plaintiff's writ of administrative mandate because private university did not allow cross-examination during Title IX disciplinary proceeding*).*

24

*Monroe Cty. Bd. of Educ.*, 526 U.S. 629 (1999). UST overlooked how DC determined *Monroe* was perfectly compatible with the Negligence Duty. A-38-39.

Finally, UST claims the Negligence Duty conflicts with *Boston College*, which determined a "university owed no independent duty of care relating to student disciplinary matters." *UST-Br.,* p.30. (discussing *Doe v. Trustees of Boston College*, 892 F.3d 67 (1st Cir. 2018). DC, however, appropriately looked to the Minnesota Supreme Court rather than the First Circuit. Furthermore, John detailed the compatibility of the Negligence Duty with *Boston College* <u>and</u> the *Univ. of Penn.* (270 F. Supp.3d (E.D. Pa. 2017)) decisions. *John-Br.,* pgs.37, 41-42. UST objects that these comparisons involve "contract" claims[13] – something John acknowledged. *Id*. UST's objections lack merit because breaches of university policies are common factors in evaluating the Negligence Duty and the contractual duties outlined in *Boston Coll.* and *Univ. of Penn. Id.*

## IV. <u>The Record Disproves UST's Claim That It Did Not Breach the Negligence Duty.</u>

Facts detailed above invalidate UST's claim that no "factual or legal" basis exists for finding UST breached the Negligence Duty. *UST-Br.,* p.33. UST's six additional arguments regarding the Negligence Duty also fail. First, UST alleges John cannot claim UST withheld exculpatory evidence by denying John access to

---

[13] *UST-Br.,* p.36-37.

Appellate Case: 19-1594     Page: 25     Date Filed: 07/24/2019 Entry ID: 4811238

security videos because the videos highlighted "inconsisten[cies]" in both Jane and John's testimony. *UST-Br.,* p.45.[14]

Jane's inconsistency was critical to her credibility. Videos prove Jane lied when she claimed she was so frightened she checked the exit door to make sure John could not get back in. *Id.,* p.19. John's alleged inconsistency, by contrast, turned out not to be an inconsistency at all. UST claimed John said he "left Jane's residence hall alone" when "a screenshot of security footage [] showed him giving someone a thumb's up on his departure." *Id.,* p.20. But (1) Factfinders' interview notes contradicted UST's claim about what John said;[15] and (2) UST's "screenshot" of John looking backwards while exiting the dorm proves John did leave the dorm alone. *App.*263 (containing screenshot).

More importantly, UST does not address the irreparable harm caused by UST's prohibition of John's viewing surveillance videos. For, these videos contradicted Jane's testimony about (a) her physical interactions with John prior to entering her dorm; and (b) her allegations about her intoxication level. *App.*455-460.

---

[14] UST claims other alleged "inconsistencies between John's version of events and the evidence" are located on pgs. 18-19 of its brief. *UST-Br.,* p.45. These pages contain no such inconsistencies.

[15] *Compare, App.318* (containing Factfinders' notes from second interview stating that during John's first interview he claimed he left Jane's dorm alone.); with *App.314* (containing Factfinders' note from John's first interview which does *not* contain a statement by John that he left Jane's dorm alone).

Consequently, jurors would likely determine UST violated the Negligence Duty by denying John access to the videos.

Jurors would also likely discard UST's arguments regarding the "redacted version of the Factfinders' Report" UST provided. *UST Br.,* p.47. UST provides no citation to support its claim that the Report included Factfinders' "interview notes." *UST-Br.,* p.57. UST's denial of John's access to these notes is a disputed material fact. *John-Br.,* p.35. And, UST appears to admit Factfinders' interview notes were not attached to the report as the report alleges. This is because their interview notes were separated from the report by more than 50 pages in UST's Appendix. *Compare, App.247* (containing last page of Factfinders' Report), with *App.304* (containing first page of Factfinders' interview notes).

Second, UST argues no Negligence Duty breach occurred because John admitted violating UST policies by not obtaining Jane's "verbal" consent. *UST-Br.,* pgs.21, 53. Jurors would reject this argument. UST defined "consent" as any "*conduct*" by Jane that "indicate[d]" she "freely agree[d] to engage in a sexual act at the time of the act . . . ." *Id.,* p.5. (emphasis added). Here, Jane's *conduct* in items 1-7 on pages 5 and 6 qualified as "*conduct*" manifesting "*consent*." Far from *John* admitting to anything, UST violated the Negligence Duty by not asking *Jane* whether she engaged in this conduct.

