March 6, 2020

Office of the Clerk
United States Court of Appeals for the Eight Circuit
Thomas F. Eagleton Courthouse
111 South 10th Street
St. Louis, MO 63102

**RE: John Doe v. Univ. of St. Thomas / Case No. 19-1594**

To Whom It May Concern:

Pursuant to FRAP 28(j), Appellant John Doe ("Doe") submits the attached supplemental authorities (a) Doe v. Johnson & Wales Univ., No.18-cv-106, 2019 WL 6324905 (R.I. Nov. 26, 2019)("J&W Univ."); (b) *Doe v. Syracuse Univ., et al.,* No.5:19-cv-190 (N.D.N.Y. Feb. 21, 2020)("Syracuse"); and (c) Christian Meissner, Adrienne Lyles *Title IX Investigations: The Importance of Training Investigators In Evidence-Based Approaches To Interviewing,* 8 J. Appl. Res. Mem. Cogn. 4 (Dec. 2019)("ML Research").

*ML Research* and pages 17-18 and 28 of *Syracuse* highlight the legal and scientific deficiencies of Appellee St. Thomas' ("St. Thomas") trauma informed Title IX practices ("Trauma Informed Practices"). These practices violated St. Thomas' duties to Doe under *Abbariao* by causing St. Thomas to be biased in favor of students who accuse others of sexual misconduct ("Accusing Student(s)"). *See, Appellant's Brief,* pgs.17-18, 29-33 (discussing St. Thomas' Trauma Informed Practices and *Abbariao v. Hamline University School of Law*, 258 N.W.2d 108, 110-113 (Minn. 1977)); *Appellant's Reply Brief*, pgs.5-13 (same).

For instance, St. Thomas' employees used FETI techniques causing them to believe even those Accusing Students who deliberately omit information and/or provide inconsistent testimony, because such behavior is allegedly caused by trauma. *Appellant's Brief,* pgs.29-30. *ML Research* determined "no available research"

supports the Trauma Informed Practices advanced by FETI. *ML Research,* p.392. It also detailed how FETI has resulted in "investigators [being] susceptible to . . . bias . . . and . . . presumptions of guilt that can" adversely impact Title IX disciplinary proceedings. *Id.*

Pages *3-4 of *J&W Univ.* illuminate how St. Thomas violated *Abbariao* by prohibiting Doe from cross-examining his Accusing Student. *Appellant's Brief,* pgs.46-30 (discussing same); *Appellant's Response To Minnesota Private College's Amicus Brief*, pgs.15-21 (same).

*J&W Univ.* and *Syracuse* are relevant despite addressing contract claims rather than negligence claims: the rationale behind their Trauma Informed Practices and cross-examination findings mirror the rationale this Court should use to determine St. Thomas violated *Abbariao.*

This foregoing letter complies with the word limitations of Fed. R. App. P. 28(j) because the body of the letter, excluding this paragraph, contains less than 350 words.

Sincerely,

/s/ Eric Rosenberg

Eric Rosenberg

Enclosure.

2019 WL 6324905
Only the Westlaw citation is currently available.
United States District Court, D. Rhode Island.

John DOE[1] Plaintiff,
v.
JOHNSON & WALES UNIVERSITY, Defendant.

C.A. No. 18-CV-00106-MSM-LDA
|
Signed 11/26/2019

**Attorneys and Law Firms**

James P. Ehrhard, Ehrhard & Associates, P.C., Worcester, MA, for Plaintiff.

Jeffrey S. Brenner, Steven M. Richard, Nixon Peabody LLP, Jeremy M. Licht, Providence, RI, for Defendant.

## MEMORANDUM AND ORDER

Mary S. McElroy, United States District Judge.

**\*1** This matter comes before the Court on a Motion for Summary Judgment filed by defendant Johnson & Wales University ("JWU"), in a lawsuit claiming jurisdiction under both the diversity clause of 28 U.S.C. § 1332 and the federal question clause of 28 U.S.C. § 1331. For the reasons that follow, I grant the Motion with respect to Counts IV (discrimination in education on the basis of gender, in violation of Title IX, 20 U.S.C. § 1681), and VI (negligent infliction of emotional distress). I deny the Motion with respect to Counts I (breach of contract) and II (breach of the covenant of good faith and fair dealing).

## BACKGROUND
This complaint was filed by a former student at JWU who, in the fall of his junior year, was accused of having committed two sexual assaults on a fellow student approximately one year earlier in October 2016.

According to the undisputed facts, Mary Smith[2] and Doe had a romantic and sexual relationship in the Fall of 2016. During that relationship, they had slept together and engaged in consensual sexual intercourse in Doe's dormitory room on at least four occasions. On the fifth occasion, according to Smith, she was sleeping with Doe in his dormitory room, but awoke to use the bathroom; he followed her into the bathroom where they had intercourse. This time, however, she complained of pain and Doe, she alleges, refused to stop. The couple then returned to bed for the remainder of the night. Approximately a week later, the two had consensual intercourse again and again it caused her pain; they changed positions in an attempt to eliminate the pain but that was not successful. Smith claimed that Doe continued to complete the sex act until he ejaculated.

Eight or nine months later, around June 1, 2017, Smith's then-boyfriend B.K. reported to campus police that his girlfriend had been sexually assaulted by Doe. After campus police conducted a preliminary investigation, Smith said she did not want to proceed, and the matter was closed. Three months later, however, accompanied by B.K., Smith filed a formal complaint. Doe was charged, the University held a disciplinary proceeding, and he was ultimately expelled.

The conduct of the investigation and adjudication of that allegation form the basis of Doe's complaint in this Court. Doe maintains that the procedure was unfair and as such violated his contractual right to a "fair" proceeding as granted him by the "Conduct Review Process." ("CRP") which is part of the JWU "Student Code of Conduct." ("SCC").[3] He also asserts that JWU's conduct in this case manifested gender discrimination in violation of Title IX and constituted negligent infliction of emotional distress. JWU maintains that it gave Doe all the rights he could reasonably expect under its process as described in the Conduct Review Process; it denies the allegations of discrimination and negligence.[4]

## THE DISCIPLINARY PROCESS
**\*2** Doe's complaint takes issue with specific parts of the proceedings, and from that platform alleges violations of state and federal law. In brief, he complains that:

> 1. he was never given a copy of what was an 18-page statement by Smith; it was read to him at a "Pre-Hearing Conference" shortly after he was charged and he was allowed, in the presence of

another student whom he chose as his "advisor," to take notes. That is undisputed.

2. the process was not sufficiently explained to him, in that he was not told "how and if he could question any witnesses, bring any witnesses, bring and/or submit any evidence, whether there would be opening statements or closing statements." JWU asserts that Doe was adequately informed and that he was told at least twice he should ask questions if he did not understand something or wanted more information. Doe disputes that the explanation was adequate but does not dispute he was told he could call with questions.

3. he was allowed to listen to the adjudication panel's questioning of Mary Smith, but he was not allowed to question her or any witnesses. In JWU's description of the process, and the Affidavits of the panelists questioning the students (EFC 54, 55, 56), it is clear that while the panelists went back and forth between the two students twice, they did not ask Doe whether he had any questions he wanted propounded to Smith.

4. the standard of proof was preponderance of the evidence.[5] JWU agrees.

5. the hearing was not transcribed, and no other record was made of it. JWU agrees.

6. his appeal should have been granted because there was new evidence of a post-incident Instagram posting by Smith. JWU contends this is not grounds for an appeal and that the evidence was not new.

7. JWU has conducted its disciplinary procedures in a gender discriminatory way. The factual assertions Doe makes in support of this contention are noted *infra* at n.11. JWU does not contest the specific facts Doe points to but maintains they do not demonstrate gender discrimination.

**STANDARD FOR SUMMARY JUDGMENT**

The standard for summary judgment is a familiar one and needs little elaboration here. The Court must examine the documents submitted by the parties to determine whether there exists a disputed issue of material fact. "Summary judgment is only proper when 'there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.' " *Doe v. Trustees of Boston College,* 892 F.3d 67, 79 (1st Cir. 2018), quoting

Fed.R.Civ.P. 56(a). My inquiry, therefore, is to determine, with respect to each surviving count of the complaint, whether there are material facts sufficiently in dispute that "a reasonable jury could resolve the point in favor of the nonmoving party." *Id.,* quoting *Rivera-Muriente v. Agosto-Alicea,* 959 F.2d 349, 352 (1st Cir. 1992).

**STATE LAW CLAIMS**

**COUNTS I AND II**

**BREACH OF CONTRACT AND OF COVENANT OF GOOD FAITH**

Both the breach of contract and breach of the covenant of good faith and fair dealing claims, in a diversity case, sound in state law. *Doe v. Trustees of Boston College, supra* at 88 (applying Massachusetts law); *Crellin Technologies, Inc. v. Equipmentlease Corp.,* 18 F.3d 1, 4 (1st Cir. 1994) (applying Rhode Island law). JWU is a Rhode Island Corporation with campuses in several parts of the country, including Rhode Island and Massachusetts.[6]

**\*3** The relationship between a student and a private university "is contractual in nature." *Gorman v. St. Raphael Acad.,* 853 A.2d 28, 34 (R.I. 2004). *Accord, Mangla v. Brown University,* 135 F.3d 80, 83 (1st Cir. 1998). These contracts have "unique qualities" that warrant deference to the flexibility of the institution to "properly exercise its educational responsibility." *Gorman, supra* at 34, quoting *Mahavongsanan v. Hall,* 529 F.2d 448, 450 (5th Cir. 1976). That same deference excuses "strict adherence to contract law." *Gorman, supra*

The contract that is relevant here is JWU's "Student Code of Conduct," which includes the JWU "Conduct Review Process." It is that process that led to Doe's expulsion. The Student Code of Conduct, like a student handbook, forms part of the overall contract between the student and university and "can be a source of terms defining the reciprocal rights and obligations of a school and its students." *Gorman, supra* at 34. In construing terms of the contract between students and universities courts look to, among other things, the student handbook. *See*

*President and Fellows of Harvard College,* 56 F.Supp.2d. 129, 130 (D. Mass 1999) (student handbook is one source of rights and obligations). The standard for interpreting the contractual terms contained in the "Conduct Review Process" is that of " 'reasonable expectation—what meaning the party making the manifestation, the university, should reasonably expect the other party to give it.' " *Mangla v. Brown University, supra* at 83.

Turning to the "Conduct Review Process," that publication promises that JWU will adjudicate disciplinary complaints in a "fair" proceeding. While the plaintiff acknowledges that the process does not explicitly give him any of the rights he alleges were denied him (e.g., a right to a copy of the complaint, a right to question witnesses), he maintains that these and other entitlements are integral to a "fair" proceeding.[7]

"Fair" is not a term with a commonly accepted definition. It is conclusory: its precise meaning fluctuates with the context in which it is used.[8] Its meaning, particularly with respect to what components of an investigation and hearing process must be included in order to satisfy "fair," is thus open to interpretation. While the Court determines as a matter of law whether a contract term has a clear and unambiguous meaning, *Paul v. Paul*, 986 A.2d 989, 993 (R.I. 2010), it is up to the fact-finder to determine that meaning once the Court finds that the term is susceptible of more than one interpretation. *Botelho v. City of Pawtucket School Dept.*, 130 A.3d 172, 176 (R.I. 2016) (a term is ambiguous when it is 'reasonably and clearly susceptible to more than one rational interpretation."); *Haviland v. Simmons*, 45 A.3d 1246, 1258 (R.I. 2012). When a term is ambiguous, its meaning becomes a "question of fact" for the jury. *Botelho* at 177-78. *See e.g., McBrayer v. Teckla, Inc.,* 496 F.2d 122, 126 (5th Cir. 1974), *reh. den.* 502 F.2d 1167 (whether financing was carried out in a "reasonable and businesslike manner" as required by the contract was question of fact for the jury); *Home Shopping Club, Inc. v. Miller Broadcasting, Inc.,* 982 F.Supp. 809, 811 (D.Kan. 1997) (where contract required plaintiff to "make available" certain programming time to defendant, jury was to decide what steps constituted "mak[ing time] available"); *Westinghouse Broadcasting Co., Inc. v. Dial Media, Inc.,* 122 R.I. 571, 410 A.2d 986, 991 (1980) (what "best interest" meant in context of advertiser's obligation was a question of fact for the jury).

**\*4** Whether Doe was entitled to the procedural protections he specifies depends on whether the guarantee of a "fair" proceeding would create a reasonable expectation that those aspects would be included.[9] *Doe v. Brown University,* 166 F.Supp. 3d 177, 191 (D.R.I. 2016), citing

*Havlik v. Johnson & Wales Univ.,* 509 F.3d 25, 34-35 (1st Cir. 2007). I find that in the context of an ==uncounseled college junior==, facing the frightening and very serious prospect of possible expulsion from school, in a case of contrary "he said," "she said" allegations, a reasonable juror could determine that the meaning of "fair" includes being provided more protections than Doe alleges he received.[10] *See, Doe v. Trustees of Boston College,* 892 F.3d at 86 (whether an outside communication breached a reasonable expectation that Board would meet in private was a dispute of material fact that a reasonable jury could resolve in favor of the plaintiffs).

Because the breach of contract claim survives the summary judgment phase, the count alleging a breach of the covenant of fair dealing does as well and summary judgment is denied on Counts I and II. *Doe v. Trustees of Boston College, supra* at 88.

## COUNT VI: NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

The parties do not disagree that Rhode Island law requires physical symptoms in order to maintain an action for negligent infliction of emotional distress. *Reilly v. United States,* 547 A.2d 894, 896 (R.I. 1988). Doe offers no proof to support this component of his claim. Therefore, there is no genuine issue of material fact and summary judgment in favor of JWU is appropriate and hereby granted on Count VI.

## FEDERAL CLAIM

## COUNT IV: TITLE IX

**\*5** Doe maintains that his treatment at the hands of JWU constituted discrimination on the basis of gender in violation of 20 U.S.C. § 1681, known more familiarly as Title IX [of the Education Amendments of 1972]. "Title IX provides that '[n]o person in the United States shall, on the basis of sex ... be subjected to discrimination under any education program or activity receiving Federal

Appellate Case: 19-1594 Page: 5 Date Filed: 03/09/2020 Entry ID: 4889050

financial assistance.' 20 U.S.C. § 1681(a). This provision is enforceable 'through an implied private right of action.' " *Doe v. Trustees of Boston College,* 892 F.3d at 89-90 (citations omitted). University discipline violates Title IX when "gender is a motivating factor in the decision to discipline." *Yusuf v. Vassar College,* 35 F.3d 709, 715 (2d Cir. 1994).

For the purpose of reviewing Title IX discrimination claims, the First Circuit has adopted the framework of *Yusuf v. Vassar College, supra,* describing two categories of gender discrimination: "erroneous outcome" and "selective enforcement." *Yusuf* at 715, explicitly adopted by *Doe v. Trustees of Boston College,* 892 F.3d at 90. Although the approval by the First Circuit of the Second Circuit's formulation was predicated upon the agreement of the parties in *Trustees of Boston College,* the Circuit has since again applied the *Yusuf* framework. *Haidak v. University of Massachusetts-Amherst,* 933 F.3d 56, 74 (1st Cir. 2019).[11]

Doe frames his complaint as one of "erroneous outcome," arguing that the adjudication by JWU that Doe was "responsible" on these facts and circumstances, as well as other factors,[12] was egregiously inaccurate. A plaintiff must, indeed, "offer evidence 'cast[ing] some articulable doubt on the accuracy of the outcome of the disciplinary proceeding," in order to prevail on an "erroneous outcome" theory. *Doe v. Trustees of Boston College,* 892 F.3d at 90.

A challenge, even if persuasive, to the integrity of the University's factfinding, however, is not sufficient: a plaintiff must also offer evidence to "show [that] gender bias was a motivating factor." *Id.* at 91, quoting *Yusuf,* 35 F.3d at 715. Gender as a motivating factor supplies the causal connection between Title IX's prohibition and the injury to the plaintiff. *Doe v. Vanderbilt University,* No. 3:18-cv-00569, 2019 WL 4748310 at *7 (M.D. Tenn. Sept. 30, 2019). It is this obstacle that Doe fails to surmount. Absent some smoking gun,[13] which a single reference to Mary Smith as a [possible] "victim" is not, Doe must like others in his position rely on statistical evidence to raise an inference of gender bias as a *motivating* factor. Here, Doe points only to the fact that a relatively small number of students adjudicated were female: he acknowledged, however and JWU has

demonstrated, that the vast majority of complainants are female and the minority male. The only way the ratio of adjudicated males to females would be probative of gender bias as a motivating factor is if Doe could point to a disparity between the number of males and females making accusations and those charged by the University; if, for example, the University prosecuted 95% of males who were accused but only 5% of females who were accused, that would raise at least a suspicion of purposeful bias on the part of the University. Doe lacks, however, the critical component of that statistical comparison because he has paid no attention to the breakdown of accusations. If the showing in *Haidak, supra* was insufficient to establish a causal connection despite the evidence there that of 93 men and 26 women who were the subject of hearings, all 13 of the ones expelled were male, it is surely insufficient here. *See also, Doe v. Trustees of Boston College,* 892 F.3d at 90 (statistical showing inadequate despite the fact that "between August 1, 2005 and July 1, 2015, only male students have been accused of sexual assault."). Moreover, as the Circuit noted in *Boston College,* the word "victim" is gender neutral; thus, the fact that the campus police referred to the accuser as a possible "victim" does not by itself indicate gender bias.

**\*6** No matter how strong Doe's showing is that the verdict reached by JWU was factually wrong, that is not enough. JWU is entitled to summary judgment on Count IV.

## CONCLUSION

The defendant's Motion for Summary Judgment is denied with respect to Counts I and II and granted with respect to Counts IV and VI.

IT IS SO ORDERED.

**All Citations**

--- F.Supp.3d ----, 2019 WL 6324905

Footnotes

1   This case was transferred from the District of Massachusetts, where the plaintiff is a resident and where it was originally filed. (ECF 22). Shortly thereafter, he was granted permission to pursue this lawsuit under the pseudonym of John Doe.

2   Also, a pseudonym. All students have been referred to by pseudonyms or initials by the parties and, therefore, by the Court.

Appellate Case: 19-1594   Page: 6   Date Filed: 03/09/2020 Entry ID: 4889050

3    The CRP provides, "The university administers the Conduct Review Process in good faith, making every reasonable effort to be fair to all involved." It also guarantees a resolution that is "prompt, fair and impartial."

4    A number of counts were previously dismissed by this Court: Counts III (estoppel and reliance), V (intentional infliction of emotional distress), and VII (a prayer for injunctive relief as a separate cause of action).

