

McGraw Law Firm, P.A.

FINDING JUSTICE ONE CASE AT A TIME

Beau D. McGraw*
Attorney at Law
beau@mcgrawlawfirm.com

Melissa M. Schultz
Legal Assistant
melissa@mcgrawlawfirm.com

Zachary Longsdorf
Of Counsel

July 2, 2020

Office of the Clerk
United States Court of Appeals for the Eighth Circuit
Thomas F. Eagleton Courthouse
111 South 10th Street
St. Louis, MO 63102

Re:     John Doe v. University of St. Thomas
        Case Number: 19-1594

To Whom It May Concern:

Appellant John Doe ("Doe") submits the attached supplemental authority that the Sixth Circuit issued on June 29, 2020, in *John Doe v. Oberlin College*, Case No. 19-3342. This decision is relevant to whether Appellee breached its duty to provide Doe with a fair and impartial disciplinary proceeding with the appropriate due process protections. *See e.g. Appellant Br.*, pgs. 9, 10, and 51.

The Sixth Circuit determined that the district court had abused its discretion in dismissing Doe's Title IX discrimination claim. It held that by pleading the following, Doe had pled facts plausibly suggesting that erroneous outcome was caused by sex bias: irregularities in the process, the hearing panel ignoring flat contradictions in Roe's statements, Doe's presentation of statistics showing that "every single case" that went to a hearing panel resulted in a decision that the accused was "responsible" (i.e., guilty) on at least one charge; and the overall lack of factual support for the outcome of the proceedings. *Oberlin College*, p. 10-12. The Court stated that its decision was based on the proposition that "we determine guilt or innocence individually—rather than collectively, based on one's identification with some demographic group." *Id.* 1.

The Sixth Circuit's holding supports Doe's position that Appellee breached the duty it owed him to provide a fair and impartial proceeding that would determine his guilt or innocence individually and on the merits of the allegations against him, rather than on the basis of him being accused of sexual misconduct.

This foregoing letter complies with the word limitations of Fed. R. App. P. 28(j) because the body of the letter, including this paragraph, contains less than 350 words.

Very truly yours,

**MCGRAW LAW FIRM, P.A.**

**/s/Beau D. McGraw**

Beau D. McGraw

Enclosure

RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 20a0195p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

JOHN DOE,

*Plaintiff-Appellant,*

*v.*

OBERLIN COLLEGE,

*Defendant-Appellee.*

No. 19-3342

Appeal from the United States District Court
for the Northern District of Ohio at Cleveland.
No. 1:17-cv-01335—Solomon Oliver, Jr., District Judge.

Argued: December 12, 2019

Decided and Filed: June 29, 2020

Before: GILMAN, KETHLEDGE, and READLER, Circuit Judges.

_____

## COUNSEL

**ARGUED:** Christopher C. Muha, KAISERDILLON PLLC, Washington, D.C., for Appellant. Aaron M. Herzig, TAFT STETTINIUS & HOLLISTER LLP, Cincinnati, Ohio, for Appellee. **ON BRIEF:** Christopher C. Muha, KAISERDILLON PLLC, Washington, D.C., for Appellant. David H. Wallace, Cary M. Snyder, TAFT STETTINIUS & HOLLISTER LLP, Cleveland, Ohio, for Appellee.

KETHLEDGE, J., delivered the opinion of the court in which READLER, J., joined. GILMAN, J. (pp. 13–22), delivered a separate dissenting opinion.

## OPINION

KETHLEDGE, Circuit Judge.   Any number of federal constitutional and statutory provisions reflect the proposition that, in this country, we determine guilt or innocence individually—rather than collectively, based on one's identification with some demographic group.   That principle has not always been perfectly realized in our Nation's history, but as judges it is one that we take an oath to enforce.   Here, the relevant statute is Title IX of the Higher Education Act of 1965, which bars universities that receive federal funds from discriminating against students based on their sex.   John Doe argues that his complaint in this case adequately stated a claim that Oberlin College did precisely that when it determined his responsibility on a sexual-assault allegation.   We agree, and reverse the district court's decision to the contrary.

I.

Given that this appeal comes to us on a motion to dismiss, we take as true all the factual allegations in Doe's complaint, and make all reasonable inferences in his favor.   *See Doe v. Baum*, 903 F.3d 575, 581 (6th Cir. 2018).

A.

Oberlin overhauled its sexual-assault policy in 2013-14, in response to a "very public complaint" by a female student.   That student had two complaints in particular: that the College had taken too long to resolve her claim of sexual assault—thereby harming her emotionally—and that her assailant had received too light a punishment (he was suspended rather than expelled).   The College formally adopted its revised Sexual Misconduct Policy in May 2015. Relatedly, Oberlin instructed its faculty, "via an online resource guide," that they should "[b]elieve" students who report sexual assault, because "a very small minority of reported sexual assaults prove to be false reports."

The Policy adopted in May 2015 defines "Sexual Assault" as "[h]aving or attempting to have intercourse or sexual contact with another individual without consent." Intoxication precludes consent only when it results in "incapacitation," which the Policy defines as a condition where the person "lack[s] conscious knowledge of the nature of the act" or "is physically helpless." Examples include when a person is "asleep, unconscious, or otherwise unaware that sexual activity is occurring." A website maintained by Oberlin's "Office of Equity, Diversity and Inclusion" reiterates that "[i]ncapacitation describes a level of intoxication in which a person is unable to control their body or no longer understands who they are with or what they are doing." Charges of sexual assault based upon incapacitation also require "an assessment of whether a Responding Party [*i.e.*, the person accused], or a sober, reasonable person in the Responding Party's position, knew or should have known that the Reporting Party was incapacitated."