Appellate Case: 19-1594     Page: 27     Date Filed: 07/24/2019 Entry ID: 4811238

UST's third argument involves interactions between Dean of Students Linda Baughman ("Baughman") and Lange. *UST-Br.,* pgs.46-47. Baughman irreparably biased Lange against John by telling Lange that John's yet-to-be filed appeal would be meritless. *John-Br.,* p.34. Additionally, conflicts of interests created by Lange's involvement in drafting John's original suspension decision precluded her from fairly adjudicating John's subsequent appeal. *Id.* UST claims Lange and the Appeals Board "did not rely" on their boss' belief that John's appeal was meritless—but UST provides no citation to the record for this unsubstantiated claim. *UST-Br.,* 47.

UST also lacks grounds to challenge DC's finding that Lange and Baughman's interactions were "improper." *John-Br.,* p.34 (quoting DC's decision). This is because UST falsely claims John "cannot identify a single provision of the Policy that [Lange and Baughman's interactions] violated." *UST-Br.,* p.47. In fact, John detailed how UST's training created Accuser-Favored Bias that caused Lange and Baughman to violate UST's promise of a fair and impartial disciplinary proceeding. *John-Br.,* pgs.23, 25, 33-35.

Fourth, UST repeatedly accuses John of misrepresenting facts in the record. *See e.g., UST-Br.,* pgs.25, 35, 43, 44. As detailed above, jurors would likely determine UST – not John - is guilty of these factual misrepresentations. Regardless, the existence of so many disputed material facts proves DC errored in granting summary judgment.

Fifth, UST alleges John inappropriately relies on non-negligence and FRCP 12(b)(6) decisions. *UST-Br.,* p.36-37. UST advances this argument in a brief that itself relies on the same allegedly objectionable decisions.[16] Setting aside UST's hypocrisy, the facts detailed above identify concrete evidence that UST exhibited Accuser-Favored Bias which breached the Negligence Duty. This evidence also dooms UST's attempts to distinguish this case from four FRCP 12(b)(6) decisions that refused to dismiss claims based on biased university training. *UST-Br.,* p.36-37 (attempting to distinguish *Doe v. Univ. of Miss.*, No. 3:16-CV-63-DPJ-FKB, 2018 WL 3570229 (S.D. Miss. July 24, 2018); *Norris v. Univ. of Colo.*, 362 F. Supp. 3d 1001 (D. Colo. 2019); *Doe v. Trs. of Univ. of Pa.*, 270 F. Supp. 3d 799 (E.D. Pa. 2017); and *Doe v. Ohio State Univ.*, 219 F. Supp. 3d 645, 658 (S.D. Ohio 2016)).

Finally, UST alleges that finding it breached the Negligence Duty would contradict five decisions[17] that dismissed Title IX claims because plaintiffs failed to

---

[16] *See, UST-Brief* (advancing arguments based on *Univ. of Cincinnati*, 173 F. Supp. 3d 586; *Z.J. v. Vanderbilt Univ.*, 355 F.Supp.3d 646, 698 (M.D. Tenn. 2018); *Sahm v. Miami Univ.*, 110 F. Supp. 3d 774 (S.D. Ohio 2015); *Doe v. Cummins*, 662 Fed. App'x. 437 (6th Cir. 2016)).

[17] *UST's Brief,* p.34 (discussing *Sahm,* 110 F. Supp. 3d 774; *Id.,* pgs.24, 38 (addressing *Gomes v. Univ. of Maine Sys.*, 365 F. Supp. 2d 6 (D. Me. 2005); *Id.,* p.38 (discussing *University of Cincinnati*, 173 F. Supp. 3d 586; *Doe v. Univ. of Denver*, No. 16-cv-00152, 2018 WL 1304530 (D. Colo March 13, 2018); *Bleier v. Coll. of Holy Cross*, No. 11-11541-DJC, 2013 WL 4714340 (D. Mass. Aug. 26, 2013).