5    In the CRP, the standard of proof is described as "more likely than not." Doe complains that this standard, whether phrased in terms of preponderance or likelihood, is too low.

6    The parties have addressed the state law claims under Rhode Island law, and I will do the same. *See, Fashion House, Inc. v. K mart Corp.,* 892 F.2d 1076, 1080 (1st Cir. 1989) (Court honored parties' agreement to follow Michigan law).

7    JWU makes much of Doe's failure to address each of the University's assertions in its Statement of Undisputed Facts, and, citing *Schiffmann v. United States,* No. 12-695, 2014 WL 1394199 at *1 (D.R.I. April 9, 2014), it demands that any factual allegations not specifically disputed be deemed admitted. But Doe makes his case for an unfair proceeding virtually entirely on facts put forth or acknowledged by JWU itself.

8    For example, a determination of a "fair" price depends on factors not relevant to a determination of whether a particular punishment of a child for misbehavior is "fair."

9    *Doe v. Trustees of Boston College,* 942 F.3d 527 (1st Cir. 2019), presented a very different situation. The contract at issue there guaranteed "fundamental fairness" in the disciplinary proceeding. Agreeing that the contract governed the process to which Doe was entitled, and looking to state law, the Court noted that Massachusetts had a well-developed and extensive body of law defining the meaning of "fundamental fairness" in school disciplinary cases. Here, the word "fair" is not similarly clearly defined in Rhode Island law as it applies to a school disciplinary hearing and, therefore, its interpretation is a question for the jury. This Court does not seek to impose federal due process standards on this private university and its students; rather the issue here is a question of contractual interpretation and application. The current case also occurs in a fundamentally different procedural context. In *Doe* the plaintiff had to demonstrate probability of success in order to prevail on his motion for a preliminary injunction.

10    For example, it appears that JWU put a significant burden on Doe to ascertain the details of the process, rather than provide him with a detailed description. It gave him copies of the relevant policies and publications, it told him he could bring "relevant" materials and "witnesses with personal knowledge" and that the Director of Student Conduct was available to answer questions. In a subsequent letter, Director Gray reiterated that he should contact her if he had any questions. A reasonable jury could find that requiring Doe to discern what questions he should ask (e.g., could he propound written questions before Ms. Smith was interviewed by the panel or after she gave a statement; could he make an opening or closing statement, what would constitute "personal knowledge" by a witness, would a roommate sleeping in the room close to the bathroom who heard nothing be a witness "with personal knowledge," etc.), is unfair when students are strangers to such a process and rely entirely on what is told to them to inform their understanding of what they are up against. A reasonable juror could decide that it is not "fair" to require a student who knows little or nothing to figure out what s/he does not know in order to ask productive questions.

11    Doe has suggested that I eschew *Yusuf's* framework in favor of one recently articulated by the Seventh Circuit in *Doe v. Purdue University,* 928 F.3d 652 (7th Cir. 2019). As *Haidak* applied the *Yusuf* framework two months after *Doe v. Purdue University* was published, I decline that invitation.

12    He complains of the nomenclature used by campus police during the investigative stage in referring to Mary Smith as a "victim"; and of an alleged over-reaction to what is known as the "Dear Colleague" letter from the Obama-era Department of Education which he believes caused the University to engage in a "witch-hunt against men;" and on a rate of adjudications showing that only 20% of the students charged with sexual assault have been female. These combined, he avers, create an inference of purposeful discrimination.

13    *See, e.g., Doe v. Washington and Lee University,* No. 6:14-cv-00052, 2015 WL 4647996 at *10 (W.D. Va. Aug. 5, 2015) (finding as indicative of discriminatory motivation the fact that the University's Title IX Officer, who had "considerable influence" on the proceedings, had publicly endorsed an article positing that sexual assault occurs whenever a woman has consensual sex with a man and regrets it because she had internal reservations that she did not outwardly express," a scenario much like the facts at issue there.).

**End of Document**

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

JOHN DOE,

                              Plaintiff,                    5:19-cv-00190 (BKS/ATB)

v.

SYRACUSE UNIVERSITY, SYRACUSE UNIVERSITY
BOARD OF TRUSTEES, SHEILA JOHNSON-WILLIS,
in her individual capacity, and BERNERD JACOBSON, in
his individual capacity,

                              Defendants.

**Appearances:**

*For Plaintiff:*
Michael Thad Allen
Allen Law, LLC
P.O. Box 404
Quaker Hill, CT 06375

Julie E. Burt
Law Office of Julie E. Burt
128 Garden Street
Farmington, CT 06032

*For Defendants:*
Edward G. Melvin
Barclay Damon LLP
Barclay Damon Tower
125 East Jefferson Street
Syracuse, NY 13202

**Hon. Brenda K. Sannes, United States District Judge:**

**MEMORANDUM-DECISION AND ORDER**

I.     **INTRODUCTION**

        Plaintiff John Doe brings this action alleging: (1) violations under Title IX of the

Education Amendments of 1972, 20 U.S.C. § 1681 *et seq.* ("Title IX") (First, Second, and Third

Claims); (2) breach of contract (Fourth Claim); (3) breach of the implied covenant of good faith and fair dealing (Fifth Claim); (4) negligence (Sixth Claim); (5) gross negligence (Seventh Claim); and (6) violation of Art. I, § 6 of the New York State Constitution's Due Process Clause (Eighth Claim). (Dkt. No. 1). Defendants Syracuse University, the Syracuse University Board of Trustees (the "Syracuse Defendants"), Sheila Johnson-Willis, and Bernerd Jacobson (the "Individual Defendants") move to partially dismiss the Complaint. (Dkt. No. 20). The parties have filed responsive papers. (Dkt. Nos. 27, 28). For the reasons that follow, the motion is granted in part and denied in part.

## II.   FACTS[1]

### A.   The Encounters Between RP[2] and Plaintiff

Plaintiff and RP "met at church in their home state and, when they arrived in Syracuse for school in August 2016, "began spending time together on a regular basis," including by attending church together. (Dkt. No. 1, ¶¶ 21, 23–25). As their relationship evolved, "balancing their mutual attraction, their commitments to others, and their Christian values became increasingly conflicted." (*Id.* ¶ 26). Neither Plaintiff nor RP "had "extensive sexual experience." (*Id.*). The two "disclosed . . . that they were still virgins." (*Id.*). Both "had resolved to remain abstinent until marriage and remained committed to that resolution." (*Id.*).

Plaintiff and RP had three sexual encounters. (*Id.* ¶¶ 27–49). Each encounter "developed in the same pattern" in which RP demonstrated her "affirmative consent at every stage." (*Id.* ¶ 32).

---

[1] The facts are drawn from the Complaint, (Dkt. No. 1), as well as some of the documents attached to Defendants' motion to dismiss. *See infra* Section IV.A. The Court assumes the truth of, and draws reasonable inferences from, the well-pleaded factual allegations. *Faber v. Metro. Life Ins. Co.*, 648 F.3d 98, 104 (2d Cir. 2011).

[2] As in the Complaint, the Court refers to the alleged sexual assault victim as RP.

### 1.    October 11, 2016 – First Sexual Encounter

On October 11, 2016, Plaintiff called RP to ask if she wanted to "hang out." (*Id.* ¶ 27).
RP "said she would like to get together," and "later divulged that her current boyfriend had
broken up with her." (*Id.*). The two had dinner. (*Id.*). After dinner, RP "continued to seek support
from Plaintiff and asked to go to his apartment where she continued to talk." (*Id.* ¶ 28).

As they sat on the couch, the two "had their arms around each other and eventually began
to kiss." (*Id.*). The encounter progressed to "mutual fondling," and the two "agreed to move into
[Plaintiff's] bedroom." (*Id.* ¶ 29). They then "mutually agreed to remove each other's clothing as
evidenced by their simultaneous actions and desires." (*Id.*). Plaintiff "picked [RP] up and carried
her, and [RP] demonstrated her active participation by wrapping her legs around [Plaintiff's]
waist." (*Id.*). "RP was an active, willing, and assertive participant" in the sexual encounter. (*Id.*).
The two "attempted vaginal intercourse but without success." (*Id.*).

After the encounter, Plaintiff "felt conflicted, and RP stated she still had feelings for her
recent ex-boyfriend." (*Id.* ¶ 30). The two "also discussed how they both believed their encounter
had violated their Christian values." (*Id.*). Plaintiff regretted being in a relationship with another
woman. (*Id.* ¶ 31). Plaintiff felt "such emotional anguish" that RP "offered to take him to the
hospital," but he "refused this assistance." (*Id.*). That night, Plaintiff "sought professional
support independent of RP." (*Id.*).

### 2.    October 24, 2016 – Second Sexual Encounter

During the two weeks after their October 11th encounter, Plaintiff and RP "continued to
struggle with feelings of guilt." (*Id.* ¶ 33). Plaintiff "experienced emotional trauma over cheating
on his . . . girlfriend by 'hooking up' with RP." (*Id.* ¶ 198). Plaintiff told his girlfriend, and his
relationship with his girlfriend "ended as a result of the confession." (*Id.* ¶ 33). Plaintiff
"continued to independently seek emotional support during this time from a Christian

Counselor." (*Id.*). Plaintiff and RP "continued to have feelings for each other." (*Id.* ¶ 34). On multiple occasions, they discussed whether they should "avoid 'hanging out' to ward off the temptation of another sexual encounter." (*Id.*). "By the weekend of October 22/23, 2016," the two "discussed the effect of their behavior on their relationship and expressed that they would each seek forgiveness as they were taught by their Christian upbringing and values." (*Id.*).

On October 24th, they originally planned to meet at a coffee shop, "but instead, RP voluntarily drove to [Plaintiff's] apartment around 5:00 p.m." and went inside. (*Id.* ¶ 35). Plaintiff discussed his "feelings about his break up and about his Christian values." (*Id.*). The two agreed to stay at Plaintiff's apartment to talk, and "soon they both began to be intimate, which again evolved into a sexual encounter." (*Id.* ¶ 36). They began to kiss and "agreed through their actions and words to move to [Plaintiff's] bedroom." (*Id.*). RP actively wrapped her legs and arms around [Plaintiff]" when he picked her up.  (*Id.*). The two "continued various sexual behaviors that they both enjoyed and desired to continue." (*Id.*). The two "attempted vaginal intercourse" "but again without success." (*Id.*). RP "gave affirmative consent to each specific sexual act." (*Id.* ¶ 38).

After the October 24th encounter, Plaintiff and RP "once again felt conflicted by their Christian values and their sexual desire." (*Id.* ¶ 41). The two "discussed RP's unstable and unpredictable relationship with another man, which increased her feelings of her wrongdoings during their sexual encounters." (*Id.*). "They discussed their need to avoid temptation and follow their Christian values, so they decided that it would be best if they stayed away from each other." (*Id.*). That evening, Plaintiff "again felt remorse for their behavior and again sought support" from a professional counselor." (*Id.*).

4

### 3.   November 13, 2016 – Third Sexual Encounter

On November 13th, Plaintiff went to church in Syracuse and saw RP there.  (*Id.* ¶ 43). RP "stated she had no money for lunch, and so [Plaintiff] invited her to have lunch at his apartment after church." (*Id.*). RP responded "that she would like to." (*Id.*). RP "later gave contradictory accounts," denying "wanting to come to [Plaintiff's] apartment even though she voluntarily drove her own car." (*Id.*). Once inside Plaintiff's apartment, "they began to kiss on [Plaintiff's] couch." (*Id.* ¶ 44). Throughout this time, "RP was an active and willing participant, and both parties mutually participated in the sexual behavior." (*Id.*).

As during the prior encounters, Plaintiff and RP "moved to his bedroom." (*Id.*). "RP again actively wrapped her legs around [Plaintiff] as he carried her to the bedroom." (*Id.*). They "removed each other's clothing and progressed to mutual fondling." (*Id.*). Plaintiff was "attentive to RP's desires and cues." (*Id.*) Plaintiff, being "conscious of RP's feelings and desires, asked RP if she wanted to stop 'making out.'" (*Id.*). "RP said yes, so [Plaintiff] immediately stopped his actions." (*Id.*).

RP remained next to Plaintiff and began "flirtatiously teasing him and touching him." (*Id.* ¶ 45). Plaintiff "responded to her and kissed her, and [RP] responded by kissing him back and fully and actively participat[ing] in the physical contact." (*Id.*). Plaintiff was "cognizant they were acting on mutual desires that they may both later regret." (*Id.*). RP said, "not to worry about it" and that it "didn't bother" her that "they were in a similar situation as their other two encounters." (*Id.*). After RP made those statements, Plaintiff asked "if they could 'make out' again, and RP . . . consented to kissing again." (*Id.* ¶ 46). As during the prior two occasions, the encounter progressed beyond making out. (*Id.*). The two "began undressing each other." (*Id.*). Plaintiff asked if he and RP "could again attempt vaginal sex." (*Id.* ¶ 47). RP "consented, agreed, and continued to engage in the sexual behavior." (*Id.*). On this occasion, "the two successfully

5

completed vaginal intercourse." (*Id.*). "All sexual acts" followed the "exact same pattern of voluntary, mutually consensual sex as in their prior encounters." (*Id.* ¶ 48).

Afterwards, Plaintiff and RP "talked about feeling remorse about their mutual desires, completing the sexual act, and conflict with their faith." (*Id.* ¶ 49). Both RP and Plaintiff "believed they had failed to contain sinful urges outside of marriage." (*Id.* ¶ 198). RP told Plaintiff that "she was conflicted due to her attempt to commit again to her other boyfriend." (*Id.* ¶ 49). She also told Plaintiff that "she was upset that she may not be a virgin anymore and expressed confusion about this point." (*Id.*). The two "agreed not to see each other to avoid temptation," and then "turned to small talk." (*Id.*).

## B. RP Reports That Plaintiff Sexually Assaulted Her

Two days later, RP "discussed her sexual encounters with a Syracuse professor." (*Id.* ¶ 101). The professor "encouraged RP to rethink the consensual events of November 13, 2016 as non-consensual." (*Id.*). Syracuse did not investigate what the professor said or how RP's account to the professor differed from her other accounts of the events. (*Id.* ¶ 102). Plaintiff "was not provided the opportunity to find out what the professor said." (*Id.*). Plaintiff could not determine whether or not RP's statements to the professor were consistent with her contradictory reports to others. (*Id.*). At this time, RP "deleted all of her text messages between [Plaintiff] and herself, eliminating evidence of their consensual contact and communications."  (*Id.* ¶ 103).

### 1. RP Gives Inconsistent Accounts of the November 13, 2016 Encounter, and the Syracuse Department of Public Safety ("DPS") Issues a No Contact Order

#### a. RP's November 15, 2016 Account

On November 15, 2016, at approximately 3:12 p.m., RP reported a "sexual assault" to DPS Officer Matthew Zingaro. (*Id.* ¶ 104). Zingaro referred the matter to the Syracuse Police Department ("SPD") (*Id.*). Early that evening SPD Officer Marlena Jackson of the Criminal

6

Investigation Division interviewed RP on campus. (*Id.* ¶ 105). RP told Jackson that she "did not consent *to having any sexual relations* with" Plaintiff on November 13th. (*Id.* ¶ 105). RP admitted that the preceding "incidents [with Plaintiff] were consensual." (*Id.*).

###### b. DPS Issues an No Contact Order

After DPS "first received a report," it issued a No Contact Order dated November 15, 2016. (*Id.* ¶ 137). Plaintiff alleges that Syracuse violated its policy by failing to notify Plaintiff of this No Contact Order and by not issuing RP a "symmetrical" No Contact Order, instructing her to stay away from Plaintiff. (*Id.* ¶¶ 138–39, 229–30, 237). Plaintiff also alleges that Syracuse did not "inform RP that it would keep the . . . [No Contact Order] secret," which opened the door to her "accusations that [Plaintiff] was further violating Syracuse's rules by contacting her." (*Id.* ¶ 138).

On November 27, 2016, Plaintiff contacted RP and left a voicemail. (*Id.* ¶¶ 141–42). A week later, on December 2, 2016, RP complained to DPS that Plaintiff "had contacted her by voicemail the previous week." (*Id.* ¶ 141). RP admitted to DPS that Plaintiff "had not been inappropriate in any way" and that "she was not fearful or upset due to [Plaintiff]." (*Id.* ¶¶ 96, 141). RP however believed Plaintiff "was violating Syracuse rules and [that Plaintiff] had disobeyed the [No Contact Order]." (*Id.* ¶ 143). Because Syracuse kept the No Contact Order secret, Plaintiff "inadvertently . . . aggravate[d] RP." (*Id.* ¶¶ 143, 230(a)).

Syracuse's Office of Student Rights and Responsibilities informed Plaintiff of the No Contact Order's "existence" in a December 1, 2016 email. (*Id.* ¶ 144). The Office announced that it had "reviewed" the No Contact Order and "determined that it will remain in effect at this time," although Plaintiff "could not be aware of the [No Contact Order] in the first place." (*Id.*). This was Plaintiff's "first inkling" of any administrative action against him. (*Id.* ¶ 137).

Appellate Case: 19-1594      Page: 15      Date Filed: 03/09/2020 Entry ID: 4889050

### c.      RP's December 6, 2016 Account

RP's allegations of sexual assault "went through several permutations." (*Id.* ¶ 100). On December 6th, RP gave a "second, more extensive account to Officer Michael Murphy" of the SPD's Abused Persons Unit. (*Id.* ¶ 108). This time, RP addressed her struggle with her religious beliefs, explaining her desire to follow Christian teachings, which "included abstaining from sexual intercourse until marriage," and betraying her boyfriend by "having 'hookups' with [Plaintiff]." (*Id.*). RP also knew and felt guilty about the fact that Plaintiff was in a relationship with another woman. (*Id.*).

Whereas previously, RP had initially "insisted that ***nothing*** was consensual during the [November 13th] encounter" with Plaintiff, she now "acknowledged kissing [Plaintiff] back." (*Id.* ¶¶ 110, 194). Moreover, "although she first insisted" to Murphy that "'fingering' and a 'hand job' was as far as things had ever gone during any of their sexual encounters," RP later "admitted to a pregnancy scare over their second [October 24th] encounter" because they "had attempted vaginal intercourse" but that "her inexperience made penetration difficult." (*Id.*). Despite having previously told Murphy, as well as Jackson that "the[] previous [October 11th and 24th] instances had been consensual," RP now "insisted that the previous attempt at a vaginal intercourse had been ***non-consensual***." (*Id.* ¶¶ 110–11, 194).