Allegations of sexual assault are handled by the school's "Title IX Team," which is led by the school's Title IX Coordinator. Members of the Title IX Team receive "annual training in strategies to protect parties who experience sexual misconduct[,]" but no training as to "how to conduct impartial fact-finding proceedings." If the Title IX Team "determines that a claim must be resolved through formal resolution," a Hearing Coordinator "facilitate[s] the adjudication" through a Hearing Panel. The Title IX Coordinator then oversees an investigation, which the Policy says will "usually" be completed "within 20 business days." If an investigation takes longer, the Policy says, the College will "notify all parties of the reason(s) for the delay and the expected adjustment in time frames."

Upon receiving a report of the investigation, the Title IX Coordinator and the Hearing Coordinator together decide whether to send the matter "to a Hearing Panel for resolution." Hearing panels have three members, and "make factual findings, determine whether College policy was violated, and recommend appropriate sanctions and remedies." The Title IX Coordinator and Hearing Coordinator then determine what sanction, if any, to impose. The entire process, the Policy recites, should normally be completed "within 60 business days"; if the resolution takes longer, the Policy says again, the College will notify the parties "of the reason(s) for the delay and the expected adjustment in time frames."

B.

Professor Meredith Raimondo was named Oberlin's Title IX Coordinator in 2013, while the new Policy was being drafted. In 2014 she said she came to her work "committed to survivor-centered processes." During a panel discussion in 2015—in response to another speaker's comment about a "middle category" of cases, "where we're not talking about . . . sex with someone who is fundamentally unconscious"—Raimondo said that she is "uncomfortable" with the term "grey areas[,]" because "I think it's used too often to discredit particularly women's experiences of violence."

In November 2015, the federal Department of Education's Office of Civil Rights notified Oberlin that the Office was investigating the College "to determine whether it had violated Title IX in a recent sexual assault disciplinary proceeding." That investigation was "not limited to the complaint that occasioned it," but was "a systemic investigation of the College's policies, procedures, and practices with respect to its sexual harassment and sexual assault complaint process." The investigation soon became "the focus of local media attention." Shortly before that notification, the Office's director, Catherine Lhamon, told a national media publication that "'[w]e don't treat rape and sexual assault as seriously as we should,'" citing data "about the rate of unwanted sexual activity experienced specifically by college women." Lhamon had also recently warned university administrators that they could lose all their federal funding if they did not heed the Office's mandates, and elsewhere cited "'a need to push the country forward.'"

C.

The incident at issue here occurred during the pendency of the Office's investigation—in the early morning of February 28, 2016. The complainant, referred to in this litigation as Jane Roe, and the accused, referred to as John Doe, were both undergraduates at Oberlin. (Doe was then a junior; the complaint does not specify when Roe matriculated.) The two students had met at a party in December 2015, after which they spent the night in Doe's room and had consensual intercourse without a condom. For the next two months they had little interaction. On February 27, 2016, Roe went to a concert and then to at least one party afterward, where she consumed alcohol. At 1:02 a.m. on February 28, Doe texted Roe, asking "what are you up to tonight?"

The two then exchanged nine texts during the next 30 minutes. Roe texted that she was "about to smoke [marijuana]" in the residence hall where Doe had a room, and asked him, "[c]ool if I come up in a bit?" Doe replied "yea" and the two arranged to meet in his room.

Roe arrived around 1:45 a.m. The two "briefly engaged in small talk" before making out for "10-15 minutes" in Doe's bed and taking off their clothes. Then, at Roe's request, Doe put on a condom, and the two had vaginal sex. They stopped when Roe said she was thirsty, at which point Doe took off his condom, wrapped a towel around himself, and got some water for her in the hallway. Then they resumed having sex, this time without a condom, until Roe said she was "dry down there[,]" explaining, "I'm not sober." Doe stopped the vaginal sex and asked Roe if she would perform oral sex on him. Roe agreed. Afterward they engaged in small talk and Roe left, saying she had a lot to do the next day.

Nine days later, Roe went to Raimondo and said that Doe had sexually assaulted her. Raimondo did not inform Doe of the charge until a week later, when she told him, via email, only that "the College is investigating a report" that Doe had sexually assaulted Roe "on 2/27/16 while she was incapacitated due to alcohol and unable to consent to sexual activity."

Two days later, Raimondo appointed Joshua D. Nolan to investigate Roe's allegations. Even though the College's policy states that investigation of a sexual-assault claim should usually take no more than 20 days and resolution of the entire matter should take no more than 60, Nolan took 120 days just to issue an investigative report. Sixty-one days after the process began, Doe emailed Raimondo as follows:

> I really do feel as though I am at my wits end. . . . I have had sleepless nights, eating problems and have been constantly thinking about this for the past months. This has consumed my life. My grades have slipped and I am a shell of my former self. . . . I cannot get in contact with Josh [Nolan] who has seemingly disappeared. I have emailed him twice in the past week. . . . Finals is around the corner and I simply cannot go through them with this looming over my head. . . . Please help me.

Raimondo did not respond with any information—notwithstanding the Policy's assurances that, in such circumstances, the College will notify the parties "of the reason(s) for the delay and the expected adjustment in time frames."