Appellate Case: 19-1594     Page: 29     Date Filed: 07/24/2019 Entry ID: 4811238

establish anti-*male* bias. *Sahm*, 110 F. Supp. 3d at 778 (dismissing Title IX claim because bias "in favor of the alleged victims of sexual assault claims, . . . . is not the equivalent of demonstrating bias against male students."); *University of Cincinnati*, 173 F. Supp. 3d at 602 (finding "Plaintiffs' allegations concerning the sexual assault training . . . [did not] reflect . . . bias against men."); *Bleier,* 2013 WL 4714340, at *13 (determining "there was "no genuine dispute as to whether the [training] materials are biased in favor of a particular gender . . . ."); *Gomes* 365 F. Supp. 2d at 29-30 (finding assault advocacy program could not substantiate anti-*male* bias required in Title IX claim); *Univ. of Denver,* 2018 WL 1304530, *10 (noting Title IX training materials that might "indicate preferential treatment of" Accusers does not "support an inference of" the anti-*male* bias required in Title IX claim).

UST's reliance on these decisions fails because John need *not* establish anti-*male* bias. Rather, UST's gender-neutral Accuser-Favored Bias established its Negligence Duty breach. *See e.g., Supra,* §1. UST, ironically, admits DC fell prey to the same sleight of hand UST attempts here, conflating anti-male bias with Accuser-Favored Bias. *UST's Brief,* p.35 (quoting A43-44 which contained DC's erroneous belief that John must causally link bias "against accused *males*" to UST's training).

Instead of citing these five decisions, UST should have referred to *Doe v. Brown Univ.*, 210 F. Supp. 3d 310 (D.R.I. 2016). This decision involved a bench

Appellate Case: 19-1594    Page: 30    Date Filed: 07/24/2019 Entry ID: 4811238

trial verdict in favor of an accused student alleging breach of contract in part because his university's training taught "survivors of sexual assault sometimes exhibit counter-intuitive behaviors," which caused "at least one panelist [to] completely disregard[] an entire category of evidence." *Id.,* at 342. Stated another way, the *Brown* trial evidence featured some of the same Accuser-Favored Bias that caused UST's Negligence Duty breach.

Rather than cite *Brown*, UST advanced arguments based on *Richmond; de Llango; Robinson; Columbia Coll. Chicago; Amherst Coll.;* and *Austin* while ignoring John's previous distinguishing of these cases. *Compare, UST-Br.,* pgs.30, 34 (discussing *Doe v. Columbia Coll. Chicago,* 299 F.Supp.3d 939 (N.D. Ill. 2017); *Doe v. Amherst Coll.,* 238 F. Supp. 3d 195 (D. Mass. 2017); *Austin v. Univ. of Oregon,* 205 F. Supp. 3d 1214 (D. Or. 2016); *Richmond v. Fowlkes,* 228 F.3d 854 (8th Cir. 2000); *Robinson v. Univ. of Minnesota,* No. A17-1620, 2018 WL 4395020 (Minn. Ct. App. Sept. 17, 2018); and *de Llano v. Berglund,* 282 F.3d 1031 (8th Cir. 2002)), with *John-Br.,* pgs.37-38, 43 (same).

Based on the forgoing, John requests this Court find UST's Accuser-Favored Bias breached the Negligence Duty by fueling "collective guilt" methodologies that caused John's erroneous suspension.

Appellate Case: 19-1594    Page: 31    Date Filed: 07/24/2019 Entry ID: 4811238

## V. UST Did Not Refute DC's Abuse of Discretion in Prohibiting Jane's Deposition.

John outlined facts and court decisions proving DC abused its discretion by prohibiting Jane's deposition. *John-Br.,* pgs.51-55. UST's factual response is devoid of any reference to the record. *UST-Br.,* p.57.  This Court, consequently, should reject these unsupported allegations. Similarly, the one decision UST cited in support of its argument is distinguishable. *Compare, UST-Br.,* p.57 (discussing *Hockey League Players' Concussion Injury Litig.*, No. 14-cv-2551, 2017 WL 1493671 (D. Minn. April 26, 2017) ("HLP Litig."), with HLP Litig. 2017 WL 1493671, *11-12 (requiring third-party produce some subpoenaed documentation after determining production was not burdensome).