Regarding "their third sexual encounter, RP "avoided mention of mutual oral sex." (*Id.* ¶ 112) She "described her participation in their sex as passive: She 'ended up with her clothes off' and 'ended up on top of Plaintiff . . . [and] remained on top of him for a few minutes.'" (*Id.*). At the conclusion of this interview, RP stated that "she did not want to see" Plaintiff prosecuted, punished, or investigated further. (*Id.* ¶ 115). On December 9th, the SPD "completed a detailed interview with [Plaintiff] as part of its investigation." (*Id.* ¶ 116). The SPD subsequently "closed any and all criminal investigation." (*Id.* ¶ 117).

### C.      The Public and Governmental Pressure on Syracuse University

At the "precise time of RP and [Plaintiff's] sexual encounters, Syracuse faced substantial criticism" from sources, including "its student body, the media, and [the] federal and state government" for allegedly looking the other way when female students complained of sexual assault as well as not actively prosecuting alleged male perpetrators." (*Id.* ¶¶ 51, 191).

Colleges and universities, including Syracuse, "feared being investigated or sanctioned by the Department of Education's Office for Civil Rights ("OCR") for violating Title IX." (*Id.* ¶ 52). Protests broke out at universities, including Syracuse. (*Id.* ¶¶ 57, 67–68, 75). Universities also "feared lawsuits brought by alleged female victims of sexual assault" as well as "complaints to the OCR and [the] Department of Justice." (*Id.* ¶ 52).

Defendants "strove to demonstrate that Syracuse would do anything to support female students who alleged sexual assault." (*Id.* ¶ 65). In the case of RP and other women who came forward "in the 2016/2017 timeframe, Syracuse's willingness to accept uncritically female accusations of sexual assault reached a zenith" and Syracuse was "eager and overly enthusiastic to demonstrate to the student body and the public that it was serious about quashing a supposed male 'rape culture' on campus." (*Id.* ¶ 66). Syracuse "took active steps to increase the number of Title IX cases against male students" and "presumed male students responsible for sexual assault by virtue of archaic assumptions about male sexual desire." (*Id.* ¶ 192). Simultaneously, "in violation of its own policies, Syracuse relaxed the standards of evidence for alleged female victims," applied "lax investigatory techniques to accusing students," and "increased the sanctions imposed on male students accused of sexual assault." (*Id.*).

OCR attorneys scheduled a visit to Syracuse on January 24, 2017, in response to a "complaint alleging that Syracuse was not acting promptly enough when it received notice of female students' allegations of sexual assault." (*Id.* ¶¶ 70–71). To appease OCR, Syracuse

administrators emphasized that "[c]ampus officials said they have taken 'significant steps' in recent years to prevent sexual and relationship violence." (*Id.* ¶ 72). Syracuse's Title IX Office "instituted gender biased policies and procedures due to the atmosphere of student protests, media attention, and governmental pressure." (*Id.* ¶ 75). Syracuse "appointed administrators and staff who furthered this bias," which "manifested" in the course of Plaintiff's case. (*Id.*).

### D.    Syracuse's Title IX Proceedings Against Plaintiff

#### 1.    Syracuse Initiates a Title IX Complaint Against Plaintiff

On January 25, 2017, the day after OCR came to campus, "Syracuse initiated its Title IX Complaint against [Plaintiff]." (*Id.* ¶¶ 146–47). The complaint was brought by Syracuse, not RP. (*Id.* at 2 n.1). Plaintiff alleges that Syracuse initiated this complaint, over two months after the report by RP, and over a month after the SPD had closed its investigation "in response to public and governmental pressure to extirpate the so-called 'rape culture' among Syracuse male students." (*Id.* ¶ 74).

#### 2.    Trauma-informed Victim Interview Techniques

The Title IX investigator in Plaintiff's case, Defendant Bernerd Jacobson, has a "background in victim advocacy, in which he championed the victim's voice." (*Id.* ¶ 85). Jacobson uses "'trauma-informed' [victim] interview techniques" ("TIVITs") that privilege alleged victims' accounts over those of the accused male students. (*Id.* ¶¶ 86–87). Jacobson and others "viewed their job as to support the perceived vulnerability of women to Syracuse 'rape culture.'" (*Id.* ¶ 218).

Syracuse teaches its Title IX investigators TIVITs and does so in an "amateur and unprofessional manner to individuals with no proper education." (*Id.* ¶¶ 90–91). TIVITs "hold that victims' memories are fragmented and prone to expressions of feelings or sensations rather than the precise recall of events." (*Id.* ¶ 88). Under TIVITs, perpetrators of sexual assault "are

supposedly rational actors" who "plan[], practic[e], and becom[e] habitual rapists and sexual predators." (*Id.*). "Inconsistency in the alleged female victim's account thereby becomes evidence that her testimony is truthful, because of alleged trauma." (*Id.* ¶ 89). Conversely, the accused's consistent story becomes "evidence that he is a premeditated and experienced sex offender." (*Id.*). Syracuse implements TIVITs despite "the lack of solid scientific support in assessing" victim testimony. (*Id.* ¶ 93).

These techniques were applied to Plaintiff and RP "at every stage in the investigation." (*Id.* ¶¶ 90, 96, 193). TIVITs were "applied to RP despite the absence of any clinical determination of whether, in fact, RP suffered trauma." (*Id.* ¶ 96). RP never sought trauma treatment at a hospital. (*Id.*). Syracuse applies TIVITs with "bias against male students," (*id.* ¶ 97), and to "enhance the credibility and lower the standards of evidence in order to find alleged female victims 'credible.'" (*Id.* ¶ 219).

### 3.   Jacobson's Report

Jacobson interviewed RP on January 25, 2017, the same day Syracuse initiated the Title IX complaint." (*Id.* ¶¶ 118–19). He interviewed RP again on April 3, 2017. (*Id.* ¶ 119). With Jacobson, "RP reverted to her account that the two sexual 'hookups' in October had been entirely consensual and dropped her allegation of any sexual assault before November 13, 2016. (*Id.*). When discussing her third encounter with Plaintiff, "RP reverted to insisting that ***nothing was consensual*** and that 'she didn't do anything that he could have interpreted as 'yes.'' (*Id.* ¶ 120). For the first time, RP "averred that she 'was in shock.'" (*Id.* ¶¶ 120, 193–94).

Jacobson completed the Investigation Report ("Jacobson Report") on April 17, 2017. (*Id.* ¶ 163). The Jacobson Report summarizes Jacobson's two interviews with RP as well as "the statement that [Plaintiff] made to Detective James Hill of the Syracuse DPS." (*Id.* ¶¶ 150, 195). Jacobson also appended SPD reports of interviews with Plaintiff and RP. (*Id.* ¶ 150).

Jacobson failed to scrutinize evidence weighing on RP's credibility, including "contradictions between various statements" and the destruction of text messages. (*Id.*). In "an affirmative credibility assessment," Jacobson concluded, RP is "credible and the information she provides is reliable.'" (*Id.* ¶¶ 155–56, 194). "Jacobson disregarded and gave no account of inconsistencies in RP's statements, in particular RP's vacillation about sexual contact on November 13, 2016 to which she had consented after claiming that no sexual contact had been consensual on that day." (*Id.* ¶ 157). Jacobson "also gave no account of RP's vacillation about attempted vaginal sex prior to November 13, 2016, in which she had accused [Plaintiff] of another sexual assault to SPD officer Murphy, contradicting clear statements that the prior two sexual encounters had been consensual." (*Id.*). Jacobson then gave "only cursory treatment" to Plaintiff's "consistent accounts," (*id.* ¶¶ 158, 196, 211), but noted that Plaintiff's "description of events was "also entirely plausible." (*Id.* ¶ 158).

Jacobson released his report on April 17, 2017, "82 days from the date of the Syracuse Complaint and a full six months from the time the matter was first reported to Syracuse." (*Id.* ¶ 163).[3] Plaintiff's hearing "was not scheduled until May 5, 2017, the first day of [Plaintiff's] finals week." (*Id.* ¶ 165).

### 4.    Notice of Formal Charges[4]

`       On April 28, 2017, Plaintiff received notice of the formal charges:

1) Physical harm or threat of physical harm to any person or persons, including but not limited to: assault, sexual abuse, or other forms of physical abuse.

---

[3] The Jacobson Report, released on April 17, 2017, was "timed within the closing weeks of the spring semester" when Plaintiff was only "one course short of graduation with his Masters degree." (Dkt. No. 1, ¶ 164).

[4] Plaintiff alleges that he has never received a copy of the complaint against him. (*Id.* ¶ 134). Plaintiff only learned of the complaint "through a single reference in the final investigation report, which merely listed the date Syracuse originated the complaint." (*Id.*). He alleges that he only learned of "the specific allegations" against him "at the end, rather than at the outset of" the investigation, in the Jacobson Report. (*Id.* ¶ 230(d)).

3) Conduct—whether physical, verbal or electronic, oral, written or video—which threatens the mental health, physical health, or safety of any person or persons including, but not limited to hazing, drug or alcohol abuse, bullying or other forms of destructive behavior.

15) Violation of University policies, rules or regulations that are published in the Student Handbook, or other official University publications or agreements.

- Syracuse University Policy on Sexual Assault, Sexual Harassment, Stalking or Relationship Violence.

(*Id.* ¶ 166).

### 5. The University Conduct Board Hearing (the "Hearing")

The Hearing took place on May 5, 2017 before "a panel of three career administrators" (collectively the "Board"). (*Id.* ¶ 168). Both RP and Plaintiff testified. (Dkt. No. 20-2, at 46). Syracuse, however, did not permit Plaintiff to hear what RP said. (Dkt. No. 1, ¶ 181). The Board concluded that Plaintiff performed cunnilingus on RP; that Plaintiff had RP perform fellatio on him; that the parties engaged in sexual touching; and that Plaintiff had vaginal intercourse with RP, all without RP's affirmative consent. (Dkt. No. 20-2, at 44). The Board followed Jacobson's findings "and found RP credible." (*Id.*; Dkt. No. 1, ¶ 169). The Board specifically cited to RP's "consistency with her recollection of events," without addressing the fact that its findings—that RP and Plaintiff had "two previous incidents of consensual sexual contact" and that RP consented to kissing in the bedroom on November 13, 2016—were inconsistent with previous statements by RP. (Dkt. No. 20-2, at 43–44).

The Board found that RP "withdrew consent" when the parties were kissing in the bedroom, and that Plaintiff then then "stopped the interaction." (Dkt. No. 1, ¶ 172; Dkt. No. 20-2 at 43). The Board found that Plaintiff wanted to continue the sexual activity and kissed RP without consent. (Dkt. No. 20-2, at 43). After that point, the Board "considered consent permanently and irrevocably withdrawn—without, however, making any findings as to how

13

[Plaintiff] somehow forced RP to position herself on top of him or forced, physically, emotionally, or otherwise, her mouth onto his penis." (Dkt. No. 1, ¶ 172).

    While the Board found RP "credible," it concluded that Plaintiff was only "partially credible," citing to his admission that he 1) had sexual desire for RP, and 2) was 'horny' after RP withdrew consent for kissing. (*Id.* ¶ 173; Dkt. No. 20-2, at 44). Plaintiff alleges that applying "archaic stereotypes of male sexual desire, the Board took [Plaintiff's] admission of being 'horny' as evidence that he could not credibly deny sexually assaulting RP." (Dkt. No. 1, ¶¶ 174, 190, 211). The Board also found that Plaintiff "premeditated these actions and had intent to engage in sexual contact and intercourse with [RP] from the moment he saw her at church" because by Plaintiff's "own admission, when he saw [RP] at church, he knew he wanted to have sexual relations with her and knew that such acts would occur." (*Id.* ¶ 174; Dkt. No. 20-2, at 46). Plaintiff alleges that these findings "conformed to the stereotype and archaic assumption that Syracuse was beset by a male 'rape culture' driven by uncontrollable male sexual desire, while female students are its passive victims and targets." (Dkt. No. 1, ¶¶ 175, 190). Plaintiff alleges that the Board did not question RP about her sexual desire for Plaintiff. (*Id.* ¶¶ 175, 211(g)).

    Plaintiff alleges that the Board "also held it against [Plaintiff] that" the sexual encounter "had started, stopped, and began again." (*Id.* ¶ 177). According to Plaintiff "[u]ndisputed evidence" that Plaintiff "had done the right thing by ceasing sexual contact where RP said, 'no' was . . . another piece of evidence Syracuse turned on its head" and "held this to be evidence that no further affirmative consent was possible." (*Id.* ¶¶ 177, 40).

    RP alleged for the first time at the hearing, and the Board credited the allegation, that she was "fearful of leaving" Plaintiff's apartment "prior to sexual contact." (*Id.* ¶ 178). The Board "thus disregarded RP's previous statement that she was not fearful or upset" by Plaintiff. (*Id.* ¶¶

96, 178; Dkt. No. 20-2, at 44, 47). The Board concluded that the incident "caused [RP] significant trauma and is affecting her mental well-being." (Dkt. No. 1, ¶ 178; Dkt. No. 20-2, at 47). By contrast, "the Board ignored undisputed evidence of [Plaintiff's] mental anguish and trauma, which had caused him to call a counseling hotline twice." (Dkt. No. 1, ¶¶ 178, 198; Dkt. No. 20-2, at 14). Plaintiff alleges that "'[t]rauma' averred by the alleged female victim was enough to justify contradictions in [RP's] story." (Dkt. No. 1, ¶ 179). "Undisputed trauma of the male student, however, did not make his consistent story credible to the Board." (*Id.*). The Board did not explain its "contradictory findings." (*Id.* ¶ 180). Plaintiff alleges that Syracuse failed to apply a "preponderance standard" to Plaintiff's case, as required by its policies, and that if it had applied the correct standard "a finding of 'not responsible' would have been the only conceivable outcome." (*Id.* ¶¶ 230, 247).[5]

Plaintiff further alleges that the delay in his case—which spanned 107 days from the January 25th initiation of the Title IX complaint until the Board's May 11th decision—violated Syracuse's policy that the process would be completed within 60 days. As a result, Plaintiff needlessly spent additional time, effort, and tuition for Spring Semester to complete his Masters Program. (*Id.* ¶ 165). Plaintiff alleges that he "never received any written explanation or notice for Syracuse's delay, contrary to and in violation of [the Handbook]." (*Id.* ¶¶ 164, 229, 237).

### E.   Plaintiff's Expulsion from Syracuse University

At time of Syracuse's final decision to expel Plaintiff, he had "only one more remaining class and was only awaiting his research results to finish his last degree requirements." (*Id.* ¶ 22). Plaintiff "received recommendations from staff and professors" when Syracuse expelled him in

---

[5] On May 16, 2017, Plaintiff appealed the Board's decision. (*Id.* ¶ 184). The Syracuse "appeals panel" affirmed the Board's decision. (*Id.* ¶ 185; Dkt. No. 20-2, at 50).

Spring 2017 but "was forever barred from completing his degree." (*Id.*). Plaintiff has been "unable to complete his Masters degree," (*id.* ¶¶ 186, 202), and has a "permanent mark on his transcript indicating a conduct code violation, which he must disclose to any future university or employer to which he applies." (*Id.* ¶ 186). Plaintiff has been "unable to enroll" in a new university to pursue graduate studies. (*Id.* ¶ 187). Without "correcting and expunging his transcript," Plaintiff's "career will suffer permanent damage" and his "professional future has been permanently blighted." (*Id.*). By "erroneously labeling him a sex offender," Syracuse has "blocked [Plaintiff's] career path in forensic science." (*Id.*). Plaintiff has "forfeited tuition and fees," (*id.* ¶¶ 202, 214, 225), and suffered emotional distress, psychological damage, loss of income, reputational damage, and diminished career opportunities. (*Id.* ¶¶ 202, 214, 225).

## III.  LEGAL STANDARD

To survive a motion to dismiss under Rule 12(b)(6) for failure to state a claim, "a complaint must provide 'enough facts to state a claim to relief that is plausible on its face.'" *Mayor & City Council of Balt. v. Citigroup, Inc.*, 709 F.3d 129, 135 (2d Cir. 2013) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). The plaintiff must provide factual allegations sufficient "to raise a right to relief above the speculative level." *Id.* (quoting *Twombly*, 550 U.S. at 555). The court must accept as true all factual allegations in the complaint and draw all reasonable inferences in the plaintiff's favor. *See EEOC v. Port Auth.*, 768 F.3d 247, 253 (2d Cir. 2014) (citing *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007)). However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). When deciding a motion to dismiss, the Court's review is ordinarily limited to "the facts as asserted within the four corners of the complaint, the documents attached to the complaint as

16

exhibits, and any documents incorporated in the complaint by reference." *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 191 (2d Cir. 2007).

## IV.   DISCUSSION

### A.   Documents Extraneous to the Complaint

Defendants attach a number of exhibits in support of their motion. (*See* Dkt. Nos. 20-1– 20-4). Thus, as a preliminary matter, the Court must decide which, if any, to consider in resolving this motion. Defendants argue the Court may "review documents integral to the complaint upon which the plaintiff relied in drafting his pleadings, as well as any documents attached to the complaint as exhibits and any statements or documents incorporated into the complaint by reference." (Dkt. No. 20-6, at 11) (internal quotation marks omitted). Plaintiff argues that the Court should not consider this evidence because (1) doing so contravenes the general rule when adjudicating a motion to dismiss under Fed. R. Civ. P. 12(b)(6); (2) Defendants "mischaracterize[e] . . . these documents"; and (3) Defendants previously "withheld the extraneous documents on which they now rely" from Plaintiff's educational file. (Dkt. No. 27, at 11–13).

"Generally, consideration of a motion to dismiss under Rule 12(b)(6) is limited to consideration of the complaint itself." *Faulkner v. Beer*, 463 F.3d 130, 134 (2d Cir. 2006). However, considering "materials outside the complaint is not entirely foreclosed on a 12(b)(6) motion." *Id.* A complaint "is deemed to include any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference." *Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 230 (2d Cir. 2016) (quoting *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002)). "Where a document is not incorporated by reference, the court may nevertheless consider it where the complaint relies heavily upon its terms and effect, thereby rendering the document integral to the complaint." *Id.* (quoting *DiFolco v. MSNBC Cable L.L.C.*,

622 F.3d 104, 111 (2d Cir. 2010) (internal quotation marks omitted)). Even where a document is deemed "'integral' to the complaint, it must be clear on the record that no dispute exists regarding the authenticity or accuracy of the document." *Id.* (quoting *DiFolco*, 622 F.3d at 111). "It must also be clear that there exist no material disputed issues of fact regarding the relevance of the document." *Id.* (quoting *Faulkner*, 463 F.3d at 134). "This principle is driven by a concern that a plaintiff may lack notice that the material will be considered to resolve factual matters." *Id.* Thus, "if material is not integral to or otherwise incorporated in the complaint, it may not be considered unless the motion to dismiss is converted to a motion for summary judgment and all parties are 'given a reasonable opportunity to present all the material that is pertinent to the motion.'" *Id.* (quoting Fed. R. Civ. P. 12(d)). As set forth below, the Court finds that some, but not all of the documents submitted by Defendants may be considered.