Doe did not learn the substance of the allegations against him until July 7, 2016—more than four months after the charge was made—when Nolan finally submitted his report. Nolan had interviewed ten people "with knowledge of the events of February 27/28"—including Roe and Doe—in addition to interviewing Raimondo. For the most part Roe's account of what happened in the room was consistent with Doe's account, described above. But there were several differences, which included Roe's statement that, before the two engaged in vaginal sex, Doe had asked her for oral sex, and Roe responded by asking him if he had a condom. Roe did not mention saying she was thirsty or that Doe had gotten her water. She did say that Doe "asked" her for oral sex again after they stopped having intercourse, and that she said, "okay, but I'm not very sober right now"; and that during oral sex Doe "kept pushing her head down and causing her to gag." Separately, the report noted that, in a personal journal entry soon after the incident, Roe wrote that Doe had "asked" her "to go down on him."

Most of the other interviewees were friends of Roe. One said that Roe was "intoxicated" that night but not "overly" so, and that Roe's "speech was not slurred and she seemed steady on her feet." Another friend said Roe was "out of it" and "very distant." A third friend, who saw Roe immediately before the incident, said that she asked Roe, "You good?" Roe said "yes" and walked off to Doe's room.

Nolan also interviewed three of Roe's friends who had talked to her after the incident. One lived in the same residence hall as Doe; Roe visited her shortly after the incident, saying "I can't believe I was with" Doe and that she was "disappointed and upset that she had done something." This friend said that Roe's speech was "slower" than usual but "not slurred[.]" A second friend told Nolan that, on February 29, Roe told her that she had been "too intoxicated to consent" to sex with Doe. Neither of these two friends said anything about Roe saying that Doe had used force against her. A third friend said that, three or four days after the incident, Roe asserted that Doe had "sexually assaulted" her by "forc[ing] oral sex on her."

### D.

The College thereafter sent the matter to a hearing panel, which set a hearing date of October 5, 2016. A few days before that date, Doe asked the Title IX Team to assign him an

"advisor" for the hearing. Such an advisor, the College conceded at oral argument, is supposed to serve the best interests of the accused at the hearing. The Title IX Team appointed Assistant Dean Adrian Bautista as Doe's advisor.

At the hearing itself, Roe testified mostly along the lines of what she had told Nolan, with one major change: when asked whether Doe asked her to perform oral sex on him, she said "No"—that he had not. Instead, she said at the hearing, "Doe simply grabbed her neck and forced her mouth onto his penis after he stopped having vaginal intercourse with her." As for incapacitation, when asked how Doe would have known she was intoxicated, Roe said only, "I made the statement, 'I am not sober right now.'" In addition, when asked to "speak a little more about why" she had asked Doe for a condom, she said, "[w]e were no longer clothed and I felt that if anything was to continue happening, I wanted a condom."

Three of Roe's friends testified on her behalf. One was the friend whose room Roe had visited after the incident; she testified consistently with her statement to Nolan, except that she added that Roe was "not making sense with the sentences she was saying[.]" She also said that Roe was upset about being with Doe, because she had a crush on a different student. A second witness was the friend who asked Roe, "You good?"; in addition to what she had told Nolan, this friend said that, in her observation, the situation "seemed pretty normal" and not "a potentially bad situation." A third friend testified as to how much Roe had drank that night, but said nothing about whether she appeared incapacitated.

Doe's testimony mirrored what he told Nolan. He specifically denied using any force on Roe. Nolan himself also testified, and was asked whether he had "heard any testimony that contradicted what he had been told [during] the investigation." Nolan responded that he had "heard just one contradiction": namely, Roe's testimony that Doe "had not asked her to perform oral sex on him." Nolan explained that, during the investigation, Roe testified that Doe "had in fact asked this of her."

As for advisor Bautista, he "left the hearing early." Two weeks later, he retweeted: "To survivors everywhere, we believe you."

On October 6, 2016—about 240 days after Roe's complaint—the hearing panel issued a decision in which it found Doe responsible for sexual misconduct because "the preponderance of the evidence established that effective consent was not maintained for the entire sexual encounter that occurred on February 28, 2016." Consent was absent, the panel found, because Roe was incapacitated, as the Policy defined it, from the moment she told Doe that she was "not sober." The panel cited no other behavior supporting a finding either that Roe was incapacitated as defined by the Policy or that Doe would have had any reason to think she was. Nor did the panel mention the contradiction cited by Nolan, between what Roe told him (and several friends) and what she told the hearing panel, as to whether Doe had "asked" for oral sex. As a sanction, the panel recommended the most severe one:    expulsion.    The College accepted that recommendation and ordered Doe expelled.

Doe appealed two weeks later, challenging on three grounds the panel's findings. The first was the newly discovered testimony of J.B., who had been Roe's "best friend" before the incident and was only "an acquaintance" of Doe. Roe had told J.B. (a male) about the incident two days after it occurred, and asked J.B. to accompany her to her interview with Nolan, "as her designated support person." During that interview, J.B. was alarmed that Roe's account to Nolan differed dramatically from what she had told J.B. shortly after the incident. J.B. did not comment during the interview on those differences, because doing so would have been "awkward[,]" and because Nolan "had already told him he would call him back at some point to interview him alone." But "Nolan never did." J.B. emailed Raimondo as soon as he heard about the panel's decision, saying that Roe had told him that Doe did not use force on her and that her hearing testimony mischaracterized the nature of their interaction in other ways. Raimondo apparently never responded. In support of the appeal itself, J.B. wrote a handwritten statement in which he said, among other things, that he felt "morally compelled to come forward at this time"; that "I know [Roe] provided false testimony"; and that Roe had told him that Doe "asked her to 'go down' on him and that she agreed to do so."