Conversely, Jane's Amicus Brief contained valid waiver arguments. *Jane's Amicus Brief,* pgs.8-9. UST did not raise these arguments. Therefore, this Court should determine UST waived its right to do so and find DC abused its discretion in prohibiting Jane's deposition.

## VI. Experts Are Not Necessary to Establish UST's Breach of the Negligence Duty.

Contrary to UST's claim,[18] DC correctly ruled expert testimony was unnecessary because the Negligence Duty involves "issues like fairness and impartiality . . . average citizen[s] can consider without the help of an expert." *A.48*

---

[18] *UST-Br.,* p.54.

Appellate Case: 19-1594     Page: 32     Date Filed: 07/24/2019 Entry ID: 4811238

(rejecting UST's arguments based on *A.M.J. v. Royalton Pub. Sch.*, Civ. No. 05-2541, 2006 WL 3626979 (D. Minn. Dec. 12, 2006).

Likewise, this Court should reject UST's allegation that the Negligence Duty is "beyond layperson[s]' understanding because it involves educational disciplinary procedures "designed to comply with . . . regulatory requirements." *UST-Br.*, p.55. Laypersons need no expert to evaluate whether UST's training materials exhibited Accuser-Favored Bias by teaching UST employees to believe (a) only 2% to 10% of Accusers' sexual assault allegations are false; and (b) Accusers tell the truth even if they "provide inconsistent explanations of assault" and/or "deliberately omit[] details" related to allegations against Accused Students *A.50-51.*

Similarly, UST's "regulatory requirements" arguments fails. As detailed above, laypersons comparing UST's training materials with the regulations UST cites can easily determine UST's arguments lack merit. *Supra,* pgs.2-3, 16.

## VII. UST's Negligence Duty Breach Caused John Significant and Lasting Damage and Such Breach Was Foreseeable by UST.

UST knows it incorrectly claims "the undisputed facts" prove "John suffered no cognizable damages." *UST-Br.,* p.55. When John was asked about damages attributable to UST, John detailed how UST's disciplinary proceeding caused him to lose a $17,000 annual scholarship. *App.300-31.* This lost scholarship clearly satisfies the damage requirements in the *K-Mart Corp.* decision cited by UST. *UST-Br.,* p.56 (discussing *Doe v. Kmart Corp.,* No. A16-0465, 2017 WL 474404 (Minn.

33

Ct. App. Feb. 6, 2017). Consequently, UST's damage argument should be rejected. This is especially true because John testified about the significant and lasting damage UST caused. For instance, John testified about his extensive counseling and a suicide attempt because of the powerlessness he experienced during UST's bias fueled adjudication of Jane's false allegations. *App.295-296.*

## CONCLUSION

Based on the foregoing, John respectfully requests this Court reverse DC's decision. To do otherwise would prohibit students of Minnesota's private universities from seeking legal recourse when universities unlawfully label them sex offenders in violation of federal law and university policies.

Respectfully Submitted,

/s/ Eric Rosenberg
Eric Rosenberg (0069958)
Rosenberg & Ball Co. LPA
395 North Pearl Street
Granville, Ohio 43023
Phone: 740.644.1027
Fax 866.498.0811 fax
erosenberg@rosenbergball.com

/s/Beau D. McGraw
Beau D. McGraw, I.D. No.: 31190X
McGraw Law Firm, PA
10390 39th Street North, Suite 3
Lake Elmo, MN 55042
Telephone: (651) 209-3200
beau@mcgrawlawfirm.com

34

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32(a)(7), I hereby certify that this brief is proportionally spaced, 14-point Times New Roman font. Per Microsoft Word software, the brief contains 6,471 words, excluding those parts exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii).

*/s/ Eric J. Rosenberg*
Counsel for Plaintiff-Appellant John Doe

## CERTIFICATE OF SERVICE

I hereby certify that on July 22, 2019, a copy of the foregoing REPLY BRIEF OF APPELLANT was filed electronically with the Clerk of the Court using the CM/ECF system, which will send notice of such filing to all registered parties.

*/s/ Eric J. Rosenberg*
Counsel for Plaintiff-Appellant John Doe

Appellate Case: 19-1594    Page: 35    Date Filed: 07/24/2019 Entry ID: 4811238