### 1.   The 2016-17 Handbook

The Complaint relies on, and includes a URL that navigates to, a version of the Syracuse Handbook entitled "Student Conduct System Handbook 2017–18." [6] (Dkt. No. 1, ¶ 122). Asserting that 2017–18 Handbook was not "in effect during the relevant 2016–17 school year, Defendants attach the 2016–17 Handbook as an exhibit to their motion. (Dkt. No. 20-2, at 51-89; Dkt. No. 20-6, at 16 n.2; Dkt. No. 28, at 4 n.2). Plaintiff responds that "Defendants have improperly introduced the [2016–17] Handbook into the record on their Rule 12(b)(6) motion. (Dkt. No. 27, at 13 n.3).

---

[6] The Court cites to the Handbook by Part number or, where necessary, page number. Syracuse University, *Student Conduct System Handbook: 2017-2018*, http://studentconduct.syr.edu/_documents/StudentConductSystem Handbook2017-2018.pdf (last visited Feb. 21, 2020).

The Court declines to consider the 2016-17 Handbook attached to Defendants' motion because a "disputed issue[] of fact regarding the relevance of the document" underlies Defendants' argument. *See Nicosia*, 834 F.3d at 231 (quoting *Faulkner*, 463 F.3d at 134). That is, the parties do not appear to agree which contractual terms were in force at the time of the relevant events. *Id.* at 231 ("If . . . there is a dispute as to the relevance, authenticity, or accuracy of the documents relied upon, the district court may not dismiss the complaint with those materials in mind.").

## 2.    Documents Referred to and Relied Upon in the Complaint

Defendants have attached (1) the Jacobson Report, (2) the Board's Opinion, (3) the Appeal Panel's Opinion, and (4) a December 1, 2016 email from Eric Nestor to Plaintiff to their motion, arguing that the Court may consider these exhibits because Plaintiff "relies upon and references" them. (Dkt. No. 20-6, at 12; Dkt. No. 20-2, at 1-50, 90-91). The Court agrees. Throughout his Complaint, Plaintiff repeatedly refers to these documents and sometimes summarizes their contents. (*E.g.*, Dkt. No. 1, ¶¶ 75, 95, 98, 144, 150–51, 153–62, 169–80, 182, 185, 194, 211). Moreover, the Complaint "relies heavily upon [their] terms and effect, thereby rendering the document[s] integral to the complaint." *Nicosia*, 834 F.3d at 230 (quoting *DiFolco*, 622 F.3d at 111). Since Plaintiff "obviously possessed them and relied on them in drafting" the Complaint, the Court will consider them. *Routh v. Univ. of Rochester*, 981 F. Supp. 2d 184, 191 (W.D.N.Y. 2013)

## 3.    Additional Emails Attached to the Complaint

Defendants attach additional emails to their motion: emails exchanged between Tekhara Watson and Jacobson, (Dkt. No. 20-4, at 1–3); a February 9, 2017 emailed letter from Jacobson to Plaintiff, (*id.* at 4); emails exchanged between Jacobson and Plaintiff, (*id.* at 5–6); and an April 14, 2017 email from Defendant Sheila Johnson-Willis to Plaintiff. (*Id.* at 7). However,

19

because the emails were "'not attached to the complaint, w[ere] not incorporated by reference in the complaint,' and therefore 'w[ere] not integral to the complaint,' it is improper to consider [them] when considering a motion to dismiss." *Jones v. Halstead Mgmt. Co., LLC*, 81 F. Supp. 3d 324, 332 (S.D.N.Y. 2015) (quoting *DiFolco*, 622 F.3d at 113). Accordingly, the Court declines to consider them.[7]

### B.   Title IX (First, Second, and Third Claims Against Syracuse Defendants)

The Syracuse Defendants move to dismiss Plaintiff's Title IX claims as applied to Defendant Board of Trustees. (Dkt. No. 20-6, at 12–13). The Syracuse Defendants argue that the claim should be dismissed because "Plaintiff fails to allege that the Board of Trustees is an 'educational entity' that receives federal funds" as required to establish liability under Title IX." (*Id.* at 13). In response, "Plaintiff withdraws Count 1-3 against the Board." (Dkt. No. 27, at 30). Accordingly, the Syracuse Defendants' motion to dismiss Plaintiff's Title IX claims as to the Board of Trustees is granted.

### C.   Breach of Contract (Fourth Claim Against Syracuse Defendants)

Plaintiff's fourth cause of action alleges breach of contract under New York law against Syracuse. (Dkt. No. 1, ¶¶ 227–32). The Syracuse Defendants argue that Plaintiff's breach of contract claim should be dismissed, arguing that Plaintiff alleges "the sorts of non-actionable statements of general policy that courts applying New York law cannot support a breach of contract claim." (Dkt. No. 20-6, at 14). Plaintiff responds that his contract claims are "rooted in specific promises set forth in Syracuse policies." (Dkt. No. 27, at 20).

---

[7] The Court finds documents Plaintiff has hyperlinked in the Complaint to be "referenced" therein and will consider them in deciding this motion. *Estate of Roman v. City of Newark*, 914 F.3d 789, 796, 799 (3d Cir. 2019) (considering documents hyperlinked in the Complaint), *cert. denied*, 140 S. Ct. 82 (2019), *and cert. denied*, 140 S. Ct. 97 (2019).

To survive a motion to dismiss for a breach of contract claim under New York law,  the

complaint must allege facts which show: "(1) the existence of an agreement, (2) adequate

performance of the contract by the plaintiff, (3) breach of the contract by the defendant, and (4)

damages." *Habitzreuther v. Cornell Univ.*, No. 14-cv-1229, 2015 WL 5023719, at *5, 2015 U.S.

Dist. LEXIS 112209, at *14 (N.D.N.Y. Aug. 25, 2015) (quoting *Eternity Glob. Master Fund Ltd.*

*v. Morgan Guar. Trust Co. of N.Y.*, 375 F.3d 168, 177 (2d Cir. 2004)).

Under New York law, "an implied contract is formed when a university accepts a student

for enrollment: if the student complies with the terms prescribed by the university and completes

the required courses, the university must award him a degree." *Papelino v. Albany Coll. of*

*Pharmacy of Union Univ.*, 633 F.3d 81, 93 (2d Cir. 2011) (citing *Carr v. St. John's Univ.*, 17

A.D.2d 632, 633 (2d Dep't), *aff'd*, 12 N.Y.2d 802 (1962)). The terms of the implied contract are

"contained in the university's bulletins, circulars and regulations made available to the student."

*Id.* (quoting *Vought v. Teachers Coll., Columbia Univ.*, 127 A.D.2d 654, 654 (2d Dep't 1987)).

"Implicit in the contract is the requirement that the institution 'act in good faith in its dealing

with its students.'" *Id.* (quoting *Olsson v. Bd. of Higher Educ.*, 49 N.Y.2d 408, 413–14 (1980)).

At the same time, "the student must fulfill [his] end of the bargain by satisfying the university's

academic requirements and complying with its procedures." *Id.* (quoting *Gally v. Columbia*

*Univ.*, 22 F. Supp. 2d 199, 206 (S.D.N.Y. 1998)). To "state a claim for breach of such a contract,

a student must identify 'specifically designated and discrete promises.'" *Nungesser v. Columbia*

*Univ.*, 169 F. Supp. 3d 353, 370 (S.D.N.Y. 2016) (quoting *Ward v. New York Univ.*, No. 99-cv-

8733, 2000 WL 1448641, at *4, 2000 U.S. Dist. LEXIS 14067, at *11 (S.D.N.Y. Sept. 28,

2000)). "'General policy statements' and 'broad and unspecified procedures and guidelines' will

not suffice." *Id.* (quoting *Ward*, 2000 WL 1448641, at *4, 2000 U.S. Dist. LEXIS 14067, at

Appellate Case: 19-1594   Page: 29   Date Filed: 03/09/2020 Entry ID: 4889050

*10); *see also Gally*, 22 F. Supp. 2d at 208 ("[G]eneral promises about ethical standards" that are "subject to neither quantification nor objective evaluation" "are far different from the types of specific promises which have led to valid breach of contract claims against universities.").

### 1.    Syracuse's Policies

Syracuse has promulgated policies to address sexual misconduct as well as other student conduct code violations, including its Title IX Policy and the Student Conduct System Handbook ("the Handbook") to comply with Title IX's requirements as well as other applicable laws. (*Id.* ¶¶ 122, 126).

### 2.    The November 2016 No Contact Order

The Handbook Provides that if a No Contact Order "is issued, both parties will receive a written copy of the Order and both parties are expected not to have contact with one another. (Handbook, Part 4.7). It further provides that No Contact Orders "will be reviewed by the Director of the Office of Student Rights and Responsibilities, or a designee, within two business day of its issuance. The Director, or designee, will determine if there is a need to continue the order, amend the order, or remove the order. Both parties will be notified in writing of the decision of the Director, or the designee." (*Id.* at 4.8).

Plaintiff alleges that the Syracuse Defendants breached Part 4.7 by (i) failing to notify him that a No Contact Order had been issued or provide a copy until weeks later and (ii) "by failing to issue a symmetrical [No Contact Order] instructing RP to stay away from" Plaintiff. (*See* Dkt. No. 1, ¶¶ 135–40). The Syracuse Defendants acknowledge that a temporary No Contact Order was issued on November 15, 2016, when RP first reported the allegation, but note

22

that Plaintiff receive notice of the order via Nestor's December 1, 2016 email.[8] (Dkt. No. 20-6, at 15).

Plaintiff has plausibly alleged that Syracuse breached the policy provision that "both parties will receive a written copy" of a No Contact Order with respect to the Order issued on November 15, 2016. (Dkt. No. 1, ¶¶ 137, 144). RP had been notified by November 27th when Plaintiff left her a voicemail. (*Id.* ¶¶ 142–43). Furthermore, as Plaintiff alleges, the delay in notifying him about the No Contact Order caused him to unknowingly violate it. (*Id.* ¶¶ 141–43). Because Plaintiff had not been notified, he could not have known that he was "expected not to have contact" with RP when he left her a voicemail. (Handbook, Part 4.7).

Handbook Part 4.7, moreover, "cannot be characterized as generalized 'policy statements' or 'unspecified procedures.'" *Doe v. Syracuse Univ. ("Doe 2019")*, No. 18-cv-377, 2019 WL 2021026, at *11, 2019 U.S. Dist. LEXIS 77580, at *31 (N.D.N.Y. May 8, 2019). (Dkt. No. 20-2, at 2; Dkt. No. 20-6, at 15). Accordingly, drawing all inferences in Plaintiff's favor, Plaintiff has plausibly alleged that the Syracuse Defendants breached the No Contact Order policy.

### 3.      Notice and a Fair Proceeding

A "Statement of Student Rights and Responsibilities" in the Handbook provides that "students have the right to fundamental fairness before formal disciplinary sanctions are imposed by the University for violations of the Code of Student Conduct." (Handbook, at 2). This

---

[8] The Syracuse Defendants further argue that Nestor did not send notice earlier because he had not been advised of the No Contact Order, and that Plaintiff was not provided with the Order earlier "because SPD specifically directed DPS not to do so during the pendency of its investigation." (Dkt. No. 20-6, at 15 (emphasis omitted). According to the Complaint, however, the SPD investigation was still proceeding on December 1, 2016, when Nestor did notify Plaintiff of the Order. (*See* Dkt. No. 1, ¶¶ 116–17 (describing SPD interview of Plaintiff on December 9, 2016 and subsequent termination of SPD investigation)). At this stage of the proceedings, where the Court must assume the truth of the well-pled facts in the Complaint, the Court declines to consider these arguments further.

23

provision further states that "[s]tudents have the right to written notice and the opportunity for a hearing before any change in status is incurred for disciplinary reasons unless a significant threat to persons or property exists." (*Id.*). A Bill of Rights in the Handbook states that "[a]ll students have the right to . . . [p]articipate in a process that is fair, impartial, and provides adequate notice and meaningful opportunity to be heard." (*Id.* at 4). The Handbook further provides that "[t]he complainant and respondent will be notified simultaneously in writing of the charges filed against the respondent." (*Id.* at Part 10.15).[9]

Plaintiff alleges that Syracuse "fail[ed] to provide [Plaintiff] with written notice of the charges against him" in violation of these provisions. (Dkt. No. 27, at 21).[10] Plaintiff alleges that "to this day [he] has not received a copy of the complaint against him" and that he "only learned of the formal charges on April 28, 2017." (Dkt. No. 1, ¶¶ 132, 166). The Syracuse Defendants argue that promises "that students [are entitled to] receive 'written notice' or 'adequate notice' are 'the sorts of non-actionable statements of general policy that courts applying New York law have held cannot support a breach of contract claim.'" (Dkt. No. 20-6, at 16 (citing, inter alia, *Doe v. Syracuse Univ. ("Doe 2018")*, 341 F. Supp. 3d 125, 141 (N.D.N.Y. 2018)). The Syracuse Defendants also argue that "the University in fact provided Plaintiff with adequate and sufficient notice as set forth in the Handbook" because the "Bill of Rights and Statement of Student Rights

---

[9] While the Syracuse Defendants assert that this policy provision was not yet in effect, the Court cannot resolve that issue at this stage of the proceedings.

[10] Plaintiff also cites to Syracuse's obligation to establish procedures for "a prompt, fair and impartial" proceeding, quoting  34 C.F.R. § 668.46(k)(3)(i)(B)(2-3), a regulation enacted under the Clery Act.  (Dkt. No 27 at 21 & n.6; *Id.* ¶ 133). *See Z.J. v. Vanderbilt University*, 355 F. Supp. 3d 646, 706 n.48 (M.D. Tenn. 2018).  Plaintiff does not have a cause of action under this regulation: the Clery Act "specifically states that its provisions do not give rise to private causes of action against educational institutions." 20 U.S.C. §§ 1092(f)(14)(A)(i); 1092(i)(5)(C); 1092(j)(2)(B). *Beck v. Cornell Univ.*, No. 16-cv-1104, 2016 WL 6208535, at *2, 2016 U.S. Dist. LEXIS 130554, at *4–5 (N.D.N.Y. Sept. 22, 2016) (citing *Dziedzic v. State Univ. of New York at Oswego*, Case No. 10-cv-1018, 2014 WL 7331926, at *2), *report and recommendation adopted*, 2016 WL 6208542, 2014 U.S. Dist. LEXIS 175343 (N.D.N.Y. Oct. 24, 2016)). The obligations imposed by the Clery Act are enforced by the Department of Education. *Doe v. United States Dep't of Health and Human Servs.*, 85 F. Supp. 3d 1, 4 (D.D.C. 2015).

24

and Responsibilities do not provide any specific timetable for when notice must be provided." (*Id.*).

The Court agrees with the Syracuse Defendants in part. The Bill of Rights, which provides for the right to "adequate notice" is not a specific contractual promise that could be the basis of a viable breach of contract claim, *see*, *e.g.*, *Noakes v. Syracuse Univ.*, 369 F. Supp. 3d 397, 420 (N.D.N.Y. 2019); *Doe 2018*, 341 F. Supp. 3d 125 at 141. And to the extent that Plaintiff is relying on a right to "written notice," the April 17, 2017 Jacobson Report, which Plaintiff acknowledged having received, and which does list three code of student conduct violations and the "conduct alleged," was written notice.  (Dkt. No. 1, ¶ 210(a)).

However, to the extent Plaintiff is relying on the provision stating that a student will be notified "in writing of the charges *filed* against the respondent," that provision is specific and concrete, and Plaintiff has plausibly alleged that it was breached. (Handbook, Part 10.15) (emphasis added). Plaintiff asserts that Syracuse violated this provision because he "was never notified, and still to this day has not received the complaint against him." (Dkt. No. 27, at 22; Dkt. No. 1, ¶ 132). The Syracuse Defendants cite to the Jacobson Report, (Dkt. No. 20-2, at 1–2), which refers to the "[f]ormal complaint reported January 25, 2017"; but the Jacobson Report does not contain any information about that complaint or the conduct charged in that complaint. (Dkt. No. 20-2 at 1). The Syracuse Defendants also cite to Plaintiff's allegation that he received notice, on April 28, 2017, of the "formal charges brought by Syracuse." (Dkt. No. 1, ¶ 166). The record does not reflect how Plaintiff received this notice.. Thus, construing the allegations in the light most favorable to Plaintiff, he has plausibly alleged that he did not receive notice "in writing of the charges filed against [him]." (Handbook, Part 10.15).

25

Finally, the fairness provisions in the Bill of Rights and the Statement of Student Rights and Responsibilities are insufficient to state a breach of contract claim. (*See* Handbook, at 4 (affording students the right to "[p]articipate in a process that is fair, impartial, and provides adequate notice and meaningful opportunity to be heard"); Handbook, at 2 ("Students have the right to fundamental fairness before formal disciplinary sanctions are imposed by the University for violations of the Code of Student Conduct")). "Provisions that students will be treated in a 'fundamentally fair' manner, or in a manner that is consistent with fundamental 'student rights,' are the sorts of non-actionable statements of general policy that courts applying New York law have held cannot support a breach of contract claim." *Doe 2018*, 341 F. Supp. 3d at 141; *see also Noakes*, 369 F. Supp. 3d at 419. Accordingly, the Syracuse Defendants' partial motion to dismiss Plaintiff's breach of contract claim is granted as to the failure to provide a fair proceeding.

### 4.     Delay in the Process

The Handbook provides that "[t]he process of investigation and the Board's decision will be concluded within 60 days of the original complaint, pending special circumstances." (Handbook, Part 10.21). It further provides that "[i]f circumstances arise that delays either the investigation or the Board's determination of an outcome, both parties will be sent written notification of the delay and its cause." (*Id.*; *see also* Title IX Policy G(j)).  Plaintiff alleges that there were no special circumstances warranting the delay in his case—which spanned 107 days from the January 25th initiation of the Title IX complaint until the Board's May 11th decision. (Dkt. No. 1, ¶¶ 131, 162, 230(c)). Plaintiff alleges that he never received any written explanation or notice for this delay. (*Id.* ¶ 164).[11] Plaintiff further alleges that he "spent additional tuition for

---

[11] The Syracuse Defendants dispute Plaintiff's allegation of that he was not informed of any special circumstances. (Dkt. No. 20-6, at 18). In doing so, however, they cite an email outside the record of what the Court can consider on this motion to dismiss. (*Id.*; Dkt. No. 28, at 8–9).