A second ground of the appeal was a statement by H.H., a mutual friend of Roe and Doe, who said that, as Roe was about to leave for Doe's room, she "did not appear drunk" and that her "speech was normal[.]" She too said that Roe had told her after the incident that Doe "asked"

Roe to "go down on him." The third ground was a letter from Dr. Judith Esman, who stated, as an expert, that Roe's behavior that night gave Doe no reason to think she was incapacitated as defined by the Policy. Doe also challenged his sanction as too severe.

The College denied Doe's appeal about a month later, dismissing the statements of J.B. and H.H. as largely cumulative, and Dr. Esman's letter as largely irrelevant. The College also upheld the sanction of expulsion, "with almost no explanation."

E.

Doe thereafter brought this lawsuit, claiming that the College's "egregious misapplication of the Policy's definition of 'incapacitation'" was the result of sex discrimination in violation of Title IX. Doe also brought claims for breach of contract (the Policy itself being the contract) and negligence under Ohio law. The district court dismissed Doe's claim under Title IX for failure to state a claim, and declined to exercise supplemental jurisdiction over the state-law claims (mistakenly, all agree, given that the court had diversity jurisdiction over those claims). This appeal followed.

II.

We review de novo the district court's dismissal of Doe's complaint. *See Baum*, 903 F.3d at 580. "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks omitted).

Doe sued Oberlin under Title IX, which bars universities that receive federal funds "from discriminating against students on the basis of sex." *Baum*, 903 F.3d at 585. Doe asserts in particular an "erroneous outcome" claim, which is that a university reached "an erroneous outcome in a student's disciplinary proceeding because of the student's sex." *Id*. To state a claim under that theory, "a plaintiff must plead facts sufficient to (1) cast some articulable doubt on the accuracy of the disciplinary proceeding's outcome, and (2) demonstrate a particularized causal connection" between the flawed outcome and sex discrimination. *Id*. (internal quotation marks and ellipses omitted).

Here, everyone agrees that Doe pled facts casting doubt on the accuracy of his proceeding's outcome. The question, then, is whether he pled facts plausibly suggesting that outcome was caused by sex bias.

As an initial matter, Oberlin argues that, to show a "particularized causal connection" between the flawed outcome and sex bias, Doe must identify some bias unique to his own proceeding. But that argument misreads our precedents. We have never held that, to be "particularized" in this sense, the effects of the causal bias must be limited to the plaintiff's own case. To the contrary, for example, we have held that "*patterns* of decision-making" in the university's cases can show the requisite connection between outcome and sex. *Doe v. Miami Univ.*, 882 F.3d 579, 593 (6th Cir. 2018) (emphasis added). Otherwise, a university that categorically discriminates against men or women in sexual-assault proceedings could escape liability in erroneous-outcome cases. What Doe must show here, rather, is simply that he alleged facts supporting an inference of sex bias in his particular proceeding.

For any number of reasons, we hold that he did. We begin with the "clear procedural irregularities" in the College's response to the "allegations of sexual misconduct," which, as the Second Circuit has held, "will permit a plausible inference of sex discrimination." *Menaker v. Hofstra Univ.*, 935 F.3d 20, 33 (2d Cir. 2019). The College's own Policy states that usually its investigation will be completed in 20 days, and the matter as a whole will be resolved in 60. But here the investigation alone took 120 days; Doe was not even informed of the specific allegations against him for that same period; and the hearing panel did not reach a decision until about 240 days after the complaint, which was 180 days later than contemplated by the Policy. That delay was compounded by the College's failure to do what the Policy twice promised it would do, namely to notify the parties "of the reason(s) for the delay and the expected time frames." Those omissions were especially strange given that those promises were included in the Policy precisely because, in 2012, a female student had understandably complained about the emotional harm caused by the College's delay in resolving the proceeding in which she was involved. And those omissions were stranger still given that Doe pleaded with Raimondo via email about the emotional devastation wrought by the delays in his proceeding—and received little or no

response. Remarkable as well was advisor Bautista's performance, given that he did not even attend the entire hearing, even though his role was to assist Doe there.

Likewise remarkable—in a proceeding in which the credibility of accuser and accused were paramount—was the failure of the hearing panel even to comment on the flat contradiction, expressly noted by Nolan at the hearing, between what Roe told him during his investigation and what she said during the hearing, regarding whether Doe "asked" for oral sex. *Cf. Baum*, 903 F.3d at 586. And of a piece was the Appeals Officer's failure even to acknowledge the importance of J.B.'s statement as impeachment evidence regarding Roe's claims. Procedural irregularities provide strong support for Doe's claim of bias here.

Doe's claim also finds support from his allegation that—throughout the pendency of his disciplinary proceeding—the federal Department of Education's Office of Civil Rights was engaged in "a systemic investigation of the College's policies, procedures, and practices with respect to its sexual harassment and sexual assault complaint process." For "pressure from the government to combat vigorously sexual assault on college campuses and the severe potential punishment—loss of all federal funds—if [the College] failed to comply" can likewise yield "a reasonable inference" of sex discrimination. *Miami Univ.*, 882 F.3d at 594. Oberlin contended at oral argument that we should reject that inference here, because Raimondo "welcomed" the federal investigation. But on this record, suffice it to say, that fact could cut either way.

Doe's complaint also cites Oberlin's "Spring 2016 Campus Climate Report," which stated that—during the very academic year in which Doe's "responsibility" was determined—"every single case" that went to a hearing panel resulted in a decision that the accused was "responsible" (*i.e.*, guilty) on at least one charge. That statistic likewise supports Doe's claim. *See Miami Univ.*, 882 F.3d at 593. Oberlin responds that only 10 percent of sexual-assault complaints were resolved through a formal hearing that year. But Doe reads that same Report to mean that, in 80 percent of the cases, the complainant herself chose not to pursue the matter formally. In still other cases, the responding party had graduated or otherwise left the College. And in any event the 100 percent responsibility rate—in cases where most if not all the respondents were male—supports an inference regarding bias in the hearings themselves.