Spring Semester [and] valuable time and effort to complete his Masters Program – all for naught." (*Id.* ¶ 165).

The Handbook's 60-day provision is not a generalized "policy statement" or "unspecified procedure," *Doe 2019*, 2019 WL 2021026, at *11, 2019 U.S. Dist. LEXIS 77580, at *31. Thus, Plaintiff has plausibly alleged that the Syracuse Defendants breached Part 10.21 of the Handbook by its delay in the process.

### 5.    Application of the Preponderance of Evidence Standard

Plaintiff alleges that Syracuse failed to "apply the preponderance of evidence" as set forth in the Handbook and the Title IX policies. (Dkt. No. 1, ¶ 230(e)). Defendants argue that Plaintiff fails to "identify a specific promise or obligation that was breached by the University," and, in any event, it "is clearly applied" by the Board in its decision. (Dkt. No. 20-6, at 19).

The Handbook provides, in relevant part, at Part 10.17: that "the Board will determine whether it is more likely than not that the respondent violated the Code of Student Conduct using the preponderance of the evidence standard."[12] Syracuse's Title IX policy provides, in relevant part: "In determining whether sex discrimination, sexual harassment or sexual misconduct occurred, the University . . . uses a 'preponderance of the evidence' standard," which means "evidence which is of greater weight or is more convincing than opposing evidence such that it is 'more likely than not' than an act occurred."(*See* Dkt. No. 1, ¶¶ 122, 130; Title IX Policy, § V.G.g). As described in the Handbook, preponderance of the evidence "requires a demonstration that it is 'more likely than not' that the respondent . . . has violated the Code of Student Conduct." (Handbook, Part 5.3).

---

[12] Under the policy, "respondent" refers to the person against whom a complaint was filed—here, Plaintiff.

The preponderance of the evidence standard is an "expressly enumerated" right. *Doe 2019*, 2019 WL 2021026, at \*11, 2019 U.S. Dist. LEXIS 77580, at \*31. It is not, as the Syracuse Defendants argue, a "non-actionable statement of general policy" akin to a policy that students will be treated, for example, in a "fundamentally fair" manner. (Dkt. No. 28, at 10). While the Board's decision does, as the Syracuse Defendants note, state that the Board applied a preponderance of the evidence standard, and credibility determinations are for the Board, construing the allegations in the light most favorable to the Plaintiff, he has plausibly alleged that the disciplinary decision was a result-driven determination in which Syracuse failed to apply the applicable standard.

First, Plaintiff has alleged specific facts in support of his allegation that the credibility determinations against him and in favor of RP were not rationally based on the evidence. (Dkt. No. 1, ¶¶ 119–20, 151, 157–61, 169, 173–81, 190, 192, 193, 198, 210(d), 211). Specifically, Plaintiff alleges that Jacobson's report "assessed RP as credible," without addressing or considering RP's "multiple versions of events"; that Jacobson "disregarded and gave no account of inconsistencies in RP's statements"; and that the Board followed these findings, finding RP credible, even though its express findings reflect that she "made multiple untrue statements about her sex with Plaintiff," without any explanation of this discrepancy. (*Id.* ¶¶ 119-120, 156-157, 169-172, 180; *see also* Dkt. 20-2, at 8 (Jacobson Report); Dkt. No. 20-2, at 41 (Board Opinion)). Furthermore, Plaintiff alleges that the investigation relied on "trauma informed techniques" that "turn unreliable evidence into its opposite," such that inconsistency in the alleged female victim's account . . . becomes evidence that her testimony is truthful." (Dkt. No. 1, ¶ 89). Plaintiff, on the other hand, was found by the Board to be "lacking in credibility" because he, inter alia, acknowledged his sexual desire for RP and acknowledged that he "was still 'horny'

28

after she withdrew consent for kissing."  (*Id.* ¶ 173; *see also* Dkt. No. 20-2, at 44 (Board Opinion)).

Second, Plaintiff further supports his claim with allegations that the pressure campaign led to bias against him. (Dkt. No. 1, ¶¶ 51–74, 191). Plaintiff has alleged specific facts in support of his assertion that there was a pressure campaign that resulted in Syracuse deciding to make Plaintiff "an example of Title IX enforcement," (*Id.* ¶¶ 51–74, 147, 191), including Syracuse's initiation of the complaint against him one day after the Office for Civil Rights' campus visit, which was over two months after RP's report. (*Id.* ¶¶ 74, 146, 211). Plaintiff has also alleged specific facts concerning the purported bias of individual Syracuse Defendants, including Jacobson and the Hearing Board's chair.[13] (*Id.* ¶¶ 75–99). Accordingly, construing all of the allegations in the light most favorable to Plaintiff, and at this preliminary stage of the proceedings, the Court finds Plaintiff has plausibly alleged that Syracuse breached its obligation to apply the preponderance of the evidence standard.

### D.   Breach of the Covenant of Good Faith and Fair Dealing (Fifth Cause of Action Against Syracuse Defendants)

Plaintiff alleges that the Syracuse Defendants breached the covenant of good faith and fair dealing. (*Id.* ¶¶ 233–40). The Syracuse Defendants argue that the claim should be dismissed because "New York law does not recognize a separate cause of action for breach of the implied covenant of good faith and fair dealing when a breach of contract claim, based on the same facts, is also pled." (Dkt. No. 20-6, at 20 (quoting *Yu v. Vassar Coll.*, 97 F. Supp. 3d 448, 482 (S.D.N.Y. 2015)). Plaintiff acknowledges that principle but argues that a party "may plead a claim for breach of the covenant of good faith and fair dealing in the alternative." (Dkt. No. 27,

---

[13] For instance, Plaintiff alleges that the chair, Carrie Grogan Abbott, closed an entire student television station in response to a complaint against a single show that "portrayed sensitive topics in a way that adversely affected women on campus" and "promoted male 'rape culture.'" (Dkt. No. 1, ¶ 76).

29

at 24–25) (quoting *Hard Rock Cafe Int'l, (USA), Inc. v. Hard Rock Hotel Holdings, LLC*, 808 F. Supp. 2d 552, 567 (S.D.N.Y. 2011)).

As both parties recognize, New York law "does not recognize a separate cause of action for breach of the implied covenant of good faith and fair dealing when a breach of contract claim, based upon the same facts, is also pled." *Nungesser*, 169 F. Supp. 3d at 372–73 (quoting *Yu*, 97 F. Supp. 3d at 482). A "breach of the implied covenant of good faith and fair dealing claim that is duplicative of a breach of contract claim must be dismissed." *Id.* (quoting *Yu*, 97 F. Supp. 3d at 482); *see also Cruz v. FXDirectDealer, LLC*, 720 F.3d 115, 125 (2d Cir. 2013) ("[W]hen a complaint alleges both a breach of contract and a breach of the implied covenant of good faith and fair dealing based on the same facts, the latter claim should be dismissed as redundant.").

A party may plead a claim for breach of the covenant of good faith and fair dealing in the alternative; however, Plaintiff has not done so. Plaintiff's breach of contract and breach of the implied covenant of good faith and fair dealing rest on the same allegations. Specifically, Plaintiff realleges: investigatory bias, the failure to provide him with the No Contact Order, the length of the investigation, the failure to apply a preponderance standard, and the failure to provide sufficient notice of the charges against him. (*See* Dkt. No. 1, ¶¶ 236–38). Since each of these allegations also underpinned Plaintiff's breach of contract claim, his claim for breach of the implied covenant of good faith and fair dealing must be dismissed. *See Doe 2019*, 2019 WL 2021026, at *12, 2019 U.S. Dist. LEXIS 77580, at *34–35 (dismissing implied covenant of good faith and fair dealing claim when "[a] close examination of the facts alleged . . . reveals that both claims, at essence, arise from the same operative facts and seek the same damages"); *Nungesser*, 169 F. Supp. 3d at 373 (dismissing implied covenant of good faith and fair dealing claim when

30

the plaintiff "failed to plead any facts, separate from the facts with which he attempts to state a claim for breach of contract in support of his claim for a breach of the covenant of food faith and fair dealing"); *see also Keefe v. New York Law Sch.*, 71 A.D.3d 569, 570 (1st Dep't 2010) (noting that only a school's "specific promises" "can establish the existence of an implied contract," and "[a]bsent the existence of a contract, a claim alleging breach of the implied covenant of good faith and fair dealing is legally unavailing").

### E.     Negligence and Gross Negligence (Sixth and Seventh Causes of Action Against All Defendants)

Plaintiff alleges claims for negligence and gross negligence. (Dkt. No. 1, ¶¶ 241–255). To establish a prima facie case of negligence under New York law, a plaintiff must show: "(1) the defendant owed the plaintiff a cognizable duty of care; (2) the defendant breached that duty; and (3) the plaintiff suffered damage as a proximate result." *Noakes*, 369 F. Supp. 3d at 420 (quoting *Williams v. Utica Coll. of Syracuse Univ.*, 453 F.3d 112, 116 (2d Cir. 2006)). In addition to the elements required for negligence, a "claim for gross negligence will be sustained only if the plaintiff alleges facts plausibly suggesting that the defendant's conduct 'evinces a reckless disregard for the rights of others or smacks of intentional wrongdoing.'" *Bayerische Landesbank, N.Y. Branch v. Aladdin Capital Mgmt. LLC*, 692 F.3d 42, 61 (2d Cir. 2012) (quoting *M+J Savitt, Inc. v. Savitt*, No. 08-cv-8535, 2009 WL 691278, at *12, 2009 U.S. Dist. LEXIS 21321, at *37 (S.D.N.Y. Mar. 17, 2009)).

Plaintiff alleges that Syracuse owed Plaintiff a duty "to conduct its Title IX process with the care and diligence of a reasonable institution in its position," citing to Syracuse's obligations under Federal law, including the Clery Act, and the accreditation standards under the Middle States Commission on Higher Education. (Dkt. No. 1, at 62). Plaintiff asserts that Syracuse had a duty to keep him free from discrimination, citing to its "policies stating that it would protect

[Plaintiff] from discrimination on the basis of sex." (Dkt. No. 27, at 29-30). Plaintiff, however, has not cited to any New York law recognizing a duty of care owed by a private university stemming from its disciplinary proceedings. And, as Defendants argue, "New York State law does not recognize a claim for negligent investigation or prosecution." (Dkt. No. 20-6, at 21). *See Noakes*, 369 F. Supp. 3d at 421 (citing *Prasad v. Cornell Univ.*, No. 15-cv-322, 2016 WL 3212079, at *23, 2016 U.S. Dist. LEXIS 161297, at *74 (N.D.N.Y. Feb. 24, 2016)); *Yu*, 97 F. Supp. 3d at 484.

The Clery Act specifically states that it may not be construed to "(i) create a cause of action . . . for any civil liability; or (ii) establish any standard of care." 20 U.S.C. § 1092(f)(14)(A). *See supra* note 10; *Z.J.*, 355 F. Supp. 3d at 703 (rejecting claim of negligence based on the Clery Act). Courts in this Circuit have rejected the argument that the accreditation standards give rise to a duty of care for colleges or universities because there is no New York law "recogniz[ing] a duty of care arising out of accreditation standards." *Rolph v. Hobart & William Smith Colleges*, 271 F. Supp. 3d 386, 409 (W.D.N.Y. 2017); *Noakes*, 369 F. Supp. 3d at 421 (same).

Furthermore, Plaintiff's negligence allegations are similar to those underpinning his contract claim: that Syracuse "breached its duty (contract) with plaintiff to follow its own rules regarding student discipline." *Faiaz v. Colgate Univ.*, 64 F. Supp. 3d 336, 362 (N.D.N.Y. 2014) (dismissing negligence claim where "facts alleged in support of the plaintiff's negligence claim are similar to those alleged in connection with his contract claim-that the University breached its duty (contract) with plaintiff to follow its own rules regarding student discipline"). Plaintiff alleges that Defendants' negligent conduct stemmed from issuing the secret No Contact Order, dragging out the proceedings against him without cause, insufficient notice of the charges against

him, failing to apply the preponderance standard, and failing to provide fair and unbiased

proceedings. (*See* Dkt. No. 1, ¶ 247). Each of these theories also underpins Plaintiff's breach of

contract claim. Plaintiff's contract claim, however, cannot be transformed into a tort claim

simply by alleging a duty of care. *Faiaz*, 64 F. Supp. 3d at 362. Having failed to establish that

Syracuse owed Plaintiff a duty of care in connection with its investigation, Plaintiff's claims for

negligence and gross negligence are dismissed.

### F.   Due Process Under Article I, Section 6 of the New York State Constitution (Eighth Cause of Action Against All Defendants)

Plaintiff alleges a due process violation under the New York State Constitution. (Dkt. No.

1, ¶¶ 256–69). Plaintiff alleges that the Syracuse Defendants became state actors for purposes of

New York's Due Process Clause through Syracuse's implementation of Education Law Article

129-B, commonly known as the "Enough is Enough" Law. (*Id*. ¶ 258; Dkt. No. 27, at 27).

Defendants argue that this is insufficient to establish state action. (Dkt. No. 20-6, at 22–23).

The Due Process Clause of the New York Constitution provides that "[n]o person shall be

deprived of life, liberty or property without due process of law." N.Y. Const., art. I, § 6. To state

a due process violation under the New York State Constitution, "a plaintiff must allege '[s]tate

involvement in the objected to activity.'" *Doe 2019*, 2019 WL 2021026, at *8, 2019 U.S. Dist.

LEXIS 77580, at *23 (quoting *Sharrock v. Dell Buick-Cadillac, Inc.*, 45 N.Y.2d 152, 160 (1978)

(alteration in original)). The factors to consider in determining whether there is state action

include: (1) "the source of authority for the private action"; (2) "whether the State is so entwined

with the regulation of the private conduct as to constitute State activity"; (3) "whether there is

meaningful State participation in the activity"; and (4) "whether there has been a delegation of

what has traditionally been a State function to a private person." *Doe v. Harrison*, No. 03-cv-

3943, 2006 WL 2109433, at *5, 2006 U.S. Dist. LEXIS 52058, at *15–16 (S.D.N.Y. July 28,

2006) (quoting *SHAD All. v. Smith Haven Mall*, 66 N.Y.2d 496, 505 (1985)). "Satisfaction of one of these criteria may not necessarily be determinative to a finding of State action." *Id.* (quoting *Sharrock*, 45 N.Y.2d at 158).

An allegation of state action "must include more than an obligation to follow, or adhere[] to, state law." *Doe 2019*, 2019 WL 2021026, at *9, 2019 U.S. Dist. LEXIS 77580, at *27. *Doe v. Skidmore College*, for instance, involved a New York State Article 78 proceeding in which a private university had revised its policy to comply with the Enough is Enough law. 152 A.D.3d 932, 933 (3d Dep't 2017). The court there rejected the student's "claims as to fundamental fairness" at a private university, noting that  the university's "relationship with its students is essentially a private one such that, absent some showing of State involvement, [its] disciplinary proceedings do not implicate the full panoply of due process guarantees." *Id.* at 935 (quoting *Rensselaer Soc. of Eng'rs v. Rensselaer Polytechnic Inst.*, 260 A.D.2d 992, 994 (3d Dep't 1999)); *see also Jacobson v. Blaise*, 157 A.D.3d 1072, 1074 (3d Dep't 2018) (quoting Department of Education guidance which states that the process required by Enough is Enough "should not be read to extend to private colleges the constitutional due process rights that apply to public colleges"); *Kickertz v. New York Univ.*, 25 N.Y.3d 942, 944 (2015) ("A student subject to disciplinary action at a private educational institution is not entitled to the full panoply of due process rights.").[14]

Here, Plaintiff fails to allege sufficient state involvement in the disciplinary proceedings of Syracuse University, a private university, to support a due process claim under the New York

---

[14] As another court in the Northern District has noted, students at private universities are not without any procedural protections. "[S]chools within New York State must abide by the Enough is Enough law." *Doe 2019*, 2019 WL 2021026, at *9, 2019 U.S. Dist. LEXIS 77580, at *27. And private universities may provide students with rights above the minimum required by law. *Id.* (noting that "many" private universities "have chosen to provide students additional rights over and above the minimum required by law.").

34

Constitution. And "[w]ithout state involvement, plaintiff's state law due process claim fails," and must be dismissed. *Doe 2019*, 2019 WL 2021026, at *10, 2019 U.S. Dist. LEXIS 77580, at *28.

## V.       CONCLUSION

For these reasons, it is hereby

**ORDERED** that Defendants' Partial Motion to Dismiss under Fed. R. Civ. P. 12(b)(6) (Dkt. No. 20) is **GRANTED in part** and **DENIED in part**; and it is further

**ORDERED** that Defendants' Partial Motion to Dismiss (Dkt. No. 20) the Title IX claims (First, Second, and Third Causes of Action) as to the Defendant Board of Trustees is **GRANTED**, and those causes of action as to those defendants are **DISMISSED**; and it is further

**ORDERED** that Defendants' Partial Motion to Dismiss (Dkt. No. 20) the breach of contract claims (Fourth Cause of Action) is **GRANTED** as to the to the failure to provide Plaintiff a fair and unbiased proceeding and "written notice" or "adequate notice," but **DENIED** as to the failure to provide a written copy of the November 2016 No Contact Order; the failure to provide notice in writing of the charges filed against Plaintiff; the failure to apply a preponderance of the evidence standard; and the delay in the proceeding; and it is further

**ORDERED** that Defendants' Partial Motion to Dismiss (Dkt. No. 20) is **GRANTED** as to the implied covenant of good faith and fair dealing cause of action (Fifth Cause of Action); the negligence causes of action (Sixth and Seventh Causes of Action); and the Due Process Claim under the New York State Constitution (Eighth Cause of Action), and those causes of action are **DISMISSED**.