But Doe's strongest evidence is perhaps the merits of the decision itself in his case. True, the first element of an erroneous-outcome claim—whether the facts of the case "cast some articulable doubt on the accuracy of the disciplinary proceeding's outcome[,]" *Baum,* 903 F.3d at 585—already takes into account the proceeding's outcome to some extent. But when the degree of doubt passes from "articulable" to grave, the merits of the decision itself, as a matter of common sense, can support an inference of sex bias. *Cf. Doe v. Purdue Univ.*, 928 F.3d 652, 669 (7th Cir. 2019) (reasoning that a "perplexing" basis of decision can support an inference of sex bias). And on the merits here the panel's decision was arguably inexplicable. Per the terms of Oberlin's Policy, intoxication does not negate consent—only "incapacitation" does. The Policy rather precisely defines that term. And the record here provided no apparent basis for a finding that Roe "lack[ed] conscious knowledge of the nature of the act" of oral sex, or that she was "asleep, unconscious, or otherwise unaware that sexual activity [was] occurring[,]" or that she "no longer underst[ood] who [she was] with or what [she was] doing." Nor was there any apparent reason for Doe to perceive that Roe was in such a state. To the contrary, Roe was conscious and aware enough to engage in a coherent exchange of texts, to make small talk, and to reason that, "[w]e were no longer clothed and I felt that if anything was to continue happening, I wanted a condom." Thus, on this record—and making all inferences in Doe's favor at this stage of the litigation—one could regard this as nearly a test case regarding the College's willingness ever to acquit a respondent sent to one of its hearing panels during the 2015-16 academic year. Doe has amply stated a claim for sex discrimination in violation of Title IX.

\*      \*      \*

The district court's March 31, 2019 Order is reversed, and the case is remanded for further proceedings consistent with this opinion.

## DISSENT

RONALD LEE GILMAN, Circuit Judge, dissenting. This circuit has articulated a two-part test that a plaintiff must meet in order to survive a motion to dismiss under the Title IX erroneous-outcome theory. *Doe v. Baum*, 903 F.3d 575, 585 (6th Cir. 2018). Under that test, "a plaintiff must plead facts sufficient to (1) 'cast some articulable doubt' on the accuracy of the disciplinary proceeding's outcome, and (2) demonstrate a 'particularized . . . causal connection between the flawed outcome and gender bias.'" *Id.* (quoting *Doe v. Miami Univ.*, 882 F.3d 579, 592 (6th Cir. 2018)).

I fully agree with the majority that Doe has raised a colorable claim as to the first prong of this test. The key problem that I see with the majority's opinion, however, is that it proceeds to conflate the two prongs. In fact, the opinion flatly states that "Doe's strongest evidence is perhaps the merits of the decision itself in his case." Maj. Op. at 12. But our previous caselaw makes clear that "allegations of a procedurally or otherwise flawed proceeding that has led to an adverse and erroneous outcome combined with a conclusory allegation of gender discrimination is *not* sufficient to survive a motion to dismiss." *Doe v. Cummins*, 662 F. App'x 437, 452 (6th Cir. 2016) (emphasis added) (quoting *Yusuf v. Vassar Coll.*, 35 F.3d 709, 715 (2d Cir. 1994)). And this court has explicitly rejected the lower pleading standard that the majority now adopts. *See Miami Univ.*, 882 F.3d at 589 ("Whatever the merits of the Second Circuit's decision in [*Doe v.*] *Columbia University*, [831 F.3d 46 (2d Cir. 2016),] to the extent that the decision reduces the pleading standard in Title IX claims, it is contrary to our binding precedent."). I therefore dissent from the majority's conclusion that Doe has pleaded facts sufficient to establish an inference of gender bias.

### I. The merits of Oberlin's decision as a measure of gender bias

The majority cites *Doe v. Purdue University*, 928 F.3d 652 (7th Cir. 2019), for the proposition that, "when the degree of doubt passes from 'articulable' to grave, as a matter of common sense the merits of the decision itself can support an inference of sex bias," and that

"a 'perplexing' basis of decision can support an inference of sex bias." Maj. Op. at 12 (emphasis in original) (quoting 928 F.3d at 669). But not only is *Purdue University* an out-of-circuit opinion and therefore not binding on this court, it nowhere uses the word "articulable." And *Purdue University* never calibrates the degree of doubt as passing from "articulable" to "grave." The opinion's use of the word "perplexing," moreover, *see* 928 F.3d at 669, did not cause it to hold that a perplexing decision can generally support an inference of gender bias.

*Purdue University* instead held that the extreme departure from typical adjudicatory norms *in that case* was so perplexing that it supported an inference of gender bias. In *Purdue University*, the administrator "chose to credit Jane's account without hearing directly from her," and "Jane did not even submit a statement in her own words to the Advisory Committee." *Id.* Purdue's advisory committee also "took no other evidence into account. They made up their minds without reading the investigative report and before even talking to John." *Id.* In the present case, in contrast, the hearing committee heard from both Doe and Roe, and it took the report of the investigator—an outside, male, independent attorney—into account. The adjudicatory circumstances before us, in order words, are not near as "perplexing" as those in *Purdue University*.