**IT IS SO ORDERED.**

Dated: February 21, 2020
       Syracuse, New York

Brenda K. Sannes
U.S. District Judge

Appellate Case: 19-1594   Page: 43   Date Filed: 03/09/2020 Entry ID: 4889050

Journal of Applied Research in Memory and Cognition 8 (2019) 387–397

Contents lists available at ScienceDirect

# Journal of Applied Research in Memory and Cognition

journal homepage: www.elsevier.com/locate/jarmac



# Title IX Investigations: The Importance of Training Investigators in Evidence-Based Approaches to Interviewing



Christian A. Meissner* and Adrienne M. Lyles

Iowa State University, United States

Under Title IX, schools in the United States that receive federal financial assistance are legally required to provide a prompt and impartial process for investigating complaints of sex-based discrimination. These investigations critically rely upon information obtained in interviews. We provide an evaluation of interview training that is presently available to college and university Title IX investigators. Our review finds that while certain core interviewing skills align with evidence-based practice and available science, other suggested practices are at odds with the available science, and additional effective interviewing practices related to the retrieval of memory and the assessment of credibility are critically absent. We recommend a set of evidence-based practices for Title IX investigative interviews that are likely to (a) improve the development of rapport and cooperation with an interviewee, (b) elicit more accurate and relevant information from memory, and (c) enhance assessments of credibility when applying strategic questioning approaches.

---

### General Audience Summary

Title IX investigations are conducted in the United States when schools receive complaints of sex-based discrimination. These civil procedures rely on the participation, recall, and evidence provided by complainants (individuals who report experiencing sexual misconduct), respondents (individuals who are alleged to have engaged in sexual misconduct), and witnesses. This renders critical the role of effective interviewing procedures in Title IX investigations. In the present article, we evaluate current training and practice based upon several trauma-informed interview courses that are prevalent in the U.S. higher education industry. We find that while certain core interviewing skills appear to align with evidence-based practice and available research, other suggested practices are at odds with the available science, and additional effective interviewing practices that are related to the retrieval of memories and the assessment of credibility within an interview are critically absent. We believe it is important that colleges and universities develop standards of best practice for Title IX interviews, and we recommend a set of evidence-based approaches that have been evaluated in relevant contexts. We also encourage university Title IX offices to initiate collaborations with scholars both to introduce evidence-based training and to initiate research programs that might further advance the science of interviewing in the context of Title IX investigations.

---

Keywords: Investigative interviewing, Credibility assessment, Eyewitness memory

Title IX of the Education Amendments of 1972 states, "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." Title IX applies to any education or training program (from preschool through

---

Author Note

Christian A. Meissner & Adrienne M. Lyles, Department of Psychology, Iowa State University, Ames, IA, United States.

* Correspondence concerning this article should be addressed to Christian A. Meissner, Department of Psychology, Iowa State University, W112

Lagomarcino Hall, 901 Stange Road, Ames, IA 50011, United States. Contact: cmeissner@iastate.edu.

higher education) operated by a recipient of federal financial assistance. The present article centers on colleges and universities, wherein the primary function of Title IX is to guarantee the right to participate in higher education free from discrimination on the basis of sex. This in turn requires that such institutions identify, respond to, end, remedy, and prevent sexual misconduct. Federal guidance stemming from the Clery Act (1990) broadly defines sexual misconduct as including sexual assault, sexual harassment, stalking, and relationship (including dating and domestic) violence. If institutions of higher education fail to adequately respond to sexual misconduct allegations, they risk losing federal funding. Toward this end, Title IX requires all recipients of federal assistance to designate at least one Title IX coordinator who is charged with managing the implementation and administration of a university's procedures for resolving Title IX complaints, including investigating complaints. Title IX's statutory language is brief, and the law is supported by a variety of policy guidance documents that elaborate an institution's responsibilities. The U.S. Department of Justice (Civil Rights Division) and the U.S. Department of Education (Office for Civil Rights) share enforcement responsibility for Title IX. In 2015, the Department of Education's Office for Civil Rights published a Title IX Resource Guide that outlines the scope of Title IX, the responsibilities and authority of a Title IX coordinator, and Title IX's various administrative requirements.

The White House Task Force to Protect Students from Sexual Assault ("Task Force") was established in January 2014 to address sexual misconduct in higher education. The Task Force's First Report (Not Alone: The First Report of the White House Task Force to Protect Students From Sexual Assault, 2014) called on the Justice Department's Center for Campus Public Safety to develop a "trauma-informed training program" for campus officials involved in sexual misconduct investigation and adjudication. This trauma-informed approach was further promoted by the Obama administration in its (now rescinded) 2014 Q&A on Title IX and Sexual Violence, wherein the administration promoted the training of investigators and school officials on such topics as the impact of trauma on victims, the neurobiology of traumatic experiences, and appropriate methods to communicate with students subjected to sexual violence. The guidance also suggested that schools should consider that traumatic events such as sexual violence can lead to delayed decision making by the complainant, and that engagement with the complainant (such as interviews and hearings) should be conducted in a manner that does not reintroduce or inflict additional trauma. The Task Force's Second Report (Preventing and Addressing Campus Sexual Misconduct: A Guide for University and College Presidents, Chancellors, and Senior Administrators, 2017) once again emphasized the importance of trauma-informed investigations, and was accompanied by a guide for higher education presidents and senior leaders that reinforced the obligation for institutions to provide a victim-centered and trauma-informed response to sexual misconduct.

While the current article centers on U.S. Title IX regulations and related investigations of sexual misconduct on higher education campuses, the topic is truly an international challenge. A high-profile sexual assault case at Warwick University in the United Kingdom is illustrative of the issues faced by higher education officials around the globe (Mararike & Griffiths, 2019). While our focus here addresses the U.S. Title IX context, we expect that the evidence-based interviewing practices, having been developed by an international research community, would be broadly applicable to the conduct of such investigations on higher education campuses in other countries.

## How Do Title IX Investigations Differ from Law Enforcement Investigations?

There are important differences between Title IX investigations of sexual assault and police investigations, and a number of writers have discussed the significance of maintaining this distinction (Swan, 2016). Whereas criminal complaints cannot usually go forward without a victim's participation, higher education institutions are required to address every complaint: Once a school knows or reasonably should know of an incident of sexual misconduct, the school must take steps to understand what occurred and respond appropriately. Criminal investigations are supported by subpoenas, search warrants, and forensic testing; in contrast, Title IX investigations rely on the participation, recall, and evidence provided by the parties themselves. This renders critical the role of effective interviewing in Title IX investigations. Because it is up to the investigator to gather, document, and analyze all available evidence and to do so relying entirely on the voluntary participation of the parties, it is essential that investigators work to promote the cooperation and reporting of all those involved.

The differences between criminal investigations and campus Title IX investigations are made clear when one reflects upon the function of Title IX: Schools are investigating and adjudicating sex discrimination, not rape. Title IX is a civil, not a criminal, law that imposes obligations on schools, not on individuals (Collins, 2016). Schools do not have primary responsibility for investigating criminal conduct, but they do have primary responsibility for investigating unwelcome, inappropriate, and harassing conduct (i.e., sexual misconduct) in the same way that schools are responsible for responding to academic misconduct (Baker, 2017). School proceedings can be understood as a means to address sexual violence as a civil rights issue, a process that is separate from and parallel to criminal proceedings in those cases where a victim, or jurisdiction, chooses to pursue a criminal complaint against a subject.

Importantly, a complainant (or victim) may choose to pursue a campus Title IX investigation and criminal charges at the same time. Federal guidelines do not reconcile conflicts on state and federal laws, nor do they provide guidance for coordinating campus and criminal processes in the case of concurrent investigations (Smith & Gomez, 2016). Under the U.S. Department of Education's 2018 proposed Title IX regulations, which would replace the Obama administration's Title IX guidance, concurrent law enforcement activity may constitute good cause for reasonably extending the timeframe of the grievance process in order to allow evidence uncovered in the criminal investigation to be included in the school's final determination of responsibility.

In general, a criminal investigation is completely independent of a Title IX investigation and often runs concurrently. Concurrent investigations, in which a complainant pursues *both* criminal and campus investigations, could be independent (information shared only through formal processes as the criminal and campus investigations reach certain stages), joint (criminal and campus investigators communicate frequently through formal and informal methods), or simultaneous (investigators coordinate their efforts). What a concurrent investigation looks like depends entirely on the jurisdiction. A school may decide to temporarily delay the fact-finding portion of a Title IX investigation while law enforcement gathers evidence for a criminal investigation; however, the school would promptly resume and complete the Title IX investigation once police have completed their own evidence gathering. In all cases, Title IX investigators are careful to ensure that complainants do not have to tell their stories multiple times to different people across disparate offices. As such, Title IX investigators work collaboratively across campus units and community agencies to ensure that both complainants and respondents have adequate support and resources.

### What Types of Cases do Title IX Investigators Address?

As Title IX practitioners will attest, there is no such thing as a "typical" Title IX investigation. The alleged misconduct, facts, circumstances, and relationship of the parties varies widely across cases. The most complex cases may involve complicated power dynamics, alternative sexual behavior, sexual subcultures, minoritized populations, and reluctant complainants. Title IX complaints can also involve parties across campus affiliations, including undergraduate students, graduate students, faculty, staff, administrators, visitors, and third-party affiliates.

There is little available data that describe the relative frequency of campus investigations by complainant and respondent status, and such data reporting is not required by either law or federal guidance. While the Obama administration's Office for Civil Rights did provide details about its investigations into schools' handling of Title IX investigations, the Trump administration ended the practice of disclosing when and how investigations are resolved in March of 2018. Although they rarely make the data public, Title IX offices will generally track complainants and respondents across a variety of data points. This is especially important as campuses evaluate the complexity of Title IX complaints involving male complainants, sexual minorities, historically underrepresented and marginalized students, and graduate students alleging sexual misconduct by faculty members (Black et al., 2011; Cantor et al., 2017; Edwards et al., 2015). Though data describing the relative frequency of case types is generally not made available by universities, several schools have publicly released such figures. For example, Brown University disclosed that the primary types of incidents reported in 2017–2018 involved sexual or gender-based harassment (49%) and sexual assault (38%), while the University of Alaska at Fairbanks disclosed for 2016–2017 that the most frequently reported incidents involved sexual assault (28%), sexual harassment (27%), unwelcomed sexual contact (14%), and dating or domestic violence (14%).

### What are the Qualifications and Training of Title IX Investigators?

Universities have wide discretion as to who conducts Title IX investigations and how investigations are conducted. According to federal regulations (see *Revised Sexual Harassment Guidance*, 2001), investigations must be "prompt" (though there is no fixed time frame under which a school must complete an investigation) and they must be "equitable." An equitable Title IX investigation requires a "trained investigator" to "analyze and document the available evidence to support reliable decisions," "objectively evaluate the credibility of parties and witnesses," "synthesize all available evidence," and "take into account the unique and complex circumstances of each case" (see Q&A on Campus Sexual Misconduct, 2017).

There is no formal training or minimum qualifications required for either Title IX coordinators or investigators, and there is little available information on Title IX investigators' training, background, or practices. While coordinators may or may not themselves conduct investigations, Title IX does not require that a school have investigators—it requires that each school have at least one *coordinator* (34 C.F.R. § 106.8(a)). One recent study, while highlighting the lack of standardization and requirements for Title IX coordinators, found that the majority of Title IX coordinators have less than three years of experience, have widely varying training, and serve their Title IX role in only a part-time capacity (Wiersma-Mosley & DiLoreto, 2018).

While Title IX regulations require that federal funding recipients, when they know or reasonably should know of possible sex-based harassment, take immediate and appropriate steps to investigate or otherwise determine what happened, the regulations do not offer guidance as to best practice for conducting investigations. For-profit consultation firms and law practices have largely filled this gap by offering workshops and trainings to support the development of investigative skills. Unfortunately, these trainings lack standardization and are frequently presented from a compliance perspective, including "tips" on not getting sued and checklists for investigations.

The Association of Title IX Administrators (ATIXA) and the NCHERM Group (TNG) are popular providers of training for Title IX offices. A recent study of the role of Title IX coordinators in institutions of higher education found that a majority of Title IX coordinators were current members of and trained by ATIXA (see Wiersma-Mosley & DiLoreto, 2018). Because these Title IX trainings are often facilitated by attorneys, there is an emphasis on due process as encompassing notice, the presumption of innocence, and the opportunity to participate, present evidence, and offer witnesses. Workshops typically center on recent case law, as well as federal policy and enforcement updates. ATIXA and TNG, for instance, offer several levels of trainings, from "foundational" skills for civil rights investigators to "nuanced" questioning techniques and training in investigation techniques. The Association for Student Conduct Administration's (ASCA) Sexual Misconduct Institute offers training that claims to provide participants with updates on court cases, practice in investigative skills, knowledge in cultural competency, information on consent and capacity, and advice on trauma and self-care.

The Association of Workplace Investigators similarly offers a training institute, seminars, and webinars in workplace investigations. Many law firms also provide Title IX trainings and seminars. The second author (AML) has attended multiple trainings facilitated by Husch Blackwell LLP, and similar trainings are offered by law firms such as Clark Hill PLC, Hirschfeld Kraemer LLP, and Van Dermyden Maddux Law Corporation. Given the vast landscape of training options, we offer a review of the most prevalent training protocols in the industry: investigative interview training provided by ATIXA and a trauma-informed interview protocol known as the Forensic Experiential Trauma Interview.

## Current Training in the Conduct of Title IX Investigative Interviews

Organizations such as ATIXA also offer training in the conduct of investigative interviews for Title IX investigators. We note at the outset that while studies have generally documented the interviewing and interrogation practices of law enforcement, military, and intelligence personnel (see Russano, Kelly, & Meissner, (2019, in press)), no empirical studies have detailed the training or interviewing practices of Title IX investigators. For the purposes of this paper, we conducted a review of training materials that were publicly available on the ATIXA website—the industry's leading distributor of interview training for Title IX investigators (see Wiersma-Mosley & DiLoreto, 2018). As an example, ATIXA offers an *Investigation in a Box* (Sokolow, Swinton, Morris, Price, & Issadore, 2015) toolkit that describes best practices with respect to interviewing the complainant (or victim), witnesses, and respondent (or alleged perpetrator). In addition, we also reviewed both presentations and supplemental materials associated with ATIXA training from recent years (2012 to 2017), as well as materials from courses completed by one of the current authors who conducts Title IX investigations (AML), including presentations by Husch Blackwell LLP, Markel Consulting LLC, Fisher Phillips LLP, and Cozen O'Connor. Finally, we offer a review of trauma-informed interviewing, with a focus on the most well-known interview protocol currently being trained to Title IX investigators, the Forensic Experiential Trauma Interview. We note that few (if any) distinctions are generally made with respect to interviewing best practice across different types of interviewee (complainants, witnesses, or respondents), with the exception that trauma-informed interviewing has generally focused on eliciting information from a complainant who may have experienced (and therein reexperience) anxiety or trauma related to an incident.

**Basic interviewing skills.** In general, these documents and course materials might best be described as covering the basics of interviewing cooperative individuals and highlighting, in an abbreviated format, the core skills and competencies that investigators should demonstrate. Overall, the available course materials were generally consistent with an evidence-based perspective (see Swanner, Meissner, Atkinson, & Dianiska, 2016). For example, investigators were encouraged (a) to develop rapport and offer an empathic, understanding, and non-judgmental interview context; (b) to inform the interviewee about the process of both the investigation and the interview, and to address any questions they might have therein; (c) to ask open-ended questions, followed by more focused questions once an initial narrative has been provided; (d) to avoid biased or leading questions and more generally to be mindful of investigative biases that might influence the interview process; and (e) to invite the interviewee to describe or provide any evidence that would support the account.

**Confrontational and accusatorial interview approaches.** Where the training materials appear to conflict with best practice relates to interviews of the respondent. Federal guidelines require that once a school opens an investigation that may lead to disciplinary action against a respondent, the school should provide the respondent with written notice of the allegations (Q&A on Campus Sexual Misconduct, 2017). However, there is some disagreement across the training materials regarding whether the respondent should be confronted with evidence supporting the allegation (such as a statement by the complainant or physical evidence collected by investigators) at the outset of the interview. Such confrontation at the outset of the investigative process could both increase resistance and promote the use of direct questioning by investigators regarding the veracity of the allegations (see Kelly, Miller, & Redlich, 2016). More generally, a confrontational and guilt-presumptive approach is likely to lead to a confirmatory process wherein investigators ask presumptive and leading questions, conduct longer and more pressure-filled interviews, and ultimately increase the likelihood of eliciting false information or false confessions (Meissner & Kassin, 2004; Narchet, Meissner, & Russano, 2011). While certain training materials promote a somewhat confrontational approach (Sokolow et al., 2015), other materials suggest a more empathic and non-judgmental approach in which the interviewer acknowledges the difficulty of the situation and allows the respondent to provide information about their contact and interaction with the complainant, including an open-ended narrative related to the allegation (e.g., Sandler, 2013). The latter empathic and non-judgmental approach is consistent with an evidence-based perspective (see Meissner, Surmon-Bohr, Oleszkiewicz, & Alison, 2017).

On a related note, we find no evidence that training materials advocate an accusatorial (or psychologically manipulative) approach to interviewing the respondent (Kassin et al., 2010)—for example, no "themes" involving the minimization of blame or responsibility are provided, and no suggestions are offered with respect to downplaying the seriousness of the allegations or the potential consequences associated with the allegation. Further, we found no evidence that Title IX investigators are regularly sent to popular interrogation training courses that advocate accusatorial practices (such as the Reid Technique). Indeed, an accusatorial ethos contradicts the premise of Title IX as a civil rights procedure, distinct from criminal proceedings. Participation in traditional interrogation courses and the application of such interview procedures would likely be

grounds for objection by a respondent's attorney in subsequent litigation.

**Credibility assessment.** Federal guidance stipulates that the credibility of *all parties and witnesses* should be evaluated (Q&A on Campus Sexual Misconduct, 2017). ATIXA training documents generally address the issue of credibility assessment, given its importance to rendering a determination regarding the allegation (Henry et al., 2016); however, recommendations for evaluating interview testimony is somewhat mixed as it relates to the available evidence base (Vrij, 2019; Vrij, Hartwig, & Granhag, 2019). For example, training materials at times recommend against the evaluation of non-verbal behavior, while other materials encourage investigators to consider demeanor and anxiety cues along with non-cooperative responses (vague responses or refusals to answer a question). Studies have shown that non-verbal indicators of deception are weak and unreliable (DePaulo et al., 2003), whereas verbal cues and the elicitation of verifiable details are most diagnostic (Vrij, 2019). On a positive note, the majority of the available training materials encourage an emphasis on subsequent evaluation of the interview narrative and the practice of corroborating statements with other investigative evidence or information. Finally, training documents offered a mixture of recommendations with respect to evaluating the (in)consistency of information provided by an interviewee. While some encourage investigators to contextualize the nature or relevance of the inconsistency, others note that within-statement inconsistency can be used to impeach the credibility of the individual. As discussed below, some aspects of trauma-informed interviewing allow for the presence of omissions and inconsistencies related to anxiety or discomfort, or the retrieval of traumatic memories (e.g., Sokolow et al., 2015). Generally speaking, inconsistencies have not been shown to reliably discriminate veracity (Granhag & Strömwall, 2002) and truthful memory recall has been shown to include the natural omission or subsequent recollection of details (Fisher, Brewer, & Mitchell, 2009).