*Purdue University*'s extreme circumstances were later noted by the Seventh Circuit in *Doe v. Columbia College Chicago*, 933 F.3d 849 (7th Cir. 2019), where the court held that a male plaintiff had not adequately pleaded gender bias on the part of the university that had found him guilty of sexual assault. The court distinguished *Purdue University* by pointing out that "[t]wo members of the panel [in *Purdue University*] candidly stated that they had not read the investigative report. The one who apparently had read it asked John accusatory questions that assumed his guilt. Because John had not seen the evidence, he could not address it." *Id.* at 855 (quoting *Purdue University*, 928 F.3d at 658). In *Columbia College Chicago*, by contrast, these problems were not apparent. *See id.* at 856 (noting that Doe was permitted to access the investigative materials). So too in the present case: Doe was permitted to access the materials and information submitted; it just took longer than he had anticipated. But nowhere does Doe allege that this delay occurred only for male students, or that the process was different for men. *See id.* ("[John did] not allege that females accused of sexual assault were allowed to review

materials or that only female victims were allowed to review them."). Oberlin's delay, without any proof that these delays happened only to male students, cannot support a finding of gender bias.

## II.    Claims of procedural irregularities

This leaves the majority's two other major points. One addresses Doe's claims of procedural irregularities. The majority cites *Menaker v. Hofstra University*, 935 F.3d 20 (2d Cir. 2019), for the proposition that procedural irregularities can support an inference of gender bias. *Menaker*, in turn, relied on the reasoning of *Columbia University*, 831 F.3d 46, the very case that our circuit has rejected for lowering the Title IX pleading standard. *See Miami Univ.*, 882 F.3d at 589. The majority's reliance on *Menaker* is thus highly questionable, especially because the case is easily distinguishable.

In *Menaker*, a male tennis coach alleged "that Hofstra [University] completely disregarded the process provided for in its written 'Harassment Policy,'" which provided "for a 'Formal Procedure'" to investigate allegations of harassment and assault. 935 F.3d at 34–35. Menaker claimed "that he received none of these procedural protections." *Id.* at 35. He alleged "that he was terminated despite the fact that Hofstra Vice President Jefferey Hathaway *knew* that at least one of the accusations against him was false and believed the complaint to be a 'ploy.'" *Id.* at 34 (emphasis in original). Menaker further claimed "that his supervisor was aware of [his accuser's] frustration regarding her scholarship and her attempts to manipulate the athletic department in the spring of 2016." *Id.* And despite an express promise that Menaker would receive a copy of the investigative report, he never did. *Id.* Against this backdrop, the Second Circuit concluded that the procedural irregularities supported an inference of gender bias. Not so in the present case, where Doe received almost all of the protections and procedures outlined in Oberlin's manual. The process was admittedly not perfect, but Doe had a hearing, received a copy of the investigative report, and was permitted to present his story. In sum, *Menaker* does not support the majority's conclusion that gender bias has been adequately pleaded.

The majority also cites the time frame of the investigation as supporting procedural irregularities. But Oberlin's Sexual Misconduct Policy explicitly notes that individual cases

might require a longer time frame. Admittedly, Oberlin should have notified Doe in writing that the investigation and resolution were taking longer than the 20 days and the 60 days, respectively, stated as goals in the Policy. Oberlin, however, apparently failed to notify *either party* of the reason for the delay.

In fact, the majority points out that Oberlin had previously been criticized by a *female* student for its delay in resolving the sexual-assault proceeding in which she was involved. Maj. Op. at 10. The Policy was ostensibly adopted to address that criticism, but Doe has not alleged any link between the delay or lack of notice and gender bias. In the absence of any such link, Oberlin's delay in resolving his case should have no bearing on our analysis.

**III.    Alleged pressure from the Department of Education**

The majority's other major point involves alleged outside pressure on Oberlin. It cites *Miami University* for the proposition that "'pressure from the government to combat vigorously sexual assault on college campuses and the severe potential punishment—loss of all federal funds—if [the College] failed to comply'—can likewise yield 'a reasonable inference of sex discrimination.'" Maj. Op. at 11 (quoting 882 F.3d at 594). This characterization, in my opinion, overstates the holding of the *Miami University* decision.

Although the court in *Miami University* did consider the pressure from the government as one piece of its analysis, it was just that: one piece. Our caselaw makes clear that "external pressure [from the government] alone is not enough to state a claim that the university acted with bias in [any] particular case. Rather, it provides a backdrop that, when combined with other circumstantial evidence of bias . . . , [can] give[] rise to a plausible claim." *Doe v. Baum*, 903 F.3d 575, 586 (6th Cir. 2018).

In other words, the court can consider whether there was pressure from the federal government, but that pressure alone cannot yield a reasonable inference of gender discrimination. *See Doe v. Univ. of Dayton*, 766 F. App'x 275, 281 (6th Cir. 2019) ("[A]lleging that a university adopted certain procedures due to pressure from the federal government is not enough on its own . . . .") (citing *Doe v. Cummins*, 662 F. App'x 437, 452–53 (6th Cir. 2016)). And in *Miami University*, that pressure was coupled with other key factors that are not present in this case.

One of those key factors in *Miami University* was that both parties to the encounter in question were alleged to have been highly intoxicated. 882 F.3d at 584, 586, 592. Yet the university launched an investigation regarding only the male, and not regarding the female. *Id.* at 593–94. In addition, the accused male in *Miami University* introduced statistical evidence showing that every male accused of sexual misconduct during the past two semesters was found responsible for the alleged violation. *Id.* at 593. He also presented an affidavit from an attorney who had represented many students in disciplinary proceedings, with the attorney alleging a pattern of the university pursuing investigations concerning male students but not female students. *Id.* As discussed more fully below, Doe introduced no comparable statistical evidence in the present case.