**Trauma-informed interviewing.** Many of the workshops offered by ATIXA and best practice guides developed for Title IX investigations emphasize the importance of trauma-informed interviewing (Busch-Armendariz, Sulley, & Hill, 2016; Henry et al., 2016; Rohman, Ingram, & Watkins, 2018; Webb et al., 2018). As to the question of why and when trauma-informed interviewing became accepted best practice, it appears to have been the result of guidance offered by the Department of Education's Office for Civil Rights, which arose out of a Resolution Agreement with the University of Virginia requiring that the university "develop and provide training on sexual harassment and sexual violence" that includes "the potential impact of trauma on the behavior of victims of sexual harassment or sexual violence, including how it may impact participating in the investigative process" (University of Virginia Resolution Agreement, V(B)4, 2015).

In general, trauma-informed interviewing involves both understanding how a traumatic experience influences the encoding, storage, and retrieval of information in memory, and recognizing that the retrieval of such a memory could itself be a traumatic experience for the interviewee (Rohman et al., 2018).

Investigators are encouraged to offer a supportive, empathic, and non-judgmental context in which they invite the complainant to largely control the narrative that is provided. A lack of chronological linearity and the omission of details from the narrative are acknowledged as facets of retrieving a traumatic memory, and investigators are encouraged to explore the party's sensory experiences, asking about sounds, smells, sights, and feelings. Investigators are also encouraged to watch for non-verbal and emotional signs of re-experiencing the traumatic event, including lack of eye contact, being physically closed-off, and extreme variations in affect.

One of the most popular trauma-informed interviewing protocols currently offered to Title IX investigators is the Forensic Experiential Trauma Interview (FETI). This protocol was originally developed by Russell Strand (Strand & Heitman, 2017), a former special agent with the U.S. Army Criminal Investigative Division, as a trauma-informed approach to interviews with victims of sexual assault. The second author (AML) recently completed FETI training, and the first author (CAM) has reviewed training and source materials associated with the technique. FETI training is also being given to sexual assault investigators in federal, state, and local law enforcement agencies.

FETI is purportedly based upon the neurobiology of traumatic memory (Hopper, 2012; Lisak, 2009), in which a traumatic event is said to cause the release of "stress hormones" that impair the "cognitive brain" (i.e., the prefrontal cortex and hippocampus), leaving the more "primitive" parts of the brain to encode experiential and sensory information. FETI specifies that perpetrators and victims experience different neurobiological responses to the same event: Whereas perpetrators are believed not to experience a neurobiological stress response and to therein maintain cognitive control, victims are purported to experience significant stress leading to cognitive impairment, peritraumatic dissociation, and tonic immobility. We know of no scientific studies that support this contention of neurobiological response differences between perpetrators and victims. A review of the available evidence-base suggests that the neurobiological mechanisms that generally influence cognition during traumatic events (encoding, consolidation, and retrieval from long-term memory) are well understood at the biochemical level, including subcortical pathways involving the hippocampus, amygdala, and thalamus, as well as the sensory and association cortices (see Hoscheidt, Dongonkar, Payne, & Nadel, 2013). While a critique of the claims offered by FETI regarding the neurobiology of trauma lie outside the scope of this review, it is clear that the influence of stress and emotion on the brain are complex and multifaceted, leading at times to the enhancement of memory and at other times to the disruption of encoding and retrieval processes (see Lindau, Almkvist, & Mohammed, 2016).

Based upon these claims, FETI assumes that victims will offer inaccurate and chronologically disorganized recall, and thereby encourages interviewers to accept omissions or errors in recall and to focus on the elicitation of sensory and emotional experiences. Strand and Heitman (2017) go even further: "In fact, good solid neurobiological science routinely demonstrates that, when a person is stressed or traumatized, inconsistent statements

are not only the norm, but sometimes strong evidence that the memory was encoded in the context of severe stress and trauma" (p. 2). Available research, however, fails to fully substantiate systematic differences in inconsistent or disorganized recall as a function of traumatic experience (Metcalfe, Brezler, McNamara, Maletta, & Vuorre, 2019; Rubin et al., 2016; Waters, Bohanek, Marin, & Fivush, 2013).

Further, Strand and Heitman (2017) note that FETI was purportedly designed to obtain *psychophysiological evidence*:

The victim/witness may also experience physiological reactions to the trauma including the emotional feelings combined with the physical manifestations of stress, crisis, and trauma such as shortness of breath, increased heart rate, dilated pupils, muscle rigidity and/or pain, light-headedness and or headache, tonic immobility, dissociation, etc. Identifying and properly documenting these reactions to their experience are essential pieces of information that can greatly assist the Interviewer in understanding the context of the experience and provide significant forensic psychophysiological evidence. (p. 8)

There is no available research known to the current authors that would support such claims.

The FETI protocol suggests initiating an interview by demonstrating "genuine concern and empathy towards the interviewee in an attempt to provide a sense of psychological and physical safety during the interview process" (Strand & Heitman, 2017, p. 4). Research has supported the importance of developing rapport and demonstrating empathy and interest in an investigative interview (see Vallano & Schreiber Compo, 2015). The protocol also appears to encourage the use of open-ended prompts to initiate the recall of information, as well as active listening to encourage continued recall ("please tell me more"), and to discourage the use of leading or suggestive questions. This orientation is quite consistent with the robust research literature on effective interviewing protocols, including the Cognitive Interview for witnesses (Fisher & Geiselman, 1992) and suspects (Geiselman, 2012).

Overall, Strand and Heitman (2017) describe FETI as a "highly effective technique for victim, witness, and some suspect/subject interviews" (p. 2). They further claim that the method has resulted in "reports of better victim interviews by those who have used it" (p. 2) and that the method "obtains significantly more information about the experience, enhances a trauma victim's ability to recall, reduces the potential for false information, and allows the interviewee to recount the experience in the manner in which the trauma was experienced" (p. 3). A search of the available research literature yielded no published, peer-reviewed studies on the efficacy or effectiveness of FETI. The supporting materials reviewed by the authors provided no experimental or field studies comparing the effectiveness of FETI to either existing practice or other comparable methods developed within the empirical literature. Only anecdotal claims (testimonials) are provided to bolster some degree of efficacy and relevance to forensic practice: we

deem this an insufficient basis upon which to rest claims of effectiveness.

## Recommendations for Developing Evidence-Based Interviewing Best Practices in Title IX Investigations

Our review of current training and practice in Title IX investigative interviewing suggests that while some core elements might be considered evidence-based, other aspects (such as disagreement regarding the confrontational nature of a complainant interview and the perceived efficacy of trauma-informed interviewing approaches) are at odds with the available science. In addition, many novel tactics that have been developed and assessed by scholars over the past few decades (such as the Cognitive Interview, the Timeline Technique, and other strategic interviewing tactics to assess credibility) have not been trained to Title IX investigators or incorporated into practice. Given the essential role of interview statements provided by complainants, respondents, and witnesses in Title IX investigations, we believe it is critical that the field begin to adopt standards of best practice that incorporate evidence-based interviewing approaches.

A robust research literature has developed over the past three decades to document (a) the fragility of memory and the potential influence of misinformation and biased or leading questioning strategies (Loftus, 2005; Newman & Garry, 2013), (b) the impacts of stress and emotion on memory recall (Hoscheidt et al., 2013; Lindau et al., 2016), (c) the influence of psychologically manipulative interviewing and interrogation approaches that can lead to false admissions or false confessions (Kassin et al., 2010), and (d) the relative inability of individuals, including skilled investigators, to assess credibility (Bond & DePaulo, 2006) given their focus on non-diagnostic cues to deception such as non-verbal signs of anxiety or nervousness (DePaulo et al., 2003). Further, an emerging research literature has begun to systematically develop and evaluate best practices for investigative interviews (Meissner et al., 2017; Russano et al., (2019, in press)). Below, we review a set of evidence-based interviewing tactics that, based upon our experience, would appear most appropriate for Title IX investigations.

### Limit Cognitive Biases in Investigative Interviews

While the goal of an investigative interview is generally to facilitate an interviewee's recall, it is important that investigators remove any potential influence of bias prior to entering the interview context. Research has demonstrated that investigators are susceptible to various forms of bias, and that presumptions of guilt can both influence assessments of credibility (Meissner & Kassin, 2002) and set in motion a cycle of cognitive and behavioral confirmation in which investigators ask more guilt presumptive and pressure-filled questions, leading to contamination of a statement (Garrett, 2015) and false confessions (Kassin, Goldstein, & Savitsky, 2003; Narchet et al., 2011). Investigators must be careful not to presume that the respondent engaged in misconduct, and to utilize interview approaches that limit the

likelihood of biased or leading questioning.[1] Because cognitive biases can be problematic in any interview (complainant, respondent, or witness), it is important to limit cognitive biases throughout the investigatory process.

## Develop Rapport and Facilitate Cooperation with Interviewees

Evidence-based recommendations for developing rapport and trust have been developed by scholars (Abbe & Brandon, 2014). The development of rapport is frequently cited by investigators as critical (Kassin et al., 2007; Russano, Narchet, Kleinman, & Meissner, 2014), and field data support the influence of rapport for developing cooperation and facilitating disclosure (Kelly et al., 2016). Building rapport—like limiting bias—is crucial with all parties and witnesses involved in the investigatory process (Vallano & Schreiber Compo, 2015). It is clear that an empathic, non-judgmental, and collaborative approach can facilitate conversational rapport and reduce an interviewee's reluctance to cooperate (Alison, Alison, Noone, Elntib, & Christiansen, 2013; Walsh & Bull, 2012). Rapport has also been shown to increase the quality of information provided by witnesses and reduce the likelihood of errors or acceptance of misinformation (Vallano & Schreiber Compo, 2011). Further, a variety of tactics have been developed to facilitate liking and common ground with an interviewee (Brimbal, Kleinman et al., 2019; Goodman-Delahunty & Howes, 2014), including the selective disclosure of personal information by the interviewer (Mann & Murphy, 1975), acts of reciprocity that provide hospitality or fulfill an interviewee's needs (Matsumoto & Hwang, 2018), offers of positive affirmation that support an interviewee's self-worth (Davis, Soref, Villalobos, & Mikulincer, 2016), and the identification of common interests or identities shared by the interviewer and interviewee (Brimbal, Dianiska, Swanner, & Meissner, 2019). Importantly, these rapport strategies are effective with and apply equally to *all interviewees*.

## Enhance the Retrieval of Accurate Information from Memory

Research has consistently demonstrated the value of open-ended questions, followed by relevant probe questions (i.e., who, what, where, when, why, or how), and the minimal use of appropriate closed-ended questions (i.e., a question designed to resolve, validate, or verify certain details that were mentioned previously) (Griffiths & Milne, 2006; Powell, Fisher, & Wright, 2005). More than three decades of research has also confirmed the efficacy of the Cognitive Interview (CI), first developed by Fisher and Geiselman (1992). Studies have consistently shown that the CI increases the amount of correct information retrieved

by the interviewee, absent a significant cost to the accuracy of responding (Memon, Meissner, & Fraser, 2010). While the CI includes aspects of interviewing best practice, it is the cognitive elements of the interview protocol that appear to provide its most important benefits to memory retrieval, including the use of eye closure and mental context reinstatement, witness compatible questions (e.g., sketching), and various mnemonic approaches (e.g., recalling from a different perspective or reversing temporal order; see Leins, Fisher, & Vrij, 2012). Scholars have demonstrated the effectiveness of the CI for recalling events involving high-arousal (Ginet & Verkampt, 2007) and for eliciting information from subjects in sexual assault cases (Brandon et al., 2019). In addition to the benefits of interview tactics generally subsumed within the CI, a novel technique has been developed to facilitate the recollection of information during a specified period of time. Referred to as the Timeline Technique (Hope, Mullis, & Gabbert, 2013), the approach has been shown to significantly increase the retrieval of information and to reduce sequencing errors in recall.

## Use Strategic Questioning to Improve Assessments of Credibility

Finally, given the ineffectiveness of training in non-verbal indicators of deception detection (Hauch, Sporer, Michael, & Meissner, 2016), a new science of credibility assessment has emerged that is based upon a cognitive understanding of deception (Vrij, 2019). From this perspective, interview tactics have been developed that leverage key differences in cognitive processing and strategy use between liars and truth tellers. These techniques are premised on seminal findings that liars experience greater cognitive load, that truth tellers generally can recall and provide more information (details) than liars, and that liars generally prepare for questions that they expect to be asked (and therein develop a relatively fixed narrative that they can provide consistently). Interviewing techniques such as asking for the narrative in reverse chronological order (Evans, Michael, Meissner, & Brandon, 2013), inviting the individual to provide more information by sharing a model statement (Ewens et al., 2016), or asking unexpected questions or inviting the individual to recall information in unexpected ways (such as generating a sketch; Leins et al., 2012) have been shown to significantly improve assessments of credibility (Vrij, Fisher, & Blank, 2017). Research has also demonstrated that asking an interviewee to explicitly provide details that could be verified by an investigator following the interview (a so-called *verifiability approach*) can successfully distinguish liars and truth tellers with respect to the type of details provided (Nahari, 2018; Nahari, Vrij, & Fisher, 2014). Finally, research has demonstrated that effective evidence disclosure tactics can facilitate assessments of credibility. Specifically, studies suggest that the strategic revelation of information is most successful when evidence is presented late in an interview (after the interviewee has exhausted their narrative), and when evidence is gradually disclosed from weaker to stronger evidence types or framings (Hartwig, Granhag, & Luke, 2014).

---

[1] This presumption of "innocence" has been formally proposed under the Department of Education's November 29, 2018, Notice of Proposed Rulemaking amending regulations implementing Title IX such that a school must "include a presumption that the respondent is not responsible for the alleged misconduct until a determination regarding responsibility is made at the conclusion of the grievance process."

## The Importance of Researcher-Practitioner Collaborations and Avenues for Future Research

The evidence-based practices described above are often a product of researcher-practitioner collaborations that have been facilitated over the past decade (see Meissner, Hartwig, & Russano, 2010; Meissner et al., 2017). In fact, the current article is the product of exactly this type of collaboration: the first author (CAM) is a psychological scientist who has spent his career examining the psychological mechanisms underlying investigative interviews, and the second author (AML) is both a scholar (PhD) and a practicing attorney (JD) who currently serves as Associate Director of Equal Opportunity and Senior Deputy Title IX Coordinator. Their mutual interest in improving the interviewing practices of Title IX investigators was spurred by a recent training that was coordinated by the first author and attended by the second author. Implementing and assessing the effectiveness of evidence-based techniques in the Title IX context has since become a collaborative exercise. There is tremendous value in scholars working with practitioners to understand the Title IX context, and jointly initiating a research program that ensures the efficacy of the proposed reforms.

Finally, our review highlights a significant deficiency in descriptive, experimental, and applied research on currents practices in the context of Title IX investigations. Collaborations between scholars and practitioners could begin to address this lapse by conducting field assessments of interview practices and noting challenges or unique aspects of the interview context that might require adaptation or further research. Having said this, we believe that the interviewing literature has addressed relevant issues surrounding the retrieval of emotional or traumatic memories, including cases involving sexual assault and abuse, and therein has demonstrated the value of a rapport-based approach (Read, Powell, Kebbell, & Milne, 2009), the utility of asking appropriate open-ended questions (e.g., Powell et al., 2005), and the effectiveness of the Cognitive Interview (e.g., Brandon et al., 2019; Fisher & Geiselman, 2010; Shepherd, Mortimer, Turner, & Watson, 1999). To a lesser extent, recent experimental work has also assessed other important factors that are relevant to Title IX investigations. For example, alcohol and/or drugs are frequently involved in sexual assaults among college students (see Richards, 2019). Consumption of alcohol has been shown to reduce the amount of information subsequently recalled in an interview setting (Jores, Colloff, Kloft, Smailes, & Flowe, 2019), though limited research has assessed the efficacy of various interview protocols or techniques in this context (Flowe et al., 2019). Further research is also needed to assess whether and how rapport-based tactics might motivate reluctant witnesses to provide information, particularly surrounding alternative sexual practices, sexual subcultures, and the experiences of sexual minorities. Finally, it is important to further evaluate current interview approaches with respect to how the retelling of a traumatic experience might impact the psychological well-being of the victim, and the extent to which certain approaches that purport to be "trauma informed" might actually minimize such negative repercussions.

## In Closing

Under Title IX, schools that receive federal financial assistance are legally required to provide a prompt and impartial process for investigating complaints of sex-based discrimination. These investigations critically rely upon information obtained in interviews conducted with complainants, respondents, and witnesses. In the present article, we evaluated a sample of trauma-informed interview training that is presently available to Title IX investigators, including the Forensic Experiential Trauma Interview (one of the most popular interview protocols in this area). Our review finds that while certain core interviewing skills appear to align with evidence-based practice and available research, other suggested practices are at odds with the available science, and additional effective interviewing practices related to the retrieval of memories and the assessment of credibility within an interview are absent from current training programs. We recommended a set of evidence-based practices for Title IX investigative interviews that are likely to (a) improve the development of rapport and cooperation with an interviewee, (b) elicit more accurate and relevant information from memory, and (c) improve assessments of credibility when applying strategic questioning approaches. Further, we encourage Title IX offices to collaborate with scholars to both introduce evidence-based practices and to spur further research that will improve the application of these practices to the Title IX context.

## Conflict of Interest

The authors declare no conflict of interests.

## Author Contributions

The authors contributed equally to the writing and editing of the current article.

## References

Abbe, A., & Brandon, S. E. (2014). Building and maintaining rapport in investigative interviews. *Police Practice & Research*, *15*, 207–220. http://dx.doi.org/10.1080/15614263.2013.827835

Alison, L., Alison, E., Noone, G., Elntib, S., & Christiansen, P. (2013). Why tough tactics fail and rapport gets results: Observing Rapport-Based Interpersonal Techniques (ORBIT) to generate useful information from terrorists. *Psychology, Public Policy and Law*, *19*, 411–431. http://dx.doi.org/10.1037/a0034564

Baker, K. (2017). Campus misconduct, sexual harm and appropriate process: The essential sexuality of it all. *Journal of Legal Education*, *66*, 777–803.

Black, M. C., Basile, K. C., Breiding, M. J., Smith, S. G., Walters, M. L., Merrick, M. T., Chen, J., & Stevens, M. R. (2011). *The National Intimate Partner and Sexual Violence Survey (NISVS): 2010 summary report*. Atlanta, GA: National Center for Injury Prevention and Control, Centers for Disease Control and Prevention.