In sum, the court in *Miami University* considered the pressure from the federal government as just one factor set against a backdrop of uneven enforcement. *Id.* We have no comparable evidence of uneven enforcement in the case before us.

## IV.    Lack of a particularized causal connection regarding gender bias

I now turn to the question of whether Doe has sufficiently pleaded an inference of gender bias in accordance with the law of this circuit. Sixth Circuit caselaw makes clear that a plaintiff must allege a particularized causal connection between the flawed outcome and gender bias. *Baum*, 903 F.3d at 585 (quoting *Miami Univ.*, 882 F.3d at 592). Evidence to support such a causal connection "might include, inter alia, statements by members of the disciplinary tribunal, statements by pertinent university officials, or patterns of decision-making that also tend to show the influence of gender." *Miami Univ.*, 882 F.3d at 593 (citation omitted). Doe alleges that statements made by Dr. Meredith Raimondo and statistical evidence support this causal connection. But both the record and the law of this circuit are to the contrary.

### A.    Dr. Raimondo's statements

As to Dr. Raimondo, the majority selectively quotes a statement that she made during a panel discussion in 2015 to the effect that she was "'uncomfortable' with the term 'grey areas[,]' because 'I think it's used too often to discredit particularly women's experiences of violence.'"

Maj. Op. at 4. The majority leaves out, however, the full panel discussion, during which Dr. Raimondo made the following additional remarks:

> What are the spaces, for example, for *men* to come forward and report gender-based harms? . . . When our procedures assume that women are the only people who report, we shut that space down even further.

American Constitution Society, *Sex, Lies and Justice: A Discussion of Campus Sexual Assault, Title IX Compliance, and Due Process*, YouTube (June 23, 2015), https://www.youtube.com/watch?v=EbmfXvd_6gw (33:38–50) (last visited June 15, 2020) (emphasis added). She further stated:

> *All students are our students, regardless of what role they may play in this*, and for me the question and the goal of these processes has to start with this: for a student who comes forward to make a report, a safe, supportive space for someone to ask, what are the harms that you experienced and how can we address them so you can continue your education. *And for the student who is accused, the question is also important and needs to be met I think equally with respect and dignity*, but my question for that student is: What, if anything, in your conduct are you willing to be accountable for and how can you be responsible for the harm you've done to others, *if in fact that was the result of your conduct*? Hearings are a tool or a technique for answering those big questions.

*Id.* (29:33–30:23) (emphases added). I fail to see how these comments as a whole could support an inference of gender bias against men. If anything, they demonstrate a balanced and thoughtful approach that treats men and women equally.

### B. Statistical evidence

The majority opinion also cites the statistic that "'every single case' that went to a hearing panel resulted in a decision that the accused was 'responsible' (*i.e.*, guilty) on at least one charge." Maj. Op. at 11. But as Oberlin points out, approximately 10% of roughly 100 complaints related to sex-based misconduct even made it to the hearing stage. In other words, approximately 90% of cases did not lead to a finding of responsibility or any kind of disciplinary action.

The majority further notes that Doe reads Oberlin's 2016 Campus Climate Report to mean that, in 80% of these complaints, the complainant chose not to formally pursue the matter. Maj. Op. at 11. But the Report says nothing to that effect. It instead states the following:

> Most parties making reports ask for various remedies but also request that the College take no disciplinary action . . . . About 20 percent of all reports in 2015–16 were referred to full investigation, and if appropriate, formal investigation. The threshold to move to formal process was met in around half of investigations
> . . . .

Although the Report acknowledges that "most parties" requested no disciplinary action, nothing in the Report suggests that a full 80% chose not to formally pursue their complaints. In other words, the 20% of the complaints referred to full investigation in no way implies that the other 80% were dropped because of a lack of pursuit by the complainants.

The majority also states that there is a "100 percent responsibility rate" at the hearing stage. Maj. Op. at 11. But "responsibility" in this context has a very broad meaning. In each of these approximately 10 cases, the accused was found responsible on at least one charge, but not all of them. Only 70% of respondents were found responsible on all charges. And the "penalties" ranged widely—from "education" to expulsion. As the Report states:

> When the threshold was met, findings of responsibility on all charges occurred in 70 percent of processes. In the remaining processes, the responding party was found responsible for some but not all of the conduct charges. Sanctions have ranged from deferred probation and education to dismissal . . . .

In addition, these cases included all forms of potential sex-based misconduct—not only sexual assault, but also discrimination, harassment, retaliation, stalking, and/or intimate partner violence.

I would further note that disciplinary hearings in approximately 10 cases is not a statistically significant number from which this court can make any kind of conclusion about gender bias. *See Doe v. Cummins*, 662 F. App'x 437, 454 (6th Cir. 2016) ("[N]ine cases is hardly a sufficient sample size for this court to draw any reasonable inferences of gender bias from these statistics.").

Finally, we have no information regarding the gender breakdown between who was found responsible and who was not. Doe alleges that the vast majority of the Oberlin students accused of sexual misconduct were men. But, as the district court aptly noted:

> This by itself is not indicative of discrimination or bias against men. Plaintiff does not claim that *only* men were found responsible for misconduct. As outlined in *Doe v. Univ. of Dayton*, this is "not the type of pattern that would show an improper influence of gender. Indeed, this sadly, is just what the court would expect. According to the Department of Justice, over 95% of sexual assaults are perpetrated by males, while fewer than 3% are by females." *Doe v. Univ. of Dayton*, No. 3:17-CV-134, 2018 WL 1393894, at *9 (S.D. Ohio 2018). A pattern that would support a claim of gender bias would involve sexual assault accusations against women that were not investigated or adjudicated by the College. *Id.* Plaintiff makes no such claim here.