Bond, C. F., & DePaulo, B. M. (2006). Accuracy of deception judgments. *Personality & Social Psychology Review*, *10*, 214–234. http://dx.doi.org/10.1207/s15327957pspr1003_2

Brandon, S. E., Arthur, J. C., Ray, D. G., Meissner, C. A., Kleinman, S. M., Russano, M. B., & Wells, S. (2019). The High-Value Detainee

Interrogation Group (HIG): Inception, evolution, and impact. In M. Staal, & S. Harvey (Eds.), *Operational psychology: A new field to support national security and public safety*. ACB-CLIO.

Brimbal, L., Dianiska, R. E., Swanner, J. K., & Meissner, C. A. (2019). Enhancing cooperation and disclosure by manipulating affiliation and developing rapport in investigative interviews. *Psychology, Public Policy, & Law*, *25*, 107–115. http://dx.doi.org/10.1037/law0000193

Brimbal, L., Kleinman, S. M., Oleszkiewicz, S., & Meissner, C. A. (2019). Developing rapport and trust in the interrogative context: An empirically-supported and ethical alternative to customary interrogation practices. In S. Barela, S. Barela, et al. (Eds.), *Interrogation and torture: Research on efficacy and its integration with morality and legality*. Oxford University Press.

Busch-Armendariz, N. B., Sulley, C., & Hill, K. (2016). *The blueprint for campus police: Responding to sexual assault*. Austin, TX: Institute on Domestic Violence & Sexual Assault, The University of Texas at Austin.

Cantor, D., Fisher, B., Chibnall, S., Townsend, R., Lee, H., Bruce, C., & Thomas, G. (2017). *Report on the AAU campus climate survey on sexual assault and sexual misconduct*. The Association of American Universities.

Collins, E. (2016). The criminalization of Title IX. *Ohio State Journal of Criminal Law*, *13*, 365–396.

Davis, D., Soref, A., Villalobos, J. G., & Mikulincer, M. (2016). Priming states of mind can affect disclosure of threatening self-information: Effects of self-affirmation, mortality salience, and attachment orientations. *Law & Human Behavior*, *40*, 351–361. http://dx.doi.org/10.1037/lhb0000184

DePaulo, B. M., Lindsay, J. J., Malone, B. E., Muhlenbruck, L., Charlton, K., & Cooper, H. (2003). Cues to deception. *Psychological Bulletin*, *129*, 74–118. http://dx.doi.org/10.1037/0033-2909.129.1.74

Edwards, K. M., Sylaska, K. M., Barry, J. E., Moynihan, M. M., Banyard, V. L., Cohn, E. S., Walsh, W. A., & Ward, S. K. (2015). Physical dating violence, sexual violence, and unwanted pursuit victimization: A comparison of incidence rates among sexual-minority and heterosexual college students. *Journal of Interpersonal Violence*, *30*, 580–600.

Evans, J. R., Michael, S. W., Meissner, C. A., & Brandon, S. E. (2013). Validating a new assessment method for deception detection: Introducing a psychologically based credibility assessment tool. *Journal of Applied Research in Memory & Cognition*, *2*, 33–41. http://dx.doi.org/10.1016/j.jarmac.2013.02.002

Ewens, S., Vrij, A., Leal, S., Mann, S., Jo, E., Shaboltas, A., Ivanova, M., Granskaya, J., & Houston, K. (2016). Using the Model Statement to elicit information and cues to deceit from native speakers, non-native speakers and those talking through an interpreter. *Applied Cognitive Psychology*, *30*, 854–862. http://dx.doi.org/10.1002/acp.3270

Fisher, R. P., Brewer, N., & Mitchell, G. (2009). The relation between consistency and accuracy of eyewitness testimony: Legal versus cognitive explanations. In R. Bull, R. Bull, et al. (Eds.), *Handbook of psychology of investigative interviewing: Current developments and future directions* (pp. 121–136).

Fisher, R. P., & Geiselman, R. E. (1992). *Memory-enhancing techniques for investigative interviewing: The cognitive interview*. Springfield: Charles C Thomas, Publisher.

Fisher, R. P., & Geiselman, R. E. (2010). The cognitive interview method of conducting police interviews: Eliciting extensive information and promoting therapeutic jurisprudence. *International Journal of Law & Psychiatry*, *33*, 321–328.

Flowe, H. D., Humphries, J., Takarangi, M. K. T., Zelek, K., Karoğlu, N., Gabbert, F., & Hope, L. (2019). An experimental examination of the effects of alcohol consumption and exposure to misleading postevent information on remembering a hypothetical rape scenario. *Applied Cognitive Psychology*, *33*, 393–413.

Garrett, B. L. (2015). Confession contamination revisited. *Virginia Law Review*, *101*, 395.

Geiselman, R. E. (2012). The cognitive interview for suspects (CIS). *American Journal of Forensic Psychology*, *30*, 5–20.

Ginet, M., & Verkampt, F. (2007). The cognitive interview: Is its benefit affected by the level of witness emotion? *Memory*, *15*, 450–464.

Goodman-Delahunty, J., & Howes, L. M. (2014). Social persuasion to develop rapport in high stakes interviews: Qualitative analyses of Asian-Pacific practices. *Policing & Society*, *3*, 270–290. http://dx.doi.org/10.1080/10439463.2014.942848

Granhag, P. A., & Strömwall, L. A. (2002). Repeated interrogations: Verbal and non-verbal cues to deception. *Applied Cognitive Psychology*, *16*, 243–257.

Griffiths, A., & Milne, R. (2006). Will it all end in tiers? In R. Williamson (Ed.), *Investigative interviewing: Research rights and regulation* (pp. 167–189). Cullompton, U.K.: Willan.

Hartwig, M., Granhag, P. A., & Luke, T. (2014). Strategic use of evidence during investigative interviews: The state of the science. In D. C. Raskin, D. C. Raskin, et al. (Eds.), *Credibility assessment* (pp. 1–36). Academic Press.

Hauch, V., Sporer, S. L., Michael, S. W., & Meissner, C. A. (2016). Does training improve the detection of deception: A meta-analysis. *Communication Research*, *43*, 283–343. http://dx.doi.org/10.1177/0093650214534974

Henry, M., Lewis, W. S., Morris, L. K., Schuster, S. K., Sokolow, B. A., Swinton, D. C., & Van Brunt, B. (2016). *The seven deadly sins of Title IX investigations*. ATIXA (Association of Title IX Administrators).

Hope, L., Mullis, R., & Gabbert, F. (2013). Who? What? When? Using a timeline technique to facilitate recall of a complex event. *Journal of Applied Research in Memory and Cognition*, *2*, 20–24.

Hopper, J. (2012). *Victim impact: Pre-training handout*. Unpublished document included in *Special Victims Unit Investigations Course* training materials, U.S. Army Military Police School (Fort Leonard Wood, MO).

Hoscheidt, S. M., Dongonkar, B., Payne, J., & Nadel, L. (2013). Emotion, stress, and memory. In D. Reisburg (Ed.), *The Oxford handbook of cognitive psychology* (pp. 557–570). Oxford: Oxford University Press.

*Jeanne Clery Disclosure of Campus Security Policy and Campus Crime Statistics Act* (1990). Pub. L. No. 101-542, 20 U.S.C. § 1092(f); 34 C.F.R. § 668.46.

Jores, T., Colloff, M. F., Kloft, L., Smailes, H., & Flowe, H. D. (2019). A meta-analysis of the effects of acute alcohol intoxication on witness recall. *Applied Cognitive Psychology*, *33*, 334–343.

Kassin, S. M., Drizin, S. A., Grisso, T., Gudjonsson, G. H., Leo, R. A., & Redlich, A. D. (2010). Police-induced confessions: Risk factors and recommendations. *Law & Human Behavior*, *34*, 3–38. http://dx.doi.org/10.1007/s10979-009-9188-6

Kassin, S. M., Goldstein, C. C., & Savitsky, K. (2003). Behavioral confirmation in the interrogation room: On the dangers of presuming guilt. *Law & Human Behavior*, *27*, 187–203.

Kassin, S. M., Leo, R. A., Meissner, C. A., Richman, K. D., Colwell, L. H., Leach, A. M., & La Fon, D. (2007). Police interviewing and interrogation: A self-report survey of police practices and beliefs. *Law & Human Behavior*, *31*, 381–400. http://dx.doi.org/10.1007/s10979-006-9073-5

Kelly, C. E., Miller, J. C., & Redlich, A. D. (2016). The dynamic nature of interrogation. *Law & Human Behavior*, *40*, 295–309. http://dx.doi.org/10.1037/lhb0000172

Leins, D., Fisher, R. P., & Vrij, A. (2012). Drawing on liars' lack of cognitive flexibility: Detecting deception through varying report modes. *Applied Cognitive Psychology*, *26*, 601–607. http://dx.doi.org/10.1002/acp.2837

Lindau, M., Almkvist, O., & Mohammed, A. H. (2016). Effects of stress on learning and memory. In G. Fink's (Ed.), *Stress: Concepts, cognition, emotion, and behavior* (pp. 153–160). UK: Academic Press: London.

Lisak, D. (2009). *The neurobiology of trauma*. Unpublished document included in *Special Victims Unit Investigations Course* training materials, U.S. Army Military Police School (Fort Leonard Wood, MO).

Loftus, E. F. (2005). Planting misinformation in the human mind: A 30-year investigation of the malleability of memory. *Learning & Memory*, *12*, 361–366. http://dx.doi.org/10.1101/lm.94705

Mann, B., & Murphy, K. C. (1975). Timing of self-disclosure, reciprocity of self-disclosure and reactions to an initial interview. *Journal of Counseling Psychology*, *22*, 304.

Mararike, S., & Griffiths, S. (2019). Warwick University expels student for rape but fails to tell police. *The Times*. Downloaded on June 20, 2019, from https://www.thetimes.co.uk/article/warwick-university-expels-student-for-rape-but-fails-to-tell-police-dmczt2jzx

Matsumoto, D., & Hwang, H. C. (2018). Social influence in investigative interviews: The effects of reciprocity. *Applied Cognitive Psychology*, *32*, 163–170.

Meissner, C. A., Hartwig, M., & Russano, M. B. (2010). The need for a positive psychological approach and collaborative effort for improving practice in the interrogation room. *Law & Human Behavior*, *34*, 43–45. http://dx.doi.org/10.1007/s10979-009-9205-9

Meissner, C. A., & Kassin, S. M. (2002). "He's guilty!": Investigator bias in judgments of truth and deception. *Law & Human Behavior*, *26*, 469–480. http://dx.doi.org/10.1023/A:1020278620751

Meissner, C. A., & Kassin, S. M. (2004). "You're guilty, so just confess!" Cognitive and behavioral confirmation biases in the interrogation room. In D. Lassiter (Ed.), *Interrogations, confessions, and entrapment* (pp. 85–106). Kluwer Academic/Plenum Press.

Meissner, C. A., Surmon-Bohr, F., Oleszkiewicz, S., & Alison, L. (2017). Developing an evidence-based perspective on interrogation: A review of the U.S. government's High-Value Detainee Interrogation Group research program. *Psychology, Public Policy, & Law*, *23*, 438–457. http://dx.doi.org/10.1037/law0000136

Memon, A., Meissner, C. A., & Fraser, J. (2010). The Cognitive Interview: A meta-analytic review and study space analysis of the past 25 years. *Psychology, Public Policy, & Law*, *16*, 340–372.

Metcalfe, J., Brezler, J. C., McNamara, J., Maletta, G., & Vuorre, M. (2019). Memory, stress, and the hippocampal hypothesis: Firefighters' recollections of the fireground. *Hippocampus*, http://dx.doi.org/10.1002/hipo.23128

Nahari, G. (2018). The applicability of the verifiability approach to the real world. In J. P. Rosenfeld (Ed.), *Detecting concealed information and deception* (pp. 329–349). Academic Press.

Nahari, G., Vrij, A., & Fisher, R. P. (2014). Exploiting liars' verbal strategies by examining the verifiability of details. *Legal & Criminological Psychology*, *19*, 227–239.

Narchet, F. M., Meissner, C. A., & Russano, M. B. (2011). Modeling the influence of investigator bias on the elicitation of true and false confessions. *Law & Human Behavior*, *35*, 452–465. http://dx.doi.org/10.1007/s10979-010-9257-x

Newman, E. J., & Garry, M. (2013). False memory. In *The SAGE handbook of applied memory*. pp. 110–126. New York: Sage Publications.

*Not Alone: The First Report of the White House Task Force to Protect Students from Sexual Assault* (2014). Downloaded on May 1, 2019, from https://www.justice.gov/archives/ovw/page/file/905942/download

Powell, M. B., Fisher, R. P., & Wright, R. (2005). Investigative interviewing. In *Psychology and law: An empirical perspective*. pp. 11–42.

*Q&A on Campus Sexual Misconduct* (2017). U.S. Department of Education, Office for Civil Rights.

Read, J. M., Powell, M. B., Kebbell, M. R., & Milne, R. (2009). Investigative interviewing of suspected sex offenders: A review of what constitutes best practice. *International Journal of Police Science & Management*, *11*, 442–459.

*Revised sexual harassment guidance: Harassment of students by school employees, other students, or third parties* (2001). U.S. Department of Education, Office for Civil Rights.

Richards, T. N. (2019). An updated review of institutions of higher education's responses to sexual assault: Results from a nationally representative sample. *Journal of Interpersonal Violence*, *34*, 1983–2012.

Rohman, K., Ingram, B., & Watkins, C. (2018). *Trauma-informed interviewing in workplace investigations*. Public Interest Investigations, Inc. Downloaded on May 1, 2019, from https://piila.com/trauma-informed-interviewing-in-workplace-investigations/

Rubin, D. C., Deffler, S. A., Ogle, C. M., Dowell, N. M., Graesser, A. C., & Beckham, J. C. (2016). Participant, rater, and computer measures of coherence in posttraumatic stress disorder. *Journal of Abnormal Psychology*, *125*, 11–25. http://dx.doi.org/10.1037/abn0000126

Russano, M. B., Kelly, C. E., & Meissner, C. A. (2019). From the ivory tower to the interrogation room: Training and field evaluation research on suspect interviewing. In R. Bull, & I. Blandon-Gitlin (Eds.), *Handbook of legal and investigative psychology*. New York, NY: Routledge, in press.

Russano, M. B., Narchet, F. M., Kleinman, S. M., & Meissner, C. A. (2014). Structured interviews of experienced HUMINT interrogators. *Applied Cognitive Psychology*, *28*, 847–859.

Sandler, B. R. (2013). *Supplemental resource materials: The ATIXA Title IX investigator training*. NCHERM/ATIXA.

Shepherd, E., Mortimer, A., Turner, V., & Watson, J. (1999). Spaced cognitive interviewing: Facilitating therapeutic and forensic narration of traumatic memories. *Psychology, Crime & Law*, *5*, 117–143.

Smith, G. M., & Gomez, L. M. (2016). The regional center for investigations and adjudication: A proposed solution to the challenges of Title IX investigations in higher education. *Penn State Law Review*, *120*, 977–1000.

Sokolow, B. A., Swinton, D. C., Morris, L. K., Price, M. E., & Issadore, M. N. (2015). *Investigation in a box: A toolkit from the Association of Title IX Administrators*. ATIXA.

Strand & Heitman (2017). *The Forensic Experiential Trauma Interview (FETI)*. Downloaded on May 1, 2019, from https://www.slideshare.net/LoriDHeitman/feti-public-description-jan-2017

Swan, S. (2016). Between Title IX and the criminal law: Bringing tort law to the campus sexual assault debate. *Kansas Law Review*, *63*, 963–986.

Swanner, J. K., Meissner, C. A., Atkinson, D., & Dianiska, R. E. (2016). Developing diagnostic, evidence-based approaches to interrogation. *Journal of Applied Research in Memory & Cognition*, *5*, 295–301. http://dx.doi.org/10.1016/j.jarmac.2016.07.001

*The second report of the White House Task Force to Protect Students from Sexual Assault* (2017). Downloaded on May 1, 2019, from https://www.whitehouse.gov/sites/whitehouse.gov/files/images/Documents/1.4.17.VAW%20Event.TF%20Report.PDF

*Title IX of the Education Amendments* (1972). 20 U.S.C. §§ 1681–1688.

*Title IX Resource Guide* (2015). U.S. Department of Education, Office for Civil Rights.

*University of Virginia Resolution Agreement, No. 11-11-6001* (2015). U.S. Department of Education, Office for Civil Rights. Downloaded on June 3, 2019, from https://www2.ed.gov/about/offices/list/ocr/docs/investigations/more/11116001-b.pdf

Vallano, J. P., & Schreiber Compo, N. (2011). A comfortable witness is a good witness: Rapport-building and susceptibility to misinformation in an investigative mock-crime interview. *Applied Cognitive Psychology*, *25*, 960–970.

Vallano, J. P., & Schreiber Compo, N. (2015). Rapport-building with cooperative witnesses and criminal suspects: A theoretical and empirical review. *Psychology, Public Policy, & Law*, *21*, 85–99.

Vrij, A. (2019). Deception and truth detection when analyzing nonverbal and verbal cues. *Applied Cognitive Psychology*, *33*, 160–167.

Vrij, A., Fisher, R. P., & Blank, H. (2017). A cognitive approach to lie detection: A meta-analysis. *Legal & Criminological Psychology*, *22*, 1–21.

Vrij, A., Hartwig, M., & Granhag, P. A. (2019). Reading lies: Nonverbal communication and deception. *Annual Review of Psychology*, *70*, 295–317.

Walsh, D., & Bull, R. (2012). Examining rapport in investigative interviews with suspects: Does its building and maintenance work? *Journal of Police & Criminal Psychology*, *27*, 73–84.

Waters, T. E., Bohanek, J. G., Marin, K., & Fivush, R. (2013). Null's the word: A comparison of memory quality for intensely negative and positive events. *Memory*, *21*, 633–645.

Webb, K., Wyandt-Hiebert, M. A., Hanenberg, S., Beck, D., Claypool, T., Hoch, A., Jacobsen, J., Janssen-Robinson, A., Pasco, S., & Stewart, D. (2018). *Addressing sexual and relationship violence: A trauma-informed approach*. ACHA (American College Health Association).

Wiersma-Mosley, J. D., & DiLoreto, J. (2018). The role of Title IX coordinators on college and university campuses. *Behavioral Sciences*, *8*, 38–52.

Received 13 May 2019;
received in revised form 1 July 2019;
accepted 5 July 2019
Available online 29 September 2019