(Emphasis in original.)

Our caselaw has repeatedly emphasized the above point. *See, e.g.*, *Cummins*, 662 F. App'x at 453 (explaining that "the most obvious reasons for the disparity between male and female respondents in . . . sexual-misconduct cases . . . [are that the college] has only received complaints of male-on-female sexual assault, and . . . males are less likely than female to report sexual assaults" (citation and internal quotation marks omitted)); *see also Doe v. Univ. of Denver*, 952 F.3d 1182, 1193–94 (10th Cir. 2020) ("The courts that have engaged in this analysis have generally concluded that statistical disparities in the gender makeup of complainants and respondents can readily be explained by 'an array of alternative' nondiscriminatory possibilities, potentially 'reflect[ing], for example, that male students on average . . . committed more serious assaults,' that sexual-assault victims are likelier to be women, or that female victims are likelier than male victims to report sexual assaults.") (collecting cases). Without allegations that accused students who are male are found guilty more frequently than accused students who are female, Doe has failed to allege any pattern of gender bias.

V.     **The law of other circuits**

This brings me to my final point. The Sixth Circuit is far from alone in its requirement that a plaintiff show a particularized causal connection. In fact, the vast majority of other courts that have considered this question have required proof of a causal connection between an alleged

erroneous outcome and gender bias. *See, e.g.*, *Doe v. Trustees of Bos. Coll.*, 892 F.3d 67, 91 (1st Cir. 2018) ("To show this causal link [between an outcome and gender bias], the Does cannot merely rest on superficial assertions of discrimination, but must establish that 'particular circumstances suggest[ ] that gender bias was a motivating factor.'" (citation omitted)); *Doe v. Loh*, Civ. A. No. PX-16-3314, 2018 WL 1535495, at *8 (D. Md. Mar. 29, 2018) ("To sustain what is known as an 'erroneous outcome' claim, Doe must plausibly aver: (1) that he was subjected to a procedurally or otherwise flawed proceeding, (2) which has led to an adverse and erroneous outcome; and (3) the particular circumstances suggest that gender bias is the motivating factor behind the erroneous finding." (citation and internal quotation marks omitted)), *aff'd*, 767 F. App'x 489 (4th Cir. 2019); *Doe v. Univ. of Miss.*, 361 F. Supp. 3d 597, 607 (S.D. Miss. 2019) ("A '[p]laintiff[] who claim[s] that an erroneous outcome was reached must allege particular facts sufficient to cast some articulable doubt on the accuracy of the outcome of the disciplinary proceeding.' Additionally, the plaintiff must 'allege particular circumstances suggesting that gender bias was a motivating factor behind the erroneous finding . . . . Such allegations might include, inter alia, statements by members of the disciplinary tribunal, statements by pertinent university officials, or patterns of decision-making that also tend to show the influence of gender.'" (quoting *Yusuf v. Vassar Coll.*, 35 F.3d 709, 715 (2d Cir. 1994)); *Austin v. Univ. of Or.*, 925 F.3d 1133, 1138 (9th Cir. 2019) ("Even if the outcome of the administrative conference procedure was erroneous, the complaint is missing any factual allegations that show that sex discrimination was the source of any error."); *Doe v. Valencia Coll.*, 903 F.3d 1220, 1236 (11th Cir. 2018) ("[A] student must show both that he was 'innocent and wrongly found to have committed an offense' and that there is 'a causal connection between the flawed outcome and gender bias.'" (citation omitted)); *Robinson v. Howard Univ., Inc.*, 335 F. Supp. 3d 13, 27 (D.D.C. 2018) ("[A]llegations of a procedurally or otherwise flawed proceeding that has led to an adverse and erroneous outcome combined with a conclusory allegation of gender discrimination is not sufficient to survive a motion to dismiss." (citation omitted)), *aff'd sub nom. Robinson v. Wutoh*, 788 F. App'x 738 (D.C. Cir. 2019).

This viewpoint by almost all of the courts that have opined on this issue is unsurprising. Such an approach is fully consistent with the text of Title IX itself, which requires a plaintiff to show that he or she was subjected to discrimination "on the basis of sex." 20 U.S.C. § 1681(a).

There are numerous reasons why a college's disciplinary process might yield a result that seems incorrect or unfair—sloppy analysis by overworked administrators, administrative processes that do not mirror those of the judicial system, details that simply do not make it into the college's disciplinary record—and to assume that those results were the result of gender bias reads out the causal requirement in Title IX. It also conflicts with the well-established principle "that school-disciplinary committees are entitled to a presumption of impartiality, absent a showing of *actual bias*," *see Doe v. Cummins*, 662 F. App'x 437, 449–50 (6th Cir. 2016) (collecting cases) (emphasis added), and that "[a]ny alleged prejudice on the part of the [decisionmaker] must be evident from the record and cannot be based in speculation or inference," *id.* at 450 (brackets in original) (quoting *Nash v. Auburn Univ.*, 812 F.2d 655, 665 (11th Cir. 1987)). Yet, in my opinion, this is exactly what the majority has done here: speculate. Absent an allegation of some particularized facts linking *gender bias* to Oberlin's disciplinary practices or proceedings, I respectfully dissent as to the viability of Doe's Title IX claim.